# EXHIBIT A

Brent O. Hatch (5715)
hatch@hatchpc.com
Adam M. Pace (14278)
pace@hatchpc.com
HATCH LAW GROUP, P.C.
22 East 100 South, Suite 400
Salt Lake City, Utah 84111
Telephone: (801) 869-1919

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DISH TECHNOLOGIES L.L.C. and SLING TV L.L.C.<br><br>Plaintiffs,<br><br>v.<br><br>MG PREMIUM LTD, MG BILLING LTD, and MG BILLING IRELAND LTD, SONESTA TECHNOLOGIES, s.r.o., SONESTA MEDIA, s.r.o., and YELLOW PRODUCTION, s.r.o.<br><br>Defendant. | **DECLARATION OF DAN MINNICK IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Case: 2:23-cv-552-BSJ<br><br>Judge: Judge Bruce Jenkins |

## DECLARATION OF DAN MINNICK

I, DAN MINNICK, declare under penalty of perjury that the following is true and correct:

1.      I am over 18 years of age and competent to make this declaration. If called to testify as a witness, I could and would testify truthfully under oath to each of the statements in this declaration. Except as otherwise stated herein, this declaration is based upon my personal knowledge, the books and records at DISH, and/or information reported to me in the regular course of business by other individuals in the organization with personal knowledge of such facts.

2.     I hold a Bachelor of Science degree in Mining Engineering from the Montana College of Mineral Sciences and a master's degree in Electrical Engineering from the Rensselaer Polytechnic Institute.

3.     I am currently employed by DISH Network L.L.C. as a Senior Advisor. I joined EchoStar Technologies Corporation more than 25 years ago in 1996 as a software architect. Since then, I have served in many roles, including Engineering Director and Vice President of Engineering.  Prior to my role as a Senior Advisor, I served as the Senior Vice President of Software Engineering at DISH.  Among other responsibilities, I oversaw the software development for DISH's set-top boxes.

4.     DISH Technologies L.L.C. is a wholly-owned subsidiary of DISH Network L.L.C., which is a wholly owned indirect subsidiary of DISH Network Corporation, a publicly traded company.  DISH Network L.L.C. operates the satellite pay TV services business and is publicly known as "DISH Network."  DISH Technologies L.L.C., which was previously named EchoStar Technologies L.L.C., designs and develops the hardware (such as the Hopper set-top boxes) and software (for the set-top boxes, which includes Adaptive Bitrate Streaming technology) for the DISH Network® satellite pay TV service operated by DISH Network L.L.C. I refer to DISH Network L.L.C. and DISH Technologies L.L.C. collectively here as "DISH," unless there is a reason to distinguish between these entities.  DISH's history has been intertwined with that of EchoStar Corporation ("EchoStar") and its current affiliates. EchoStar was spun off from DISH Network Corporation in 2008, although DISH Network Corporation thereafter reacquired some of EchoStar's subsidiaries and, just a few weeks ago, DISH Network Corporation and EchoStar announced an agreement to merge the two companies. The merger transaction is expected to close later this year.

5.     DISH's headquarters are located in Englewood, Colorado.

6.     The inventors of the adaptive-bitrate streaming ("ABR") patents are Drew Major, Mark Hurst and David Brueck. Drew Major and Mark Hurst work at DISH's offices in American Fork, Utah. It is my understanding that David Brueck resides in Utah and is currently retired.

2

7.     DISH has successfully enforced the ABR Patents to either enjoin infringement or to obtain a license for infringing use of DISH's technology.

8.     On August 24, 2018, DISH filed a patent infringement complaint against Jadoo TV, Inc. for infringement of certain ABR Patents. *DISH Technologies L.L.C. et al. v. Jadoo TV, Inc.*, Case No. 5-18-CV-05214, Dkt. 1 (N.D. Cal.).

9.     On May 24, 2021, after the lifting of a bankruptcy stay, Jadoo agreed upon a resolution and consented to the entry of a judgment and an injunction in favor of DISH. Ex. OO, *DISH Technologies L.L.C. et al. v. Jadoo TV, Inc.*, Case No. 5-18-CV-05214, Dkt. 97 at ¶¶ 5-7 (N.D. Cal. May 28, 2021) (the "Jadoo Injunction").

10.    As part of that injunction, because Jadoo did not license the ABR Patents, Jadoo was enjoined from providing adaptive bitrate streaming on any Jadoo application or set-top box. Jadoo Injunction at ¶ 8. Specifically, Jadoo agreed to remove all ABR functionality by a firmware update and removed adaptive bitrate streaming from its applications and set-top boxes.

11.    On January 25, 2019, DISH filed suit against Univision Communications, Inc., a provider of Spanish-language content and media to subscribers, for infringement of certain ABR Patents. *DISH Technologies L.L.C. et al v. Univision Communications Inc.*, Case No. 1-19-cv-00144, Dkt. 1 (D. Del.). The parties resolved that dispute by entering into a patent license agreement and the lawsuit was dismissed on April 3, 2019. *DISH Technologies L.L.C. et al v. Univision Communications Inc.*, Case No. 1-19-cv-00144, Dkt. 8 (D. Del.).

12.    ViacomCBS Inc. has also taken a license to DISH's ABR Patents.

13.    On April 12, 2021, DISH filed an enforcement action at the International Trade Commission ("Commission") against Peloton, lululemon (the maker of Mirror fitness equipment), and iFit (the maker of NordicTrack fitness equipment), accusing certain streaming exercise equipment of infringing DISH's ABR Patents. DISH obtained an injunction against all three parties for their use of adaptive bitrate streaming in the streaming-exercise equipment. Since then, Peloton licensed the ABR Patents at $75 million, and lululemon also licensed the ABR Patents for an undisclosed amount. iFit is purporting to abide by the injunction for its

3

accused products and released a software update that it contends does not use the ABR Patents. DISH and iFit disagree on that issue and are still actively litigating the action.

14.     Further, DISH filed federal court complaints in U.S. against Peloton, lululemon, and iFit, which were stayed pending the action at the International Trade Commission.

15.     DISH seeks to enforce its patents by entering license agreements. If, however, an infringing party refuses to license DISH's ABR Patents, DISH will seek to enjoin that party from further infringement of the ABR Patents.

16.     If DISH cannot enforce its ABR Patents though an injunction or a license, DISH is and will continue to be irreparably harmed by the infringement without adequate remedy for the use. It is my understanding that one example of an irreparable harm is DISH will be unable to timely recover any legal judgment against the defendants without an injunction or license.

17.     I currently reside in Castle Rock, Colorado.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 6 day of September, 2023, at CASTLE ROCK CO

Dan Minnick

4

# EXHIBIT B

Brent O. Hatch (5715)
hatch@hatchpc.com
Adam M. Pace (14278)
pace@hatchpc.com
HATCH LAW GROUP, P.C.
22 East 100 South, Suite 400
Salt Lake City, Utah 84111
Telephone: (801) 869-1919

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DISH TECHNOLOGIES L.L.C. and SLING TV L.L.C.<br><br>Plaintiffs,<br><br>v.<br><br>MG PREMIUM LTD, MG BILLING LTD, and MG BILLING IRELAND LTD, SONESTA TECHNOLOGIES, s.r.o., SONESTA MEDIA, s.r.o., and YELLOW PRODUCTION, s.r.o.<br><br>Defendant. | **DECLARATION OF DON AVIV IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br><br>Case: 2:23-cv-552-BSJ<br><br>Judge:  The Honorable Bruce S. Jenkins |

## DECLARATION OF DON AVIV

I, Don Aviv, declare under penalty of perjury that the following is true and correct:

1.      I am over the age of 18 years, I have personal knowledge of the matters disclosed herein, and I could competently testify as to the disclosed matters under oath if requested to do so.

2.      I am the President of Interfor International ("Interfor"), a leading investigative and consulting firm that offers comprehensive domestic and foreign intelligence services to clients in the legal, corporate, and financial communities.

3.      While at Interfor, I have led and managed teams on thousands of investigations, often spanning multiple continents and involving intricate and complex facts.  For example,

Interfor has conducted thorough investigations of parties based in Cyprus, the Czech Republic, and Ireland, and has assisted with investigations into the recovery of judgments in these countries. In addition to these efforts, I directly oversee the day-to-day operations and lead Interfor's Global Investigations and Security Consulting divisions.

4.      I have over 23 years of experience in the fields of security consulting, investigations, and intelligence gathering related to legal, corporate, and financial information. Prior to my tenure at Interfor, I was the head of Global Security and Investigations for a Fortune 500 technology company.

5.      I am a Board-Certified Protection Professional (CPP), a Board Certified Physical Security Professional (PSP), a Professional Certified Investigator (PCI), and a licensed New York State Investigator.

6.      DISH Technologies L.L.C. and Sling TV L.L.C. (collectively, "DISH") have retained Interfor to conduct an investigation into the corporate structure of MindGeek, including the parent entities, subsidiary entities, and partners to MindGeek that operate certain adult video websites.  Interfor is also investigating the corporate function of MindGeek's entities, to the extent the entities have any operations, and the key executives of each MindGeek entity.  Some of the subsidiary entities identified include: MG Premium Ltd, MG Billing Ltd, MG Billing Ireland, and MindGeek S.à.r.l.

7.      The purpose of this Declaration is to provide certain preliminary findings learned as part of Interfor's investigation in support of DISH's Motion for Preliminary Injunction. Interfor's investigation is ongoing, and the investigation's scope may enlarge as further information is learned.  As such, all the statements I provide in this Declaration are provided

according to the best of my present knowledge.  I reserve any rights to amend or supplement any statement provided in this Declaration to the extent warranted.

**Name Change**

8.     In August 2023, MindGeek announced that it was changing its name to "Aylo" in a corporate re-branding effort.  In a related press release, MindGeek stated that its decision to change its name reflected a "need for a fresh start and renewed commitment to innovation, diverse and inclusive adult content, and trust and safety." Exhibit N.[1]

9.     Since the announcement of the name change, MindGeek has begun publicly transitioning its entities' names.  This transition appears to be ongoing.

10.     For example, paperwork has been filed in the Republic of Cyprus changing the name and corporate identify of various MindGeek entities to their new Aylo names.   One MindGeek entity, MG Premium Ltd, a Defendant in this lawsuit, has changed its name to "Aylo Premium Ltd."  *See, e.g.,* Exhibit QQ.

11.     Due to the ongoing name transition, for purposes of this Declaration only, and without conceding any argument on DISH's behalf, I will refer to any entity throughout this Declaration by its MindGeek name.

**Corporate Structure**

12.     Aylo's press release announcing their re-branding efforts, accessible on Aylo's website, represents that Aylo is owned by Ethical Capital Partners ("ECP"). ECP's website states that ECP "is a private equity firm managed by a multi-disciplinary advisory team."  Exhibit PP.

---

[1] Citations provided in this Declaration are to cite public sources of information stated herein and are not meant to limit DISH's assertions or sources of proof in any way.  Some citations provided in this Declaration are cited in DISH's Motion for Preliminary Injunction while others are not.  Nonetheless, all citations to exhibits in this Declaration are consistent with the order provided in DISH's Index of Exhibits for its Motion for Preliminary Injunction.

13.     Interfor's investigation into ECP's relationship with the MindGeek entities, including ECP's direct involvement with the allegedly infringing conduct, is ongoing.  As such, I reserve any rights to further supplement my statement that clarifies ECP's role in MindGeek's corporate structure and/or operation.

14.     Thus far in Interfor's investigation, Interfor has identified at least 200 entities within MindGeek's corporate umbrella, a number of which are based in the Republic of Cyprus at the same office address: 195-197 Old Nicosia-Limassol Road, Dali Industrial Zone 2540, Block 1, Cyprus.

**a.   MindGeek S.à.r.l.**

15.     MindGeek S.à.r.l. is a privately-held limited liability company organized under the laws of the Grand Duchy of Luxembourg.  MindGeek S.à.r.l.'s corporate directors include Andreas Alkiviades Andreou, who is also a Director and/or Secretary at the following MindGeek corporate subsidiaries: MG Billing Ltd, MG Freesites Ltd, and MG Premium Ltd. MindGeek S.à.r.l.'s managers also include persons such as Anis Baba. Exhibit W, at 3.

16.     Thus far into Interfor's preliminary investigation, my team has identified fifteen sworn affidavits or declarations of Mr. Andreou that were filed in American Federal Courts and touch on the corporate identities and presences of various MindGeek entities. I rely on four of those sworn statements in forming my opinion, which I understand are also attached as Exhibits K, W, and X, and RR.

17.     MindGeek S.à.r.l., according to Mr. Andreou, "is nothing more than a holding company," and "has no employees or operations of its own."  MindGeek S.à.r.l. operates as a parent company, owning many MindGeek corporate subsidiaries, including MG Premium Ltd. Exhibit X, at 2; Exhibit K, at 2; Exhibit W, at 2.

### b. **MG Premium Ltd**

18. According to a sworn declaration given by Mr. Andreou in *Fleites v. MindGeek*, MG Premium Ltd is a privately-held limited liability company organized under the laws of the Republic of Cyprus.  MG Premium Ltd's principal place of business is located at 195-197 Old Nicosia-Limassol Road, Block 1 Dali Industrial Zone, Cyprus.  Exhibit K, at 4.

19. MG Premium Ltd is the "controller" of certain websites providing adult content and pornographic videos, including at least: Brazzers.com; DigitalPlayground.com; Men.com; Babes.com; SeanCody.com; TransAngels.com; RealityKings.com; MOFOS.com; Twistys.com; WhyNotBi.com; FAKEHub.com; FAKETaxi.com; Lesbea.com; milehighmedia.com; BangBros.com; HentaiPros.com; Erito.com; TransHarder.com; Metrohd.com; Squirted.com; PropertySex.com; Transsensual.com; Bromo.com; TrueAmateurs.com; Massagerooms.com; Deviante.com; VRTemptation.com; BiEmpire.com; RealityDudes.com. *See, e.g.,* Exhibits V, BB, GG, HH, II, and DDD.

20. As represented in Mr. Andreou's sworn testimony, "MG Premium Ltd does not have any employees or offices . . . in the United States." Exhibit K, at 4.

21. As represented MG Premium Ltd, like other MindGeek entities, is controlled by many of the same officers, like Andreas Andreou and Anis Baba. Exhibit RR, at 7-8.

22. In numerous sworn statements, Mr. Andreou has stated that MG Premium Ltd is "adequately capitalized, both possessing its own bank accounts and serving as a party to and responsible for fulfilling its own contracts."  Exhibit RR, at 7; Exhibit K at 4.

23. Based on the findings of Interfor's preliminary investigation, no representative from MG Premium Ltd, or any MindGeek entity, has further explained the financial operations of

any MindGeek entity such as, for example, how each MindGeek entity receives revenue or how profits are shared among MindGeek entities.

24.     Many of the websites controlled by MG Premium Ltd allow users to enter into subscriptions to view the content listed on the website. *See, e.g.,* Exhibit V, at 1.

25.     Each of the websites controlled by MG Premium Ltd provides subscribers and/or users with adult content and/or pornographic videos.  *See, e.g.,* Exhibit FF.

**c.  MG Billing Ltd and MG Billing Ireland**

26.     MG Billing Ltd and MG Billing Ireland are private limited companies organized under the laws of the Republic of Ireland.  Exhibit X, at 4.

27.     MG Billing Ltd has a place of business in Nicosia, Cyprus, located at 195-197 Old Nicosia-Limassol Road, Block 1 Dali Industrial Zone, Cyprus.  *See, e.g.,* Exhibit SS.

28.     MG Billing Ireland has a place of business in Dublin, Ireland. Exhibit X, at 4.

29.      "ProBiller," an online payment solutions platform owned at least in-part by MG Billing Ltd that facilitates transactions between subscribers and the websites controlled by MG Premium Ltd, some of which are listed above. Exhibit Y, at 2, 8.

30.     ProBiller, or MG Billing Ltd appears to be the billing provider of all the above-mentioned websites controlled by MG Premium Ltd. *See, e.g.,* Exhibit V, at 1-2.

31.     ProBiller charges subscribers on behalf of the website from which the subscriber takes out a subscription.  Upon subscribing to a participating website, ProBiller collects the subscriber's subscription fees. *See, e.g.,* Exhibit Y, at 2.

32.     According to ProBiller's Terms of Service, MG Billing Ltd provides each subscriber with "one access right to access the [website] and its materials for which [a] Subscriber is purchasing a membership." Exhibit Y, at 2.

33.     MG Billing Ltd's officers have represented in sworn statements that MG Billing Ltd is "adequately capitalized, both possessing its own bank accounts and serving as a party to and responsible for fulfilling its own contracts."   No representative from MG Billing Ltd, or any MindGeek entity, has explained the meaning of "adequately capitalized."   Exhibit X, at 4.

**d. Sonesta Technologies s.r.o. and Sonesta Media s.r.o.**

34.     According to a sworn declaration in the case of *Preservation Technologies LLC v. WGCZ Ltd. s.r.o*, Sonesta Technologies s.r.o. and Sonesta Media s.r.o. are both private limited liability companies organized under the laws of the Czech Republic. Both are corporate subsidiaries to United Communication Holding II a.s. Exhibit TT, at 4.

35.     Both Sonesta Technologies s.r.o. and Sonesta Media s.r.o. have their principal place of business in Prague, Czech Republic. Exhibit TT, at 7.

36.     Sonesta Technologies s.r.o. has represented that it is an operator of the website BangBros.com.  The terms of service for BangBros.com list MG Premium Ltd as the controller of the site.  Exhibit TT, at 7.

37.     Sonesta Media s.r.o. has represented that it owns certain intellectual property rights to content available on BangBros.com and, through licenses, other websites.  Some other websites offering Sonesta Media s.r.o.'s content include websites that DISH accuses infringes its ABR patents. Exhibit TT, at 7.

38.     Because Sonesta Technologies s.r.o. and MG Premium Ltd claim to operate and control BangBros.com, the two companies appear to jointly work together to provide adult content on BangBros.com.  *See* Exhibit BB, at 1.

39.     Further, because BangBros.com requires subscription fees to access its videos and other content, Sonesta Technologies s.r.o. also works with the website's biller, MG Billing Ltd doing business as ProBiller, to provide the content on the site. *See* Exhibit BB, at 1.

40.     As the owner of the intellectual property offered on BangBros.com, Sonesta Media s.r.o. likewise works with both MG Premium Ltd and MG Billing Ltd to provide the content to subscribers and/or users. *See* Exhibit BB, at 7.

**e.  Yellow Production s.r.o.**

41.     Yellow Production s.r.o. is a private limited liability companies organized under the laws of the Czech Republic. Exhibit TT, at 7.

42.     Yellow Production s.r.o. has its principal place of business in or near Prague, in the Czech Republic. Exhibit TT, at 7.

43.     As publicly expressed in the FakeTaxi.com Terms of Service, Yellow Production s.r.o. has represented that it owns certain intellectual property that is presented on websites controlled by MG Premium Ltd, such as FakeTaxi.com, FakeHub.com, FakeHostel.com, and PublicAgent.com.  Yellow Production s.r.o.'s videos and other content are also found on other websites controlled by MG Premium Ltd. Exhibit HH, at 1; Exhibit TT, at 7.

44.     The    above-listed    example    websites,   FakeTaxi.com,   FakeHub.com, FakeHostel.com, and PublicAgent.com, require subscription fees to access their videos and other content. As the content provider for these sites and others, Yellow Production s.r.o. jointly works with the websites' biller, MG Billing Ltd doing business as ProBiller, to provide the content on the site and with the websites' controller, MG Premium Ltd, to offer the content for profit. *See, e.g.,* Exhibit HH, at 1.

**Corporate Presence**

45.     Based upon the sworn statements given by Defendants in various other lawsuits, and the results of Interfor's preliminary investigation into MindGeek, none of the listed Defendant entities have offices located in the United States, have employees based in the United States, or are otherwise maintain any meaningful corporate presence within the United States. *See* Exhibit X, at 4; Exhibit RR, at 7; Exhibit K, at 4.

46.     According to the terms of service of MG Premium-controlled websites, MG Billing Ltd, through ProBiller or another company, collects subscription fees for the websites hosting content belonging to MG Premium Ltd, Sonesta Media s.r.o., and/or Yellow Production s.r.o. *See, e.g.,* Exhibit BB, at 1; Exhibit HH, at 1.

47.     As the controller of the site, MG Premium Ltd does not directly collect any subscription fees from viewers.  Instead, the Terms of Service of MG Premium-controlled sites indicate that MG Premium Ltd relies on ProBiller to collect such subscriptions.   Interfor's investigation into how ProBiller distributes the collected fees remains ongoing.  *See, e.g.,* Exhibit V, at 1.

48.     Given Interfor's experience and preliminary findings, the corporate structure and partnerships maintained by the above-named Defendants was likely deliberately created. Complicated corporate structures and partnerships, such as these, often are created to obfuscate liability in the event of such findings.

49.     Thus, after Interfor's preliminary investigation, which remains ongoing, the complicated corporate structure of the Defendants, including the discrete roles that each defendant serves in the operation of the websites controlled by MG Premium Ltd makes it likely that any monetary judgment entered in DISH's favor will not be recovered.

50.     Further, it is my understanding that DISH may be required to seek recovery of a judgment in its favor in at least one of Cyprus, Ireland, or the Czech Republic.  To the best of my knowledge to date, no Defendant maintains assets in the United States that are adequately funded to support a judgment proportional to the magnitude of DISH's claimed injury.

**Recovering Judgments Abroad**

51.     Cyprus, the Czech Republic, and Ireland are members of the European Union ("EU").  *See generally* Exhibit UU.

52.     Cyprus has been known as a nation in which wealthy individuals and companies secretly and securely store assets.  *See, e.g.,* Ex. EEE, at 2.

53.     For example, it has been reported that Russian oligarchs and elites have used Cyprus's asset protection mechanisms, such as trusts, to keep assets from outside access. *See, e.g.,* Ex. EEE, at 5-8, Ex. FFF, at 4.

54.     According to publicly available resources, such as Latham & Watkins LLP's *Enforcement of Foreign Judgments – Cyprus*, courts in Cyprus, the Czech Republic, and Ireland—as members of the EU—are obligated to comply with multinational agreements that require the reciprocal recognition and enforcement of foreign judgments.  Some of those agreements include:

    a.   The Hague Convention on the Recognition and Enforcement of Foreign Judgments in Civil and Commercial Matters;

    b.   The Hague Convention on Choice of Court Agreements 2005;

    c.   The Convention on the Recovery Abroad of Maintenance;

    d.   The United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards; and

    e.   The European Convention on Certain International Aspects of Bankruptcy.

*See, e.g.,* Exhibit MM, at 7, 8.

55.     For example, according to the Latham & Watkins LLP article, Cypriot courts will also recognize and enforce judgments from foreign countries with which Cyprus has executed bilateral agreements relating to legal and judicial cooperation. Some of those countries include: Greece, the Czech Republic, Hungary, Bulgaria, Syria, the Russian Federation, Ukraine, the states of former Yugoslavia, Egypt, China, Poland, and Germany.  The United States is not listed as a signatory with Cyprus on any agreement such that Cypriot courts will be required to fully enforce an American judgment.  Exhibit MM, at 7.

56.     According to the Latham & Watkins LLP article, if a foreign judgment is opposed in Cyprus, Cypriot courts may examine the foreign proceedings in order to determine whether the judgment was fairly issued.  If the Cypriot court finds that there was a deficiency in the foreign court that renders the judgment contrary to the requirements of natural justice or to the public policy of Cyprus, or if the court finds that the judgment was obtained by fraud, then the Cypriot court may not recognize the judgment. Exhibit MM, at 10-11.

57.     Similarly, Cypriot courts may consider whether the foreign court had personal jurisdiction over the judgment debtor pursuant to the conflict of laws rules of Cyprus. Exhibit MM, at 11-13.

58.     The information disclosed in the Latham & Watkins LLP article is entirely consistent with my and Interfor's experiences with judgment recovery in Cyprus. As such, I incorporate the article fully herein.

59.     In light of the MindGeek entities' public representations, Interfor's experiences in investigations concerning the recovery of judgments against parties with corporate structures such as the ones maintained by the Defendants, and the findings of Interfor's preliminary investigation,

it is likely that any defendant entity held liable to DISH will attempt to challenge this Court's judgment in Cypriot courts.

60.      Interfor has significant experience in investigating complex foreign corporate structures. In our experience, such complex foreign structures are often set up to shield beneficial owners against liability, obfuscate inquiries into beneficial ownership, and protect sibling entities and/or beneficial owners against liability from judgments. Based on our preliminary findings to date, our investigation into MindGeek's corporate structure has shown that its corporate structure is entirely consistent with those findings.

**Other Lawsuits**

61.      MindGeek entities, including MindGeek S.à.r.l. and MG Premium Ltd, have been involved in various lawsuits as defendants.

62.      In at least one lawsuit, *Fleites v. MindGeek*, No. 2:21-cv-04920-CJC-ADS (N.D. Cal.), 34 women (1 named woman and 33 "Jane Doe" plaintiffs) accused MindGeek S.à.r.l., MG Freesites Ltd, MindGeek USA Incorporated, three officers of MindGeek, and others of knowingly operating a criminal enterprise through a MindGeek website, Pornhub.com, where videos or images of the plaintiffs being sexually trafficked, raped, or sexually assaulted were posted for viewers.

63.      The *Fleites* case is one of several cases in which MindGeek entities were accused of violating sex trafficking laws, violating laws against the possession and distribution of child pornography, offering viewers images and/or videos showing plaintiffs being raped or sexually assaulted, or offering viewers images and/or videos without the creators' permission.  Some of the other cases include: *Doe 1 v. Murphy*, No. 7:22-cv-03576-DCC (D.S.C.) (Invasion of Privacy and Intentional Infliction of Emotional Distress claims); *Doe v. MindGeek*, No. 7:21-cv-00220-LSC (N.D. Ala.) (Violation of the Trafficking Victims Protection Reauthorization Act, and Receipt and

Distribution of Child Pornography claims); *Blocher v. MindGeek USA Inc.*, No. 3:23-cv-00209-MMD-CLB (D. Nev.) (Violation of State Human Trafficking and Rape claims); and *CV1 Mother v. Franklin*, No. 2:22-cv-00605 (M.D. Ala.) (Receipt and Distribution of Child Pornography, Violation of Trafficking Victims Protection Reauthorization Act, Violation of Alabama's human trafficking statute, Violation of the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), Conspiracy to violate RICO, and nine other tort claims resulting from the sex trafficking of a minor).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 12 day of September, 2023, at New York, New York.

Don Aviv
_____
Don Aviv
President, Interfor International

# EXHIBIT C

Brent O. Hatch (5715)
hatch@hatchpc.com
Adam M. Pace (14278)
pace@hatchpc.com
HATCH LAW GROUP, P.C.
22 East 100 South, Suite 400
Salt Lake City, Utah 84111
Telephone: (801) 869-1919

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DISH TECHNOLOGIES L.L.C. and SLING TV L.L.C.<br><br>Plaintiffs,<br><br>v.<br><br>MG PREMIUM LTD, MG BILLING LTD, and MG BILLING IRELAND LTD, SONESTA TECHNOLOGIES, s.r.o., SONESTA MEDIA, s.r.o., and YELLOW PRODUCTION, s.r.o.<br><br>Defendant. | **COMPLAINT**<br>**(Jury Trial Demanded)**<br><br>Case: _____<br><br>Judge: _____ |

## EXPERT DECLARATION OF KEVIN J. NEGUS, PH.D. IN SUPPORT OF PRELIMINARY INJUNCTION

## Table of Contents

I.   SCOPE OF THE REPORT ..................................................................... 3

II.  SUMMARY OF OPINIONS ................................................................... 6

III. LEGAL UNDERSTANDING ................................................................. 6

IV.  HTTP Live Streaming (HLS) ............................................................... 7

V.   THE '680, '798, '564, '554, '772, AND '138 PATENTS ................................ 10

VI.  THE ITC ACTION .......................................................................... 12

VII.     THE MG DEFENDANTS' ACCUSED PRODUCTS ................................. 15

IX.  CONCLUSION ............................................................................... 16

LIST OF EXHIBITS..................................................**Error! Bookmark not defined.**

EXHIBIT CCC - MATERIALS CONSIDERED ..................................................... 18

## I.      SCOPE OF THE REPORT

1.      I have been retained on behalf of DISH Technologies L.L.C. and Sling TV L.L.C. (collectively, "DISH"), as an expert consultant on telecommunications technology related to streaming media content over networks including the Internet.

2.      As part of this work, I have been requested by counsel for DISH to analyze and opine regarding infringement of U.S. Patent Nos. 10,951,680 (the "'680 Patent"), 11,677,798 ("the '798 Patent"), 9,407,564 ("the '564 Patent"), 10,469,554 ("the '554 Patent"), 8,868,772 ("the '772 Patent"), 11,470,138 ("the '138 Patent") and such other topics as addressed in this report.

3.      It is my understanding that the MG Defendants include MG Premium Ltd, MG Billing Ltd, MG Billing Ireland Ltd, Sonesta Technologies, s.r.o., Sonesta Media, s.r.o., and Yellow Production, s.r.o.

4.      It is also my understanding that the MG Defendants operate premium subscription websites that provide information that may be used for online streaming services ("MG Defendants Accused Streaming Services"), including, but not limited to, www.brazzers.com ("Brazzers Premium Site").

5.      I have prepared this report to summarize certain of my opinions regarding this subject matter and its relevance to practice of and/or infringement of the '680, '798, '564, '554, '772, and '138 Patents (collectively, "the Asserted Patents") by the MG Defendants.  At minimum, I have reviewed, relied on, and/or had access to the technical evidence described herein.

6.      I use many industry-standard acronyms such as, for example, "HTTP" wherein my usual practice is to define and/or describe the acronym at my first usage of its full-length title and then use the acronym repeatedly throughout the rest of the report.  I also sometimes provide descriptions or definitions of certain terms in "quotations", including terms that may be used in or relevant to limitations of the asserted claims, at some given point in this report and then repeat

such terms elsewhere in this report without the quotations but with my same intended description or definition unless noted otherwise.

7.      Furthermore, I often reference various documents within this report using a short form description such as, by way of non-limiting example, "RFC 8216" to refer to materials listed in Exhibit CCC wherein the correlation of the short form description and full description may be documented solely in Exhibit CCC.[1]

8.      I am being compensated at $500 per hour for my services in this matter.  My compensation is not dependent upon the outcome of this matter.  If called upon to do so, I am prepared to testify as an expert witness in this regard.

## II.     EXPERT QUALIFICATIONS AND BACKGROUND

9.      I am qualified by education and experience to testify as an expert in the field of telecommunications. Attached, as Exhibit VV, is a copy of my resume detailing my experience and education. Additionally, I provide the following overview of my background as it pertains to my qualifications for providing expert testimony in this matter.

10.      I am a Full Professor of Electrical Engineering at Montana Tech University in Butte, MT.  I lead a research program at Montana Tech to enable communications and/or tracking with electronic devices in challenging situations such as remote wilderness locations, wildlife tracking, oil and gas well development, underground mining, industrial processes and/or long-haul electric power transmission.  I mentor, supervise, and teach both senior undergraduate and

---

[1] I understand that while certain citations provided in this Declaration are to information stated herein, such citations are not meant to limit DISH's assertions or sources of proof in any way.  I am informed that some citations provided in this Declaration are cited in DISH's Motion for Preliminary Injunction while others are not.  Nonetheless, I am further informed that any citation to an already-defined "Exhibit" in this Declaration is consistent with the definitions provided in DISH's Index of Exhibits for its Motion for Preliminary Injunction.

graduate students of Electrical Engineering in the general fields of telecommunications and networking with an emphasis on wireless communication systems.

11.     In 1984 and 1985, respectively, I received the B.A.Sc. and M.A.Sc. Degrees in Mechanical Engineering from the University of Waterloo in Canada. For my M.A.Sc. Degree research and academic achievements, I received the prestigious University Gold Medal in 1985 for the best Masters thesis in the entire University of Waterloo for that year.

12.     In 1988, I received my Ph.D. in Engineering from the University of Waterloo in Canada. The Departments of Electrical Engineering and Mechanical Engineering jointly supervised my Ph.D. research on the modeling of bipolar semiconductor devices.  For my Ph.D. work, I received the Faculty Gold Medal in 1988 for the best Ph.D. thesis in the entire Faculty of Engineering across all Departments for that year. My Ph.D. thesis research also formed the basis of a paper published in 1989 that won the award for Best Paper in 1989 for the IEEE (Institute of Electrical and Electronic Engineers) journal in which it was published.

13.     I have specific experience with many wired and wireless networking standards including IEEE 802.1 and 802.3 (the "Ethernet" family of wired LANs), IEEE 802.11 (the "Wi-Fi" family of wireless LANs), IEEE 802.15 (personal area networks or "PAN"), IEEE 802.16 (also known as "WiMAX"), various cellular communications standards (such as IS-19, IS-41, IS-54, IS-95, IS-136, IS-826, IS-707, IS-856, IS-2000, CDPD, GSM, GPRS, EDGE, UMTS, CAMEL, WCDMA, HSPA, and LTE), various cordless telephone standards (such as CT-2, DECT, and PHS), and other wired networking standards (such as DOCSIS, SONET and FDDI).

14.     I am named as an inventor on numerous U.S. patents all of which have related in at least some way to products for wired and/or wireless networks.

15.     During the past 10+ years, I have provided expert testimony, reports or declarations in numerous cases in front of U.S. District Courts, the Patent Trial and Appeal Board, and the International Trade Commission.

## II.   SUMMARY OF OPINIONS

16.     Based on the materials that I have reviewed, the analyses I have performed, and the positions summarized within this report, I have formed at least the following opinions.

17.     The MG Defendants Accused Streaming Services, such as the Brazzers premium site available at www.brazzers.com, practice at least certain claims of the Asserted Patents.

18.     Infringement by the MG Defendants is summarized in claim charts I have reviewed attached as Exhibits WW – BBB.

## III.   LEGAL UNDERSTANDING

19.     I am not a lawyer, and I do not intend to offer any opinions directed specifically to the correct interpretation of the law.  However, I have a general understanding of at least certain legal issues regarding infringement based on my experience with patents and my discussions with counsel.  Additionally, I have reviewed the legal principles used to determine infringement as set forth in the AIPLA Model Patent Jury Instructions (see, for example, https://www.aipla.org/home/news-publications/model-patent-jury-instructions), and these principles have further informed my analyses herein.

20.     I understand that a determination of patent infringement is a two-step process.  In the first step, the Court must construe the claim language to determine the proper scope and meaning of each claim element.  In the second step, the claim must be compared to the accused devices to determine whether each element of the claim is found in the accused product or process. If each element of a claim, as construed by the Court, is found in the accused product or process,

and found in the arrangement required by the claim, then that product or process infringes the claim.

21.     I understand that claim construction is a matter of law and will thus be decided by the Court.  I understand that the relevant inquiry in claim construction is the question of how a person of ordinary skill in the art (or "POSITA") would have understood the claim terms at the time of the invention, in light of the patent specification, the prosecution history, and any other relevant evidence.  I understand that a POSITA is assumed to have read the claim terms in the context of the entire patent, including the specification, and its prosecution history.

22.     I understand that a dependent claim incorporates each and every limitation of the claim from which it depends.

23.     I understand that infringement of a claim is said to be literal when each limitation of each claim element, as construed by the Court, is found in identical form in the accused product or method.

24.     I understand that the burden of proof for proving patent infringement is by a preponderance of the evidence, which means that the accused device or method be more likely to infringe than not to infringe an asserted claim.

## IV.     HTTP Live Streaming (HLS)

25.     The HLS protocol as described in RFC 8216 is commonly used by streaming media servers and media players.

26.     RFC8216 is the "HTTP Live Streaming," or "HLS," protocol.  It is described as "a protocol for transferring unbounded streams of multimedia data" that "specifies the data format of the files and the actions to be taken by the server (sender) and the clients (receivers) of the streams." RFC 8216 at 1.  It "provides a reliable, cost-effective means of delivering continuous and long-form video over the Internet" and "allows a receiver to adapt the bit rate of the media to the current

network conditions in order to maintain uninterrupted playback at the best possible quality." RFC 8216 at 4.

27.    And RFC 8216 at 4, states that "HTTP Live Streaming" supports "interstitial content boundaries" and "multiple renditions of the same content", thereby offering "compatibility with large-scale HTTP caching infrastructure to support delivery to large audiences" such that by "Using this protocol, a client can receive a continuous stream of media from a server for concurrent presentation."

28.    RFC 8216 specifies that "A multimedia presentation is specified by a Uniform Resource Identifier (URI) [RFC3986] to a Playlist" wherein "A Playlist is either a Media Playlist or a Master Playlist" that contains "URIs and descriptive tags", and further that "A Media Playlist contains a list of Media Segments, which, when played sequentially, will play the multimedia presentation." RFC 8216 at 4. The Figure below is "an example of a Media Playlist" in accordance with this standard. RFC 8216 at 5.

"[E]xample of a Media Playlist"



29.    As depicted, there, "[t]he first line is the format identifier tag #EXTM3U" while "The line containing #EXT-X-TARGETDURATION says that all Media Segments will be 10 seconds long or less" and then subsequently "three Media Segments are declared" wherein "[t]he first and second are 9.009 seconds long; the third is 3.003 seconds." RFC 8216 at 5.

30. RFC 8216 further explains for the example above that, "[t]o play this Playlist, the client first downloads it and then downloads and plays each Media Segment declared within it" wherein "[d]ata SHOULD be carried over HTTP [RFC7230]" and subsequently "[t]he client reloads the Playlist as described in this document to discover any added segments." RFC 8216 at 5.

31. RFC 8216 describes that "[a] more complex presentation can be described by a Master Playlist" which "provides a set of Variant Streams, each of which describes a different version of the same content" wherein "[a] Variant Stream includes a Media Playlist that specifies media encoded at a particular bit rate, in a particular format, and at a particular resolution for media containing video" and thus "[c]lients should switch between different Variant Streams to adapt to network conditions." RFC 8216 at 5.

32. RFC 8216 states that the Media Playlist I described earlier, "contains a series of Media Segments that make up the overall presentation" wherein "[a] Media Segment is specified by a URI and optionally a byte range" and "[t]he duration of each Media Segment is indicated in the Media Playlist by its EXTINF tag." RFC 8216 at 6. And in addition, "[e]ach segment in a Media Playlist has a unique integer Media Sequence Number" wherein "[t]he Media Sequence Number of the first segment in the Media Playlist is either 0 or declared in the Playlist" while "[t]he Media Sequence Number of every other segment is equal to the Media Sequence Number of the segment that precedes it plus one." RFC 8216 at 6.

33. Each of these Media Segments "MUST carry the continuation of the encoded bitstream from the end of the segment with the previous Media Sequence Number, where values in a series such as timestamps and Continuity Counters MUST continue uninterrupted" wherein "[t]he only exceptions are the first Media Segment ever to appear in a Media Playlist and Media

Segments that are explicitly signaled as discontinuities."  RFC 8216 at 6.  And "[a]ny Media Segment that contains video SHOULD include enough information to initialize a video decoder and decode a continuous set of frames that includes the final frame in the Segment" at least because "network efficiency is optimized if there is enough information in the Segment to decode all frames in the Segment."  RFC 8216 at 6.

## V.  THE '680, '798, '564, '554, '772, AND '138 PATENTS

34.    I understand that the content of a patent (including its claims) and prior art should be interpreted the way a person of ordinary skill in the art (or "POSITA") would have interpreted the material at the time of invention unless otherwise construed by the Court as a matter of law.

35.    I understand that the "time of invention" here is no earlier than the date that the applicants for the '680, '798, '564, '554, '772, and '138 Patents first filed an application related to such patents in the United States Patent and Trademark Office, namely, April 30, 2004.

36.    In my opinion, a POSITA in the field of art related to the '680, '798, '564, '554, '772, and '138 Patents would have been a person familiar with streaming media content over networks including the Internet by way of a combination of experience and/or education.  I believe that such a POSITA would have had at least a working knowledge of the protocols and architecture of networks including the Internet including at least the relevant technical standards.

37.    As one example, the POSITA at the time of invention of the '680, '798, '564, '554, '772, and '138 Patents would have had at least a Bachelor of Science degree in one of Electrical Engineering, Computer Science, Software Engineering or an equivalent or related field, as well as at least two years of experience in the field of streaming media content over networks including the Internet.

38.    In addition to my testimony as an expert, I am prepared to testify as someone who actually practiced in the field from 1986 to present, who actually possessed at least the knowledge

of a POSITA within that time period, including at least specifically at the time of invention of the
'680, '798, '564, '554, '772, and '138 Patents, and who actually worked with others possessing at
least the knowledge of a POSITA within that time period.

39.     As part of the "Detailed Description of the Invention" section, the '554 Patent
describes "FIG. 1" as "a *schematic block diagram* illustrating one embodiment of a system **100** for
*dynamic rate shifting of streaming content* in accordance with the present invention" (emphasis
added, see, for example, '554 Patent at 6:33-35, FIG. 1 as shown below).



FIG. 1

40.     More specifically in reference to FIG. 1, the '554 Patent discloses that "the system **100** comprises a _content server_ **102** and an _end user_ **104**" that "may be _coupled by_ a data communications network" including "_the Internet_ **106** and connections **108** to the Internet **106**", wherein such "_end user station_ **104** may comprise a _personal computer_ (PC), an _entertainment system_ configured to communicate over a network, or a _portable electronic device_ configured to present content" (emphasis added, see, for example, '554 Patent at 6:34-47).

41.     The '554 Patent "relates to _video streaming over_ packet switched networks such as _the Internet_, and more particularly relates to _adaptive-rate shifting of streaming content_ over such networks" (emphasis added, see, for example, '554 Patent at 1:31-34).

## VI.    THE ITC ACTION

42.     I was previously retained by DISH to provide certain opinions regarding infringement at the International Trade Commission ("ITC") in which a full commission determined and found infringement. Ex. U (Commission Opinion (Public Version), _In the Matter of Certain Fitness Devices, Streaming Components Thereof, and Systems Containing Same_, Inv. No. 337-TA-1265 (Mar. 23, 2023)), at 1 & 93).

43.     Specifically, I understand that the ITC issued a Final Determination that the ITC Respondents' accused products infringed the '554, '555, and '156 Patents, including claim 16 of the '554 Patent.  Ex. U (Commission Opinion (Public Version, at 1 & 93)).  I further understand that Chief Administrative Law Judge Clark S. Cheney also found in his Initial Determination that the '564 Patent had been infringed by the Respondents.  Ex. T (Initial Determination (Public Version, at 254)).

44.     In the ITC Action, I submitted a lengthy declaration detailing how the ITC Respondents' accused products infringed at least claim 16 of the '554 Patent. In that ITC Action,

I confirmed that the ITC Respondents' accused products used HTTP Live Streaming ("HLS") in multiple ways.

45.     First, my initial analysis relied on testing performed using the Charles proxy program to observe network traffic to and from each ITC Respondent's application.  When a computer runs the Charles software, it can act as an HTTP proxy that enables the viewing of HTTP and HTTPS traffic between such computer and other network devices (see, for example, https://www.charlesproxy.com/overview/).  For example, Charles enables SSL Proxying such that HTTPS requests and responses can be decrypted and viewed in plain text format (see, for example, https://www.charlesproxy.com/overview/).  For end user devices that can be both configured to operate via a proxy implemented by a computer executing the Charles software and configured to use       a       Charles       Root       Certificate       (see,       for       example, https://www.charlesproxy.com/documentation/configuration/browser-and-system-configuration/ and   https://www.charlesproxy.com/documentation/using-charles/ssl-certificates/),   then   it   is possible to view HTTPS requests and responses in plain text format including payloads to and from such devices.  Additionally, Charles provides a capability for Bandwidth Throttling that forces the proxied traffic through a simulated network restriction with finite bandwidth and specified latency (see, for example, https://www.charlesproxy.com/overview/).

46.     One example of an end user device that can be operated through a proxy implemented as a computer executing the Charles software is the iPad running iOS (see, for example,       https://www.charlesproxy.com/documentation/configuration/browser-and-system-configuration/ and https://www.charlesproxy.com/documentation/using-charles/ssl-certificates/). If appropriately configured per the Charles software documentation, then a downloaded application executing on such an end user device can have its HTTPS traffic destined to or

originating from any network device within the Internet routed through the computer executing the Charles software and viewable at such computer even without specific knowledge by the user of the TLS encryption keys in use with such network devices.

47.     The Charles proxy testing revealed that each ITC Respondent was using a standard HLS implementation to perform adaptive bitrate streaming of at least some of their videos. Specifically, reviewing the Charles Proxy captures for each ITC Respondent showed the use of M3U8 files referred to in the HLS protocol as Master Manifest files.  Each Master Manifest file contained, among other metadata, URI's for the location of a separate M3U8 file for each bandwidth version of the program available referred to in the HLS protocol as a Variant Manifest. Each Variant Manifest file included URI's for various segment video files (e.g., TS files) that when played back consecutively provided a contiguous video program.  Moreover, each Variant Manifest included URI's for the same number and size of segments.  For example, each segment was identified by a media sequence number.  Segments having the same media sequence number in each Variant Manifest file corresponded to the same portion of the video program encoded at different resolutions.

48.     As the bandwidth available to the media player application was throttled and unthrottled by me using the Charles proxy program, I observed the media player application selecting to move to higher and/or lower bandwidth versions of the video program by requesting and receiving the corresponding Variant Manifests and subsequently requesting and receiving the corresponding TS files based on their media sequence numbers so that the video program was played back contiguously.

49.     Second, I reviewed discovery responses provided by the ITC Respondents as well as accompanying documents produced by each ITC Respondent.  These responses and documents

confirmed that each ITC Respondent followed the HLS protocol to deliver at least some of its video programs.

50.     I describe HLS in greater detail above in Section IV.

51.     I understand that Chief Administrative Law Judge Clark S. Cheney agreed in his Initial Determination that all ITC Respondents employed the HLS protocol.  Ex. T (Initial Determination (Public Version, at 20)).  Further, he found that the ITC Respondents' use of the HLS protocol infringed nearly all claims asserted at the ITC trial.  *Id.* at 254-55.

52.     I further understand that the commission found "a violation of section 337 by Respondents as to claims 1, 2, and 4 of the '156 patent, claims 16, 17, and 20 of the '554 patent, and claims 10, 11, 14, and 15 of the '555 patent."  Ex. U (Commission Opinion (Public Version, at 69)).

## VII.   THE MG DEFENDANTS' ACCUSED PRODUCTS

53.     Based on the information available to me at this time, I believe the MG Defendants operate services including websites that provide information that may be used to stream video programs using DISH's patented adaptive bitrate technology.  For example, I understand that the MG Defendants own the Brazzers Premium Site available at www.brazzers.com.

54.     Counsel for DISH provided me with captures that I understand to have been taken from Charles proxy showing the traffic to and from a Dell PC running Windows accessing the Brazzers website using the Google Chrome web browser and apparently the Video.js media player. My understanding is that these captures were taken during a bandwidth throttling test that I understand to have been based on those I performed for each of the ITC Respondents.

55.     I examined the capture files to analyze the HTTP communications therein.  My review shows the computer requesting and receiving Master Manifest M3U8 files for a particular video program.  These Master Manifests contain URI links to Variant Manifest M3U8 files for

each different bandwidth versions of the video program available to stream.  Each Variant Manifest contains URI links to video segment TS files identified by sequential media sequence numbers. Further, each Variant Manifest contained the same number of TS files identified by identical media sequence numbers.

56.    From my examination, described above, I believe the Brazzers Premium Site streaming service provides information to perform adaptive bitrate streaming according to the HLS protocol as described in RFC 8216.  Based on my review of these Charles proxy capture files, there appears to be no substantive difference in how the Brazzers Premium Site provides information used to stream videos according to the HLS protocol as compared to how the ITC Respondents provided information used to stream videos according to the HLS protocol.

57.    As I described above, the ITC already concluded that use of the HLS protocol infringes claims of the '554 Patent.  Thus, it is my opinion that the MG Defendants infringe the claims of the '554 Patent at least based on the operation of the streaming services associated with the Brazzers Premium Site.

58.    As to the other Asserted Patents, they each have claims directed to similar use of adaptive bitrate streaming technology.  Accordingly, it is my opinion that the MG Defendants infringe the claims of those patents as well.

59.    I have reviewed the claim charts included with DISH's Motion for Preliminary Injunction filed against the MG Defendants (Exhibits WW – BBB) and agree that such claim charts summarize infringement by the MG Defendants.

## IX.    CONCLUSION

60.    I reserve the right to add to or modify this expert report in the event that inaccuracies or omissions are discovered or if new or additional information is provided to me.  I also reserve the right to make any such other changes as may be deemed necessary or appropriate.

61.     I have not yet developed any demonstratives or illustrations to illustrate my opinions and the bases for those opinions; however, I reserve the right to present such demonstratives or illustrations at trial or a hearing.

62.     I reserve the right to supplement and/or amend my analyses and opinions expressed herein in response to any new positions taken by MG Defendants' experts or witnesses in reports, declarations, affidavits, or testimonies whether in response to my report herein or in amendment to their previous reports and testimonies to the extent such positions are relevant to the subject matter I have addressed in my report herein.

I declare under penalty of perjury that the foregoing is true and correct.

Signature: Kevin J. Negus, Ph.D.

Executed On        September 11, 2023 at Philipsburg, MT

# EXHIBIT D

Brent O. Hatch (5715)
hatch@hatchpc.com
Adam M. Pace (14278)
pace@hatchpc.com
HATCH LAW GROUP, P.C.
22 East 100 South, Suite 400
Salt Lake City, Utah 84111
Telephone: (801) 869-1919

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DISH TECHNOLOGIES L.L.C. and SLING TV L.L.C. <br><br> Plaintiffs, <br><br> v. <br><br> MG PREMIUM LTD, MG BILLING LTD, and MG BILLING IRELAND LTD, SONESTA TECHNOLOGIES, s.r.o., SONESTA MEDIA, s.r.o., and YELLOW PRODUCTION, s.r.o. <br><br> Defendant. | **DECLARATION OF THOMAS D. VANDER VEEN IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** <br><br><br> Case: 2:23-cv-552-BSJ <br><br> Judge:  The Honorable Bruce S. Jenkins |

## EXPERT DECLARATION OF THOMAS D. VANDER VEEN IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

I, THOMAS D. VANDER VEEN, hereby declare as follows:

1. I am over 18 years of age and competent to make this declaration. If called to testify as a witness, I could and would testify truthfully under oath to each of the statements in this declaration. Except as otherwise stated herein, this declaration is based upon my personal knowledge.

2. I am a Managing Director at Epsilon Economics, an economic consulting firm.

3. I specialize in the application of economic principles to intellectual property, international trade, and complex commercial disputes.

4. I received a Bachelor of Arts degree in economics and mathematics from Calvin College in 1990. I received a Master of Arts degree in economics from Brown University in 1992. I also received a Ph.D. in economics from Brown University in 1998.  A summary of my education, as well as a list of my publications and presentations, are provided in my curriculum vitae, which is attached to this declaration as **Exhibit A**.

5. Before my current employment at Epsilon Economics and other economic consulting firms, I was an economist at the U.S. International Trade Commission ("ITC") from 1999-2003.  In that role I analyzed financial, trade, and industry information, and assisted in reaching determinations in international trade litigation matters before the ITC.

6. Before my employment at the ITC, I was an assistant Professor of Economics at Skidmore College.

7. I have been retained by plaintiffs DISH Network L.L.C. and DISH Technologies L.L.C. (collectively, "DISH") in the above-captioned matter to assess and attest to certain economic and financial issues related to DISH's Motion for Preliminary Injunction.

8. Attached as **Exhibit B** to my declaration is a true and correct copy of the public version of the settlement agreement entered between DISH DBS Corporation, Sling TV L.L.C., and

DISH Technologies, L.L.C. (collectively, the "DISH Complainants") and Peloton Interactive, Inc. ("Peloton") in *Certain Fitness Devices, Streaming Components Thereof, and Systems Containing Same*, Inv. No. 337-TA-1265 (the "Settlement Agreement"), which was downloaded from the U.S. International Trade Commission's Electronic Document Information System ("EDIS") at https://edis.usitc.gov/external/attachment/795459-1991148.pdf at my instruction on September 5, 2023.

9.  It is my understanding from **Exhibit B** that the DISH Complainants and Peloton signed the Settlement Agreement on May 1, 2023.

10. It is my understanding from § 1.01 and Schedule A of **Exhibit B** that the term "ABR Patents," as used in the Settlement Agreement and hereinafter, refers to patents relating to or claiming any aspect of Adaptive Bitrate Streaming that are owned by the DISH Complainants or any of their affiliates, including U.S. Patent Nos. 9,407,564; 10,469,554; 10,469,555; 10,757,156; and 10,951,680.

11. It is my understanding from §§ 2.01 and 4.01 of **Exhibit B** that Peloton agreed to pay the DISH Complainants seventy-five million U.S. dollars (US $75,000,000.00) for an irrevocable (except as provided in § 6.03 of the Settlement Agreement), worldwide, non-exclusive, non-sublicensable license to the ABR Patents.

12. Attached as **Exhibit C** to my declaration is a true and correct copy of a Peloton Q4 FY2023 Shareholder Letter dated August 23, 2023 (the "Peloton Shareholder Letter"), which was downloaded at my instruction from https://investor.onepeloton.com/static-files/3f464ec7-507f-47e2-a5ae-45c35feb1711 on September 5, 2023.

13. It is my understanding from page 6 of **Exhibit C** that the term "Ending Paid Connected Fitness Subscriptions," as used in the Peloton Shareholder Letter and hereinafter, refers to subscriptions for which Peloton is currently receiving payment, such as a successful credit card billing or prepaid subscription credit or waiver.

14. It is my understanding from page 7 of **Exhibit C** that Peloton had approximately three million (*i.e.*, between 2,997,443 and 3,055,219) Ending Paid Connected Fitness Subscriptions at the time of the Settlement Agreement.

15. It is my understanding from pages 4 and 6 of **Exhibit C** that Peloton generated approximately $421.7 million in subscription revenue in the fiscal quarter beginning April 1, 2023, and ending on June 30, 2023.

16. Based on my understanding that Peloton generated approximately $421.7 million in subscription revenue from Ending Paid Connected Fitness Subscriptions in the fiscal quarter beginning April 1, 2023, and ending on June 30, 2023, it is my understanding that Peloton generated approximately $140.6 million per month (*i.e.*, $421,700,000 ÷ 3 = $140,566,667) in subscription fees during that fiscal quarter.

17. It is my understanding from ¶ 4 of the Complaint filed in the above-captioned litigation that Defendant MG Premium, Ltd operates online streamlining services via the website www.brazzers.com, alone or in cooperation with other of the MG Defendants, such as Yellow Production, s.r.o.

18. Attached as **Exhibit D** to my declaration is a true and correct copy of the third page of the website https://join.brazzers.com/ as of August 22, 2020, which was printed from the website https://web.archive.org/web/20200822090438/https://join.brazzers.com/ at my instruction on September 7, 2023.

19. Below is a true and correct copy of a screen capture taken from the website https://web.archive.org/web/20200822090438/https://join.brazzers.com/ at my instruction on September 7, 2023, which includes a "Most Popular" banner that appears on that website but not in the printout of that website:



20. Attached as **Exhibit E** to my declaration is a true and correct copy of the third page of the website https://join.brazzers.com/ as of May 25, 2021, which was printed from the website https://web.archive.org/web/20210525025520/https://join.brazzers.com/ at my instruction on September 7, 2023.

21. Below is a true and correct copy of a screen capture taken from the website https://web.archive.org/web/20210525025520/https://join.brazzers.com/ at my instruction on September 7, 2023, which includes a "Most Popular" banner that appears on that website but not in the printout of that website:

30 Days Membership  Billed in one payment of $29.99***   MOST POPULAR ★★★★★   $29.99/month

22. Attached as **Exhibit F** to my declaration is a true and correct copy of the third page of the website https://join.brazzers.com/ as of July 23, 2022, which was printed from the website https://web.archive.org/web/20220723113008/https://join.brazzers.com/ at my instruction on September 7, 2023.   This page shows that the  30-day membership is the "Most Popular" subscription.

23. Attached as **Exhibit G** to my declaration is a true and correct copy of the third page of the website https://join.brazzers.com/, which was printed at my instruction on September 7,

2023. As shown in **Exhibit G**, as of September 7, 2023, monthly membership fees were listed at $32.99 per month.

24.  It is my understanding from **Exhibits D-F** that the most popular subscription to access the online streamlining services provided via the website www.brazzers.com is a 30 day, or single-month, subscription.

25.  It is my understanding from **Exhibits D-G** that subscribers have historically paid between $29.99 and $32.99 for a 30-day, or single-month subscription, to access the online streamlining services provided via the website www.brazzers.com.

26.   It is my understanding from **Exhibit G** that subscribers were paying $32.99 for a single-month subscription to access the online streamlining services provided via the website www.brazzers.com on September 7, 2023.

27.  It is my understanding from Article 24, § 2 of the European Union ("EU") Digital Services Act, which is available at the website https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32022R2065&qid=1666857835014, that online services like those provided via the website www.brazzers.com are required to publish information on the average monthly active recipients of the service in the EU, calculated as an average over the period of the past six months.

28.  Attached as **Exhibit H** to my declaration is a true and correct copy of the webpage at www.brazzers.com/eu_dsa, which was downloaded at my instruction on September 5, 2023.

29.  It is my understanding from **Exhibit H** that there were 2,980,969 average monthly recipients of the online streamlining services provided via the website www.brazzers.com

in the EU as of September 1, 2023, calculated as an average over the period of the past six months.

30.   Attached as **Exhibit I** to my declaration is a true and correct copy of the webpage at https://european-union.europa.eu/principles-countries-history/country-profiles_en,  which was downloaded at my instruction on September 5, 2023.

31.   It is my understanding from **Exhibit I** that the member countries of the EU include Austria, Belgium, Bulgaria, Croatia, Republic of Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, and Sweden.

32.   Attached as **Exhibit J** to my declaration is a true and correct copy of the webpage at https://pro.similarweb.com/?#/sales/account-overview/brazzers.com/company, which was downloaded at my instruction on September 5, 2023.

33.   It is my understanding that the webpage at https://pro.similarweb.com/?#/sales/account-overview/brazzers.com/company tracks web traffic for the webpage at www.brazzers.com, including total monthly visits to the webpage at www.brazzers.com and the share of those visits by country across 152 countries.

34.   It is my understanding from **Exhibit J** that 19.40% of the visits to the webpage www.brazzers.com were from the EU in July 2023.

35.   It is my understanding from **Exhibit J** that 28.59% of the visits to the webpage www.brazzers.com were from the United States in July 2023.

36.     I believe it is reasonable to assume that users subscribe to the online streamlining services provided via the website www.brazzers.com in similar proportion the users that visit the website www.brazzers.com.

37.     Based on my understanding that (1) there were an average of approximately 2,980,969 monthly recipients of the online streamlining services provided via the website www.brazzers.com in the EU in July 2023 and (2) 19.40% of the visits to the webpage www.brazzers.com were from the EU in July 2023, I believe it is reasonable to assume that there were approximately 15.4 million (*i.e.*, 2,980,969 ÷ 0.1940 = 15,365,820) monthly recipients of the online streamlining services provided via the website www.brazzers.com in July 2023.

38.     Based on (1) my assumption that there were approximately 15.4 million monthly recipients of the online streamlining services provided via the website www.brazzers.com in July 2023 and (2) my understanding that 28.59% of the visits to the webpage www.brazzers.com were from the United States in July 2023, I believe it is reasonable to assume that there were approximately 4.4 million (*i.e.*, 15,365,820 x 0.2859 = 4,393,088) monthly recipients of the online streamlining services provided via the website www.brazzers.com in the United States in July 2023.

39.     Based on (1) my assumption that there were approximately 4.4 million monthly recipients of the online streamlining services provided via the website www.brazzers.com in the United States in July 2023 and (2) my understanding that subscribers were paying $32.99 per month to access the online streamlining services provided via the website www.brazzers.com around the same time period, I believe it is reasonable to assume that approximately $144.9 million (*i.e.*, 4,393,088 x $32.99 = $144,927,967) in subscription

fees were generated from the online streamlining services provided via the website www.brazzers.com in the United States in July 2023, which is greater than the average monthly subscription fees of $140.6 million generated by Peloton around the same time period.

40. Because I believe it is reasonable to assume that the MG Defendants are generating more monthly subscription revenue than Peloton for its online streaming services, I believe it is reasonable to assume that any damages awarded in the above-captioned investigation will be greater than the $75 million licensing fee paid by Peloton.

41. I believe that my calculation of approximately $144.9 million in subscription fees that were generated from the online streamlining services provided via the website www.brazzers.com in the United States in July 2023 is conservative.

42. I believe that my calculation of approximately $144.9 million in subscription fees that were generated from the online streamlining services provided via the website www.brazzers.com in the United States in July 2023 is conservative based on my understanding that, unlike Peloton, the MG Defendants also generate advertising revenue from the online streamlining services provided via the website www.brazzers.com. That advertising revenue is not reflected in my calculation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September  7 , 2023 in   Chicago, Illinois

Thomas D. Vander Veen, Ph.D.

# EXHIBIT D-A



## Thomas D. Vander Veen, Ph.D.
**Managing Director**

Epsilon Economics                                          Office:   312.637.2960
111 South Wacker Drive; 50th Floor
Chicago, Illinois 60606

tvanderveen@epsiloneconomics.com

## Summary

Thomas Vander Veen specializes in the application of economics to intellectual property, international trade, and complex commercial disputes.  Dr. Vander Veen has served as an economic expert in U.S. Courts, state courts and before the U.S. International Trade Commission.

His expertise includes valuation of intellectual property; evaluation of economic damages related to patent, copyright and trademark infringement, false advertising, breach of contract, and theft of trade secrets; and economic analysis in section 337 intellectual property matters before the U.S. International Trade Commission.  Dr. Vander Veen's analysis of economic damages has included the development and analysis of consumer surveys.  His intellectual property experience also includes the evaluation of commercial success of patented products, including in ANDA actions.  He has studied market structure, competition, and performance of numerous pharmaceutical products, including pricing, marketing and promotion, and regulatory approval.  He has performed economic analysis in numerous industries, including medical devices, pharmaceuticals, consumer retail products, consumer electronic devices, semiconductors, software and automotive products.

Dr. Vander Veen served as the principal economic advisor to a Commissioner, and subsequently the Chairman, of the U.S. International Trade Commission.  He has taught economics and finance at Northwestern University and economics at Skidmore College.  He served as the Chairman of the Board of Directors of the Chicago Youth Centers. He serves as a Governing Member of the Chicago Symphony Orchestra Association and on the boards of several academic and non-profit institutions.

Appx000049



## Education

- Ph.D. (Economics), Brown University, 1998

- M.A. (Economics), Brown University, 1992

- B.A. (Economics and Mathematics), Calvin College, 1990

## Professional and Academic Experience

- Epsilon Economics
  Managing Director and Vice Chairman, 2022 – present
  Managing Director and President, 2015 – 2022

- REV Entertainment
  Senior Advisor, 2023 – present

- Northwestern University – McCormick School of Engineering and Applied Science
  Adjunct Lecturer, 2016

- Navigant Economics
  Managing Director and Principal, 2013 – 2015
  Director and Principal, 2010 – 2013

- LECG, LLC
  Senior Managing Economist, 2006 – 2010

- Wheaton College
  Adjunct Instructor of Economics – 2009

- Charles River Associates, Inc. / CRA International, Inc. / InteCap, Inc.
  Associate Principal, 2005 – 2006
  Associate, 2003 – 2005

- U.S. International Trade Commission
  Economist and Advisor to Commissioner Stephen Koplan, 1999 – 2003

- Skidmore College
  Assistant Professor of Economics, 1997 – 1999



## Professional Affiliations

- American Economic Association

- Licensing Executives Society

- International Trade Commission Trial Lawyers Association (Associate Member)

## Expert Testimony

1. Janssen Pharmaceuticals, Inc., et al. v. **Tolmar, Inc.**
   U.S. District Court – District of Delaware
   Case No. 1:21-cv-01784
   *Patent Infringement*

2. *Certain Bio-Layer Interferometers and Components Thereof*
   Sartorius BioAnalytical Systems, Inc. v. **Gator Bio, Inc.**
   U.S. International Trade Commission
   Investigation No. 337-TA-1344
   *Patent Infringement*

3. Epistar Corporation v. **Lowe's Companies, Inc. and Lowe's Home Centers, LLC**
   U.S. District Court – Central District of California
   Case No. 2:17-cv-03219 (Damages Retrial)
   *Patent Infringement*

4. *Certain Video Processing Devices and Products Containing the Same*
   VideoLabs, Inc. v. **ASUSTeK Computer Inc. and ASUS Computer International**
   U.S. International Trade Commission
   Investigation No. 337-TA-1323
   *Patent Infringement*

5. *Certain Movable Barrier Operator Systems and Components Thereof*
   Overhead Door Corporation and GMI Holdings, Inc v. **The Chamberlain Group, Inc.**
   U.S. International Trade Commission
   Investigation No. 337-TA-1209 (Enforcement Proceeding)
   *Patent Infringement*

6. *Certain Cellular Base Station Communication Equipment*
   **Apple Inc.** v. Ericsson Inc., et al.
   U.S. International Trade Commission
   Investigation No. 337-TA-1302
   *Patent Infringement*



7. *Core Orientation Systems*
   **Australian Mud Co. Pty Ltd., Reflex USA LLC** v. Boart Longyear Group Ltd., et al.
   U.S. International Trade Commission
   Investigation No. 337-TA-1309
   *Patent Infringement*

8. *Certain Playards and Strollers*
   **Graco Children's Products Inc., et al.** v. Baby Trend, Inc., et al.
   U.S. International Trade Commission
   Investigation No. 337-TA-1288
   *Patent Infringement*

9. *Certain High-Performance Gravity-Fed Water Filters and Products Containing Same*
   Brita LP v. **Zero Technologies LLC and Culligan International Co.**
   U.S. International Trade Commission
   Investigation No. 337-TA-1294
   *Patent Infringement*

10. *Certain Oil-Vaping Cartridges, Components Thereof, and Products Containing*
    **Shenzhen Smoore Technology Limited** v. Blinc Group Holdings, LLC, et al.
    U.S. International Trade Commission
    Investigation No. 337-TA-1286
    *Patent Infringement*

11. *Certain Flocked Swabs, Products Containing Flocked Swabs, and Methods of Using*
    Copan Industries, Inc., et al. v. **NEST Scientific Inc., et al.**
    U.S. International Trade Commission
    Investigation No. 337-TA-1279
    *Patent Infringement*

12. *Certain Video Security Equipment and Systems, Related Software, Components
    Thereof, and Products Containing Same*
    **Avigilon Corporation, Motorola Solutions, Inc., et al.** v. Verkada Inc.
    U.S. International Trade Commission
    Investigation No. 337-TA-1281
    *Patent Infringement*

13. *Certain Replacement Automotive Lamps*
    Kia Corporation and Kia America, Inc. v. **TYC Brother Industrial Co., Ltd.; Genera
    Corporation; LKQ Corporation; Keystone Automotive Industries, Inc.**
    U.S. International Trade Commission
    Investigation No. 337-TA-1291
    *Patent Infringement*



14. *Certain Replacement Automotive Lamps*
    Hyundai Motor Company, et al. v. **TYC Brother Industrial Co., Ltd.; Genera Corporation; LKQ Corporation; Keystone Automotive Industries, Inc.**
    U.S. International Trade Commission
    Investigation No. 337-TA-1292
    *Patent Infringement*

15. *Certain Wearable Electronic Devices with ECG Functionality and Components Thereof*
    AliveCor, Inc. v. **Apple Inc.**
    U.S. International Trade Commission
    Investigation No. 337-TA-1266
    *Patent Infringement*

16. *Certain Radio Frequency Transmission Devices and Components Thereof*
    **Zebra Technologies** v. OnAsset Intelligence, Inc.
    U.S. International Trade Commission
    Investigation No. 337-TA-1278
    *Patent Infringement*

17. *Certain Fitness Devices, Streaming Components Thereof and Systems*
    **DISH DBS Corporation, et al.** v. iFIT, Inc.; Peloton Interactive, Inc.; et al.
    U.S. International Trade Commission
    Investigation No. 337-TA-1265
    *Patent Infringement*

18. *Certain Portable Battery Jump Starters and Components Thereof*
    The NOCO Company v. **Schumacher Electric Corporation; et al.**
    U.S. International Trade Commission
    Investigation No. 337-TA-1256
    *Patent Infringement*

19. *Certain IP Camera Systems Including Video Doorbells and Components Thereof*
    **SkyBell Technologies, Inc. et al.** v. Vivint Smart Home, Inc.; SimpliSafe, Inc.; et al.
    U.S. International Trade Commission
    Investigation No. 337-TA-1242
    *Patent Infringement*

20. *Certain UMTS and LTE Cellular Communications Modules*
    Koninklijke Philips N.V, et al. v. **Thales DIS AIS USA, LLC, Thales DIA AIS Deutschland GmbH,** et al.
    U.S. International Trade Commission
    Investigation No. 337-TA-1240
    *Patent Infringement*



21. *Certain Radio Frequency Identification Products, Components Therefore, and Products Containing the Same*
**Amtech Systems, LLC** v. Kapsch TrafficCom AG, et al.
U.S. International Trade Commission
Investigation No. 337-TA-1234
*Patent Infringement*

22. *Certain Shingled Solar Modules, Components Thereof, and Methods for Manufacturing*
The Solaria Corporation v. **Canadian Solar Inc. and Canadian Solar (USA) Inc.**
U.S. International Trade Commission
Investigation No. 337-TA-1223
*Patent Infringement*

23. *Certain Artificial Eyelash Extension Systems, Products, and Components Thereof*
Lashify, Inc. v. **KISS Nail Products, Inc., Ulta Salon, Cosmetics & Fragrance, Inc., Walmart, Inc. and CVS Pharmacy, Inc.**
U.S. International Trade Commission
Investigation No. 337-TA-1226
*Patent Infringement*

24. Zimmer, Inc., et al. v. **Heraeus Medical LLC, et al.**
Kosciusko County Superior Court, State of Indiana, Marshall County
Cause No. 43D01-1802-PL-000021
*Trade Secret Misappropriation, Breach of Contract, Tortious Interference*

25. *Certain Variable Speed Wind Turbine Generators and Components Thereof*
General Electric Company v. **Siemens Gamesa Renewable Energy Inc., et al.**
U.S. International Trade Commission
Investigation No. 337-TA-1218
*Patent Infringement*

26. **Shure Incorporated, et al.** v. ClearOne, Inc.
U.S. District Court – District of Delaware
Civil Action No. 19-1343-RGA-CJB
*Patent Infringement, False Advertising, Tortious Interference, Unfair Competition*

27. Micro Focus (US), Inc., et al. v. **Insurance Services Office, Inc.**
U.S. District Court – District of Delaware
Case No. 15-252-RGA
*Breach of Contract, Copyright Infringement*

28. *Certain Movable Barrier Operator Systems and Components Thereof*
Overhead Door Corporation and GMI Holdings, Inc v. **The Chamberlain Group, Inc.**
U.S. International Trade Commission
Investigation No. 337-TA-1209
*Patent Infringement*



29. **Medline Industries, Inc.** v. C.R. Bard, Inc.
    U.S. District Court – Northern District of Illinois, Eastern Division
    Civil Action No. 1:17-cv-07216
    *Patent Infringement*

30. Arendi S.A.R.L. v. **LG Electronics, Inc., et al.**
    U.S. District Court – District of Delaware
    Case No. 1:12-cv-01595 (LPS)
    *Patent Infringement*

31. *Certain Electronic Devices, Including Streaming Players, Televisions, Set Top Boxes,*
    *Remote Controllers, and Components Thereof*
    Universal Electronics, Inc. v. **Roku, Inc., et al.**
    U.S. International Trade Commission
    Investigation No. 337-TA-1200
    *Patent Infringement*

32. *Certain Chemical Mechanical Planarization Slurries and Components Thereof*
    **CMC Materials, Inc.** v. DuPont de Nemours, Inc., et al.
    U.S. International Trade Commission
    Investigation No. 337-TA-1204
    *Patent Infringement*

33. *Certain Portable Gaming Console Systems with Attachable Handheld Controllers*
    Gamevice, Inc. v. **Nintendo Co., Ltd. and Nintendo of America, Inc.**
    U.S. International Trade Commission
    Investigation No. 337-TA-1197
    *Patent Infringement*

34. *Certain Lithium-Ion Battery Cells, Battery Modules, Battery Packs*
    **LG Chem, Ltd. and LG Chem Michigan Inc., et al.** v. SK Innovation Co., Ltd, et al.
    U.S. International Trade Commission
    Investigation No. 337-TA-1181
    *Patent Infringement*

35. *Certain Pouch-Type Battery Cells, Battery Modules, and Battery Packs*
    SK Innovation Co., Ltd, et al. v. **LG Chem, Ltd. and LG Chem Michigan Inc.**
    U.S. International Trade Commission
    Investigation No. 337-TA-1179
    *Patent Infringement*

36. *Certain Bone Cements and Bone Cement Accessories*
    Zimmer, Inc., et al. v. **Heraeus Medical GmbH and Heraeus Medical LLC**
    U.S. International Trade Commission
    Investigation No. 337-TA-1175
    *Trade Secret Misappropriation, False Advertising, Tortious Interference*



37. **Medline Industries, Inc.** v. C.R. Bard, Inc.
U.S. District Court – Northern District of Illinois, Eastern Division
Civil Action No. 1:16-cv-03529
*Patent Infringement*

38. *Certain Wireless Communication Devices and Related Components Thereof*
Innovation Sciences LLC v. **Resideo Technologies, Inc, HTC Corporation, et al.**
U.S. International Trade Commission
Investigation No. 337-TA-1180
*Patent Infringement*

39. ClearOne, Inc. v. **Shure Incorporated**
U.S. District Court – Northern District of Illinois, Eastern Division
Civil Action No. 1:17-cv-03078
*Patent Infringement*

40. *Certain Laparoscopic Surgical Staplers, Reload Cartridges, and Components Thereof*
Ethicon LLC, et al. v. **Intuitive Surgical, Inc., et al.**
U.S. International Trade Commission
Investigation No. 337-TA-1167
*Patent Infringement*

41. *Certain Foodservice Equipment and Components Thereof*
Illinois Tool Works Inc., et al. v. **Guangzhou Rebenet Catering Equipment Manufacturing Co., Ltd., et al.**
U.S. International Trade Commission
Investigation No. 337-TA-1166
*Patent Infringement*

42. *Certain Vehicle Security and Remote Convenience Systems and Components Thereof*
**DEI Holdings, Inc., Directed, LLC and Directed Electronics Canada Inc.** v.
Automotive Data Solutions, Inc. and Firstech, LLC
U.S. International Trade Commission
Investigation No. 337-TA-1152
*Patent Infringement*

43. *Certain Multi-Stage Fuel Vapor Canister Systems and Activated Carbon Components Thereof*
**Ingevity Corp. and Ingevity South Carolina, LLC** v. MAHLE Filter Systems North America, Inc., et al.
U.S. International Trade Commission
Investigation No. 337-TA-1140
*Patent Infringement*



44. Automotive Data Solutions, Inc. v. **Directed Electronics Canada Inc., DEI Holdings, Inc. and Directed, LLC**
U.S. District Court – Central District of California
No. 2:18-cv-01560-GW
*Patent Infringement, Copyright Infringement, Trade Secret Misappropriation*

45. **Medline Industries, Inc.** v. C.R. Bard, Inc.
U.S. District Court – Northern District of Illinois, Eastern Division
Civil Action No. 1:14-cv-03618
*Patent Infringement*

46. *Certain Unmanned Aerial Vehicles and Components Thereof*
**Autel Robotics USA LLC** v. SZ DJI Technology Co. Ltd., DJI Technology Inc., et al.
U.S. International Trade Commission
Investigation No. 337-TA-1133
*Patent Infringement*

47. *Certain Wireless Mesh Networking Products and Related Components Thereof*
SIPCO LLC v. **Emerson Electric Co.**, et al.
U.S. International Trade Commission
Investigation No. 337-TA-1131
*Patent Infringement*

48. *Certain Motorized Vehicles and Components Thereof*
**FCA US LLC** v. Mahindra & Mahindra Ltd.; Mahindra Automotive North America, Inc.
U.S. International Trade Commission
Investigation No. 337-TA-1132
*Trademark and Trade Dress Infringement*

49. *Certain Magnetic Data Storage Tapes and Cartridges Containing the Same*
**Fujifilm Corporation, et al** v. Sony Corporation, et al.
U.S. International Trade Commission
Investigation No. 337-TA-1012 (Enforcement Proceeding)
*Patent Infringement*

50. Core Wireless Licensing S.A.R.L. v. **LG Electronics, Inc. and LG Electronics Mobilecomm U.S.A., Inc.**
U.S. District Court – Eastern District of Texas, Marshall Division
Case No. 2:14-cv-912-JRG-RSP (Damages Retrial)
*Patent Infringement*

51. *Certain Microfluidic Systems and Components Thereof and Products Containing Same*
**10X Genomics, Inc.** v. Bio-Rad Laboratories, Inc.
U.S. International Trade Commission
Investigation No. 337-TA-1100
*Patent Infringement*



52. *Certain Memory Modules and Components Thereof, and Products Containing Same*
Netlist Inc. v. **SK hynix Inc., SK hynix America, Inc. et al.**
U.S. International Trade Commission
Investigation No. 337-TA-1089
*Patent Infringement*

53. *Certain Strontium-Rubidium Radioisotope Infusion Systems and Components Thereof Including Generators*
Bracco Diagnostics Inc. v. **Jubilant DraxImage Inc. et al.**
U.S. International Trade Commission
Investigation No. 337-TA-1110
*Patent Infringement*

54. Rick C. Sasso, M.D. v. **Warsaw Orthopedic, Inc., Medtronic, Inc., et al.**
Plymouth Circuit Court, State of Indiana, Marshall County
Cause No. 50C01-1806-PL-000027
*Breach of Contract*

55. **VIZIO, Inc.** v. Nichia Corporation
The United States Patent and Trademark Office, Patent Trial and Appeal Board
Case Nos. IPR2017-01608 and IPR2017-01623
*Patent Review*

56. Epistar Corporation v. **Lowe's Companies, Inc. and Lowe's Home Centers, LLC**
U.S. District Court – Central District of California
Case No. 2:17-cv-03219
*Patent Infringement*

57. *Certain Gas Spring Nailer Products and Components Thereof*
Kyocera Senco Brands Inc. v. **Hitachi Koki U.S.A., Ltd.**
U.S. International Trade Commission
Investigation No. 337-TA-1082
*Patent Infringement*

58. *Certain Clidinium Bromide and Products Containing Same*
**Valeant Pharmaceuticals North America LLC et al.** v. ECI Pharmaceuticals, et al.
U.S. International Trade Commission
Investigation No. 337-TA-1109
*False Advertising, Unfair Competition*

59. Nuance Communications, Inc. et al. v. **Pindrop Security, Inc.**
U.S. District Court – Eastern District of Virginia, Alexandria Division
Civil Action No. 1:17cv1193 (CMH/IDD)
*Breach of Contract, Copyright Infringement, Unfair Competition*



60. *Certain Batteries and Electrochemical Devices Containing Composite Separators, Components Thereof, and Products Containing the Same*
**LG Chem, Ltd., et al** v. Amperex Technology Limited, et al.
U.S. International Trade Commission
Investigation No. 337-TA-1087
*Patent Infringement*

61. *Certain Automated Teller Machines, ATM Modules, Components Thereof, and Products Containing the Same*
**Nautilus Hyosung, Inc., et al.** v. Diebold Nixdorf, Incorporated, et al.
U.S. International Trade Commission
Investigation No. 337-TA-989 (Enforcement Proceeding)
*Patent Infringement*

62. *Certain Electrochemical Glucose Monitoring Systems and Components Thereof*
Dexcom, Inc. v. **AgaMatrix, Inc.**
U.S. International Trade Commission
Investigation No. 337-TA-1075
*Patent Infringement*

63. *Certain Magnetic Data Storage Tapes and Cartridges Containing the Same*
**Fujifilm Corporation, et al** v. Sony Corporation, et al.
U.S. International Trade Commission
Investigation No. 337-TA-1076
*Patent Infringement*

64. *Certain Solid State Storage Drives, Stacked Electronics Components, and Products Containing Same*
BiTMICRO, LLC v. **SK hynix Inc., Samsung Semiconductor, Inc. et al.**
U.S. International Trade Commission
Investigation No. 337-TA-1097
*Patent Infringement*

65. *Certain Robotic Vacuum Cleaning Devices and Components Thereof*
**iRobot Corporation** v. Bissell Homecare, Inc., Hoover, Inc., et al.
U.S. International Trade Commission
Investigation No. 337-TA-1057
*Patent Infringement*

66. *Certain Magnetic Tape Cartridges and Components Thereof*
Sony Corporation, et al. v. **Fujifilm Corporation, et al.**
U.S. International Trade Commission
Investigation No. 337-TA-1058
*Patent Infringement*



67. *Certain Semiconductor Devices and Consumer Audiovisual Products Containing Same*
Broadcom Corporation v. **MediaTek Inc., MediaTek USA Inc. and MStar Semiconductor Inc.**
U.S. International Trade Commission
Investigation No. 337-TA-1047
*Patent Infringement*

68. *Certain Digital Cable and Satellite Products, Set-Top Boxes, Gateways, and Components Thereof*
Sony Corporation, et al. v. **ARRIS International plc, Pace Americas LLC, et al.**
U.S. International Trade Commission
Investigation No. 337-TA-1049
*Patent Infringement*

69. *Certain Graphics Systems, Components Thereof, and Consumer Products Containing the Same*
ATI Technologies ULC, et al. v. **VIZIO, MediaTek Inc., Sigma Designs, Inc., et al.**
U.S. International Trade Commission
Investigation No. 337-TA-1044
*Patent Infringement*

70. *Certain Magnetic Tape Cartridges and Components Thereof*
Sony Corporation, et al. v. **Fujifilm Corporation, et al.**
U.S. International Trade Commission
Investigation No. 337-TA-1036
*Patent Infringement*

71. **Huawei Technologies Co. Ltd.** v. T-Mobile US, Inc. and T-Mobile USA, Inc.
U.S. District Court – Eastern District of Texas, Marshall Division
Case Nos. 2:16-cv-00052-JRG-RSP, 2:16-cv-00055-JRG-RSP, 2:16-cv-00056-JRG-RSP, and 2:16-cv-00057-JRG-RSP
*Patent Infringement*

72. **Amneal Pharmaceuticals, LLC** v. Purdue Pharma L.P., et al.
The United States Patent and Trademark Office, Patent Trial and Appeal Board
Case Nos. IPR2016-01027 and IPR2016-01028
*Patent Review*

73. *Certain Audio Processing Hardware, Software, and Products Containing the Same*
Andrea Electronics Corporation v. **Apple Inc., Samsung Electronics Co., Ltd. et al.**
U.S. International Trade Commission
Investigation No. 337-TA-1026
*Patent Infringement*

Appx000060



74. *Certain Sleep-Disordered Breathing Treatment Mask Systems*
**ResMed Corp.; ResMed Inc.; et al.** v. Fisher & Paykel Healthcare, Inc. et al.
U.S. International Trade Commission
Investigation No. 337-TA-1022
*Patent Infringement*

75. *Certain Memory Modules and Components Thereof*
Netlist Inc. v. **SK hynix Inc., SK hynix America, Inc. et al.**
U.S. International Trade Commission
Investigation No. 337-TA-1023
*Patent Infringement*

76. Audio MPEG, Inc. et al. v. **Dell, Inc.**
U.S. District Court – District of Virginia
Case No. 2:15-cv-73 (HCM/RJK)
*Patent Infringement*

77. *Certain Mobile Electronic Devices Incorporating Haptics*
Immersion Corporation v. **Apple Inc. and AT&T Mobility LLC**
U.S. International Trade Commission
Investigation No. 337-TA-1004/990
*Patent Infringement*

78. Nokia Technologies LTD v. **LG Electronics Inc.**
ICC International Court of Arbitration
ICC Case No. 22326/EMT/GR

79. *Certain Magnetic Data Storage Tapes and Cartridges Containing the Same*
**Fujifilm Corporation, et al** v. Sony Corporation, et al.
U.S. International Trade Commission
Investigation No. 337-TA-1012
*Patent Infringement*

80. *Certain Silicon-On-Insulator Wafers*
Silicon Genesis Corporation v. **Soitec S.A.**
U.S. International Trade Commission
Investigation No. 337-TA-1025
*Patent Infringement*

81. *Certain Sleep-Disordered Breathing Treatment Systems and Components Thereof*
**ResMed Corp.; ResMed Inc.; and ResMed Ltd.** v. BMC Medical Co., Ltd. et al.
U.S. International Trade Commission
Investigation No. 337-TA-997
*Patent Infringement*



82. *Certain Automated Teller Machines, ATM Modules, Components Thereof, and Products Containing the Same*
    **Nautilus Hyosung, Inc., et al.** v. Diebold, Incorporated, et al.
    U.S. International Trade Commission
    Investigation No. 337-TA-989
    *Patent Infringement*

83. Core Wireless Licensing S.A.R.L. v. **LG Electronics, Inc. and LG Electronics Mobilecomm U.S.A., Inc.**
    U.S. District Court – Eastern District of Texas, Marshall Division
    Case No. 2:14-cv-912-JRG-RSP
    *Patent Infringement*

84. *Certain RF Capable Integrated Circuits and Products Containing the Same*
    ParkerVision, Inc. v. **Qualcomm Incorporated; Apple Inc.; LG Electronics, Inc.; Samsung Electronics Co., Ltd.; et al.**
    U.S. International Trade Commission
    Investigation No. 337-TA-982
    *Patent Infringement*

85. *Certain Automated Teller Machines, ATM Modules, Components Thereof, and Products Containing Same*
    Diebold, Incorporated, et al. v. **Nautilus Hyosung, Inc., et al.**
    U.S. International Trade Commission
    Investigation No. 337-TA-972
    *Patent Infringement*

86. *Certain Wearable Activity Tracking Devices, Systems, and Components Thereof*
    Fitbit, Inc. v. **AliphCom, Inc. d/b/a/ Jawbone and BodyMedia, Inc.**
    U.S. International Trade Commission
    Investigation No. 337-TA-973
    *Patent Infringement*

87. Oracle USA, Inc. et al. v. **Rimini Street, Inc. and Seth Ravin**
    U.S. District Court – District of Nevada
    Case No. 2:10-cv-0106-LRH-PAL
    *Copyright Infringement*

88. Core Wireless Licensing S.A.R.L. v. **LG Electronics, Inc. and LG Electronics Mobilecomm U.S.A., Inc.**
    U.S. District Court – Eastern District of Texas, Marshall Division
    Case No. 2:14-cv-911-JRG-RSP
    *Patent Infringement*

Appx000062



89. *Certain Variable Valve Actuation Devices and Automobiles Containing the Same*
Jacobs Vehicle Systems, Inc. v. **Fiat Chrysler Automobiles N.V.; FCA US LLC, et al.**
U.S. International Trade Commission
Investigation No. 337-TA-954
*Patent Infringement*

90. Zimmer, Inc. v. **Stryker Corporation; Howmedica Osteonics Corp.; et al.**
U.S. District Court – Northern District of Indiana
Case No. 3:14-cv-00152-JD-CAN
*Breach of Contract, Breach of Fiduciary Duty, Unfair Competition, Tortious Interference*

91. *Certain Electronic Devices, Including Wireless Communication Devices, Computers, Tablet Computers, Digital Media Players, and Cameras*
Ericsson Inc. and Telefonaktiebolaget LM Ericsson v. **Apple Inc.**
U.S. International Trade Commission
Investigation No. 337-TA-952
*Patent Infringement*

92. *Certain Lithium Metal Oxide Cathode Materials, Lithium-Ion Batteries for Power Tool Products Containing Same, and Power Tool Products with Lithium-Ion Batteries Containing Same*
BASF Corporation and UChicago Argonne, LLC v. **Umicore S.A.; Umicore USA, Inc.**; et al.
U.S. International Trade Commission
Investigation No. 337-TA-951
*Patent Infringement*

93. *Certain Network Devices, Related Software and Components Thereof (II)*
Cisco Systems, Inc. v. **Arista Networks, Inc.**
U.S. International Trade Commission
Investigation No. 337-TA-945
*Patent Infringement*

94. *Certain Light-Emitting Diode Products and Components Thereof*
Cree, Inc. v. **Feit Electric Co. Inc.; Unity Opto Technology, Co. Ltd.; et al.**
U.S. International Trade Commission
Investigation No. 337-TA-947
*Patent Infringement, False Advertising*

95. *Certain Three-Dimensional Cinema Systems and Components Thereof*
RealD, Inc. v. **MasterImage 3D, Inc. and MasterImage 3D Asia, LLC**
U.S. International Trade Commission
Investigation No. 337-TA-939
*Patent Infringement*



96. *Certain Network Devices, Related Software and Components Thereof (I)*
Cisco Systems, Inc. v. **Arista Networks, Inc.**
U.S. International Trade Commission
Investigation No. 337-TA-944
*Patent Infringement*

97. **LG Chem, LTD.** v. Celgard, LLC
The United States Patent and Trademark Office, Patent Trial and Appeal Board
Case No. IPR2014-00692
*Patent Review*

98. Pfizer Inc. and UCB Pharma GMBH v. **Alkem Pharmaceuticals, Inc. et al.**
U.S. District Court – District of Delaware
Case No. 1:13-cv-01110-GMS
*Patent Infringement*

99. *Certain Consumer Electronics and Display Devices with Graphics Processing and Graphics Processing Units Therein*
NVIDIA Corporation v. **Qualcomm Inc.;** Samsung Electronics Co., Ltd.; et al.
U.S. International Trade Commission
Investigation No. 337-TA-932
*Patent Infringement*

100. **Heckler & Koch, Inc., Heckler & Koch GmbH, et al.** v. German Sport Guns GmbH and American Tactical Imports, Inc.
U.S. District Court – Southern District of Indiana
Case No. 1:11-CV-1108 SEB-TAB
*Breach of Contract, Tortious Interference*

101. *Certain Television Sets, Television Receivers, Television Tuners, and Components Thereof*
Cresta Technology Corporation v. **Silicon Laboratories Inc.; MaxLinear, Inc.; et al.**
U.S. International Trade Commission
Investigation No. 337-TA-910
*Patent Infringement*

102. *Certain Non-Volatile Memory Devices and Products Containing Same*
Macronix International Co., Ltd. et al. v. **Spansion, Inc. et al.**
U.S. International Trade Commission
Investigation No. 337-TA-909
*Patent Infringement*



103. *Certain Soft-Edged Trampolines and Components Thereof*
**Springfree Trampoline, Inc. et al.** v. Vuly Trampolines Pty. Ltd.
U.S. International Trade Commission
Investigation No. 337-TA-908
*Patent Infringement*

104. *Certain Optical Disc Drives, Components Thereof and Products Containing Same*
Optical Devices, LLC v. **Lenovo Group Ltd.; LG Electronics, Inc.; et al.**
U.S. International Trade Commission
Investigation No. 337-TA-897
*Patent Infringement*

105. *Certain Sleep-Disordered Breathing Treatment Systems and Components Thereof*
**ResMed Corp.; ResMed Inc.; and ResMed Ltd.** v. BMC Medical Co., Ltd. et al.
U.S. International Trade Commission
Investigation No. 337-TA-890
*Patent Infringement*

106. United Therapeutics Corporation v. **Sandoz, Inc.**
U.S. District Court – District of New Jersey
Civil Action No. 12-1617
*Patent Infringement*

107. *Certain Microelectromechanical Systems ("MEMS Devices") and Products Containing the Same*
STMicroelectronics, Inc. v. **InvenSense, Inc.; Roku, Inc.; and Black & Decker, Inc.**
U.S. International Trade Commission
Investigation No. 337-TA-876
*Patent Infringement*

108. *Certain Wireless Communications Equipment and Articles Therein*
**Samsung Electronics Co. Ltd., et al.** v. Ericsson Inc. et al.
U.S. International Trade Commission
Investigation No. 337-TA-866
*Patent Infringement*

109. *Certain Wireless Devices with 3G and/or 4G Capabilities and Components Thereof*
InterDigital Communications, Inc. et al. v. **Huawei Technologies Co., Ltd., et al.**
U.S. International Trade Commission
Investigation No. 337-TA-868
*Patent Infringement*

Appx000065



110. *Certain Electronic Devices, Including Wireless Communication Devices, Tablet Computers, Media Players, and Televisions, and Components Thereof*
Ericsson Inc. et al. v. **Samsung Electronics Co. Ltd., et al.**
U.S. International Trade Commission
Investigation No. 337-TA-862
*Patent Infringement*

111. *Reduced Folate Nutraceutical Products and L-methylfolate Raw Ingredients*
**Merck & Cie, Pamlab, LLC, et al.** v. Macoven Pharmaceuticals, Inc. et al.
U.S. International Trade Commission
Investigation No. 337-TA-857
*Patent Infringement*

112. *Certain Wireless Consumer Electronics Devices and Components Thereof*
Technology Properties Limited LLC et al. v. **Acer Inc.; Amazon.com; et al.**
U.S. International Trade Commission
Investigation No. 337-TA-853
*Patent Infringement*

113. *Certain Audiovisual Components and Products Containing the Same*
LSI Corporation and Agere Systems, Inc. v. **Funai Electric Co., Ltd., et al.**
U.S. International Trade Commission
Investigation No. 337-TA-837
*Patent Infringement*

114. *Certain Electronic Imaging Devices*
FlashPoint Technology, Inc. v. **ZTE Corporation,** et al.
U.S International Trade Commission
Investigation No. 337-TA-850
*Patent Infringement*

115. *Certain Consumer Electronics and Display Devices and Products Containing Same*
Graphics Properties Holdings, Inc. v. **Research in Motion Corp.** et al.
U.S International Trade Commission
Investigation No. 337-TA-836
*Patent Infringement*

116. *Certain Food Waste Disposers and Components and Packaging Thereof*
Emerson Electric Co. v. **Anaheim Manufacturing Co. et al.**
U.S. International Trade Commission
Investigation No. 337-TA-838
*Patent Infringement, Trade Dress Infringement*



117. *Certain Electronic Digital Media Devices and Components Thereof*
Apple, Inc. v. **Samsung Electronics Co., Ltd. et al.**
U.S. International Trade Commission
Investigation No. 337-TA-796
*Patent Infringement*

118. **Del Monte International GmbH** v. Del Monte Philippines, Inc. and GTL Limited
American Arbitration Association
*Breach of Contract*

119. Galderma Laboratories, L.P. et al. v. **Tolmar, Inc. and Actavis Mid Atlantic LLC**
U.S. District Court – District of Delaware
C.A. No. 10-cv-45 (LPS)
*Patent Infringement*

120. *Certain Semiconductor Chips and Products Containing Same*
Rambus, Inc. v. **Freescale Semiconductor, Inc. et al.**
U.S. International Trade Commission
Investigation No. 337-TA-753
*Patent Infringement*

121. *Certain Printing and Imaging Devices and Components Thereof*
**Ricoh Company, Ltd. et al.** v. Oki Data Corporation et al.
U.S. International Trade Commission
Investigation No. 337-TA-690
*Patent Infringement*

122. *MEMS Devices and Products Containing the Same*
Analog Devices, Inc. v. **Knowles Electronics LLC,** et al.
U.S. International Trade Commission
Investigation No. 337-TA-700
*Patent Infringement*

123. **Software Tree, LLC** v. Red Hat, Inc., et al.
U.S. District Court – Eastern District of Texas
6:09-cv-00097-LED
*Patent Infringement*

124. *Certain MLC Flash Memory Devices and Products Containing Same*
**BTG International Inc.** v. Samsung Electronics Co., Ltd. et al.
U.S. International Trade Commission
Investigation No. 337-TA-683
*Patent Infringement*



125. *Certain Silicon Microphone Packages, and Products Containing The Same*
**Knowles Electronics, LLC** v. Analog Devices, Inc.
U.S. International Trade Commission
Investigation No. 337-TA-695
*Patent Infringement*

126. *Certain Automotive Multimedia Display and Navigation Systems, Components Thereof, and Products Containing Same*
Honeywell International, Inc. v. **Alpine Electronics, Inc.; Pioneer Corporation**
U.S. International Trade Commission
Investigation No. 337-TA-657
*Patent Infringement*

127. O'Gara—Hess & Eisenhardt Armoring Company LLC v. **Ibis Tek, LLC et al.**
Common Pleas Court of Butler County, Ohio
CV 2006 04 1157
*Misappropriation of Confidential and Trade Secret Information*

128. Multimatic, Inc. v. **Faurecia Interior Systems USA, Inc**.
U.S. District Court – Eastern District of Michigan
05-60120
*Breach of Contract*

129. Eaton Corporation v. **ZF Meritor LLC, et al.**
U.S. District Court – Eastern District of Michigan
03-74844
*Patent Infringement*

130. *Certain Automated Mechanical Transmission Systems for Medium-Duty and Heavy-Duty Trucks, and Components Thereof*
Eaton Corporation v. **ZF Meritor LLC, et al.**
U.S. International Trade Commission
Investigation No. 337-TA-503
*Patent infringement*

131. *Certain Shirts with Pucker Free Seams and Methods of Producing Same*
TALTECH Limited, et al. v. **Esquel Apparel, Inc. et al.**
U.S. International Trade Commission
Investigation No. 337-TA-517
*Patent infringement*

132. *Certain Universal Transmitters for Garage Door Openers*
**The Chamberlain Group, Inc.** v. Skylink Technologies, Inc. et al.
U.S. International Trade Commission
Investigation No. 337-TA-497
*Patent Infringement, Digital Millennium Copyright Act*



## Publications and Presentations

1. *"*Forum: Valuation and damages in IP disputes," *Financier Worldwide*, January 2017.

2. Speaker, *The Uncertain Future of At-Risk Launches: A Study of Injunctive Relief, Damages and the Impact of Protonix,* American Conference Institute's Second Annual Paragraph VI Disputes Master Symposium, Chicago, IL. October 1, 2014.

3. Speaker, *Valuation of Innovation Product and Intellectual Property Based Assets,* Institute of Food Technologists Pre-Annual Meeting Short Course: Commercializing Innovation in Food Products, New Orleans, LA. June 21, 2014.

4. Speaker, *Valuation of Innovation Product and Intellectual Property Based Assets,* Institute of Food Technologists Annual Meeting: Food Expo Forum, Chicago, IL. July 16, 2013.

5. Speaker, *Uniloc USA, Inc. v. Microsoft Corp.: The End of the 25% Rule,* Licensing Executives Society Aerospace and Transportation Committee Webinar, August 1, 2012.

6. "Can We 'Spot' Price-Fixing from Price Patterns?" The *Economics Committee Newsletter*, American Bar Association Section of Antitrust Law, Vol. 12, No. 1, pages 3-6 (Summer 2012).

7. Speaker, *Valuation of Innovation Product and Intellectual Property Based Assets,* Institute of Food Technologists Pre-Annual Meeting Short Course: Commercializing Innovation in Food Products, Las Vegas, NV. June 25, 2012.

8. Guest Lecturer, Patent Litigation, Chicago-Kent College of Law.  March 6, 2012.

9. Panel Speaker, *Damages*, 12th Annual Silicon Valley Advanced Patent Law Institute, Palo Alto, CA.  December 9, 2011.

10. Speaker, *Technical Session: Intellectual Property Perspective, Patents & Valuation,* Chicago Section – Institute of Food Technologists, River Forest, IL.  June 22, 2011.

11. Guest Lecturer, IP Litigation, John Marshall Law School.  March 2, 2011.

12. Speaker, *Recent Developments at the U.S. International Trade Commission*, AIPPI-US Annual Meeting and International IP Forum, Chicago, IL.  November 8, 2010.

13. Instructor, *Intellectual Asset Management: Valuation*, Licensing Executives Society Professional Development Series: Intermediate, Chicago, IL.  July 14, 2010.



14. Instructor, *Intellectual Asset Management: Valuation*, Licensing Executives Society Professional Development Series: Intermediate, Toronto, ON.  July 16, 2008.

15. Instructor, *Intellectual Asset Management: Valuation*, Licensing Executives Society Professional Development Series: Intermediate, San Francisco, CA.  March 5, 2008.

16. Panel Speaker, *Potential Impact of the Proposed Legislative Changes to Infringement Remedies and Patent Practice*, Los Angeles Intellectual Property Law Association: Washington in the West Conference, Los Angeles, CA.  January 30, 2008.

17. Instructor, *Valuation of Intellectual Property*, Practicing Law Institute: Annual Patent Law Institute, San Francisco, CA.  January 29, 2008.

18. Instructor, *Advanced Valuation Skills*, Licensing Executives Society Professional Development Series: Intellectual Asset Management Advanced Series, Philadelphia, PA.  June 13-14, 2007.

19. Instructor, *Advanced Valuation Skills*, Licensing Executives Society Professional Development Series: Intellectual Asset Management Advanced Series, San Francisco, CA.  November 1-2, 2006.

20. Guest Lecturer, *Financial Issues for Engineers*, Master of Engineering Management Program, Northwestern University.  March 2006.

21. "AFDC and Births to Unwed Women."  With Kurt C. Schaefer and Sarah E. Hamersma. *Labour Economics*.  9, pages 801-813 (2002).

22. "Optimal Contracts for Teams: A Note on the Results of McAfee and McMillan." *International Economic Review*.  36(4), pages 1051-6 (November 1995).

# EXHIBIT D-B

# EXHIBIT B

DocuSign Envelope ID: 0U4U2ZDA-4H84-4ACB-B21F-1HC42FD18CB4

PUBLIC VERSION

*Execution Copy*

## SETTLEMENT, PATENT LICENSE, AND RELEASE AGREEMENT

This Settlement, Patent License and Release Agreement (this **"Agreement"**) is made and effective as of the last date signed by the below signatories (the **"Effective Date"**) by, between and among: (1) DISH DBS Corporation, a corporation organized and existing under the laws of the State of Colorado and having a principal place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112 (**"DDBS"**), Sling TV L.L.C., a limited liability company organized and existing under the laws of the State of Colorado and having a principal place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112 (**"Sling"**), and DISH Technologies L.L.C., a limited liability company organized and existing under the laws of the State of Colorado and having a principal place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112 (**"DISH,"** and together with DDBS and Sling, collectively, the **"Licensors"**), on the one hand, and (2) Peloton Interactive, Inc., a company organized under the laws of Delaware and having a place of business at 441 Ninth Avenue, 6th Floor, New York, NY 10001 (**"Peloton"** or **"Licensee"**), on the other hand.  The Licensors and Licensee are sometimes referred to herein as a **"Party"** and together as the **"Parties."**

### RECITALS

WHEREAS, DISH owns by valid assignment the entire right, title, and interest in and to a portfolio of United States and foreign patents and patent applications relating to adaptive bit rate streaming (collectively, the **"ABR Patents,"** as defined below);

WHEREAS, Sling is the exclusive licensee with the right to sublicense the ABR Patents;

WHEREAS, the United States International Trade Commission (**"ITC"**) instituted Investigation No. 337-TA-1265 against Peloton on May 19, 2021 (the **"Investigation"**);

WHEREAS, DISH and Sling filed a complaint for patent infringement against Peloton in the U.S. District Court for the Eastern District of Texas, Case No. 2:21-cv-00132, on April 13, 2021 (the **"Texas Case"**) (referred to with the Investigation collectively as the **"Lawsuits"**); and

WHEREAS, the Parties now desire to settle the Lawsuits and enter into this Agreement in order to provide for (a) a full, final, complete, and global settlement of the Lawsuits, and (b) worldwide freedom to operate and complete peace for Licensee, its predecessors, predecessor owners of all products and services, its divested businesses, and their past, present, and future customers and supply chain participants with respect to Peloton Licensed Products and Services (as defined below), in all cases on, before, and after the Effective Date and in each case (items (a) and (b)) on the terms and conditions set forth herein.

DocuSign Envelope ID: 004B22DA-4B64-4ACB-821F-F8C42FD16C64

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing and the covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, do hereby agree as follows:

### Article 1.    DEFINITIONS

**Section 1.01** **"ABR Patent(s)"** means (a) the patents and patent applications listed in Schedule A, (b) any and all patents and patent applications relating to or claiming any aspect of Adaptive Bitrate Streaming (i) that are owned by Licensors or any of their Affiliates at any time or (ii) under which Licensors or any of their Affiliates at any time have the contractual right to license to third parties; and (c) any and all related parent and child patents or applications of the foregoing in clauses (a) and (b), including any and all reissue patents, reexamination certificates, continuations, continuations-in-part, divisionals and/or foreign counterparts already in existence or that come into existence in the future claiming priority to any of the foregoing patents or their underlying applications.

**Section 1.02** **"ABR Patent License"** has the meaning set forth in Section 2.01.

**Section 1.03** **"Accused Products"** means the products and services of the Licensee and its Affiliates that have been (a) accused or identified by the Licensors in the Lawsuits or any related proceedings including before CBP, and/or (b) the subject of any exclusion order, cease and desist order, consent order, seizure and forfeiture order or other order, notice, or determination issued by the ITC in connection with the Investigation, including (i) any component, module or portion of the foregoing in clauses (a) and (b) whether made by or for Licensee or sourced by Licensee from third parties; and (ii) any natural growth or evolution of the foregoing in clauses (a) and (b), in each case whether or not they are rebranded.

**Section 1.04** **"Adaptive Bitrate Streaming"** has the same meaning in this Agreement as the meaning ascribed to the term in the Commission Opinion, *In the Matter of Certain Fitness Devices, Streaming Components Thereof, and Systems Containing Same*, March 23, 2023 (ITC Inv. No. 337-TA-1265), pages 8-10.

**Section 1.05** **"Affiliate(s)"** means any Person that, directly or indirectly through one or more intermediaries, now or in the future, Controls, is Controlling, is Controlled by or under common Control with another Person; provided that, as to common Control, DDBS's, Sling's and DISH's Affiliates shall not include EchoStar Corporation or any of its direct or indirect subsidiaries.

**Section 1.06** **"Agreement"** has the meaning set forth in the introduction.

**Section 1.07** **"Assert," "Asserted,"** and **"Assertion"** mean to commence or prosecute a Claim, whether in the United States or abroad, or to threaten in writing to do so.

**Section 1.08** **"Claims"** means any and all manner of actions, causes of action, claims, compensation, controversies, costs, damages, debts, demands, expenses, liens, liabilities, losses, investigations, rights or suits, including claims or suits for contribution and/or indemnity, of every kind, nature or description whatsoever, whether foreseen or unforeseen, known or unknown, fixed or contingent, asserted or un-asserted, direct or

indirect, liquidated or un-liquidated, at law or in equity.

**Section 1.09 "Content"** means any and all past, present, and future electronic media, text, graphics, images, music, audio, video, software, data compilations, works of authorship and any other form of data, media, or information, including Third Party Content.

**Section 1.10 "Control," "Controlled," or "Controlling"** means (a) when used with respect to any patent application or any patent, possession of the right, whether directly or indirectly through multiple tiers, and whether by ownership, license, contract or otherwise, to assign, or grant a license, covenant not to sue, sublicense or other right to or under such patent application or patent; and (b) when used with respect to any Person, the ability to direct the management and/or policies of such Person, whether through the ownership of voting securities or by contract or otherwise, and shall without limitation be deemed to exist upon the ownership of securities entitling the holder thereof to exercise more than 50% of the voting power in the election of directors of such Person.

**Section 1.11 "CBP"** means U.S. Customs and Border Protection.

**Section 1.12 "DDBS"** has the meaning set forth in the introduction.

**Section 1.13 "Development-Supply Chain"** means the business operations, hardware, software or systems involved in (a) moving the Peloton Licensed Products and Services from development to a commercial product or service that is sold, rented, licensed or otherwise Transferred to End Users; and (b) supporting, maintaining, hosting and providing other ongoing services for such Peloton Licensed Products and Services.

**Section 1.14 "DISH"** has the meaning set forth in the introduction

**Section 1.15 "Effective Date"** has the meaning set forth in the introduction.

**Section 1.16 "End User"** has the meaning set forth in Section 2.01(b).

**Section 1.17 "Existing DISH Patent"** means any patent now or hereafter owned or Controlled by a Licensor or any other Licensor Group Party that has any application filing date or priority date that is before the Effective Date.

**Section 1.18 "Existing DISH Products and Services"** means the satellite television, internet protocol television, internet service provider, live television streaming, and app-based television streaming and related products and services, in each case, that are offered by the Licensors as of the Effective Date; provided, however, that the term "Existing DISH Products and Services" shall not include any product or service in the Fitness Field of Use.

**Section 1.19 "Fitness Field of Use"** means the development, manufacture, sale, distribution, marketing, promotion, licensing, or provision of products, services, or technologies, whether tangible or intangible, related to or encompassing the exercise, physical fitness, diet and nutrition, meditation, and health and wellness industries, including exercise equipment, digital and physical fitness Content, personal training, group or individual fitness classes, fitness applications, fitness VR and AR software and services, fitness websites, fitness games, fitness tracking and goal-setting, strength products, personalized workout plans, wearables, related accessories, and other fitness-related activities and instrumentalities.

DocuSign Envelope ID: 004D22DA-4B64-4AC8-821F-F8C42FD16C64

**Section 1.20** "**Investigation**" has the meaning set forth in the Recitals.

**Section 1.21** "**Licensors**" has the meaning set forth in the introduction.

**Section 1.22** "**Licensor Group Party**" means (a) each Licensor and each of their respective Affiliates; (b) the predecessors, successors, assigns of the foregoing in clause (a); and (c) any Transferee of a patent application or patent that is subject to the licenses and/or covenants not to sue granted in this Agreement.

**Section 1.23** "**Licensee**" has the meaning set forth in the introduction.

**Section 1.24** "**Licensee Group Party**" means (a) Licensee and its Affiliates and its and their respective predecessors; (b) the respective officers, directors, managers, members, employees, agents, experts, representatives, consultants and attorneys of the foregoing in clause (a), solely in their capacities as such; (c) the Supply Chain Entities , solely in their capacities as such; (d) the End Users, solely in their capacities as such.

**Section 1.25** "**Non-Party(ies)**" means any Person other than the Parties to this Agreement and their Affiliates.

**Section 1.26** "**Party(ies)**" has the meaning set forth in the introduction.

**Section 1.27** "**Peloton Licensed Products and Services**" means:

(a)  the Accused Products; and

(b)  products, services, Content, applications, and other technology (and in each case any component, module or portion thereof, and in each case whether previously existing, now existing, or hereafter developed) of Licensee or any other Licensee Group Party.

**Section 1.28** "**Person**" means any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, or other legal entity or organization, including any Party.

**Section 1.29** "**Settlement Payment**" has the meaning set forth in Section 4.01.

**Section 1.30** "**Sling**" has the meaning set forth in the introduction.

**Section 1.31** "**Supply Chain Entities**" has the meaning set forth in Section 2.01(b).

**Section 1.32** "**Term**" has the meaning set forth in Section 6.01.

**Section 1.33** "**Texas Case**" has the meaning set forth in the Recitals.

**Section 1.34** "**Third Party Content**" means any and all past, present, and future electronic media, text, graphics, images, music, audio, video, software, data compilations, works of authorship and any other form of data, media, or information that is provided by any Non-Party.

**Section 1.35** "**Transfer**" means to sell, assign, convey, transfer, encumber or otherwise dispose of, in whole or in part, voluntarily or involuntarily, by operation of law or otherwise. "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

### Article 2.  GRANT OF RIGHTS

DocuSign Envelope ID: 004B22DA-4B64-4AC8-821F-F8C42FD16C64

**Section 2.01  ABR Patent License.**

(a) Subject to receipt by Sling of the Settlement Payment and during the Term, Licensors, for themselves and for their respective Affiliates and successors, hereby grant to Licensee and its Affiliates an irrevocable (except as provided in Section 6.03), worldwide, non-exclusive, non-sublicensable license under all of the ABR Patents to make, have made, use, have used, offer for sale, have offered for sale, sell, have sold, import and have imported, lease or have leased, perform and have performed and otherwise fully develop, market, distribute, support, maintain and commercialize the Peloton Licensed Products and Services (previously existing, now existing, or hereafter developed, or divested) in all fields of use.

(b) Subject to receipt by Sling of the Settlement Payment and during the Term, Licensors, for themselves and for their respective Affiliates and successors, hereby grant to:

(i)  any and all past, present, and future vendors, suppliers, manufacturers, developers, distributors, resellers, contractors, partners, hosts, and other third parties solely in their capacities as participants in the Development-Supply Chain for Peloton Licensed Products and Services (the foregoing, collectively, the **"Supply Chain Entities"**), and

(ii)  any and all past, present, and future Person(s) who receive one or more of the Peloton Licensed Products and Services directly or indirectly from Licensee, any of its Affiliates or its or their respective resellers or distributors, solely in their capacities as such (**"End Users"**),

an irrevocable (except as provided in Section 6.03), worldwide, non-exclusive, non-sublicensable license under all of the ABR Patents to: (A) in the case of the Supply Chain Entities, to carry out all or part of the activities set forth in Section 2.01(a) solely in their capacities as participants in the Development-Supply Chain for and in connection with the Peloton Licensed Products and Services for use, sale, offer for sale, import or other exploitation by or for the Licensee or its Affiliates pursuant to the terms of this Agreement; and (b) in the case of End Users, to carry out all or part of the activities set forth in Section 2.01(a) solely in their capacities as customers, subscribers or other users of the Peloton Licensed Products and Services.

(c)  The licenses granted in this Section 2.01 (**"ABR Patent License"**) shall be royalty-free and fully-paid up on Licensors' receipt of the Settlement Payment. The grant of the ABR Patent License is, with respect to each patent and patent application constituting the ABR Patents, retroactive to the filing date of such patent or patent application. The Content that is created by or for Licensee or its Affiliates is licensed under the ABR Patent License and covered by the releases and covenants not to sue herein for use on any device or hardware. The Third Party Content that is streamed or provided to End Users of the Peloton Licensed Products and Services is licensed under the ABR Patent License and covered by the releases and covenants not to sue herein, but only when such Third Party Content is accessed by or streamed on Peloton Licensed Products and Services.

**Section 2.02  No Other Rights.** Each Party acknowledges that, under this Agreement, each Party is granting and receiving only those rights, releases, licenses and covenants

expressly set out in this Agreement and no other rights, releases, licenses or covenants are conferred by implication, estoppel or otherwise.  The Parties understand and acknowledge that the ABR Patent License is intended to cover only Peloton Licensed Products and Services of the Licensee and the other Licensee Group Parties and is not intended to cover manufacturing activities that Licensee or its Affiliates may undertake on behalf of third parties for the purpose of obtaining rights under any ABR Patent (i.e., prohibited patent laundering activities).  Neither Licensee nor any of its Affiliates shall have any obligation to exercise, utilize, or exploit any license granted to it under this Agreement.

**Section 2.03   No Attribution of Settlement Payment.**  Nothing in this Agreement shall be construed as attributing any payment (or part of any payment) to any particular ABR Patent or family thereof.

**Section 2.04   No Admission of Liability.**  Notwithstanding anything in this Agreement to the contrary, the Licensors, for themselves and for the Licensor Group Parties, acknowledge and agree that (a) this Agreement sets forth a compromise and settlement of the Lawsuits for the purpose of avoiding the costs, disruptions, and uncertainties associated with further litigation; (b) such compromise and settlement does not constitute a ruling on the merits, an admission as to any issue of fact or principle at law or an admission of liability of Licensee or any Licensee Group Party and any and all such admission of liability is expressly denied by Licensee and its Affiliates; and (c) the Licensee and its Affiliates specifically disclaim and deny any liability concerning any infringement of the ABR Patents or the validity, patentability or enforceability of any ABR Patent.

**Article 3.**   DISMISSAL OF THE LAWSUITS

**Section 3.01   Termination of the Investigation.**

**(a)**  Within one (1) business day following the Effective Date, Licensors shall file a motion, in the form attached hereto as <u>Exhibit A</u>, with the ITC seeking a stay of all proceedings before the ITC and including a request that the ITC suspend enforcement of the ITC's limited exclusion order and cease and desist order directed to Licensee and/or any other Licensee Group Party, as well as a request for expedited consideration of the motion, in anticipation of termination of the Investigation by way of settlement pursuant to 19 C.F.R. § 210.21(b).

**(b)**  Within one (1) business day following the Effective Date, the parties to the Investigation shall jointly and in writing inform the Exclusion Order Enforcement Branch of CBP that the Parties have settled all disputes and request that CBP allow all Peloton Licensed Products and Services to enter the United States for consumption pursuant to the licenses provided by this Agreement.  To the extent CBP has detained any Accused Products or Peloton Licensed Products and Services as of the Effective Date or detains any Peloton Licensed Products and Services thereafter, Licensor will use commercially reasonable efforts to ensure that CBP releases such detained Peloton Licensed Products and Services without further delay, on grounds that all Peloton Licensed Products and Services are now authorized for importation and sale after importation as a result of this Agreement.

**(c)**  If the Effective Date occurs before the issuance of a ruling letter or any other final disposition of Licensee's requested ruling from CBP that certain redesigned versions of its

products and services do not infringe the ABR Patents, Licensee will use its commercially reasonable efforts to (i) withdraw such requested ruling, and (ii) ensure that all correspondence, documents, and exhibits submitted in connection with the request are retained by CBP in confidence and not made part of the public record, in each case pursuant to 19 C.F.R. § 177.6. For the avoidance of doubt, the redesigned products and services of Licensee and its Affiliates that are the subject of Licensee's requested ruling from CBP and any products Licensor has argued to CBP should be subject to exclusion shall be deemed "Peloton Licensed Products and Services" for purposes of this Agreement.

**(d)** Licensors shall file a petition with the ITC to rescind the Limited Exclusion Order and Cease and Desist Orders issued by the ITC on March 8, 2023 in the Investigation pursuant to 19 U.S.C. § 1337(k) and 19 C.F.R. § 210.76(a), and a motion to terminate the Investigation with the ITC pursuant to 19 C.F.R. § 210.21(b), no later than two (2) business days following the Effective Date in the forms attached hereto as Exhibit B and Exhibit C, respectively.

**Section 3.02  Dismissal of the Texas Case**. DISH and Sling shall file a motion to stay all deadlines and notice of settlement and a proposed order, and a proposed order and notice of voluntary dismissal to dismiss plaintiffs' claims with prejudice including a provision providing that each party will bear its own attorney's fees and costs, in the Texas Case no later than two (2) business days following the Effective Date using the forms attached as Exhibit D-1 and Exhibit D-2.

### Article 4.  PAYMENT, RELEASES AND COVENANTS

**Section 4.01  Payment Amount**. In consideration of the releases, licenses, covenants, rights granted and obligations excused by Licensors and their Affiliates in this Agreement, and without admission of infringement or the validity of any patent or other intellectual property right, Licensee will pay to Sling on behalf of all Licensors the total sum of seventy-five million U.S. dollars (US $75,000,000.00) (the **"Settlement Payment"**), with payment being made on or before the date that is five (5) business days after the Effective Date.

**Section 4.02  Payment Terms**.



**Section 4.03  Expenses**. The Parties shall each pay their own fees and expenses, including court costs, legal fees and expert fees, incurred in the prosecution and defense of the Lawsuits and incurred in the negotiation, preparation and execution of this Agreement. Without limitation of the foregoing, each Party irrevocably waives its right to claim

attorneys' fees as prevailing party or otherwise in the Lawsuits under 35 U.S.C. §285. Licensee shall have no responsibility or liability for the distribution of the Settlement Payment among the Licensors or their attorneys, or with respect to any Person claiming any part of such Settlement Payment, and the Licensors shall indemnify, defend and hold Licensee harmless from any Claim from any Person purporting to have an interest in the Settlement Payment.

**Section 4.04  Releases**.

  **(a)** Licensors, on behalf of themselves and each of the other Licensor Group Parties, do hereby absolutely, unconditionally and irrevocably release and forever discharge worldwide the Licensee and the other Licensee Group Parties from any and all Claims that Licensors or any other Licensor Group Party may have had from the beginning of time or may now have against them up to and as of the Effective Date based on, arising out of or relating to: (i) the Peloton Licensed Products and Services, (ii) the Claims made, Asserted or brought in the Lawsuits, (iii) the subject matter of the Lawsuits and the facts described therein; and/or (iv) misappropriation or infringement of any and all patents owned or Controlled by Licensors or any Licensor Group Party worldwide, including the ABR Patents. Nothing in this Section 4.04(a) or Section 4.04(c) shall operate to release or discharge any Claim arising or accruing after the Effective Date, including any Claim for breach of this Agreement.

  **(b)** Licensee, on behalf of itself and each of its Affiliates, does hereby absolutely, unconditionally and irrevocably release and forever discharge worldwide the Licensors and their Affiliates from any and all Claims that Licensee or its Affiliates may have had from the beginning of time or may now have against them up to and as of the Effective Date based on, arising out of or relating to: (i) the Claims made, Asserted or brought by the Licensee in the Lawsuits, and/or (ii) misappropriation or infringement of any and all patents owned or Controlled by Licensee or any of its Affiliates worldwide. Nothing in this Section 4.04(b) or Section 4.04(c) shall operate to release or discharge any Claim (A) arising or accruing after the Effective Date, including any Claim for breach of this Agreement, or (B) that relates to the infringement, validity, patentability or enforceability of any ABR Patent.

  **(c) Section 1542 of the California Civil Code.** Each of the releases set forth in Section 4.04(a) constitutes, for purposes of each released Claim, a waiver of any and all provisions, rights, and benefits conferred by any law, including United States federal law, the law of any state or territory of the United States, and principles, rules, or decisions of common law or equity, that in any way limit the extent of the released Claims as set forth above, including Section 1542 of the California Civil Code (to the extent it applies to the Lawsuits), which provides:

  > "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

**Section 4.05  Covenants Not to Sue.**

  **(a)**  Licensors, on behalf of themselves and each of the other Licensor Group

Parties, hereby covenant not to sue Licensee or any other Licensee Group Party anywhere in the world during the Term and thereafter for infringement of any Existing DISH Patent or unfair practices in import trade under 19 U.S.C. § 1337 and related authority, in each case for all of the Accused Products, whether the Accused Products existed before, on, or after the Effective Date.

(b)     Licensors, on behalf of themselves and each of the other Licensor Group Parties, hereby covenant not to sue Licensee or any other Licensee Group Party anywhere in the world during the period beginning on the Effective Date and ending on April 30, 2028 for infringement of any patent (now or hereafter owned or Controlled by a Licensor or any other Licensor Group Party), unfair practices in import trade under 19 U.S.C. § 1337 and related authority, or any other patent infringement in each case for all of the Peloton Licensed Products and Services in the Fitness Field of Use, whether such Peloton Licensed Products and Services existed before, on, or after the Effective Date.

(c)     Licensee, on behalf of itself and each of its Affiliates, hereby covenants not to sue Licensor or any of its Affiliates anywhere in the world during the period beginning on the Effective Date and ending on April 30, 2028 for infringement of any patent (now or hereafter owned or Controlled by Licensee or any of its Affiliates), unfair practices in import trade under 19 U.S.C. § 1337 and related authority, or any other patent infringement in each case for all of the Existing DISH Products and Services, whether any such Existing DISH Products and Services existed before, on, or after the Effective Date.

(d)     Each of the Licensors, on behalf of themselves and each of the other Licensor Group Parties, hereby irrevocably waives the right to recover damages and all other remedies covered by each of the covenants not to sue in Sections 4.05(a) and 4.05(b) during each of the periods in which such covenants are in effect. The Licensee, on behalf of itself and its Affiliates, hereby irrevocably waives the right to recover damages and all other remedies covered by the covenant not to sue in Section 4.05(c) during the period in which such covenant is in effect.

**Section 4.06   Domestic Industry**. Licensors covenant, on behalf of themselves and their Affiliates and respective successors and assigns, that they will not rely on the domestic activities of Licensee or its Affiliates to argue, assert, allege, or maintain any Claim in a Section 337 investigation that a domestic industry exists or is in the process of being established. Licensors hereby irrevocably waive any such argument or assertion. The Parties agree that it shall be a material breach of this Agreement by Licensors, their successors, or assigns to serve or cause to be served a third-party subpoena on Licensee or its Affiliates seeking information about Licensee's or its Affiliates' products, services and/or activities in connection with any Claim in a Section 337 investigation that a domestic industry exists or is in the process of being established.

<strong>Article 5.     MARKING</strong>

**Section 5.01**   The Licensors shall conduct research on the Licensee's products and determine which products fall within the scope of the ABR Patents. The Licensor shall provide the Licensee within 30 days of the Effective Date with all necessary information and guidance as to patent marking, including the applicable patent numbers.  Upon receiving the patent marking information proposed by the Licensors, the Licensee shall use reasonable efforts to mark the Peloton Licensed Products and Services by posting the

applicable patent numbers for the issued ABR Patents on its virtual marking website within 30 days of receipt of the information provided by Licensors. Licensors shall promptly notify the Licensee in writing of any changes to the patent marking information, including the issuance of new patents, the expiration or invalidation of existing patents, or any other changes that may affect patent marking. Each Licensor agrees that (a) nothing in this Agreement shall require Licensee to undertake any research or analysis of whether marking is warranted for any one of the Peloton Licensed Products and Services; (b) nothing in this Agreement shall require Licensee to use more than commercially reasonable efforts in responding to Licensor's requests under this Section; (c) Licensee's marking of Peloton Licensed Products and Services shall not be considered evidence of or an admission that any of those Peloton Licensed Products and Services are actually covered by any claim of the ABR Patents or that any of the ABR Patents are valid, infringed or enforceable; and (d) the failure to mark any of the Peloton Licensed Products and Services shall not be considered a breach of this Agreement.

## Article 6.  TERM, TERMINATION AND SURVIVAL

**Section 6.01  Term**.  The term of this Agreement shall commence on the Effective Date and shall continue in full force and effect until the date that is the later of six (6) years after the expiration of (i) the last-to-expire ABR Patent, or (ii) any Claim arising out of or related to the ABR Patents, whichever is later ("**Term**").

**Section 6.02  Termination for Breach**. In the event of a material breach by a Licensor in the performance of its duties, covenants, obligations or undertakings under this Agreement, the Licensee will have the right to give written notice of the specific breach involved.  If not cured such alleged breach within thirty (30) days following its receipt of notice, Licensee will have the right, in addition to any other rights and remedies it may have at law, in equity, under contract (including this Agreement) or otherwise, to terminate this Agreement on written notice.

**Section 6.03  Termination for Non-Payment by Licensee**.  If Licensee fails to timely make the Settlement Payment and Licensee has not cured such alleged breach within five (5) business days following its receipt of notice from the Licensors, the Licensors will have the right, in addition to any other rights and remedies they may have at law, in equity, under contract (including this Agreement) or otherwise, to terminate this Agreement on written notice.

**Section 6.04  Survival**. Unless specifically addressed otherwise herein, Article 1, Section 4.04, 4.05, 6.04, Article 7, Article 8 and Article 9 will survive termination or expiration of this Agreement and shall remain in full force and effect with respect to all the Parties to this Agreement.

## Article 7.  TAXES AND RIGHTS IN BANKRUPTCY

**Section 7.01  Taxes**. Each Party shall be responsible for payment of its own taxes. To the extent that any withholding tax is required by law, Licensee shall be entitled to deduct and withhold from any amounts payable pursuant to this Agreement such amounts as required by applicable Legal Requirements. Any amounts that have been deducted or withheld shall be paid over by the Licensee to the applicable governmental authority and Licensee shall provide Licensors with proof of remittance. To the extent such amounts are so deducted or

withheld, such amounts shall be treated for all purposes under this Agreement as having been paid to the Licensors to whom such amounts would otherwise have been paid. Licensors shall provide to Licensee a properly completed and executed IRS Form W-9, W-8BEN, W-8BEN-E, certificate of tax residence, and other tax forms reasonably requested by Licensee.

**Section 7.02  Rights in Bankruptcy.**  All licenses and covenants not to sue granted under or pursuant to any section of this Agreement are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the U.S. Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101(35A) of the U.S. Bankruptcy Code to the extent permitted thereunder. The Parties shall retain and may fully exercise all of their respective rights and elections under the U.S. Bankruptcy Code.

**Article 8.    CONFIDENTIALITY**

**Section 8.01**  The Parties acknowledge and agree that the confidential terms and conditions of this Agreement (as contained within the redacted portions of the public version of this document submitted to the ITC) shall be kept strictly confidential and shall not be disclosed, in whole or in part, to any Person, except as follows:

**(a)**    for the purpose of disclosure to the ITC and its employees as required by the ITC in order to effectuate rescission of the remedial orders and the termination of the Investigation;

**(b)**    confidentially to their attorneys, accountants, indemnitors, insurers, officers, employees, and directors;

**(c)**    to the extent required to enforce this Agreement, subject to the Parties' making reasonable efforts for an appropriate protective order entered in the case to prevent public disclosure thereof;

**(d)**    to fulfill their corporate financial reporting obligations under GAAP, and in connection with tax planning, preparation and audits;

**(e)**    for the purpose of disclosure in connection with reports filed with the Securities and Exchange Commission, or any other filings, reports or disclosures that may be required under applicable laws or regulations (including applicable stock exchange rules and regulations);

**(f)**    to any court or other governmental body having jurisdiction and specifically requiring such disclosure so long as, prior to any release, the releasing Party provides the other Party with notice as reasonably permitted under the circumstances, so that the other Party may seek a protective order or other appropriate remedy;

**(g)**    to existing and potential future investors and/or shareholders of the Party and to potential acquirers of the ABR Patents or either Party as reasonably required for due diligence, provided that said investors, shareholders and potential acquirers agree to keep this Agreement and its terms and conditions confidential pursuant to a non-disclosure agreement and agree to use such information only for purposes of a potential acquisition transaction;

**(h)**    with the prior written consent of the other Party, which shall not be

DocuSign Envelope ID: 004D22DA-4B64-4ACB-821F-F8C42FD16C64

unreasonably withheld by the other Party;

**(i)**　　in response to civil discovery and investigative requests, so long as, prior to any such release, the releasing Party provides the other Party with notice as reasonably permitted under the circumstances, so that the other Party may seek a protective order or other appropriate remedy; and/or

**(j)**　　pursuant to the binding order of a government agency or a court so long as, prior to any such release, the releasing Party provides the other Party with notice as reasonably permitted under the circumstances, so that the other Party may seek a protective order or other appropriate remedy.

**Section 8.02**　In the case of all such exceptions in Section 8.01 of this Agreement, each Party shall use reasonable efforts to keep the confidential terms and conditions of this Agreement confidential, including requesting that any receiving Party maintain the confidentiality of this Agreement.  In addition, in the case of the exceptions set forth in subparts (a), (c), (g) and (h) of Section 8.01 of this Agreement, the disclosing Party will disclose only that portion of this Agreement as is required to be furnished.

### Article 9.　Warranties and Representations

**Section 9.01　LIMITATION OF LIABILITY.**  NO PARTY WILL BE LIABLE TO ANY OTHER PARTY FOR INCIDENTAL, INDIRECT, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES OF ANY KIND (INCLUDING LOST REVENUES OR PROFITS, OR LOSS OF BUSINESS) IN ANY WAY RELATED TO THIS AGREEMENT, REGARDLESS OF WHETHER EITHER PARTY WAS ADVISED, HAD OTHER REASON TO KNOW, OR IN FACT KNEW OF THE POSSIBILITY THEREOF. THE FOREGOING LIMITATIONS OF LIABILITY SHALL NOT APPLY FOR ANY REASON WHATSOEVER IN CONNECTION WITH ANY WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF THE OTHER PARTY(IES).

**Section 9.02　Licensee Representations.**  Licensee represents and warrants to Licensors that: (a) Licensee is duly organized, validly existing, and in good standing in the jurisdiction stated in the preamble to this Agreement; (b) the execution and performance by Licensee of its obligations hereunder will not constitute a breach of, or conflict with, any other material agreement or arrangement, whether written or oral, by which it is bound; (c) this Agreement is a legal, valid, and binding obligation of Licensee, enforceable against Licensee in accordance with its terms; (d) Licensee has full power and authority and has taken all corporate action necessary to enter into and perform this Agreement and Licensee has all necessary rights to grant the rights granted by it in this Agreement, and (e) each person signing this Agreement on Licensee's behalf is duly authorized by Licensee to do so and to bind Licensee to this Agreement, without any further act or authorization.

**Section 9.03　Licensor Representations.**  Licensors each represent and warrant to Licensee that: (a) each Licensor is duly organized, validly existing, and in good standing in the jurisdiction stated in the preamble to this Agreement; (b) the execution and performance by each Licensor of its obligations hereunder will not constitute a breach of, or conflict with, any other material agreement or arrangement, whether written or oral, by which it is bound; (c) this Agreement is a legal, valid, and binding obligation of Licensors, enforceable against each of them in accordance with its terms; (d) each Licensor has full

DocuSign Envelope ID: 004D22DA-4B64-4ACB-821F-F8C42FD16C64

power and authority and has taken all corporate action necessary to enter into and perform this Agreement and each Licensor has all necessary rights to grant the licenses, covenants not to sue and other rights granted by it in this Agreement, (e) each person signing this Agreement on DDBS's, DISH's or Sling's behalf is duly authorized to do so and to bind DDBS, DISH, or Sling to this Agreement, without any further act or authorization; (f) DISH owns by valid assignment the entire right, title, and interest in and to the ABR Patents and all patents and patent applications which comprise the ABR Patents as of the Effective Date are listed in <u>Schedule A</u>; (g) Sling is the exclusive licensee with the sole right to sublicense the ABR Patents; (h) no Non-Party had or has any right to bring or Assert Claims for infringement or misappropriation of any ABR Patent or recover for infringement or misappropriation of any ABR Patent; (i) none of the Licensors has Transferred any Claim released in this Agreement and no Non-Party had or has any interest in any such Claim; and (j) the ABR Patents constitute all patents relating to or claiming Adaptive Bitrate Streaming that are owned or Controlled by Licensors or any of their Affiliates.

**Section 9.04  NO OTHER WARRANTIES**.  Except as expressly provided in this Article 9 and in Section 10.04, no Party makes any other representation or warranty, express or implied, nor shall any Party have any liability in respect of any infringement of patents or other rights of third parties due to any other Party's operation under the license and rights granted herein.

## Article 10.  MISCELLANEOUS PROVISIONS

**Section 10.01  Assignment/Future Affiliates**.

**(a)**     <u>No Assignment</u>. Except as set forth in this Section 10.01, neither Party may assign or Transfer this Agreement or any rights hereunder without the express, written consent of the other Party, which consent shall not to be unreasonably withheld, conditioned or denied.

**(b)**     <u>Permitted Assignment</u>. Notwithstanding the preceding in clause (a), either Party may assign this Agreement to: (i) an acquirer of all, or substantially all, of the equity or assets of the business to which this Agreement relates in any merger, consolidation, equity exchange, or reorganization of its business to which this Agreement relates, subject to the terms in Section 10.01(c) below; or (ii) any entity that becomes an Affiliate of the Party following the Effective Date. The assigning Party expressly agrees to remain jointly and severally liable with the assignee for all payments accruing and licenses, covenants and other obligations arising under this Agreement.

**(c)**     <u>Acquisition of Licensee by a Third Party</u>. In the event Licensee is acquired by an unrelated third party (**"Acquiring Party"**) and becomes an Affiliate of such Acquiring Party, the licenses and covenants granted to Licensee and the other Licensee Group Parties in this Agreement shall continue, but no pre-existing products or services of the Acquiring Party shall be deemed to be subject to, or receive the benefit of, the licenses and covenants granted in this Agreement.

**(d)**     <u>Acquisition of an Affiliate by Licensee (No ABR Litigation)</u>. If Licensee directly or indirectly acquires a Person that becomes an Affiliate of Licensee after the Effective Date (**"Newly Acquired Affiliate"**) and such Newly Acquired

Affiliate (i) is not involved in litigation with any Licensor regarding infringement of an ABR Patent (**"ABR Patent Litigation"**) immediately prior to the date of the acquisition, merger, consolidation, equity exchange, or purchase (**"Acquisition Transaction"**), and (ii) has operations primarily in the Fitness Field of Use, then such Newly Acquired Affiliate shall automatically receive the benefit of the rights, releases, waivers, licenses and covenants granted by the Licensors and the other Licensor Group Parties under this Agreement for any products, services and methods of the Newly Acquired Affiliate, effective as of the effective date of such Acquisition Transaction and covering all activities prior thereto and thereafter.

**(e)**    Acquisition of an Affiliate by Licensee (ABR Litigation). If Licensee directly or indirectly acquires a Newly Acquired Affiliate and such Newly Acquired Affiliate: (i) is involved in ABR Patent Litigation with a Licensor immediately prior to the effective date of the Acquisition Transaction, and (ii) has operations primarily in the Fitness Field of Use, then such Newly Acquired Affiliate shall not receive the benefit of the rights, releases, waivers, licenses and covenants granted by the Licensors and the other Licensor Group Parties under this Agreement for any products, services and methods of the Newly Acquired Affiliate that were made, used, sold, offered for sale or imported before the effective date of the Acquisition Transaction but Licensors, for themselves and for the other Licensor Group Parties, agree (A) to limit the period of any past damages in any ABR Patent Litigation against the Newly Acquired Affiliate regarding the alleged infringement of the ABR Patents to the three years prior to the date of the filing of that ABR Patent Litigation; and (B) that the ABR Patent License and the covenants that are granted by the Licensors and the other Licensor Group Parties under this Agreement to Licensee's other Affiliates shall extend to and cover all products, services and methods of the Newly Acquired Affiliate that are made, used, sold, offered for sale or imported after the effective date of the Acquisition Transaction. If Licensee directly or indirectly acquires a Newly Acquired Affiliate and such Newly Acquired Affiliate does not have operations primarily in the Fitness Field of Use, then such Newly Acquired Affiliate shall not receive the benefit of the rights, releases, waivers, licenses and covenants granted by the Licensors and the other Licensor Group Parties under this Agreement for any products, services and methods of the Newly Acquired Affiliate.

**(f)** 

**(g)**    Divested Businesses. In the event Licensee divests one or more of its product or service lines, business units, operating divisions or Affiliates (each, a **"Divested Business"**), the rights, releases, waivers, licenses, covenants and other benefits under this Agreement shall be (i) extended to the Divested Business, without payment of any transfer or other fees or royalties, to enable that Divested Business to continue to benefit from this Agreement to the same extent as prior to

DocuSign Envelope ID: 004D22DA-4B64-4ACB-821F-F8C42FD18C64

the divestiture and subject to the terms and conditions set forth herein; and (ii) retained by Licensee and its other remaining Affiliates.

**Section 10.02 Non-Circumvention**. Each Licensor, for itself and its Affiliates, agrees (a) that the patents and patent applications owned and/or Controlled by such Licensor and its Affiliates at any time during the term of this Agreement are intended to be encumbered by the rights, releases, waivers, licenses and covenants contained in this Agreement within the scope of such rights, releases, waivers, licenses and covenants, and each Licensor covenants and agrees, for itself and its Affiliates, that such rights, releases, waivers, licenses and covenants shall run with such patents and patent applications and apply to any assignee or Transferee of such patents or patent applications; (b) to impose the licenses and covenants not to sue in this Agreement on any third party to which the Licensor or its Affiliate assigns or otherwise Transfers a patent or patent application that is subject to this Agreement, and that any such assignment or Transfer shall provide that the Licensee may enforce the licenses and covenants not to sue as a third-party beneficiary; (c) it will not, by amendment of its corporate charter, bylaws or through any reorganization, Transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the rights, releases, waivers, licenses and covenants contained in this Agreement; and (d) all obligations of DDBS, Sling and DISH under this Agreement shall be joint and several.

**Section 10.03 Attorneys' Fees**. In any dispute or litigation between the Parties arising out of or related to this Agreement, the prevailing Party therein shall be entitled to recover from the non-prevailing Party or Parties its reasonably incurred attorneys' fees, expenses and costs of suit (if any).

**Section 10.04 Authority and Acknowledgment**. Each individual signing this Agreement on behalf of a corporation, partnership, proprietorship, association, limited liability company or other organization hereby represents and warrants that he or she has read this entire Agreement, understands all of its terms and conditions, and has authority to enter into this Agreement on behalf of such corporation, partnership, proprietorship, association, limited liability company or organization.

**Section 10.05 Choice of Law; Dispute Resolution**. This Agreement shall be interpreted, construed, enforced in accordance with, and governed by, the laws of the State of Delaware. In the event that there is a lawsuit between any of the Parties arising from, related to, or in connection with, this Agreement, including to its interpretation or performance, then the Parties agree that such lawsuit shall be venued in the United States District Court for the District of Delaware, provided that court has subject matter jurisdiction, or if that court does not have subject matter jurisdiction, then in the state courts of Delaware located in Wilmington and all Parties consent to personal jurisdiction in such courts.

**Section 10.06 Construction**. The section headings in this Agreement are for convenience of reference only, will not be deemed to be a part of this Agreement, and will not be referred to in connection with the construction or interpretation of this Agreement. Unless the context of a provision herein otherwise requires, words importing the singular shall include the plural and vice-versa. As used in this Agreement, the words "include" and "including" and variations thereof, will not be deemed to be terms of limitation, but rather will be deemed to be followed by the words "without limitation." The conjunction "or" shall be

understood in its inclusive sense (and/or).

**Section 10.07 Counterparts**. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together shall constitute but one (1) and the same instrument. Digital and electronic signatures shall be treated as valid, original signatures.

**Section 10.08 Disclaimer of Agency**. Nothing contained in this Agreement is intended or will be construed so as to establish the Parties to this Agreement as partners or as agents of each other. No Party will have any express or implied right or authority to assume or create any obligations on behalf of or in the name of any other Party or to bind any other Party in any contract, agreement or undertaking with any third party.

**Section 10.09 Entire Agreement**. This Agreement, including the Schedules and Exhibits attached hereto, sets forth the entire, final and complete understanding between the Parties relevant to the subject matter of this Agreement, and supersedes all prior negotiations, and proposed agreements, written, oral, or implied, relevant to the subject matter of this Agreement made or existing before the Effective Date. This Agreement may not be amended or modified except in a writing executed by each of the Parties. Except as expressly set forth in this Agreement, neither Party will be bound by any communications between them on the subject matter of this Agreement unless the communication: (i) is in writing; (ii) bears a date that is contemporaneous with or subsequent to the Effective Date; and (iii) is executed by each of the Parties.

**Section 10.10 Further Assurances**. Following the Effective Date, each of the Parties hereto shall, and shall cause their respective Affiliates and employees to, execute, deliver and file such additional documents, pleadings, instruments, conveyances, and assurances and take such further actions as may be reasonably required to (a) dismiss the Lawsuits, (b) end the CBP enforcement actions; (c) end notifications to any distributors and retailers and update all distributors and retailers who have previously received communications from Licensors to advise them of the settlement of the Lawsuits; and (d) carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

**Section 10.11 Jointly Drafted**. This Agreement has been negotiated between unrelated parties who are sophisticated and knowledgeable in the matters contained in this Agreement and who have acted in their own self-interest. In addition, each Party has been represented by legal counsel. This Agreement shall be deemed to have been jointly-drafted by the Parties and no ambiguity or claimed ambiguity shall be resolved against any Party on the basis that such Party drafted the language claimed to be ambiguous.

**Section 10.12 Notices**. All notices or requests that are required or permitted to be given pursuant to this Agreement must be given in writing and must be sent by email transmission with proof that is has been received by the recipient, or by first-class certified mail, postage prepaid, or by nationally recognized courier service, charges prepaid, to the Party to be notified, addressed to such Party at the address(es) set forth below, or such other address(es) as such Party may have substituted by written notice (given in accordance with this Section 10.12) to the other Party. The sending of such notice with confirmation of receipt of the complete transmission (in the case of email transmission) or receipt of such notice (in the case of delivery by first-class certified mail or by courier service) will constitute the giving thereof.

| If to be given to Licensee: | If to be given to Licensors: |
|---|---|
| Peloton Interactive, Inc.<br>Attn: Chief Legal Officer | Sling TV L.L.C.<br>Attn: General Counsel |
| *If by nationally recognized courier service*: | *If by nationally recognized courier service*: |
| | 9601 South Meridian Blvd.<br>Englewood, Colorado 80112 |
| 441 Ninth Avenue, 6th Floor<br>New York, NY 10001 | |
| *If by first-class certified mail*:<br>441 Ninth Avenue, 6th Floor<br>New York, NY 10001 | *If by first-class certified mail*:<br>P.O. Box 6655<br>Englewood, Colorado 80155 |
| *If by email*:<br>notices@onepeloton.com | *If by email*:<br>ipdept@dish.com |
| *With a copy (which shall not constitute notice) to*:<br>Covington & Burling LLP<br>Attn: Richard L. Rainey<br>One CityCenter<br>850 Tenth Street, NW<br>Washington, DC  20001-4956<br>rrainey@cov.com | *With a copy (which shall not constitute notice) to*:<br>Baker Botts LLP<br>Attn: G. Hopkins Guy  III<br>1001 Page Mill Road<br>Building One, Suite 200<br>Palo Alto, CA 94304<br>Hop.guy@bakerbotts.com |

**Section 10.13 Schedules and Exhibits.**  The following exhibits are part of this Agreement and are hereby incorporated by reference:

| | |
|---|---|
| Schedule A | ABR Patents and Patent Applications |
| Exhibit A | Complainants' Motion to Stay Proceedings and Suspend Remedial Orders as to Respondent Peloton Interactive, Inc. Based on a Settlement Agreement, and For Expedited Consideration of Same |
| Exhibit B | Complainants' Petition to Rescind the Limited Exclusion Order and Cease and Desist Order against Respondent Peloton Interactive, Inc. Based on a Settlement Agreement |

| Exhibit C | Complainants' Motion to Terminate the Investigation as to Respondent Peloton Interactive, Inc. Based on a Settlement Agreement. |
| Exhibit D-1 | Joint Motion to Stay All Deadlines and Notice of Settlement and Proposed Order |
| Exhibit D-2 | Plaintiffs' Notice of Voluntary Dismissal with Prejudice Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) and Proposed Order |

**Section 10.14 Waiver.**  No failure or delay on the part of any Party in the exercise or enforcement of any right or privilege hereunder shall operate as a waiver of such right or privilege, or of any other right or privilege hereunder.  No single or partial exercise or enforcement of any right or privilege hereunder shall preclude other or further exercise or enforcement thereof or of any other right or privilege.

**[End of text; signature page follows]**

**IN WITNESS WHEREOF**, this Agreement has been executed and delivered by the Parties hereto as of the Effective Date.

**DISH DB** ~~~~ **TION**

By: _____
        Tim Messner

Name: _____

Title: EVP & General Counsel

Date: 05/01/2023


**SLING** ~~~~

By: _____
        Tim Messner

Name: _____

Title: EVP & General Counsel

Date: 05/01/2023


**DISH T** ~~~~ **IES L.L.C.**

By: _____
        Tim Messner

Name: _____

Title: EVP & General Counsel

Date: 05/01/2023


**PELO** ~~~~ **CTIVE, INC.**

By: _____
        Tammy Albarrán

Name: _____

Title: Chief Legal Officer

Date: 05/01/2023

## <u>Schedule A</u>
## ABR PATENTS AND PATENT APPLICATIONS
### Patents

| Patent No. | Country | Title |
|---|---|---|
| 8868772 | United States | Apparatus, system, and method for adaptive-rate shifting of streaming content |
| 9407564 | United States | Apparatus, system, and method for adaptive-rate shifting of streaming content |
| 2011213730 | Australia | Apparatus, system, and method for adaptive-rate shifting of streaming content |
| 2564861 | Canada | Apparatus, system, and method for adaptive-rate shifting of streaming content |
| 5320740 | Japan | Adaptive Rate shifting device of a streaming content, the system and method |
| 10-1082642 | South Korea | The streaming content variable rate conversion apparatus, the system and method |
| 7818444 | United States | Apparatus, System, and Method for Multi-Bitrate Content Streaming |
| 8402156 | United States | Apparatus, System, and Method for Multi-Bitrate Content Streaming |
| 8612624 | United States | Apparatus, System, and Method for Multi-Bitrate Content Streaming |
| 9071668 | United States | Apparatus, System, and Method for Multi-Bitrate Content Streaming |
| 9571551 | United States | Apparatus, System, and Method for Multi-Bitrate Content Streaming |
| 9998516 | United States | Apparatus, System, and Method for Multi-Bitrate Content Streaming |
| 8683066 | United States | Apparatus, System, and Method for Multi-Bitrate Content Streaming |
| 2479680 | EPO | Method for presenting rate-adaptive streams |
| 2479680 | Austria | Method for presenting rate-adaptive streams |
| 2479680 | Switzerland | Method for presenting rate-adaptive streams |
| 602005056202.8 | Germany | Method for presenting rate-adaptive streams |
| 2479680 | Denmark | Method for presenting rate-adaptive streams |

| 2479680 | Spain | Method for presenting rate-adaptive streams |
|---|---|---|
| 2479680 | Finland | Method for presenting rate-adaptive streams |
| 2479680 | France | Method for presenting rate-adaptive streams |
| 2479680 | United Kingdom | Method for presenting rate-adaptive streams |
| 2479680 | Ireland | Method for presenting rate-adaptive streams |
| 2479680 | Italy | Method for presenting rate-adaptive streams |
| 2479680 | Netherlands | Method for presenting rate-adaptive streams |
| 2479680 | Portugal | Method for presenting rate-adaptive streams |
| 2479680 | Sweden | Method for presenting rate-adaptive streams |
| 309163 | India | Apparatus, system, and method for dynamic rate shifting of streaming content |
| 10659513 | United States | Apparatus, System, and Method for Multi-Bitrate Content Streaming |
| 10116722 | United States | Apparatus, System, and Method for Multi-Bitrate Content Streaming |
| 10165034 | United States | Apparatus, System, and Method for Multi-Bitrate Content Streaming |
| 10225304 | United States | Apparatus, system, and method for adaptive-rate shifting of streaming content |
| 10469554 | United States | Apparatus, system, and method for adaptive-rate shifting of streaming content |
| 10469555 | United States | Apparatus, system, and method for adaptive-rate shifting of streaming content |
| 10757156 | United States | Apparatus, system, and method for adaptive-rate shifting of streaming content |
| 10951680 | Unites States | Apparatus, system, and method for multi-bitrate content streaming |

## Applications

| Application No. | Country | Title |
| --- | --- | --- |
| 18/145,739 | United States | Apparatus, System, and Method for Multi-Bitrate Content Streaming |
| 16/876,604 | United States | Apparatus, system, and method for dynamic rate shifting of streaming content |
| 16/291,343 | United States | Apparatus, system, and method for dynamic rate shifting of streaming content |
| 16/156,748 | United States | Apparatus, System, and Method for Multi-Bitrate Content Streaming |
| 17/962,231 | United States | Apparatus, System, and Method for Multi-Bitrate Content Streaming |
| 18/069,450 | United States | Apparatus, System, and Method for Multi-Bitrate Content Streaming |
| 17/001,647 | United States | APPARATUS, SYSTEM, AND METHOD FOR ADAPTIVE-RATE SHIFTING OF STREAMING CONTENT |
| 17/229,432 | United States | Apparatus, System, and Method for Multi-Bitrate Content Streaming |
| 20216568.4 | European Patent Office | APPARATUS, SYSTEM, AND METHOD FOR ADAPTIVE-RATE SHIFTING OF STREAMING CONTENT |

**Exhibit A**

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C. 20436**

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN FITNESS DEVICES,**<br>**STREAMING COMPONENTS THEREOF,**<br>**AND SYSTEMS CONTAINING SAME** | **Investigation No. 337-TA-1265** |

**COMPLAINANTS' MOTION TO STAY PROCEEDINGS AND SUSPEND
REMEDIAL ORDERS AS TO RESPONDENT PELOTON INTERACTIVE, INC.
BASED ON A SETTLEMENT AGREEMENT, AND FOR EXPEDITED
CONSIDERATION OF SAME**

Complainants DISH DBS Corporation, DISH Technologies L.L.C., and Sling TV L.L.C. (collectively, "Complainants") hereby move to stay all proceedings in the above-captioned Investigation as to Respondent Peloton Interactive, Inc. ("Peloton"), including suspension of enforcement of the Limited Exclusion Order and Cease and Desist Order issued by the Commission on March 8, 2023 against Peloton, in anticipation of the termination of this Investigation as to Peloton by way of a settlement agreement pursuant to 19 C.F.R. § 210.21(b). Complainants further ask that the Commission expedite consideration of this request to stay and suspend, as the Presidential Review Period in this proceeding is presently expected to end on May 7, 2023, before this request might otherwise be addressed by the Commission. Peloton supports the relief requested. Respondents iFIT Inc., f/k/a ICON Health & Fitness, Inc., FreeMotion Fitness, Inc., and NordicTrack, Inc. (collectively, "iFIT") do not oppose the relief requested. The Office of Unfair Import Investigations ("OUII") will take a position, if any, upon reviewing this submission as filed.

On May [XX], 2023, Complainants and Peloton entered into a settlement agreement that resolves the disputes between Complainants and Peloton before the Commission and provides that conduct prohibited by the Commission's Limited Exclusion Order and Cease and Desist Order against Peloton with respect to certain fitness devices, streaming components thereof, and systems containing same is now authorized by Complainants. Complainants will soon file a petition with the Commission to formally rescind the Limited Exclusion Order and Cease and Desist Order against Peloton pursuant to 19 U.S.C. § 1337(k) and 19 C.F.R. § 210.76(a), and a motion to

terminate the Investigation as to Peloton pursuant to 19 C.F.R. § 210.21(b), which will annex confidential and public versions of the Settlement Agreement.

Good cause exists to grant this motion to stay and suspend on an expedited basis, pending ultimate resolution of the anticipated motion for rescission of the Commission's remedial orders and termination of this proceeding, in light of the resulting conservation of the resources of Complainants, Peloton, the Commission, and CBP. *See, e.g.*, *Certain Wireless Consumer Electronic Devices and Components Thereof*, Inv. No. 337-TA-853, Comm'n Op., 2013 WL 1231347 (Sept. 20, 2013) ("[T]he public interest favors settlement to avoid needless litigation and to conserve public and private resources"). The requested stay and suspension of any enforcement of the Limited Exclusion Order and Cease and Desist Order against Peloton will allow Complainants sufficient time to prepare and submit the petition seeking rescission of the Limited Exclusion Order and Cease and Desist Order against Peloton and termination of the Investigation as to Peloton, including a public version of the executed settlement agreement the parties intend to annex to Complainants' motion to terminate, and will allow the Commission a non-expedited period for briefing and consideration of that anticipated petition. Issuance of the requested suspension will also permit CBP to conserve enforcement resources which otherwise might be committed to this matter in anticipation of the imminent end of the Presidential Review Period.

For the reasons set forth above, Complainants respectfully request that the Commission stay all proceedings in this Investigation as to Peloton, and suspend enforcement of the Limited Exclusion Order and Cease and Desist Order against Peloton, in anticipation of the termination of this Investigation as to Peloton by way of a

settlement agreement pursuant to 19 C.F.R. § 210.21(b). Complainants further request

that consideration of this request for a stay and suspension be expedited.

Dated: May XX, 2023                              Respectfully submitted,

                                                 */s/ DRAFT*
                                                 Lisa M. Kattan
                                                 Jamie R. Lynn
                                                 Thomas C. Martin
                                                 Lauren J. Dreyer
                                                 Samuel L. Kassa
                                                 Andrew Wilson
                                                 Eileen Hyde
                                                 **BAKER BOTTS L.L.P.**
                                                 700 K Street, NW
                                                 Washington, DC 20001
                                                 Phone: 202.639.7700

                                                 G. Hopkins Guy, III
                                                 **BAKER BOTTS L.L.P.**
                                                 1001 Page Mill Road
                                                 Building One, Suite 200
                                                 Palo Alto, California 94304
                                                 Phone: 650.739.7500

                                                 Ali Dhanani
                                                 Thomas Carter
                                                 **BAKER BOTTS L.L.P.**
                                                 910 Louisiana Street
                                                 Houston, Texas 77002
                                                 Phone: 713.229.1234

                                                 Bethany R. Salpietra
                                                 **BAKER BOTTS L.L.P.**
                                                 2001 Ross Avenue, Suite 900
                                                 Dallas, Texas 75201
                                                 Phone: 214.953.6500

                                                 Email: DISHABRITC@BakerBotts.com

                                                 *Attorneys for Complainants DISH DBS*
                                                 *Corporation, DISH Technologies L.L.C.,*
                                                 *and Sling TV L.L.C.*

**Exhibit B**

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C. 20436**

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN FITNESS DEVICES,<br>STREAMING COMPONENTS THEREOF,<br>AND SYSTEMS CONTAINING SAME** | Investigation No. 337-TA-1265 |

**COMPLAINANTS' PETITION TO RESCIND THE LIMITED EXCLUSION
ORDER AND CEASE AND DESIST ORDER AGAINST RESPONDENT
PELOTON INTERACTIVE, INC. BASED ON A SETTLEMENT AGREEMENT**

DocuSign Envelope ID: 004D22DA-4B64-4AEB-821F-F8C42FD16C64

Complainants DISH DBS Corporation, DISH Technologies L.L.C., and Sling TV L.L.C. (collectively, "Complainants") petition the Commission to rescind the Limited Exclusion Order and Cease and Desist Order issued by the Commission on March 8, 2023 in the above-captioned Investigation against Respondent Peloton Interactive, Inc. ("Peloton") pursuant to 19 U.S.C. § 1337(k) and 19 C.F.R. § 210.76(a). Peloton supports the relief requested. Respondents iFIT Inc., f/k/a ICON Health & Fitness, Inc., FreeMotion Fitness, Inc., and NordicTrack, Inc. (collectively, "iFIT") do not oppose the relief requested. The Office of Unfair Import Investigations ("OUII") will take a position, if any, upon reviewing this submission as filed.

Rescission of the Limited Exclusion Order and Cease and Desist Order against Peloton, and termination of this Investigation as to Peloton, is warranted on the basis of a settlement agreement between Complainants and Peloton ("Settlement Agreement") entered after the Commission issued the Limited Exclusion Order and Cease and Desist Order against Peloton. A confidential and a public version of the Settlement Agreement are attached to Complainants' accompanying motion for termination pursuant to 19 C.F.R. § 210.21. There are no other agreements, written or oral, express or implied between the Complainants and Peloton concerning the subject matter of the Investigation.

As detailed in the accompanying motion for termination, the Settlement Agreement resolves the disputes between Complainants and Peloton before the Commission and provides, *inter alia*, for Complainants to seek rescission of the Limited Exclusion Order and Cease and Desist Order against Peloton and termination of this Investigation as to Peloton. The Settlement Agreement further provides that conduct prohibited by the Commission's Limited Exclusion Order and Cease and Desist Order

against Peloton with respect to certain fitness devices, streaming components thereof, and systems containing same is now authorized by Complainants. For these reasons, Complainants seek immediate rescission of the Commission's Limited Exclusion Order and Cease and Desist Order against Peloton in their entirety and termination of this Investigation as to Peloton.

The Settlement Agreement constitutes a changed condition of fact and law under Rule 210.76(a)(1). Rescission of a limited exclusion order and cease and desist order when a respondent's conduct becomes authorized by way of settlement is both in the public interest and supported by Commission precedent. *See, e.g., Certain Digital Video Receivers & Related Hardware & Software* Components, Inv. No. 337-TA-1103, Rescission of Remedial Orders (Nov. 19, 2020); *Certain Beverage Dispensing Systems and Components Thereof,* Inv. No. 337-TA- 1130, Rescission of Remedial Orders (June 3, 2020); *Certain Marine Sonar Imaging Systems, Products Containing the Same, and Components Thereof,* Inv. No. 337-TA-926, Comm'n Notice to Rescind Limited Exclusion Order and Cease and Desist Orders (June 21, 2016); *Certain Integrated Circuits, Processes for Making Same, and Products Containing Same,* Inv. No. 337- TA-450, Comm'n Order (Apr. 23, 2003).

For the reasons set forth above, Complainants respectfully request that the Commission rescind the Limited Exclusion Order and Cease and Desist Order against Peloton in this Investigation in their entirety.

Dated: May XX, 2023

Respectfully submitted,

*/s/ DRAFT*
Lisa M. Kattan

Jamie R. Lynn
Thomas C. Martin
Lauren J. Dreyer
Samuel L. Kassa
Andrew Wilson
Eileen Hyde
**BAKER BOTTS L.L.P.**
700 K Street, NW
Washington, DC 20001
Phone: 202.639.7700

G. Hopkins Guy, III
**BAKER BOTTS L.L.P.**
1001 Page Mill Road
Building One, Suite 200
Palo Alto, California 94304
Phone: 650.739.7500

Ali Dhanani
Thomas Carter
**BAKER BOTTS L.L.P.**
910 Louisiana Street
Houston, Texas 77002
Phone: 713.229.1234

Bethany R. Salpietra
**BAKER BOTTS L.L.P.**
2001 Ross Avenue, Suite 900
Dallas, Texas 75201
Phone: 214.953.6500

Email: DISHABRITC@BakerBotts.com

*Attorneys for Complainants DISH DBS*
*Corporation, DISH Technologies L.L.C.,*
*and Sling TV L.L.C.*

ATTACHMENT CONTAINS CONFIDENTIAL BUSINESS INFORMATION

<u>Exhibit C</u>

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C. 20436**

| |
|---|
| **In the Matter of** |
| **CERTAIN FITNESS DEVICES,** |
| **STREAMING COMPONENTS THEREOF,** |
| **AND SYSTEMS CONTAINING SAME** |

**Investigation No. 337-TA-1265**

<u>**COMPLAINANTS' MOTION TO TERMINATE THE INVESTIGATION AS TO**</u>
<u>**RESPONDENT PELOTON INTERACTIVE, INC. BASED ON A SETTLEMENT**</u>
<u>**AGREEMENT**</u>

**ATTACHMENT CONTAINS CONFIDENTIAL BUSINESS INFORMATION**

Complainants DISH DBS Corporation, DISH Technologies L.L.C., and Sling TV L.L.C. (collectively, "Complainants") request termination of the above-captioned Investigation in its entirety based on a settlement agreement between Complainants and Respondent Peloton Interactive, Inc. ("Peloton"). Pursuant to that agreement, Complainants and Peloton have settled all disputes in the underlying investigation. Peloton supports the relief requested. Respondents iFIT Inc., f/k/a ICON Health & Fitness, Inc., FreeMotion Fitness, Inc., and NordicTrack, Inc. (collectively, "iFIT") do not oppose the relief requested. The Office of Unfair Import Investigations ("OUII") will take a position, if any, upon reviewing the submissions as filed.

Commission Rule 210.21(a)(2) provides that "[a]ny party may move at any time to terminate an investigation in whole or in part as to any or all respondents on the basis of a settlement, a licensing or other agreement." 19 C.F.R. § 210.21(a)(2); *see also* 19 C.F.R. § 210.21(b)(1) ("An investigation before the Commission may be terminated as to one or more respondents pursuant to section 337(c) of the Tariff Act of 1930 on the basis of a licensing or other settlement agreement."). There is a settlement agreement between Complainants and Peloton concerning the subject matter of this investigation, which pursuant to 19 C.F.R. 210.21(b)(1), is attached to this motion. *See* Confidential Exhibit A. There are no other agreements, written or oral, express or implied between the parties concerning the subject matter of the Investigation.

Good cause exists to terminate this investigation as to Peloton in view of the settlement agreement. Indeed, Commission policy and the public interest favor the voluntary disposition of an investigation—which preserves the resources of the Commission, the Administrative Law Judge, and the private parties—and termination based on a settlement agreement and/or a consent order is routinely granted. *See, e.g.*, *Certain Earpiece Devices And Components Thereof*, Inv. No. 337-TA-1121, ID, Order No. 15 (Feb. 21, 2019) (granting motion to terminate based on a consent

**ATTACHMENT CONTAINS CONFIDENTIAL BUSINESS INFORMATION**

order and a settlement agreement); *Certain Powered Cover Plates*, Inv. No. 337-TA1124, ID, Order No. 5 (Sept. 26, 2018) (same). The settlement agreement contains confidential business information within the meaning of 19 C.F.R. 210.6(a). Accordingly, Complainants and Peloton request permission to redact their respective confidential business information, and further request that the un-redacted version of the settlement agreement be treated as Confidential Business Information under the Protective Order in this Investigation (Order No. 7) and not publicly disclosed. A redacted version of the settlement agreement is attached hereto as Exhibit B pursuant to 19 C.F.R. 210.21(b)(1) and will be filed publicly.

For the reasons set forth above, Complainants respectfully request that the Commission terminate this Investigation as to Peloton.

Dated: May XX, 2023

Respectfully submitted,

*/s/ DRAFT*
Lisa M. Kattan
Jamie R. Lynn
Thomas C. Martin
Lauren J. Dreyer
Samuel L. Kassa
Andrew Wilson
Eileen Hyde
**BAKER BOTTS L.L.P.**
700 K Street, NW
Washington, DC 20001
Phone: 202.639.7700

G. Hopkins Guy, III
**BAKER BOTTS L.L.P.**
1001 Page Mill Road
Building One, Suite 200
Palo Alto, California 94304
Phone: 650.739.7500

Ali Dhanani
Thomas Carter
**BAKER BOTTS L.L.P.**
910 Louisiana Street

DocuSign Envelope ID: 004D22DA-4B64-4AEB-821F-58C42FD16C64

**ATTACHMENT CONTAINS CONFIDENTIAL BUSINESS INFORMATION**

Houston, Texas 77002
Phone: 713.229.1234

Bethany R. Salpietra
**BAKER BOTTS L.L.P.**
2001 Ross Avenue, Suite 900
Dallas, Texas 75201
Phone: 214.953.6500

Email: DISHABRITC@BakerBotts.com

*Attorneys for Complainants DISH DBS
Corporation, DISH Technologies L.L.C., and
Sling TV L.L.C.*

**Exhibit D-1**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| DISH TECHNOLOGIES L.L.C and SLING TV L.L.C. | |
| *Plaintiffs,* | **Civil Action No. 2:21-cv-00132-JRG-RSP** |
| v. | |
| PELOTON INTERACTIVE, INC., | |
| *Defendant.* | |

**JOINT MOTION TO STAY ALL DEADLINES AND NOTICE OF SETTLEMENT**

Pursuant to the Court's Standing Order Regarding Proper Notification of Settlement to the Court, Plaintiffs DISH Technologies L.L.C and Sling TV L.L.C. (collectively, "Plaintiffs") and Defendant Peloton Interactive, Inc. hereby notify the Court that all matters in controversy between the parties in the above-captioned case have been resolved by settlement. The parties request that the Court continue the stay of this case as ordered on June 3, 2021 (Dkt. 21) until receipt of Plaintiffs' concurrently filed Notice of Voluntary Dismissal With Prejudice Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).

Dated: May [XX], 2023

Respectfully submitted,

**BAKER BOTTS L.L.P.**

*DRAFT*

*DRAFT*

_____
Brian M. Buroker

_____
G. Hopkins Guy, III

DocuSign Envelope ID: 094D22DA-4B54-4ACB-821F-F8C42FD15C64

DC Bar # 457158 (admitted in ED TX)
GIBSON, DUNN & CRUTCHER LLP
Washington, DC 20036-5306
Tel: (202) 955-8500
Fax: (202) 530-4200

*Attorneys for Defendant Peloton
Interactive, Inc.*

hop.guy@bakerbotts.com
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA 94304
Telephone: 650.739.7500
Facsimile: 650.739.7699

Kurt Pankratz
kurt.pankratz@bakerbotts.com
2001 Ross Ave., Suite 900
Dallas, TX 75201
(214) 953-6584
Telephone: 214.953.6584
Facsimile: 214.661.4584

Ali Dhanani
ali.dhanani@bakerbotts.com
One Shell Plaza
910 Louisiana St.,
Houston, TX 77002
Telephone: 281.250.2294
Facsimile: 713.229.2808

Jamie R. Lynn
jamie.lynn@bakerbotts.com
700 K Street, N.W.
Washington, DC 20004
Telephone: 202.639.7700

*Attorneys for Plaintiffs Dish
Technologies L.L.C. and
Sling TV L.L.C.*

DocuSign Envelope ID: 094D22DA-4B64-4AEB-821F-58C42FD16C64

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

DISH TECHNOLOGIES L.L.C and
SLING TV L.L.C.

        *Plaintiffs,*

   v.

PELOTON INTERACTIVE, INC.,

        *Defendant.*

**Civil Action No. 2:21-cv-00132-JRG-RSP**

## [PROPOSED] ORDER GRANTING JOINT MOTION TO STAY ALL DEADLINES AND NOTICE OF SETTLEMENT

Before the Court is the Joint Motion to Stay All Deadlines and Notice of Settlement (the "Motion") filed by Plaintiffs DISH Technologies L.L.C and Sling TV L.L.C. and Defendant Peloton Interactive, Inc. (collectively, the "Parties").

After due consideration, the Court **GRANTS** the Parties' Motion. It is therefore **ORDERED** that the stay of this case as ordered on June 3, 2021 (Dkt. 21) be continued until receipt of Plaintiffs' forthcoming Notice of Voluntary Dismissal With Prejudice Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).

**Exhibit D-2**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

|  |  |
|---|---|
| DISH TECHNOLOGIES L.L.C and SLING TV L.L.C. <br><br> *Plaintiffs*, <br><br> v. <br><br> PELOTON INTERACTIVE, INC., <br><br> *Defendant*. | Civil Action No. 2:21-cv-00132-JRG-RSP |

**PLAINTIFFS' NOTICE OF VOLUNTARY DISMISSAL WITH PREJUDICE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 41(a)(1)(A)(i)**

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), Plaintiffs DISH Technologies L.L.C and Sling TV L.L.C. (collectively, "Plaintiffs") hereby dismiss their claims in the above-captioned case with prejudice. Pursuant to the Court's Standing Order Regarding Dismissal Papers in Connection With Settlement, voluntary dismissal by Plaintiffs with prejudice under Federal Rule of Civil Procedure 41(a)(1)(A)(i) is appropriate because Defendant Peloton Interactive, Inc. has not served upon Plaintiffs either an answer or a motion for summary judgment. The parties have agreed that each party shall bear its own costs, expenses, and attorneys' fees.

Dated: May [XX], 2023                         Respectfully submitted,

                                                                    **BAKER BOTTS L.L.P.**

                                                                    *DRAFT*

                                                                    _____

G. Hopkins Guy, III
hop.guy@bakerbotts.com
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA 94304
Telephone: 650.739.7500
Facsimile: 650.739.7699

Kurt Pankratz
kurt.pankratz@bakerbotts.com
2001 Ross Ave., Suite 900
Dallas, TX 75201
(214) 953-6584
Telephone: 214.953.6584
Facsimile: 214.661.4584

Ali Dhanani
ali.dhanani@bakerbotts.com
One Shell Plaza
910 Louisiana St.,
Houston, TX 77002
Telephone: 281.250.2294
Facsimile: 713.229.2808

Jamie R. Lynn
jamie.lynn@bakerbotts.com
700 K Street, N.W.
Washington, DC 20004
Telephone: 202.639.7700

*Attorneys for Plaintiffs Dish
Technologies L.L.C. and
Sling TV L.L.C.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| DISH TECHNOLOGIES L.L.C and SLING TV L.L.C. *Plaintiffs,* v. PELOTON INTERACTIVE, INC., *Defendant.* | Civil Action No. 2:21-cv-00132-JRG-RSP |

### [PROPOSED] ORDER GRANTING DISMISSAL WITH PREJUDICE

Before the Court is the Notice of Voluntary Dismissal with Prejudice Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) (the "Notice") filed by Plaintiffs DISH Technologies L.L.C and Sling TV L.L.C. (collectively, "Plaintiffs"). In light of Plaintiffs' Notice, which the Court **ACCEPTS AND ACKNOWLEDGES**, and pursuant to Rule 41(a)(1)(A)(i), all pending claims and causes of action against Defendant Peloton Interactive, Inc. in the above-captioned case are **DISMISSED WITH PREJUDICE**. Each party is to bear its own costs, expenses, and attorneys' fees.

The Clerk of the Court is directed to **CLOSE** the above-captioned case.

**IT IS SO ORDERED.**

# EXHIBIT D-C

# EXHIBIT C

# PELOTON

## Q4 FY2023 Shareholder Letter

August 23, 2023

Dear Shareholders,

Peloton's FYQ4 performance is a reminder we operate a seasonal business. We ended Q4 with 4% Y/Y Connected Fitness (CF) subscription growth, but subscribers declined by 29 thousand on a Q/Q basis due to the seasonal slowdown in hardware sales and higher than anticipated CF subscription churn. The slowdown exceeded our expectations through May and through the first three weeks of June as consumer spending shifted toward travel and experiences. Then eight weeks ago the trend reversed itself, and we began to see a reacceleration in hardware sales.

Growth also was slowed by the seat post recall we announced on May 11th in so far as first party and third party sales of our original Peloton Bike were supply constrained by seat post availability. To date we've received approximately 750 thousand requests for replacement seat posts, which was more than we expected. We've fulfilled over 340 thousand of these requests and expect to fulfill the balance by the end of September, which is slower than Members wanted but 3 months sooner than we had originally communicated to Members.

The cost of this recall substantially exceeded our initial expectations, leading to an additional accrual of $40 million this quarter for actual costs incurred as well as anticipated future recall-related expenses. In addition, an estimated 15 to 20 thousand of our 2.2 million impacted Members elected to pause their monthly subscriptions in Q4 pending the receipt of a replacement seat post.

In my first letter to investors in May of last year I discussed our three primary goals for the business:

- stabilizing cash flow
- getting the right people in the right roles
- growing again

For the second time in the turnaround of Peloton, we achieved positive free cash flow* in the most recent quarter, excluding the DISH legal settlement, and despite the impact of the seat post recall on Q4 sales revenue. Pro-forma free cash flow was $1 million, so barely positive and only positive on a pro-forma basis, which was not the goal we set for the business. Nevertheless, we achieved an important milestone in rightsizing the cost structure of the business.

We don't currently expect to remain free cash flow positive in the two upcoming quarters, mainly due to seasonality of our hardware sales, timing of inventory payments, marketing spend as we invest for growth and prepare for the holiday season, and one-time cash outlay for seat posts; but we do expect to achieve this objective once again in the second half of FY24.

In February 2023, I said the focus of the prior twelve months had been on stabilizing Peloton's financial performance and that the next twelve months would focus on restoring Peloton's growth by leaning into the future of tech-enabled fitness.

This letter reaffirms the goals I outlined for investors in February. They are:

- return to YOY revenue growth
- reach sustained positive adjusted EBITDA
- reach sustained cash flow breakeven (without pro-forma adjustment)
- attract at least 1 million prospective Members to trial the Peloton App
- restore international growth
- expand corporate wellness and other commercial partnerships
- continue reducing inventory
- continue restructuring our retail store footprint
- restructure middle mile warehouses and optimize last mile delivery network
- reach cash flow breakeven with Precor

(*)  Free Cash Flow is a non-GAAP financial measure. For a reconciliation of this and each non-GAAP financial measure to their most directly comparable GAAP financial measure, and rationale for why we rely on these measures, please see the reconciliation tables located below.

- significantly improve Member Support and the overall hardware delivery experience
- sell our Ohio manufacturing facility

As we've said, expanding entry points into the Peloton brand is a critical component of our growth strategy. The introduction of our rental service, which now totals over 48 thousand subscribers, and the launch of Peloton Certified Refurbished, which totaled 6.5 thousand sales in Q4, are proving to be important growth initiatives. According to our data, the rental business continues to represent a significant incremental growth opportunity, and we have just expanded bike rentals into Germany, a market we know embraces the rental model more than most.

As I previewed in my last letter, we relaunched our Brand on May 23rd to better showcase Peloton's value proposition and its Member experience. We're already seeing meaningful positive shifts in perception across a range of measures including gains among Gen Z and consumers who are just beginning their fitness journeys. We are also seeing a mix shift in downloads towards men, Gen Z, Black and Hispanic customers. We have shifted our advertising campaign to represent what our Members actually look like and how they live to showcase the fact that Peloton is in fact for anyone, anywhere, anytime. We know shifting consumer perception and behavior takes time, but we're pleased with the progress we've already made. Kudos to Leslie Berland and our marketing team for this achievement. We'll continue to show up in new channels and in ways that open the aperture of how we are understood.

Coinciding with the Brand relaunch we introduced new App subscription tiers. We're starting to see early signs of success. Since the relaunch on May 23, we've seen more than 900 thousand App downloads, over 600 thousand of which were non-Peloton Members, representing a significant acceleration from recent trends. We've also seen a significantly higher mix of higher priced App tier (App+) Members ($24 vs $12.99/month) than we expected and strong growth of our newly introduced free tier as well, ending the quarter with 256 thousand free monthly active users. New users are more likely to be male, a key demographic opportunity for Peloton.

We also have just launched a global partnerships growth initiative. In July we announced a multi-year partnership with Liverpool FC, one of the world's premier professional sports franchises. And yesterday we announced a partnership with the University of Michigan which cuts across marketing, content, access, and experiences for students, alumni, and athletes. This announcement coincides with our launch of a strategy to pursue partner opportunities with NCAA Division 1 schools. Expect to hear more announcements about additional global partners in the weeks ahead. We're excited about our multi-prong approach to partnerships as we lean into the opportunity to grow awareness and understanding for our platform with fitness-minded consumers in co-branded settings.

We've also re-architected our commercial go-to-market strategy with a much simpler and more integrated offer. Our strategy includes commercial (selling bikes in segments like hospitality) and corporate wellness (offering the Peloton App as a benefit for employees). To achieve growth at scale, we had to make it much easier for enterprise clients as well as medium and small businesses to access our content and connected fitness hardware. These channels present significant growth opportunities, and we're leaning into them more aggressively, led by Greg Hybl, as our newly appointed SVP, General Manager, Peloton for Business.

For the last ten years Peloton has been the Henry Ford of stationary bikes. We sold any color bike frame you wanted as long as you wanted black. I'm excited to announce a change in strategy. This quarter we began work to bring a variety of limited edition bike frame colors and graphics to both the consumer and commercial markets, like yesterday's University of Michigan announcement. Expect to hear more about this exciting initiative this fall.

Finally, I want to update you on the progress we're making to offer an innovative safety improvement to existing Tread+ Members, and bring back one of our most beloved products. This past quarter the Consumer Product Safety Commission approved our design for a new rear guard for the popular product. The approval enables us to begin retrofitting existing Tread+ products later this year, enhancing the safety of our Members. Peloton will install the rear guard for Members who request one (17 thousand requests to date). The Company expects to resume pre-sales of the popular Tread+ in the US this holiday season, with first shipments about 6 weeks later. Retail pricing for new sales of Tread+ CFUs with the new rear guard is expected to be ~$6 thousand. Initial shipments will come from existing inventory of about 10 thousand units. Once that inventory is sold, we will have to stand up a new manufacturing line in order to bring the Tread+ back to the market for residential and commercial customers. We are too early in this planning process to estimate first delivery dates.

Not since I stepped into the CEO role have we had as many new irons in the fire to drive both short- and long-term growth. It's a BIG deal, and it serves to remind us that Peloton's transformation continues with urgency to pursue sustained, profitable growth. I expect these initiatives to accelerate our growth this fiscal year, but not this quarter. For the most part we have no operating history with these new initiatives which means we don't know how to model their impact on our growth. For financial planning purposes this means we've forecast some of the expense and none of the revenue these initiatives might generate in FY24. That means there could be significant upside to our financial

performance later this year, or none at all. I'm signaling significant potential upside but considerable uncertainty, in the spirit of radical transparency.

In closing, I'd like to once again thank our Members for their continued support as well as our team members for their continued dedication and hard work.

Barry McCarthy
CEO & President

**FY 2023 Q4 Operating Metrics and Financial Summary**

| User Metrics | Q4 FY22 | | Q3 FY23 | | Q4 FY23 | | % Change Y/Y | % Change Q/Q |
|---|---|---|---|---|---|---|---|---|
| Members (in millions) | | 6.9 | | 6.7 | | 6.5 | (5)% | (2)% |
| Ending Connected Fitness Subscriptions (in millions) | | 2.966 | | 3.107 | | 3.078 | 4 % | (1)% |
| Net Connected Fitness Subscription Additions (in millions) | | 0.004 | | 0.074 | | (0.029) | (850)% | (140)% |
| Average Net Monthly Connected Fitness Churn | | 1.4 % | | 1.1 % | | 1.4 % | 0 bps | 30 bps |
| Ending App Subscriptions (in millions) | | 0.980 | | 0.853 | | 0.828 | (16)% | (3)% |
| | | | | | | | | |
| **Financial Results (dollars in millions)** | | | | | | | | |
| Connected Fitness Products Revenue | $ | 295.6 | $ | 324.1 | $ | 220.4 | (25)% | (32)% |
| Subscription Revenue | | 383.1 | | 424.7 | | 421.7 | 10 % | (1)% |
| Total Revenue | $ | 678.7 | $ | 748.9 | $ | 642.1 | (5)% | (14)% |
| | | | | | | | | |
| Connected Fitness Products Gross Profit | $ | (290.1) | $ | (17.6) | $ | (82.6) | 72 % | (369)% |
| Connected Fitness Products Gross Margin | | (98.1)% | | (5.4)% | | (37.5)% | 6,070 bps | (3,200) bps |
| | | | | | | | | |
| Subscription Gross Profit | $ | 260.3 | $ | 287.8 | $ | 283.6 | 9 % | (1)% |
| Subscription Gross Margin | | 67.9 % | | 67.8 % | | 67.3 % | (70) bps | (50) bps |
| Subscription Contribution Margin [1] | | 72.1 % | | 72.3 % | | 72.1 % | 0 bps | (30) bps |
| | | | | | | | | |
| Total Gross Profit | $ | (29.8) | $ | 270.2 | $ | 201.1 | 775 % | (26)% |
| Total Gross Margin | | (4.4)% | | 36.1 % | | 31.3 % | 3,570 bps | (480) bps |
| | | | | | | | | |
| Total Operating Expenses | $ | 1,183.0 | $ | 536.2 | $ | 426.8 | (64)% | (20)% |
| | | | | | | | | |
| Net Loss | $ | (1,255.3) | $ | (275.9) | $ | (241.8) | 81 % | 12 % |
| Adjusted EBITDA [1] | $ | (288.7) | $ | (18.7) | $ | (34.7) | 88 % | (86)% |
| | | | | | | | | |
| Net Cash Used in Operating Activities | $ | (342.2) | $ | (40.9) | $ | (55.4) | 84 % | (35)% |
| Free Cash Flow [1] | $ | (411.9) | $ | (55.3) | $ | (74.0) | 82 % | (34)% |

---

[1] For a reconciliation of each non-GAAP financial measure to the most directly comparable GAAP financial measure, please refer to the reconciliation tables in the section titled "Non-GAAP Financial Measures."

## OPERATING METRICS

### Connected Fitness Subscriptions

We ended the quarter with 3.08 million Connected Fitness Subscriptions (also known as All-Access Members, or AAM), reflecting a net reduction of 29 thousand in the quarter. Hardware sales were below our expectation, particularly following the announcement of our original Bike seat post recall. Weak hardware sales (and associated subscriptions) were partially offset by higher than anticipated secondary market bike sales and subscription activations. However, churn was higher than expected, impacting our ending Connected Fitness subscription count.

### Connected Fitness Subscription Churn

Average Net Monthly Connected Fitness Churn for the quarter was 1.4%, higher than our internal expectation. As we discussed on last quarter's earnings call, we expected a sequential increase in churn, consistent with past seasonal fluctuations. However, we believe the original Bike seat post recall announcement contributed to higher than anticipated churn within the quarter.

### Peloton App

We ended the quarter with 828 thousand Peloton App subscribers, ahead of internal expectations due to better than anticipated legacy app subscriber retention following the announcement of our new App subscription tiers.

### Quarterly and Recent Highlights

### Operations

Increasing the efficiency of our operations remains a top priority, and we continue to make progress across a range of operational functions.  Within our hardware COGS, middle and last mile costs per unit declined 22% year over year in Q4, reflecting our warehouse consolidation efforts and continued collaboration with our third-party logistics partners.

We continue to make progress on reducing costs across our general and administrative (G&A) functions and sales and marketing (S&M). Within G&A, we reduced professional and legal fees (excluding settlements) by over 37% year over year in Q4. We've succeeded in reducing our legal, IT, insurance, and staff augmentation expenses and see opportunity to drive further savings through FY24. Reducing the fixed spending portion of our S&M expenses has been a key priority during FY23, and we've made substantial progress. In Q4, fixed spending within S&M decreased by over 25% year over year. The largest driver of fixed cost savings is our ongoing reduction of our first-party retail footprint. To date, we've closed 67 retail showrooms, and we will continue optimizing our showroom footprint over the course of FY24.

### Content, Software and Community

On May 23, 2023, we launched our new App Membership Tiers. Peloton now offers five distinct Membership tiers - three newly launched App Membership Tiers (Free, App One, and App+), as well as the existing All-Access Membership (Connected Fitness Subscription for Peloton equipment owners) and Guide Membership (for Guide owners who don't also own a Peloton Bike, Bike+, Peloton Tread, or Peloton Row). The new App tiers allow beginners and enthusiasts alike to work out with or without equipment – at home, outdoors or at their gym – independently or with instruction.

We also launched Peloton Gym for each of our App tiers. Peloton Gym offers step-by-step, self-guided workouts designed by Peloton Instructors that Members can take to the gym or on the go. As with all of our App features, Peloton Gym leverages our unparalleled Instructor expertise, combined with Member feedback, to enrich our Strength modality experience over time.

For our All-Access Members, we continue to deliver on our promise of an always-improving experience across Bike, Bike+, Tread, Row, and Guide. We expanded upon our gamification experiences by launching Lanebreak on Tread globally. Peloton Tread Members can now engage in an immersive, gaming-inspired workout, an experience that was previously only offered on Bike and Bike+. We also have made iterations to Run Achievements on Tread, helping Members more easily track and measure their performance. On the personal records page, Tread Members are now able to view their current run achievements alongside their output personal record ("PR").

Building on our successful launch of our Bike/Bike+ rental program in the U.S. and Canada, we were pleased to bring our rental program to Germany, beginning August 9th. While we continue to optimize our rental program, our data continues to show that rentals are incremental to our subscription base, and we're excited about expanding this low-cost, commitment-free Connected Fitness offering for Members.

We also have been testing and implementing improvements to the discovery experience and personalization algorithms, continuing efforts to showcase new content and help Members better find what they're looking for with ease. For example, following a successful beta test, in August we launched personalized workout plans for Guide users. Research shows that both Members and prospective Members are looking for more help making progress and staying motivated to their fitness goals. Personalized Plans takes progressive, goal-based plans created by fitness experts and personalizes the recommendations to fit a Member's interests, starting first with the goal of "Getting Stronger". We also launched 8 new rows of personalized recommendations on Tread and added a new layer of organization within our larger Class Collections (such as Artist Series) on Bike/Bike+, Tread,  and Row.

We draw inspiration from the incredible Peloton community every day. Millions strong, the Peloton community drives us to be the best we can be, and their enthusiasm for Peloton led us to create our annual New York based Homecoming event in 2016 to celebrate their achievements and give Members special access to Instructors and unique Peloton experiences. This summer we've re-imagined Homecoming by creating "Peloton on Tour", a five-city, three-country traveling tour. We debuted Peloton on Tour in Los Angeles (July 13-15), then visited Atlanta (August 17-19), and will be visiting Chicago, Berlin and London in the coming months. Participating Members are able to attend live classes, participate in friendly fitness competitions, and join panel discussions and Instructor and meet greets. Member response has been very positive, and we're eager to apply learnings from this inaugural tour so we can continue to evolve our approach to in-person events that celebrate our unique Peloton community.

## Q4 FINANCIAL RESULTS

### Revenue

Total revenue was $642.1 million for the three months ended June 30, 2023, comprised of $220.4 million of Connected Fitness segment revenue and $421.7 million of Subscription revenue, in-line with the midpoint of our $630 million to $650 million guidance range.

### Gross Profit and Margin

Total Gross profit was $201.1 million for the three months ended June 30, 2023, yielding a gross margin of 31.3% (versus our 41% guidance) and 42.2% excluding one-time items and inventory write-offs. Our Connected Fitness segment gross margin was (37.5)%.

Our Connected Fitness segment gross margin was negatively impacted by a $40.0 million increase to our seat post recall related reserve, driven by a higher than anticipated number of Member seat post requests. In addition, we booked a $25.2 million reserve accrual associated with excess Peloton Guide inventory, and a $4.8 million inventory write-off associated with other accessories. Together, these items negatively impacted our total reported gross margin by approximately 11 percentage points.

Subscription segment gross margin of 67.3% was in-line with our expectations.

### Operating Expenses

Total operating expenses, including restructuring and impairment expenses, were $426.8 million for the three months ended June 30, 2023. General and administrative expense decreased by $69.3 million versus the year ago period, primarily driven by reductions in legal fees, other professional fees, and personnel related expenses. Sales and marketing expense declined $20.4 million versus the year ago period, reflecting reductions in retail showroom expenses, including rent and related retail costs and personnel related expenses. research and development expense decreased $12.8 million versus the year ago period, primarily driven by reductions in personnel related expenses and product development and research costs.

This quarter we recognized $54.1 million of impairment and restructuring expense, of which $34.1 million was non-cash. The non-cash charges were primarily related to asset write-downs and write-offs associated with capitalized qualified costs incurred in connection with internal-use software under development, the closure of retail showroom locations, and other manufacturing and software assets. Note that starting in Q1 FY24, a substantial majority of our software development costs will not be eligible for capitalization and will be recognized as research and development expense. The cash charges were comprised of $17.1 million of severance payments as well as $2.9 million relating to other items including facility exit costs.

### Net Cash Used in Operating Activities, Free Cash Flow & Cash Balance

Net cash used in operating activities was $(55.4) million, including $75.0 million paid during the quarter to settle the Dish matter. Free cash flow was $(74.0) million and $1.0 million excluding the Dish matter. We ended the quarter with $813.9 million in unrestricted cash and cash equivalents. We also have access to a $400.0 million revolving credit facility, which remains undrawn to date.

### Upcoming changes to our reporting metrics

Starting in fiscal year 2024, we are making changes to our reported operating metrics. We will no longer include paused Connected Fitness subscriptions in our new Ending Paid Connected Fitness Subscriptions metric, and will now treat a pause action as a churn event in our Average Net Monthly Paid Connected Fitness Subscription Churn as described below. In Q1, we also plan to report a new metric, Average Monthly Paid App Subscription Churn. These changes are designed to align our reported metrics more closely with our strategic priorities and provide additional disclosure for investors.

### Ending Paid Connected Fitness Subscriptions

Ending Paid Connected Fitness Subscriptions will include all Connected Fitness Subscriptions for which we are currently receiving payment (a successful credit card billing or prepaid subscription credit or waiver). Historically, we have included a Connected Fitness Subscription that is paused for up to three months as a Connected Fitness Subscription. Because there is no payment on a paused subscription, we will no longer include paused Connected Fitness Subscriptions in our Ending Paid Connected Fitness Subscription count. The below table compares how Ending Paid Connected Fitness Subscriptions compares to our previous definition:

| | Three Months Ended | | | |
| --- | --- | --- | --- | --- |
| | September 30, 2022 | December 31, 2022 | March 31, 2023 | June 30, 2023 |
| Ending Connected Fitness Subscriptions[1] | 2,973,371 | 3,033,352 | 3,107,121 | 3,077,779 |
| Less: Ending Paused Connected Fitness Subscriptions | (55,054) | (54,170) | (51,902) | (80,336) |
| Ending Paid Connected Fitness Subscriptions[2] | 2,918,317 | 2,979,182 | 3,055,219 | 2,997,443 |

_____
(1) Legacy reporting metric
(2) New reporting metric starting in Q1 FY24

As of June 30, 2023, the number of our Ending Paused Connected Fitness Subscriptions increased by 55% versus March 31, 2023. While we historically experience a seasonal increase in the number of paused subscriptions in Q4, we believe a significant portion of this year's outsized increase was related to our seat post recall announced on May 11, 2023, as some Members chose to pause their subscriptions while awaiting the delivery of their replacement seat post.

**Average Net Monthly Paid Connected Fitness Subscription Churn**

To align with the new definition of Ending Paid Connected Fitness Subscriptions above, our new quarterly Average Net Monthly Paid Connected Fitness Subscription Churn will be calculated as follows: Paid Connected Fitness Subscriber "churn count" in the quarter, divided by the average number of beginning Paid Connected Fitness Subscribers each month, divided by three months. "Churn count" is defined as quarterly CF Subscription churn events minus CF Subscription unpause events minus CF Subscription reactivations.

We refer to any cancellation or pausing of a subscription for our All Access Membership as a churn event. Because we do not receive payment for paused Connected Fitness Subscriptions, a paused Connected Fitness Subscription will now be treated as a churn event at the time the pause goes into effect, which is the start of the next billing cycle. An unpause event occurs when a pause period elapses without a cancellation and the Connected Fitness Subscription resumes, and is therefore counted as a reduction in our churn count in that period. Consistent with our previous practice, our churn count will be shown net of reactivations and our new quarterly Average Net Monthly Paid Connected Fitness Subscription Churn metric will average the monthly Connected Fitness churn percentage across the three months of the reported quarter.

To date, we have reported Average Net Monthly Connected Fitness Churn, which is defined as Connected Fitness Subscription cancellations, net of reactivations, in the quarter, divided by the average number of beginning Connected Fitness Subscriptions in each month, divided by three months. This metric does not treat a pause of a Connected Fitness Subscription as a churn event. When a Connected Fitness Subscription payment method fails, we communicate with our Members to update their payment method and make multiple attempts over several days to charge the payment method on file and reactivate the subscription. We cancel a Member's Connected Fitness Subscription when it remains unpaid for two days after their billing cycle date.

Furthermore, we have reported our Average Net Monthly Connected Fitness Churn metric net of reactivations. Under this metric, a Connected Fitness Subscriber that cancels their membership (a churn event) and resubscribes in a subsequent period is considered a reactivation and is counted as a reduction in our churn count in the period during which the Subscriber resubscribes. The table below compares how Average Net Monthly Paid Connected Fitness Churn compares to our previous definition:

| | Three Months Ended | | | |
| --- | --- | --- | --- | --- |
| | September 30, 2022 | December 31, 2022 | March 31, 2023 | June 30, 2023 |
| Average Net Monthly Connected Fitness Churn[1] | 1.1 % | 1.1 % | 1.1 % | 1.4 % |
| Average Net Monthly Paid Connected Fitness Subscription Churn[2] | 1.2 % | 1.2 % | 1.1 % | 1.8 % |

_____
(1) Legacy reporting metric
(2) New reporting metric starting in Q1 FY24

In Q4, our Average Net Monthly Paid Connected Fitness Subscription churn reflects a seasonal increase in the number of paused subscriptions as well as an outsized increase in paused subscriptions related to our seat post recall, as we believe some Members chose to pause their subscriptions while awaiting the delivery of their replacement seat post. These metrics do not include data related to our App One Subscribers and App+ Subscribers.

**Ending Paid App Subscriptions**

Ending Paid App Subscriptions will include all App One and App+ subscriptions for which we are currently receiving payment.

**Average Monthly Paid App Subscription Churn**

When a Subscriber to App One or App+ cancels their membership (a churn event) and resubscribes in a subsequent period, the resubscription will be considered a new subscription (rather than a reactivation that is counted as a reduction in our churn count).

Average Paid App Subscription Churn will be calculated as follows: Paid App Subscription cancellations in the quarter, divided by the average number of beginning Paid App Subscriptions each month, divided by three months.

## Q1 FY24 OUTLOOK

| User Metrics (in millions) | Q1 FY23 | Q4 FY23 | Q1 FY24 Range | | % Change (Midpoint) | |
|---|---|---|---|---|---|---|
| | | | Low | High | Y/Y | Q/Q |
| Ending Paid Connected Fitness Subscriptions | 2.92 | 3.00 | 2.95 | 2.96 | 1% | (1)% |
| Ending Paid App Subscriptions | 0.88 | 0.83 | 0.74 | 0.75 | (15)% | (10)% |
| **Financial Results (dollars in millions)** | | | | | | |
| Total Revenue | $616.5 | $642.1 | $580 | $600 | (4)% | (8)% |
| Total Gross Margin | 35.2% | 31.3% | 46.5% | 46.5% | 1,127 bps | 1,519 bps |
| Adjusted EBITDA | $(33.4) | $(34.7) | $(20) | $(10) | 55% | 57% |

Our guidance reflects our current outlook based on performance in the quarter to date. As mentioned previously, we continue to pursue significant new growth initiatives (such as our new App subscription tiers) that are challenging to forecast. Please note that in the table above, historical periods and Q1 guidance for Ending Paid Connected Fitness Subscriptions exclude paused Connected Fitness subscriptions. Please refer to the table on page 6 for paused subscription disclosure for FY23 quarters. Our Paid App Subscription guidance reflects continued marketing investment to drive awareness and growth of our free app tier users. As a result, we expect that App marketing spend will be relatively inefficient in driving Paid App subscriber gross additions in the near term.

Our expected sequential and year over year gross margin improvement reflects continued improvements in our cost structure and operational efficiency as well as a modest continued mix-shift in Q1 revenues to subscription versus hardware revenues. For Q1, we expect modest sequential improvement to our Average Net Monthly Paid Connected Fitness churn.

As mentioned above, beginning in Q1 FY24 a substantial majority of costs incurred in connection with the development of internal-use software will not be eligible for capitalization and will be recognized as research and development expense. As such, going forward we anticipate lower than historical capital expenditures and higher research and development expense.

Our Q4 results reflect mixed performance as we continue to make progress on our transformation. Less than 18 months ago, we set out to ensure the long-term success of Peloton, and we're continuing to make progress each and every quarter. Despite unforeseen and significant headwinds, less than two years later, the underlying cost structure of the business has been dramatically improved. We are now much better equipped to drive accelerated, scaled growth in our subscriber base as we demonstrate that Peloton is truly for anyone, anytime, anywhere.

Liz Coddington
CFO

## Webcast

We will host a Q&A session at 8:30 a.m. ET on Wednesday, August 23, 2023 to discuss our financial results. To participate in the live call by phone, please go to this link to register (phone registration link), and you will be provided with dial in details. To avoid delays, we encourage participants to register at a minimum 15 minutes before the start of the call. A live webcast of the call will be available at https://investor.onepeloton.com/news-and-events/events and a replay will be available on the investor relations page of the Company's website for 30 days.

## Safe Harbor Statement

This shareholder letter contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. We intend such forward-looking statements to be covered by the safe harbor provisions for forward-looking statements contained in Section 27A of the Securities Act of 1933, as amended and Section 21E of the Securities Exchange Act of 1934, as amended. All statements contained in this shareholder letter other than statements of historical fact, including, without limitation, statements regarding our expected financial results for the first quarter of our fiscal year 2024; our execution and timing of and the expected benefits from our restructuring initiative and cost-saving measures; our supply chain management initiatives; details regarding and the timing of the launch of products and services; the launch of global partnership growth initiatives; our future operating results and financial position, including our ability to achieve positive free cash flow; our profitability; our business strategy and plans, including subscriber and market growth and international growth; our objectives for future operations; statements

regarding our future performance and our market opportunity. The words "believe," "may," "will," "estimate," "potential," "continue," "anticipate," "intend," "expect," "could," "would," "project," "plan," "target," and similar expressions are intended to identify forward-looking statements, though not all forward-looking statements use these words or expressions.

We have based these forward-looking statements on our current expectations and projections about future events and trends that we believe may affect our financial condition, results of operations, business strategy, short-term and long-term business operations and objectives, and financial needs. These forward-looking statements are subject to a number of risks, uncertainties, and assumptions and other important factors that could cause actual results to differ materially from those stated, including, without limitation: our ability to achieve and maintain future profitability; our ability to attract and maintain Subscribers; our ability to accurately forecast consumer demand of our products and services and adequately maintain our inventory; our ability to execute and achieve the expected benefits of our restructuring initiative and other cost-saving measures; our ability to effectively manage our growth and costs; our ability to anticipate consumer preferences and successfully develop and offer new products and services in a timely manner, or effectively manage the introduction of new or enhanced products and services; demand for our products and services and growth of the connected fitness products market; our ability to maintain the value and reputation of the Peloton brand; disruption or failure of our information technology systems or websites; our reliance on a limited number of suppliers, contract manufacturers, and logistics partners for our Connected Fitness Products; our lack of control over suppliers, contract manufacturers, and logistics partners; our ability to predict our long-term performance and declines in our revenue growth as our business matures; the effects of increased competition in our markets and our ability to compete effectively; any declines in sales of our Bike and Bike+; our dependence on third-party licenses for use of music in our content; actual or perceived defects in, or safety of, our products, including any impact of product recalls or legal or regulatory claims, proceedings or investigations involving our products; our ability to maintain, protect, and enhance our intellectual property; our ability to stay in compliance with laws and regulations that currently apply or become applicable to our business both in the United States and internationally; and other risk factors identified in the Company's Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K reports filed with the Securities and Exchange Commission, as such factors may be updated in our filings with the Securities and Exchange Commission, which are available on the Investor Relations page of our website at https://investor.onepeloton.com/investor-relations and on the SEC website at www.sec.gov.

You should not rely upon forward-looking statements as predictions of future events. The events and circumstances reflected in the forward-looking statements may not be achieved or occur. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, performance, or achievements. Our forward-looking statements speak only as of the date of this shareholder letter, and we undertake no obligation to update any of these forward-looking statements for any reason after the date of this shareholder letter or to conform these statements to actual results or revised expectations, except as required by law.

**FINANCIAL TABLES**

**CONSOLIDATED BALANCE SHEETS**
**(in millions, except share and per share amounts)**

| | June 30, 2023 | June 30, 2022 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 813.9 | $ 1,253.9 |
| Accounts receivable, net | 97.2 | 83.6 |
| Inventories, net | 522.6 | 1,104.5 |
| Prepaid expenses and other current assets | 205.4 | 192.5 |
| Total current assets | 1,639.1 | 2,634.6 |
| Property and equipment, net | 444.8 | 610.9 |
| Intangible assets, net | 25.6 | 41.3 |
| Goodwill | 41.2 | 41.2 |
| Restricted cash | 71.6 | 3.8 |
| Operating lease right-of-use assets, net | 524.1 | 662.5 |
| Other assets | 22.7 | 34.3 |
| Total assets | $ 2,769.1 | $ 4,028.5 |
| **LIABILITIES AND STOCKHOLDERS' (DEFICIT) EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued expenses | $ 478.4 | $ 797.4 |
| Deferred revenue and customer deposits | 187.3 | 201.1 |
| Current portion of long-term debt and other bank borrowings | 7.5 | 7.5 |
| Operating lease liabilities, current | 83.5 | 86.4 |
| Other current liabilities | 4.6 | 13.2 |
| Total current liabilities | 761.4 | 1,105.5 |
| 0% Convertible senior notes, net | 988.0 | 864.0 |
| Term loan, net | 690.9 | 690.0 |
| Operating lease liabilities, non-current | 593.8 | 725.4 |
| Other non-current liabilities | 30.1 | 50.7 |
| Total liabilities | 3,064.2 | 3,435.6 |
| Commitments and contingencies | | |
| Stockholders' (deficit) equity | | |
| Common stock, $0.000025 par value; 2,500,000,000 and 2,500,000,000 Class A shares authorized, 338,750,774 and 308,241,938 shares issued and outstanding as of June 30, 2023 and June 30, 2022, respectively; 2,500,000,000 and 2,500,000,000 Class B shares authorized, 18,016,853 and 30,032,078 shares issued and outstanding as of June 30, 2023 and June 30, 2022, respectively. | — | — |
| Additional paid-in capital | 4,619.8 | 4,291.3 |
| Accumulated other comprehensive income | 16.8 | 12.2 |
| Accumulated deficit | (4,931.8) | (3,710.6) |
| Total Stockholders' (deficit) equity | (295.1) | 592.9 |
| Total liabilities and stockholders' (deficit) equity | $ 2,769.1 | $ 4,028.5 |

**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS**
**(in millions, except share and per share amounts)**

| | Three Months Ended June 30, | | Fiscal Year Ended June 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| Revenue: | | | | |
| Connected Fitness Products | $ 220.4 | $ 295.6 | $ 1,130.2 | $ 2,187.5 |
| Subscription | 421.7 | 383.1 | 1,670.1 | 1,394.7 |
| Total revenue | 642.1 | 678.7 | 2,800.2 | 3,582.1 |
| Cost of revenue: | | | | |
| Connected Fitness Products | 303.0 | 585.7 | 1,328.8 | 2,433.8 |
| Subscription | 138.1 | 122.8 | 547.9 | 450.0 |
| Total cost of revenue | 441.1 | 708.5 | 1,876.7 | 2,883.8 |
| Gross profit | 201.1 | (29.8) | 923.5 | 698.4 |
| Operating expenses: | | | | |
| Sales and marketing | 137.8 | 158.1 | 648.2 | 1,018.9 |
| General and administrative | 162.8 | 232.1 | 798.1 | 963.4 |
| Research and development | 72.2 | 84.9 | 318.4 | 359.5 |
| Goodwill impairment | – | – | – | 181.9 |
| Impairment expense | 32.6 | 348.0 | 144.5 | 390.5 |
| Restructuring expense | 21.5 | 22.2 | 189.4 | 180.7 |
| Supplier settlements | – | 337.6 | 22.0 | 337.6 |
| Total operating expenses | 426.8 | 1,183.0 | 2,120.6 | 3,432.4 |
| Loss from operations | (225.8) | (1,212.8) | (1,197.1) | (2,734.0) |
| Other expense, net: | | | | |
| Interest expense | (27.4) | (16.5) | (97.1) | (43.0) |
| Interest income | 8.7 | 1.1 | 26.4 | 2.3 |
| Foreign exchanges gain (loss) | 3.0 | (12.7) | 7.0 | (31.8) |
| Other (expense) income, net | (0.2) | (2.3) | 2.9 | (1.5) |
| Total other expense, net | (15.8) | (30.3) | (60.9) | (74.1) |
| Loss before provision for income taxes | (241.6) | (1,243.1) | (1,258.0) | (2,808.1) |
| Income tax expense | 0.2 | 12.2 | 3.7 | 19.6 |
| Net loss | $ (241.8) | $ (1,255.3) | $ (1,261.7) | $ (2,827.7) |
| Net loss attributable to Class A and Class B common stockholders | $ (241.8) | $ (1,255.3) | $ (1,261.7) | $ (2,827.7) |
| Net loss per share attributable to common stockholders, basic and diluted | $ (0.68) | $ (3.72) | $ (3.64) | $ (8.77) |
| Weighted-average Class A and Class B common shares outstanding, basic and diluted | 355,510,222 | 337,799,792 | 346,670,699 | 322,368,818 |
| Other comprehensive (loss) income: | | | | |
| Net unrealized (losses) gains on marketable securities | $ – | $ – | $ – | $ (0.4) |
| Change in foreign currency translation adjustment | (3.1) | (1.0) | 3.6 | (4.5) |
| Derivative adjustments: | | | | |
| Net unrealized loss on hedging derivatives | – | (1.6) | – | (6.3) |
| Reclassification for derivative adjustments included in Net loss | – | 4.4 | 1.0 | 5.3 |
| Total other comprehensive (loss) income | (3.1) | 1.9 | 4.6 | (5.9) |
| Comprehensive loss | $ (244.9) | $ (1,253.4) | $ (1,257.1) | $ (2,833.7) |

## CONSOLIDATED STATEMENTS OF CASH FLOWS
### (in millions)

| | Fiscal Year Ended June 30, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| Cash Flows from Operating Activities: | | | |
| Net loss | $ (1,261.7) | $ (2,827.7) | $ (189.0) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization expense | 124.3 | 142.8 | 63.8 |
| Stock-based compensation expense | 405.0 | 328.4 | 194.0 |
| Non-cash operating lease expense | 79.8 | 92.4 | 61.5 |
| Amortization of premium from marketable securities | — | 3.4 | 9.6 |
| Amortization of debt discount and issuance costs | 13.6 | 35.3 | 13.0 |
| Goodwill impairment | — | 181.9 | — |
| Impairment expense | 144.5 | 390.5 | 4.5 |
| Net foreign currency adjustments | (7.0) | 31.8 | 3.4 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | (13.8) | (12.8) | 15.1 |
| Inventories | 537.5 | (173.7) | (587.2) |
| Prepaid expenses and other current assets | 61.2 | (32.5) | (32.3) |
| Other assets | 7.1 | (2.1) | (19.1) |
| Accounts payable and accrued expenses | (347.2) | (168.6) | 439.8 |
| Deferred revenue and customer deposits | (13.9) | 36.8 | (212.7) |
| Operating lease liabilities, net | (89.9) | (55.8) | (8.0) |
| Other liabilities | (27.3) | 10.1 | 3.8 |
| Net cash used in operating activities | (387.6) | (2,020.0) | (239.7) |
| Cash Flows from Investing Activities: | | | |
| Purchases of marketable securities | — | — | (449.1) |
| Maturities of marketable securities | — | 211.0 | 665.9 |
| Sales of marketable securities | — | 306.7 | 6.7 |
| Capital expenditures and capitalized internal-use software development costs | (82.4) | (337.3) | (252.3) |
| Business combinations, net of cash acquired | — | (11.0) | (478.2) |
| Asset acquisitions, net of cash acquired | — | (16.0) | (78.1) |
| Proceeds from sales of net assets | 12.4 | — | — |
| Net cash (used in) provided by investing activities | (69.9) | 153.3 | (585.1) |
| Cash Flows from Financing Activities: | | | |
| Proceeds from public offering, net of issuance costs | — | 1,218.8 | — |
| Proceeds from issuance of term loan, net of issuance costs | — | 696.4 | — |
| Proceeds from issuance of convertible notes, net of issuance costs | — | — | 977.2 |
| Principal repayment of Term Loan | (7.5) | — | — |
| Purchase of capped calls | — | — | (81.3) |
| Proceeds from employee stock purchase plan withholdings | 6.9 | 17.3 | 18.0 |
| Proceeds from exercise of stock options | 79.8 | 84.3 | 57.6 |
| Taxes withheld and paid on employee stock awards | — | — | (53.9) |
| Principal repayments of finance leases | (2.3) | (1.7) | (0.8) |
| Net cash provided by financing activities | 76.8 | 2,015.1 | 916.8 |
| Effect of exchange rate changes | 8.6 | (26.5) | 6.7 |
| Net change in cash, cash equivalents, and restricted cash | (372.2) | 121.9 | 98.7 |

| | | | | | |
|---|---|---|---|---|---|
| Cash, cash equivalents, and restricted cash — Beginning of period | | 1,257.6 | | 1,135.7 | 1,037.0 |
| Cash, cash equivalents, and restricted cash — End of period | $ | 885.5 | $ | 1,257.6 | $ 1,135.7 |
| Supplemental Disclosures of Cash Flow Information: | | | | | |
| Cash paid for interest | $ | 79.0 | $ | 1.0 | $ 1.3 |
| Cash paid for income taxes | $ | 14.9 | $ | 15.2 | $ 3.5 |
| Supplemental Disclosures of Non-Cash Investing and Financing Information: | | | | | |
| Accrued and unpaid capital expenditures, including software | $ | 2.4 | $ | 18.7 | $ 46.1 |
| Stock-based compensation capitalized for software development costs | $ | 12.1 | $ | 10.4 | $ 6.1 |

## NON-GAAP FINANCIAL MEASURES

In addition to our results determined in accordance with accounting principles generally accepted in the United States, or GAAP, we believe the following non-GAAP financial measures are useful in evaluating our operating performance. These non-GAAP financial measures have limitations as analytical tools in that they do not reflect all of the amounts associated with our results of operations as determined in accordance with GAAP. Because of these limitations, Adjusted EBITDA, Subscription Contribution, Subscription Contribution Margin, and Free Cash Flow should be considered along with other operating and financial performance measures presented in accordance with GAAP.

The presentation of these non-GAAP financial measures is not intended to be considered in isolation or as a substitute for, or superior to, financial information prepared and presented in accordance with GAAP. Investors are encouraged to review the reconciliation of these non-GAAP financial measures to their most directly comparable GAAP financial measures. A reconciliation of the non-GAAP financial measures to such GAAP measures can be found below.

A reconciliation of the Company's Adjusted EBITDA and Free Cash Flow guidance to the most directly comparable GAAP financial measures cannot be provided without unreasonable efforts and is not provided herein because of the inherent difficulty in forecasting and quantifying certain amounts that are necessary for such reconciliations, including net income (loss) and adjustments that are made for other expense (income), net, income tax expense (benefit), depreciation and amortization expense, stock-based compensation expense, restructuring expense, impairment expense, supplier settlements, product recall related matters, litigation and settlement expenses, transaction and integration costs, and other adjustments reflected in our reconciliation of historical Adjusted EBITDA, the amounts of which could be material.

### Adjusted EBITDA

We calculate Adjusted EBITDA as net (loss) income adjusted to exclude: other expense (income), net; income tax expense (benefit); depreciation and amortization expense; stock-based compensation expense; goodwill impairment; impairment expense; product recall related matters; certain litigation and settlement expenses; transaction and integration costs; reorganization, severance, exit, disposal and other costs associated with restructuring plans; supplier settlements; and other adjustment items that arise outside the ordinary course of our business.

We use Adjusted EBITDA as a measure of operating performance and the operating leverage in our business. We believe that this non-GAAP financial measure is useful to investors for period-to-period comparisons of our business and in understanding and evaluating our operating results for the following reasons:

- Adjusted EBITDA is widely used by investors and securities analysts to measure a company's operating performance without regard to items such as stock-based compensation expense, depreciation and amortization expense, other expense (income), net, and provision for income taxes that can vary substantially from company to company depending upon their financing, capital structures, and the method by which assets were acquired;

- Our management uses Adjusted EBITDA in conjunction with financial measures prepared in accordance with GAAP for planning purposes, including the preparation of our annual operating budget, as a measure of our core operating results and the effectiveness of our business strategy, and in evaluating our financial performance; and

- Adjusted EBITDA provides consistency and comparability with our past financial performance, facilitates period-to-period comparisons of our core operating results, and may also facilitate comparisons with other peer companies, many of which use a similar non-GAAP financial measure to supplement their GAAP results.

Our use of Adjusted EBITDA has limitations as an analytical tool, and you should not consider this measure in isolation or as a substitute for analysis of our financial results as reported under GAAP. Some of these limitations are, or may in the future be, as follows:

- Although depreciation and amortization expense are non-cash charges, the assets being depreciated and amortized may have to be replaced in the future, and Adjusted EBITDA does not reflect cash capital expenditure requirements for such replacements or for new capital expenditure requirements;

- Adjusted EBITDA excludes stock-based compensation expense, which has recently been, and will continue to be for the foreseeable future, a significant recurring expense for our business and an important part of our compensation strategy;

- Adjusted EBITDA does not reflect: (1) changes in, or cash requirements for, our working capital needs; (2) interest expense, or the cash requirements necessary to service interest or principal payments on our debt, which reduces cash available to us; or (3) tax payments that may represent a reduction in cash available to us;

- Adjusted EBITDA does not reflect certain litigation expenses, consisting of legal settlements and related fees for specific proceedings that we have determined arise outside of the ordinary course of business based on the following considerations which we assess regularly: (1) the frequency of similar cases that have been brought to date, or are expected to be brought within two years; (2) the complexity of the case; (3) the nature of the remedy(ies) sought, including the size of any monetary damages sought; (4) offensive versus defensive posture of us; (5) the counterparty involved; and (6) our overall litigation strategy;

- Adjusted EBITDA does not reflect transaction and integration costs related to acquisitions;

- Adjusted EBITDA does not reflect impairment charges for goodwill and fixed assets, and gains (losses) on disposals for fixed assets;

- Adjusted EBITDA does not reflect the impact of purchase accounting adjustments to inventory related to the Precor acquisition;

- Adjusted EBITDA does not reflect costs associated with product recall related matters including adjustments to the return reserves, inventory write-downs, logistics costs associated with Member requests, the cost to move the recalled product for those that elect the option, subscription waiver costs of service, and recall-related hardware development and repair costs;

- Adjusted EBITDA does not reflect reorganization, severance, exit, disposal and other costs associated with restructuring plans;

- Adjusted EBITDA does not reflect non-recurring supplier settlements; and

- The expenses and other items that we exclude in our calculation of Adjusted EBITDA may differ from the expenses and other items, if any, that other companies may exclude from Adjusted EBITDA when they report their operating results and we may, in the future, exclude other significant, unusual expenses or other items from this financial measure. Because companies in our industry may calculate this measure differently than we do, its usefulness as a comparative measure can be limited.

Because of these limitations, Adjusted EBITDA should be considered along with other operating and financial performance measures presented in accordance with GAAP.

The following table presents a reconciliation of Adjusted EBITDA to Net loss, the most directly comparable financial measure prepared in accordance with GAAP, for each of the periods indicated:

### *Adjusted EBITDA*

| | Three Months Ended June 30, | | Fiscal Year Ended June 30, | | Three Months Ended | |
|---|---|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 | March 31, 2023 | September 30, 2022 |
| | (dollars in millions) | | | | | |
| Net loss | $ (241.8) | $ (1,255.3) | $ (1,261.7) | $ (2,827.7) | $ (275.9) | $ (408.5) |
| Adjusted to exclude the following: | | | | | | |
| Total other expense, net | 15.8 | 30.3 | 60.9 | 74.1 | 9.1 | 33.7 |
| Income tax expense | 0.2 | 12.2 | 3.7 | 19.6 | 0.8 | 0.8 |
| Depreciation and amortization expense | 31.2 | 40.4 | 124.3 | 142.8 | 32.2 | 29.0 |
| Stock-based compensation expense | 69.8 | 74.8 | 319.9 | 271.8 | 69.3 | 105.3 |
| Goodwill Impairment | — | — | — | 181.9 | — | — |
| Impairment expense | 32.6 | 348.0 | 144.5 | 390.5 | 39.4 | 62.9 |
| Restructuring expense | 21.5 | 78.9 | 193.0 | 237.5 | 12.0 | 106.9 |
| Supplier settlements | — | 337.6 | 22.0 | 337.6 | 2.9 | — |
| Product recall related matters[1] | 40.0 | 13.3 | 80.9 | 62.3 | 9.7 | 28.9 |
| Litigation and settlement expenses[2] | (4.1) | 30.6 | 102.8 | 118.6 | 81.8 | 5.7 |
| Other adjustment items | — | 0.5 | 1.0 | 8.4 | — | 2.0 |
| Adjusted EBITDA | $ (34.7) | $ (288.7) | $ (208.5) | $ (982.7) | $ (18.7) | $ (33.4) |

_____

(1) Represents adjustments and charges associated with product recall related matters, as well as accrual adjustments. These include an adjustment to Connected Fitness Products revenue for actual and estimated future returns of zero and $14.6 million, recorded costs in Connected Fitness Products cost of revenue primarily associated with recall related matters of $40.0 million and $64.1 million, and operating expenses of zero and $2.3 million associated with recall-related hardware development costs, in each case for the three months and fiscal year ended June 30, 2023, respectively. For the three months and fiscal year ended June 30, 2022, these also include a reduction to

Connected Fitness Products revenue for actual and estimated future returns of $12.5 million and $48.9 million, recorded costs in Connected Fitness Products cost of revenue associated with inventory write-downs and logistic costs of $0.5 million and $8.1 million, and operating expenses of $0.4 million and $5.4 million associated with recall-related hardware development costs, respectively. For the three months ended March 31, 2023, these include an adjustment to Connected Fitness Products revenue for actual and estimated future returns of $(11.9) million and recorded costs in Connected Fitness Products cost of revenue associated with recall related matters of $21.6 million. For the three months ended September 30, 2022, these include a reduction to Connected Fitness Products revenue for actual and estimated future returns of $26.5 million and recorded costs in Connected Fitness Products cost of revenue associated with inventory write-downs and logistic costs of $2.5 million.

(2) Includes Dish settlement accrual of $75.0 million for the three months ended March 31, 2023 and fiscal year ended June 30, 2023. Includes litigation-related expenses for certain non-recurring patent infringement litigation and consumer arbitration for the three months and fiscal years ended June 30, 2023 and 2022, as well as for the three months ended March 31, 2023 and September 30, 2022.

## Subscription Contribution and Subscription Contribution Margin

We define "Subscription Contribution" as Subscription revenue less cost of Subscription revenue, adjusted to exclude from cost of Subscription revenue, depreciation and amortization expense, and stock-based compensation expense. Subscription Contribution Margin is calculated by dividing Subscription Contribution by Subscription revenue.

We use Subscription Contribution and Subscription Contribution Margin to measure our ability to scale and leverage the costs of our Connected Fitness Subscriptions. We believe that these non-GAAP financial measures are useful to investors for period-to-period comparisons of our business and in understanding and evaluating our operating results because our management uses Subscription Contribution and Subscription Contribution Margin in conjunction with financial measures prepared in accordance with GAAP for planning purposes, including the preparation of our annual operating budget, as a measure of our core operating results and the effectiveness of our business strategy, and in evaluating our financial performance.

The use of Subscription Contribution and Subscription Contribution Margin as analytical tools has limitations, and you should not consider these in isolation or as substitutes for analysis of our financial results as reported under GAAP. Some of these limitations are as follows:

- Although depreciation and amortization expense are non-cash charges, the assets being depreciated and amortized may have to be replaced in the future, and Subscription Contribution and Subscription Contribution Margin do not reflect cash capital expenditure requirements for such replacements or for new capital expenditure requirements; and
- Subscription Contribution and Subscription Contribution Margin exclude stock-based compensation expense, which has recently been, and will continue to be for the foreseeable future, a significant recurring expense for our business and an important part of our compensation strategy.

Because of these limitations, Subscription Contribution and Subscription Contribution Margin should be considered along with other operating and financial performance measures presented in accordance with GAAP.

The following table presents a reconciliation of Subscription Contribution to Subscription Gross Profit, the most directly comparable financial measure prepared in accordance with GAAP, for each of the periods indicated:

| | Three Months Ended June 30, | | Fiscal Year Ended June 30, | | Three Months Ended March 31, |
|---|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 | 2023 |
| | (dollars in millions) | | | | |
| Subscription Revenue | $ 421.7 | $ 383.1 | $ 1,670.1 | $ 1,394.7 | $ 424.7 |
| Less: Cost of Subscription | 138.1 | 122.8 | 547.9 | 450.0 | 136.9 |
| Subscription Gross Profit | $ 283.6 | $ 260.3 | $ 1,122.1 | $ 944.7 | $ 287.8 |
| Subscription Gross Margin | 67.3 % | 67.9 % | 67.2 % | 67.7 % | 67.8 % |
| Add back: | | | | | |
| Depreciation and amortization expense | $ 9.8 | $ 8.1 | $ 36.9 | $ 26.8 | $ 9.8 |
| Stock-based compensation expense | 10.5 | 7.6 | 42.8 | 22.7 | 9.7 |
| Subscription Contribution | $ 303.9 | $ 276.1 | $ 1,201.8 | $ 994.2 | $ 307.2 |
| Subscription Contribution Margin | 72.1 % | 72.1 % | 72.0 % | 71.3 % | 72.3 % |

The continued growth of our Connected Fitness Subscription base will allow us to improve our Subscription Contribution Margin. While there are variable costs, including music royalties, associated with our Connected Fitness Subscriptions, a significant portion of our content creation costs are fixed given that we operate with a limited number of production studios and Instructors. We expect the fixed nature of those expenses to scale over time as we grow our Connected Fitness Subscription base.

**Free Cash Flow**

We define Free Cash Flow as Net cash provided by (used in) operating activities less capital expenditures and capitalized internal-use software development costs. Free cash flow reflects an additional way of viewing our liquidity that, we believe, when viewed with our GAAP results, provides management, investors and other users of our financial information with a more complete understanding of factors and trends affecting our cash flows.

The use of Free Cash Flow as an analytical tool has limitations due to the fact that it does not represent the residual cash flow available for discretionary expenditures. For example, Free Cash Flow does not incorporate payments made for purchases of marketable securities, business combinations and asset acquisitions. Because of these limitations, Free Cash Flow should be considered along with other operating and financial performance measures presented in accordance with GAAP.

The following table presents a reconciliation of Free Cash Flow to Net cash used in operating activities, the most directly comparable financial measure prepared in accordance with GAAP, for each of the periods indicated:

| | Three Months Ended June 30, | | Fiscal Year Ended June 30, | | Three Months Ended | |
|---|---|---|---|---|---|---|
| | **2023** | **2022** | **2023** | **2022** | **March 31, 2023** | **December 31, 2022** |
| | *(dollars in millions)* | | | | | |
| Net cash used in operating activities | $ (55.4) | $ (342.2) | $ (387.6) | $ (2,020.0) | $ (40.9) | $ (88.5) |
| Capital expenditures and capitalized internal-use software development costs | (18.6) | (69.7) | (82.4) | (337.3) | (14.3) | (5.9) |
| Free Cash Flow | $ (74.0) | $ (411.9) | $ (470.0) | $ (2,357.4) | $ (55.3) | $ (94.4) |
| Adjustments to Free Cash Flow [1] | $ 75.0 | | | | | $ 102.6 |
| Adjusted Free Cash Flow | $ 1.0 | | | | | $ 8.2 |

[1] Represents adjustments to Free Cash Flow for the Dish settlement and supplier settlement payments for the three months ended June 30, 2023 and December 31, 2022, respectively.

# EXHIBIT D-D

# EXHIBIT D




Credit Card


Check

Gift Cards


Crypto
Currency

**12 Months Membership**
Billed in one payment of $119.99
$9.99/month

**6 Months Membership**
Billed in one payment of $89.99
$14.99/month

**Monthly Membership**
Billed in one payment of $32.99
$32.99/month

**2 Days Membership**
Your trial period will be billed $1.00/day[1]
$1.00/day

**Start Membership**

# EXHIBIT D-E

# EXHIBIT E



# BRAZZERS



Credit Card



Gift Cards

Crypto Currency

| | |
|---|---|
| **12 Months Membership**<br>Billed in one payment of $119.99* | $9.99/month |
| **3 Months Membership**<br>Billed in one payment of $59.99** | $19.99/month |
| **30 Days Membership**<br>Billed in one payment of $29.99*** | $29.99/month |
| **2 Days Membership**<br>Your trial period will be billed $1/day**** | $1.00/day |

*12 Months Membership initial charge of $119.99 automatically rebilling at $119.99 every 365 days until cancelled.
**3 Months Membership initial charge of $59.99 automatically rebilling at $59.99 every 90 days until cancelled.
***30 Days Membership initial charge of $29.99 automatically rebilling at $29.99 every 30 days until cancelled.
****Limited access 2 day trial period automatically rebilling at $34.99 every 30 days until cancelled.

# EXHIBIT D-F

# EXHIBIT F



 

Credit Card     Gift Cards     Crypto Currency

**12 Months Membership**
Billed in one payment of $119.99*

$**9**.99 /month

**3 Months Membership**
Billed in one payment of $59.99**

$**19**.99 /month

**30 Days Membership**
Billed in one payment of $29.99***

**MOST POPULAR** ★★★★★

$**29**.99 /month

**2 Days Membership**
Your trial period will be billed $1/day****

$**1**.00 /day

*12 Months Membership initial charge of $119.99 automatically rebilling at $119.99 every 365 days until cancelled.
**3 Months Membership initial charge of $59.99 automatically rebilling at $59.99 every 90 days until cancelled.
***30 Days Membership initial charge of $29.99 automatically rebilling at $29.99 every 30 days until cancelled.
****Limited access 2 day trial period automatically rebilling at $39.99 every 30 days until cancelled.

# EXHIBIT D-G

# EXHIBIT G

# B R A Z Z E R S

Credit Card

| | **Limited Time Offer** | | |

| **5 YEAR MEMBERSHIP** | **12 MONTHS MEMBERSHIP + 6 FREE MONTHS** | **1 MONTH MEMBERSHIP + 1 FREE MONTH** | **2 DAYS MEMBERSHIP** |

*$3.33*/MONTH

*$9.99*/MONTH

*$32.99*/MONTH

*$1.00*/2 DAYS

Billed in one payment of $199.99*

Billed in one payment of $119.99**

Billed in one payment of $32.99***

Your trial period will be billed at $1.00 for 2 days.****

*5 Year Membership initial charge of $199.99 non rebilling.
**18 Months Membership initial charge of $119.99 automatically rebilling at $119.99 every 365 days until cancelled.
***60 Days Membership initial charge of $32.99 automatically rebilling at $32.99 every 30 days until cancelled.
****Limited access 2 day trial period automatically rebilling at $39.99 every 30 days until cancelled.
Where applicable, sales tax may be added to your purchase

**START MEMBERSHIP**

SUPPORT    PRIVACY POLICY    TERMS AND CONDITIONS    CANCELLATION POLICY    EU DSA

# EXHIBIT D-H

# EXHIBIT H

ers.com has 2980969 average monthly recipients of the service in the European Union, calculated as an average over the period of the past six months.

# EXHIBIT D-I

# EXHIBIT I

**European Union**

# Country profiles

# Filter by

# Country profiles (27)

🔊 RSS *(/node/288/rss_en)*

**Showing results 1 to 20**



### Austria *(/principles-countries-history/country-profiles/austria_en)*

EU member country since 1995, Euro area member since 1999, Schengen area member since 1997 and more about Austria's participation in the EU.



### Belgium *(/principles-countries-history/country-profiles/belgium_en)*

EU member country since 1958, Euro area member since 1999, Schengen area member since 1995 and more about Belgium's participation in the EU.



### Bulgaria *(/principles-countries-history/country-profiles/bulgaria_en)*

EU member country since 2007 and more about Bulgaria's participation in the EU.



## Croatia *(/principles-countries-history/country-profiles/croatia_en)*

EU member country since 2013, Euro area member since 2023, Schengen area member since 2023 and more about Croatia's participation in the EU.



## Cyprus *(/principles-countries-history/country-profiles/cyprus_en)*

EU member country since 2004, Euro area member since 2008 and more about Cyprus's participation in the EU.



## Czechia *(/principles-countries-history/country-profiles/czechia_en)*

EU member country since 2004, Schengen area member since 2007 and more about Czechia's participation in the EU.



## Denmark *(/principles-countries-history/country-profiles/denmark_en)*

EU member country since 1973, opt-out from euro, Schengen area member since 2001 and more about Denmark's participation in the EU.



## Estonia *(/principles-countries-history/country-profiles/estonia_en)*

EU member country since 2004, Euro area member since 2011, Schengen area member since 2007 and more about Estonia's participation in the EU.



## Finland *(/principles-countries-history/country-profiles/finland_en)*

EU member country since 1995, Euro area member since 1999, Schengen area member since 2001 and more about Finland's participation in the EU.



## France *(/principles-countries-history/country-profiles/france_en)*

EU member country since 1958, Euro area member since 1999, Schengen area member since 1995 and more about France's participation in the EU.



## Germany *(/principles-countries-history/country-profiles/germany_en)*

EU member country since 1958, Euro area member since 1999, Schengen area member since 1995 and more about Germany's participation in the EU.



## Greece *(/principles-countries-history/country-profiles/greece_en)*

EU member country since 1981, Euro area member since 2001, Schengen area member since 2000 and more about Greece's participation in the EU.



## Hungary *(/principles-countries-history/country-profiles/hungary_en)*

EU member country since 2004, Schengen area member since 2007 and more about Hungary's participation in the EU.



## Ireland *(/principles-countries-history/country-profiles/ireland_en)*

EU member country since 1973, Euro area member since 1999, opt-out from Schengen area and more about Ireland's participation in the EU.



## Italy *(/principles-countries-history/country-profiles/italy_en)*

EU member country since 1958, Euro area member since 1999, Schengen area member since 1997 and more about Italy's participation in the EU.



# Latvia *(/principles-countries-history/country-profiles/latvia_en)*

EU member country since 2004, Euro area member since 2014, Schengen area member since 2007 and more about Latvia's participation in the EU.



# Lithuania *(/principles-countries-history/country-profiles/lithuania_en)*

EU member country since 2004, Euro area member since 2015, Schengen area member since 2007 and more about Lithuania's participation in the EU.



# Luxembourg *(/principles-countries-history/country-profiles/luxembourg_en)*

EU member country since 1958, Euro area member since 1999, Schengen area member since 1995 and more about Luxembourg's participation in the EU.



# Malta *(/principles-countries-history/country-profiles/malta_en)*

EU member country since 2004, Euro area member since 2008, Schengen area member since 2007 and more about Malta's participation in the EU.



# Netherlands *(/principles-countries-history/country-profiles/netherlands_en)*

EU member country since 1958, Euro area member since 1999, Schengen area member since 1995 and more about the Netherlands' participation in the EU.

**Did this page meet your expectations?**  

**European Union**

# Country profiles

# Filter by

# Country profiles (27)

🔊 RSS *(/node/288/rss_en)*

**Showing results 20 to 27**



### Poland *(/principles-countries-history/country-profiles/poland_en)*

EU member country since 2004, Schengen area member since 2007 and more about Poland's participation in the EU.



### Portugal *(/principles-countries-history/country-profiles/portugal_en)*

EU member country since 1986, Euro area member since 1999, Schengen area member since 1995 and more about Portugal's participation in the EU.



### Romania *(/principles-countries-history/country-profiles/romania_en)*

EU member country since 2007 and more about Romania's participation in the EU.



## Slavakia *(/principles-countries-history/country-profiles/slovakia_en)*

EU member country since 2004, Euro area member since 2009, Schengen area member since 2007 and more about Slovakia's participation in the EU.



## Slovenia *(/principles-countries-history/country-profiles/slovenia_en)*

EU member country since 2004, Euro area member since 2007, Schengen area member since 2007 and more about Slovenia's participation in the EU.



## Spain *(/principles-countries-history/country-profiles/spain_en)*

EU member country since 1986, Euro area member since 1999, Schengen area member since 1995 and more about Spain's participation in the EU.



## Sweden *(/principles-countries-history/country-profiles/sweden_en)*

EU member country since 1995, Schengen area member since 2001 and more about Sweden's participation in the EU.



# EXHIBIT D-J

# EXHIBIT J



























# EXHIBIT E



## The Washington Post

*Democracy Dies in Darkness*

THE TECHNOLOGY **202**

A newsletter briefing on the intersection of
technology and politics.

**Subscribe to the newsletter** ⊕

# Utah's porn crackdown has a VPN problem



Analysis by <u>Cristiano Lima</u>

with research by <u>David DiMolfetta</u>

May 5, 2023 at 9:05 a.m. EDT

**Happy Friday!** Here's to hoping email filters don't do a number on us for today's newsletter. Send news tips to: <u>cristiano.lima@washpost.com</u>.

Below: Microsoft proposes changes to its Office product to prevent an antitrust investigation, and a poll finds half of Americans want artificial intelligence to be regulated. First:

# Utah's porn crackdown has a VPN problem

A new Utah law requiring companies to verify users' ages to access pornography took effect Wednesday, sparking backlash from advocacy groups who say it undermines residents' online privacy.

In the wake of the law, searches and downloads for virtual private networks (VPNs) — which mask a user's personal information — have soared in Utah, according to data shared with The Technology 202. That suggests residents may already be trying to circumvent the rules.

**The uptick underscores the enforcement challenges officials are likely to face as they advance rules aimed at protecting children online, including efforts cropping up around the country imposing fresh age-verification requirements.**

**And it could expose companies that don't shut out VPNs to fresh legal risk.**

Several VPN service providers said they either saw a major jump in traffic or a spike in downloads after the law kicked in Wednesday — and since the site Pornhub announced it will shut out users in Utah in protest. The tools could allow users to still access impacted sites without coughing up their information.

"VPN is an easy way to circumvent age-verification requirements," said **Suzanne Bernstein**, a law fellow at the Electronic Privacy Information Center advocacy group.

- Surfshark VPN said the number of downloads of its product in Utah has approximately doubled in the past few days.

- Private Internet Access said visits to its website from Utah more than doubled in the 24 hours after the age-verification law went into effect.

- ExpressVPN said their website has seen a 300 percent boost in traffic from users in Utah since the law took effect.

**Shoshana Weissmann**, digital director and fellow at the R Street Institute think tank, said the age-verification rules could force companies to either collect more personal data, such as government-issued identification, or biometric data, including by scanning users' faces.

"Age-verification technology is really invasive in its current form," she said.

**The Utah law (S.B. 287), meant to keep minors off porn sites, is part of a mounting push in the United States to expand protections for kids online, including by vetting their ages.**

A separate Utah law (S.B. 152) requiring that social media platforms obtain parental consent to let minors use their services would force companies to "verify the age of a Utah resident seeking to maintain or open" an account.

A similar law in Arkansas (S.B. 396) requiring parental consent for users under 18 to go on social media obligates companies to "verify the age of an account holder."

Some states have taken a less direct approach to age verification, including a California law requiring platforms to vet their products for potential risks to kids before rolling them out.

That law, the California Age Appropriate Design Code (A.B. 2273), applies to platforms "likely to be accessed by children" but does not explicitly require companies to vet users' ages.

**Samir Jain**, vice president of policy at the Center for Democracy and Technology, said the difference can be moot. "There are lots of different ways that these laws are imposing de facto or implicit age-verification requirements," he said.

The think tank receives funding from tech companies including Google, Facebook and Amazon. (Amazon founder Jeff Bezos owns The Washington Post.)

**While users may be able to use VPNs to avoid getting shut out by sites, companies could still be on the hook for letting them evade the rules, Weissmann and Jain said.**

Utah's social media law, set to take effect next year, states that a "social media company shall not permit a Utah minor account holder to change or bypass restrictions on access." That type of language could expose social media companies and VPNs to legal threats, Jain said.

"There's a danger that you end up discouraging the use or even outlawing the use of VPNs or encryption or other … methods of maintaining privacy that might make it difficult to enforce these kinds of laws," Jain said.

A spokesperson for Utah Gov. **Spencer Cox** (R) did not return a request for comment.

**Cox** <u>said in March</u> **that their age-verification laws won't be "foolproof," but they will be "working with social media companies … to figure out what that's going to look like."**

"We don't want them having copies of driver's licenses on hand," he said. "That's not what we're trying to do here. We believe that there are technical, logical fixes that we can work around this."

Utah's porn law is also facing legal challenges: A trade group representing the adult entertainment industry this week accused the state of violating constitutional privacy and free speech rights, <u>according to the Salt Lake Tribune</u>.


# Our top tabs


## Microsoft proposes selling versions of Office without Teams to ward off antitrust investigation

Microsoft proposed not including the Teams workplace communications app in certain versions of its Office product to ward off a potential antitrust investigation and a fine from E.U. enforcers, **Foo Yun Chee** <u>reports for Reuters</u>.

The European Commission (EC) antitrust regulator is also weighing the proposal with Microsoft rivals, the report said, citing two people familiar with the matter.

The proposal comes after Salesforce-owned workplace communications tool Slack in 2020 complained that Microsoft had unfairly integrated the Teams app into its Office suite of workplace products.

"We have received several complaints regarding Microsoft, including by Slack, regarding Microsoft's conduct in relation to its Teams product. As you know the assessment is ongoing so we cannot comment further," an EC spokesperson told Reuters.

Microsoft said it was "open to pragmatic solutions that address its concerns and serve customers well." Salesforce declined to comment.

# EXHIBIT F

# Better Than YouTube

**Quentin Hardy** Forbes Staff
*I cover enterprise tech & its impact on business*

 Follow

May 4, 2007, 06:00pm EDT

🕐 **This article is more than 10 years old.**

Big Media strikes back with Web video almost as good as real TV.

Until recently the internet strategy for broadcasters like Disney's ABC, Fox, Time Warner and Televisa was to promote shows online so people would go watch them on a TV set. Their big fear was that a generation of viewers would throw over traditional television for jerky, five-minute productions on YouTube.

But maybe short attention spans were just a function of bad technology. A handful of show producers are trading in the Web's old flavor of video delivery (the dominant one being Adobe Systems ' Flash) for newer technologies that deliver clear and smooth streamed images. Their supposedly attention-deficient viewers are suddenly half-hour fans again.

"We've got them for 22 minutes a session, compared with 3 or 4 minutes," says Ronald Berryman, senior vice president at Fox Interactive Media. Fox and abc insert sponsors' names, such as Clorox and Allstate , right before the show and above the viewing box while the show runs. "We can increase advertising and deliver long-form content."

A company called Move Networks in American Fork, Utah is at the forefront of this next evolution. Move does for video what voice over Internet networks did for telephone calls: It breaks up the video into bits and efficiently reorganizes them over the network so there's no need for the special computer servers and dedicated transmission lines required on streams using Flash. Shows such as Fox's *24* and *Prison Break*, ABC's *Lost* and *Grey's Anatomy,* and the CW Network's *Everybody Hates Chris* are now being streamed using Move software.

Move executives say they handle more than a million full episode streams a week, and viewership has doubled every month. Move says it is now delivering as much as 200 terabytes, or 200 trillion bytes, of streams per day (the average is 80 terabytes), roughly in line with YouTube but more than the Web sites of CNN, NBC and CBS.

Fox, which tested Move Networks' technology on the Web sites of 24 of its affiliates last year, plans to expand to 200 affiliates this summer and give consumers video-editing tools so they can produce their own brief programs. Another broadcaster, which was paying $1 million a month to deliver jerky versions of its shows, expects those costs to drop up to 85% with Move.

Move, like Flash, requires users to install a software player. But unlike YouTube-style Flash video, which fetches streamed bits in a series of requests from a set of servers at the sender's end, Move gets bits from the closest storage cache (similar to technology from Web video giant Akamai) and brings them back to the screen at the best streaming rate based on the network's traffic load. It uses standard Internet protocols, which means it can take advantage of the many server farms around the world that offer up Web pages.

Both ABC and Fox say there is nothing else that can stream at this scale.

Move, with 55 employees and $22 million in funding from Hummer Winblad and Steamboat Ventures (Disney's venture capital arm), has been in business for five years. It started out as an attempt to move large files by e-mail (thus the name Move Networks) but switched to video delivery in 2004 once its founders, both from Novell , realized that video was going to be a dominant medium online. "People may want to watch chunks, but more people want to watch long forms," says Chief Executive John Edwards. "The industry just had to solve the glitches." Quality and profits. How radical can the Internet get?

Subscribe to Forbes and Save. Click Here.

 **Quentin Hardy**

Follow

As the SF-based National Editor at Forbes, I write a lot about tech, but am interested in a lots of different people and markets. I've done covers...

**Read More**

Editorial Standards

Reprints & Permissions

ADVERTISEMENT

# EXHIBIT G

5/11/2021                    Here Comes More HD Video On the Web—Move Networks Raises $46 Million in C Round

The Wayback Machine - https://web.archive.org/web/20080708234723/http://www.techcrunch.com/2008/04/14/here-comes-more-hd-video-on-th...

- o TechCrunch Network
  - CrunchBase
  - CrunchBoard
  - CrunchGear
  - CrunchNotes
  - Elevator Pitches
  - Gillmor Gang
  - InviteShare
  - MobileCrunch
  - TalkCrunch
  - TechCrunch
  - TechCrunch50
  - TechCrunchIT
  - TechCrunch France
  - TechCrunch Japan
  - TechCrunch UK

- 

Search

- About
- Contact
- Company Index
- Advertise
- Archives
- TechCrunchIT
- TC50
- Pitches
- Subscribe by: RSS
- CrunchBar
- Email
  798K readers
  BY FEEDBURNER

« Previous post
Next post »

April 14, 2008

## Here Comes More HD Video On the Web—Move Networks Raises $46 Million in C Round

Erick Schonfeld                                                                 **22 comments »**

move-networks-logo.pngInvestors are betting big on video streaming provider Move Networks. The Utah-based company just announced that it raised $46 million in a C round of venture financing. The round was led by Benchmark Capital, and also included Cisco, Comcast Interactive Media, Televisa, Steamboat Ventures and Hummer Winblad Venture Partners. That brings the total raised since December, 2006 to $91.3 million. (Competitor Brightcove has raised $86.2 million and Maven Networks was bought by Yahoo for $160 million in February).

When it comes to streaming HD video on the Web, Move Networks is becoming one of the preferred video streaming partners for many major media sites, including ABC.com, Discovery.com, ESPN.com,and Fox.com. According to the company, it collectively streams videos to 6.5 million people a month, who average 50 minutes of viewing time *per session*. But Move requires that viewers install its own proprietary video player as a plug-in to their browsers. So in a way it competes with Flash, which is getting better all the time. (Brightcove is taking a different approach by experimenting with BitTorrent and other technologies to create high-quality video experiences through a Flash player). High-definition streams still tend to run into network bottlenecks and slow connection speeds at people's homes. Whoever can solve or bypass these problems will become adopted by more video sites as the demand for HD video rises.

**Move Networks**                                                                 minimize

https://web.archive.org/web/20080708234723/http://www.techcrunch.com/2008/04/14/here-comes-more-hd-video-on-the-web—move-networks-raises-...   1/2

**Website:** movenetworks.com
**Location:** American Fork, Utah, United States
**Funding:** $91.3M



Move Networks provides Internet television delivery services to premium content owners and aggregators at a substantially lower cost and with much higher quality than competing solutions. Move Networks has inked several high-profile deals with... Learn More

## Brightcove

**Website:** brightcove.com
**Location:** Cambridge, Massachusetts, United States
**Funding:** $91.1M

Brightcove is an Internet TV platform/network that allows content makers to monetize their content with ad revenues. The site has two different content makers in mind, independents and established media entities. Brightcove provides different... Learn More

## Maven Networks

**Website:** maven.net
**Location:** Cambridge, Massachusetts, United States
**Acquired:** January 31, 2008 by Yahoo! for $160M

Maven Networks (www.maven.net) is an online video platform provider with end-to-end video syndication, content management and advertising solution. Maven helps media companies create, distribute and profit from direct-to-consumer Internet TV channels... Learn More

Information provided by **CrunchBase**

- Sphere It
- ○ SHARE
- 

Appx000179
**Page 2 of 2**

DISH_337-TA-1265_00037494

# EXHIBIT H

5/10/2021                          Reprinted with permission 1-800-843-0008

The Wayback Machine - https://web.archive.org/web/20100417103435/http://webreprints.djreprints.com:80/2398340469676.html

THE WALL STREET JOURNAL. Digital Network    WSJ.com   MarketWatch   BARRONS   D All Things Digital   SmartMoney

# THE WALL STREET JOURNAL.

Today's Paper · Video · Columns · Blogs · Graphics · Newsletters & Alerts · Journal Community

HOME   U.S.   WORLD   BUSINESS   MARKETS   TECH   PERSONAL FINANCE   LIFE & STYLE   OPINION   CAREERS   REAL ESTATE   SMALL BUSINESS

TECH JOURNAL | FEBRUARY 3, 2010

# Pushing to Bring TV to the Internet

*Start-Up's Technology Can Transmit High-Quality Video, but It Must Convince Networks to Sign On*

By ETHAN SMITH

A small start-up is trying to do what many in Hollywood and Silicon Valley have so far been unable to do: take Internet video from its YouTube origins to a full-fledged television service with dozens of channels.

"We have video on the Web," says Roxanne Austin, chief executive of Move Networks Inc. and a former president of DirecTV. "We don't have television on the Web."

Ms. Austin's 100-person company, which is based in American Fork, Utah, has raised more than $67 million from some prominent backers that include Microsoft Corp., Comcast Corp. and Walt Disney Co.'s venture-capital arm. But like past efforts by larger companies, including Microsoft and Motorola Inc., to offer Internet-delivered television, it faces obstacles, not least of which is getting content owners to sign on.

"The technology is good enough this can happen," says Boyd Peterson, an analyst at Grail Research. "Now it comes down to the business case."

Move's technology can transmit broadcast-quality video via the Web, in Internet protocol data packets. Depending on the available bandwidth, a capability called "adaptive streaming" can adjust the quality of the image (and thus the quantity of data), all the way up to high definition, the company says.

*Move Networks*

*A scene from the sitcom 'The Big Bang Theory' in a demonstration of Move's Internet-TV service.*

Move recently laid off about 15 employees amid its transition to its new Internet-TV offering, away from its earlier main business of providing video-streaming technology for the Web sites of broadcasters

If the company is able to launch the service it is now pitching to broadcasters—tentatively dubbed Move TV—viewers could watch programs in one of three ways: via a computer's Web browser; on a television that is either equipped with a built-in Internet jack or connected to a set-top converter box; or on a wireless, Internet-connected device like an iPhone or iPad.

Because Move isn't laying cable or launching satellites, the company's executives argue they can charge consumers far less than traditional pay-television operators for a comparable suite of channels. Move hopes to undercut those operators further by offering a pared-down lineup—perhaps as few as 80 to 100 channels.

*Move Networks*

*Move's programming guide, which resembles grids found in conventional TV services.*

The company is pursuing deals to act as a back-end provider for Internet-service providers that want to add TV programming to their broadband offerings, and is also considering offering its service directly to consumers.

Move does have one customer lined up: CWI, the international division of Britain's Cable & Wireless PLC, which aims to offer the TV service to its 204,000 Internet customers in 38, small, mostly Caribbean nations. The companies aim to launch the service this summer but are still in content-licensing talks.

Move executives say they have opened discussions with major U.S. broadcasters about licensing content and hope to have deals in place by the end of this year.

Mr. Peterson, the analyst, says it could be difficult for Move to sign up enough content creators, particularly small cable channels, who risk alienating the cable and satellite operators they depend on. "You're starting to see the tensions," he adds.

Move executives say they may be able to promise content owners as much money, or perhaps even more, per user, per channel, than existing competitors. But the total amount of money delivered every month is likely to be far lower than what cable and satellite operators pay.

The start-up's affiliations with both a content-creating behemoth (Disney) and a distribution giant (Comcast) could help. But even Disney isn't ready to commit. Asked about discussions with Move, a Disney spokesman said: "We always look at new technologies that offer consumers more choice, and that use business models which work for us financially."

Comcast last month launched a service called TV Everywhere that uses Move software to offer cable subscribers free on-demand access, via a Web site, to some TV programming. The service in some ways represents a pre-emptive strike against technologies like Move TV, and it isn't clear what the implications of TV Everywhere may be for Move's own subscription platform. Comcast declined to comment.

Move's proposed service would allow broadcasters to maintain some degree of what they call "linearity" in their programming—presenting their shows in a context that encourages viewers to tune in to more shows, rather than as the free-floating episodes found on services like Hulu and YouTube.

But if Move's business model were to succeed, it could turn cable providers into little more than utilities, maintaining thousands of miles of dumb pipe—pipe through which Move's snazzily repackaged TV programming would be flowing.

https://web.archive.org/web/20100417103435/http://webreprints.djreprints.com:80/2398340469676.html                          1/2

DISH_337-TA-1265_00037584

Media companies ranging from the New York Times Co. to the backers of Hulu have begun to look for online-business models that are more lucrative than their longstanding strategies of giving away their content online—often the same content that users must pay for when delivered by traditional channels like print and cable television.

"How do we create a subscription model [for television] on the Net that consumers would pay for?" asks Ms. Austin.

One of Move's tactics is to offer programming in new ways. For instance, in a demonstration of the company's proposed service, programming information is displayed in the same kind of grid that is standard on many cable systems—with a twist. A viewer can scroll backward in time and select programs from the past, as if they'd been stored on a digital video recorder.

© 2010 Dow Jones & Company. All Rights Reserved.
Sale of this Dow Jones WebReprint Service® Article Does Not Constitute Or Imply Any Endorsement
Or Sponsorship Of Any Product, Service, Company Or Organization.
REPRODUCTIONS REQUIRE FURTHER PERMISSION

Dow Jones Reprint Solutions

www.djreprints.com

Appx000182
**Page 2 of 2**

DISH_337-TA-1265_00037585

# EXHIBIT I

5/11/2021                              ABC.com makes watching TV at work better | Webware : Cool Web apps for everyone

The Wayback Machine - https://web.archive.org/web/20070522194356/http://www.webware.com:80/8301-1_109-9704105-2.html

# Webware

 Webware

## Cool web apps for everyone

CNET

[        ] [Go]

- Home
- About
- Webware 100
- Contact

Hands-on

## ABC.com makes watching TV at work better

By David Carnoy – April 2, 2007, 1:35 PM PDT



*Lost*: looking good online.

(Credit: 2007 American Broadcasting
Companies, Inc.)

Among the networks, ABC.com has been one of the most aggressive in terms of streaming full versions of its shows online after they've aired on TV. During those quieter moments at work--some call them smoking breaks without the smoking--you can watch episodes of *Lost*, *Grey's Anatomy*, *Ugly Betty*, and more, right on your computer screen. Until a few days ago, however, the picture was rather small. Now ABC.com has launched a new full-screen "HD-quality" video player, and the "broadcast" looks shockingly good.

Meanwhile, NBC also has spruced up its online video player, and it, too, has added a full-screen option. The big difference is that NBC's video player uses Adobe's Flash Video, while ABC's is built on technology from upstart Move Networks.

During a "break," CNET editors John Falcone and Matthew Moskovciak huddled around my 19-inch Sony monitor in my office for a quick look at a recent *Lost* episode and were duly impressed. The picture may not quite measure up to true hi-def, but step a few feet back, and you're looking at a very detailed, sharp image. It's the kind of moment that makes you think that someday you'll be able to ditch your cable or satellite provider and get your content from cheaper sources that also happen to be legal. What a concept.

For a more in-depth story on ABC.com and its video player, go to broadcastingcable.com.

Appx000184
**Page 1 of 3**                                                                      DISH_337-TA-1265_00037470

Source: Broadcasting & Cable

Via: AVS Forum

Category: Audio & Video, Games & Entertainment, Media Tags: ABC.com, streaming video, HD, Lost, Grey's Anatomy, Ugly Betty
Add to:

- Digg
- Del.icio.us
- Reddit

# TalkBack
# 4 messages

**Post a comment**

## Not availabe in Mexico :(

Anyone knows good proxies to "Americanize" my IP?

by **alex_mayorga** (See profile) - April 3, 2007 7:46 AM PDT

**1 comment**

## (NT) Not available for Vista :(

by **neen001** (See profile) - April 2, 2007 6:32 PM PDT

**1 comment**

▼ advertisement

Click Here
Webware Feeds

- RSS Feed
- Add to Google
- Add to My Yahoo
- Add to MSN
- Add to Bloglines
- Add to Newsgator

# Categories

- Audio & Video
- Browsers & extensions

- Chat & Email
- Commerce

- Content & Publishing
- Developer Tools

- Digital Photography
- Education & Reference

- Games & Entertainment
- Mapping

- Media
- Mobile

- Networking
- Productivity & Business

Appx000185
**Page 2 of 3**

DISH_337-TA-1265_00037471

- Search
- Security & Spyware

- Social Network & groups
- Storage

- Uncategorized
- Utilities & Drivers

- Web Design Tools
- Widgets and desktop enhancements



**About CNET Networks** | Jobs | Advertise | Partnerships
Visit other CNET Networks sites: Select Site ⌄ Go
**Copyright** © 2007 CNET Networks, Inc. All Rights Reserved. **Privacy Policy** | **Terms of Use**

Appx000186
**Page 3 of 3**

DISH_337-TA-1265_00037472

# EXHIBIT J

6/11/2021      Contentinople - R. Scott Raynovich - Online HD: Coming Faster Than You Think

The Wayback Machine - https://web.archive.org/web/20080415212235/http://www.contentinople.com:80/a_thor.asp?section= id=430&doc_id=145592





# CONTENTINOPLE
Networking the Digital Media Industry

Events | White Papers | Sponsor this site
Join | Login | About Us | Send us story ideas | RSS

Home | **Stories** | Guides | Comments | What To Do        Search



## Online HD: Coming Faster Than You Think

Written by R. Scott Raynovich

ni. rabiegs

login to like

Either I'm delusional, or the pace of high-definition (HD) technology is advancing fast enough that it may make online streaming HD downloads a legitimate competitor to traditional media -- within the next 12 months.

It's anecdotal evidence only, but I think a big indication of the trend is that my wife has been watching episodes of "Lost," in HD, on the ABC site. My wife is typically not an early adopter of technology, she usually waits until it's more mainstream. I was a bit shocked to come home one night and find Lost streaming across a 19" flat-screen computer monitor in crisp, clear glory. In simple terms, the quality of the picture was better than you got on a traditional TV set just five years ago.

For those of you who have switched over to HD cable, you know how addictive it can be. As soon as you seen some of your content in HD, you immediately want all of it in HD. This is why I think moving to HD online can be so powerful — the online properties have an opportunity to satiate the consumer's real, pent-up demand for HD content.

As Mark Cuban writes about often in his blog, HD content in itself can be a real differentiator. If you are, for example, a provider of niche content who hasn't managed to break into the cable line-up, chances are you can find and audience online. That's because there's not nearly enough HD content available.

The best news here is that while only a year ago one would have thought we would be waiting years to see viable streaming HD technology, it now appears to be coming faster than I thought.

I just got back from a trip to ... A, where I talked to a lot of people with insight into what's going on with technology that enables the content providers to more expediently deliver HD. There are many companies working to speed up HD downloads, including Move Networks, FastSoft, Shiva, and BitGravity (there are many more — those just some of the top of my mind). Judging from the ABC site, the Move Networks stuff really works. I've also recently seen impressive demos by BitGravity and FastSoft.

I think that several technologies are coming together to speed up the high-def experience. What are they?

- **Client Technology.** Media standards such as Adobe Flash, Microsoft's Windows Media, and Apple Quicktime have been upgraded lately to improve the way that rich media is handled and streamed. Or, in some cases, people like Move Networks have built an embedded client for their content provider

- **Codecs.** I led to the topic above. H.264/MPEG-4 are being more widely distributed through the improved codecs, meaning higher quality content with less bandwidth.

- **Last-mile bandwidth.** Maybe I'm just lucky cause I have a 10 Mbit/s FIOS connection to my house, which makes streaming HD realistic. But really, this is going to become a lot more common. And coming soon, we'll have 4G and mobile WiMax. Oh, read about today's announcement from Comcast on Cable Digital News.

- **Acceleration technology.** Whether it's a caching device or a server optimized for high-bandwidth delivery of media applications, more technologies are being applied to speed up the delivery of HD. For one example, FastSoft is accelerating media delivery using a WAN optimization approach with TCP that sits on only one box on the server side.

- **Content Delivery Networks (CDNs).** A new crop of CDNs such as Edgecast and BitGravity are specifically targeting high-definition media applications. They are building networks that are optimized for this type of content.

## RELATED CONTENT

- Entryway of TT&T Group Inc.'s TV? AMC 14 Sale via RIP
- Thursday, April 3, 2008 More Story Algofind New Video Download Play
- Wireless, March 10 Apple April 7 News Bits: BBC Brings iPlayer to Nintendo Wii
- Wednesday, April 9, 2008 Editorial Adobe Launches Media Flash
- Tuesday, Apr 8, 2008 More Story FCC Chief Spells Out 'D-Rebix' Plan
- Tuesday, April 1, 2008 11:09 AM EDT More Time Warner Turns to ESPN to Program AOL Sports
- Friday, April 4, 2008 More Story The Monthly Aftercast of Yahoo
- Monday, April 7, 2008 AOL Spells Out Story
- News Bits: Microsoft & Yahoo Look Homes
- Monday, April 7, 2008 More Dish CTV Movies Basecamp Sunken Oil, as Film Producer.

## WHAT TO DO

   

| **1** | **2** | **3** | **4** |
| Register to join our community | Create a profile | Rate & review services & products | Participate in the community |



## MOST POPULAR STORIES

1. SplashCast Gives Consumers Tools to Live
2. Interrop Founder: Calls VidStream Buy "Disappointing"
3. Level 3 Content Exec Steps Down
4. TenStampest Niche Social Networking Sites
5. News Bits: Downloads, Coming Soon to a PS3 Near You
6. Level 3 Embraces the Long Tail
7. Intermap CDC Redgint

https://web.archive.org/web/20080415212235/http://www.contentinople.com/author.asp?section_id=430&doc_id=145592      1/3

Appx000188
**Page 1 of 3**

DISH_337-TA-1265_00037478

Put it all together with a sudden interest from the networks and studios in getting more HD content in the hands of the consumer, and you have a recipe for this market taking off. It's shocking, really. I can't remember the last time that technology actually suprised me by arriving before I expected it.

Tags: Business, Content Delivery Network (CDN), High-Def (HD), Video

 Digg  Del.icio.us  Reddit  Email This

## Comments



### Re: SD sucks
**Jeff Baumgartner**
Rank: Pasha
Tuesday February 12, 2008 4:37:48 PM

no ratings

• **Login to Rate**

There's a way to set your favorites so you can switch to those channels in succession without hunting them down in the higher ends of the channel spectrum, but that's a kluge solution to the true problem.

But I don't know why an HD box can't automatically map to the HD feed if there's an HD and SD simulcast happening. It may be that they just "haven't gotten around to it yet." They are already doing it in digital simulcast markets...ie. if the digital box tunes to channel 9, it uses the digital feed, rather than the analog feed, of channel 9. I don't see why this can't be done in HD, too.

Early on, my HD-DVR wasn't smart enough to record the show from the HD feed automatically. Unless I manually set it up otherwise, it it would default the recording to the SD feed, which is really stoopid. But they fixed that glitch eventually. It may be that they havne't gotten around to these other fixes yet, but there's no technical reason I can think of that would prevent it.

---

**Start your Own Board**　　　　　　　　　Messages List | Post a Message | Reply



### Re: SD sucks
**rayno**
Staff
Tuesday February 12, 2008 4:03:26 PM

no ratings

• **Login to Rate**

"standard-def wasteland" -- Ha!

Another Pet Peeve -- why are cable channel guides so stoopid?

1) All the HD channels are banished to the hinterlands... like Chanell 8** or something. But, as you observed, if you have an HD box, they are likely the first channels you visit! Shouldn't the cable company be able to flop the channels so the HD Channels are 1, 2, 3, 4, e.t.c.

2) Why are the channels inflexible? You should be able the ASSIGN your channels no? Line them up like customized bookmarks. There is not a chance in H*ll I'm going to the Oxygen channel, ever. And neither is my wife, for that matter

---

**Start your Own Board**　　　　　　　　　Messages List | Post a Message | Reply



### SD sucks
**Jeff Baumgartner**
Rank: Pasha
Tuesday February 12, 2008 3:53:49 PM

no ratings

• **Login to Rate**

I totally agree on the HD thing. Once you have an HD set getting hd signals from cable, satellite or the telco, you're hooked. The first thing I do when I turn my HD set on is browse the HD tier. If nothing's there, I'll see my DVR has any HD stuff ready for viewing. Then, only then, do I enter the standard-def wasteland.

**Start your Own Board**　　　　　　　　　Messages List | Post a Message | Reply

## More from R. Scott Raynovich RSS

**Feature** Tuesday, April 15, 2008 at 11:00 AM EDT Post a comment

---

8　The Amazing Arrogance of Yahoo
9　Dwight Merriman: The Future of CDNs Is HTTP
10　NAB Day One: Akamai, CDNetworks Spruce Up

## NEWS HEADLINES

- Tuesday, April 15, 2008 at 10:06 AM EDT
  Mogulus, Kulabyte Team to Stream
- Tuesday, April 15, 2008 at 10:05 AM EDT
  New Handsets Spur Mobile Video Adoption
- Tuesday, April 15, 2008 at 10:04 AM EDT
  Peter Gabrial Launching Social Network
- Tuesday, April 15, 2008 at 10:03 AM EDT
  BBC Digital Exec Hops Over to Kangaroo
- Tuesday, April 15, 2008 at 09:52 AM EDT
  PermissionTV Raises $3M
- Monday, April 14, 2008 at 03:25 PM EDT
  AOL Lands Verizon Ads
- Monday, April 14, 2008 at 01:38 PM EDT
  TidalTV Signs Nat'l Geographic Deal
- Monday, April 14, 2008 at 01:08 PM EDT
  Move Raises $46M
- Monday, April 14, 2008 at 10:41 AM EDT
  Hulu Adds Sharing Feature
- Monday, April 14, 2008 at 10:39 AM EDT
  Report: TV Ads Still 'Robust'

**More News**

---

## Interview: BitTorrent's New CEO, Doug Walker

**News / Analysis** Monday, April 14, 2008 at 11:45 AM EDT Post a comment

## Content Delivery Economics: Eight Days to Go

**Commentary** Friday, April 11, 2008 at 10:15 AM EDT Post a comment

## Top Five Signs Yahoo/XYZ Is the New Time Warner/AOL

**News / Analysis** Wednesday, April 9, 2008 at 09:20 AM EDT Post a comment

## Flickr Video: Pay Us & Take It Easy

**News / Analysis** Tuesday, April 8, 2008 at 07:00 PM EDT Post a comment

## The New Face of News Video

**Commentary** Monday, April 7, 2008 at 02:15 PM EDT Post a comment

## The Amazing Arrogance of Yahoo

**Commentary** Friday, April 4, 2008 at 03:45 PM EDT Post a comment

## More From Beet.tv: Burning Cash Like Vegas

**News / Analysis** Thursday, April 3. 2008 at 05:35 PM EDT Post a comment

## The Jay-Z Live Nation Coup

**Feature** Wednesday, April 2, 2008 at 05:30 PM EDT Post a comment

## Mossberg, Meatballs & Video

**Commentary** Friday, March 28, 2008 at 10:45 AM EDT 2 comments

## The Music Tax: How Dumb Is That?

All From R. Scott Raynovich



**Site Links**
Home
Join
RSS
Privacy Policy and Terms
of Use

**All about Contentinople**
About Us
Contact Us
What to do

**Advertise**
For advertising
opportunities please
contact
sales@contentinople.com

**Newsletter**
Sign up now for your free
daily news update.

**Events & Research**
Upcoming Webinars
Webinar Archives
Webinar Calendar
Live Events
Industry Events
White Papers

Copyright © 2008 United Business Media LLC - All rights reserved.

DISH_337-TA-1265_00037480