# EXHIBIT AA

# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF TEXAS

## AUSTIN DIVISION

| | |
|---|---|
| FREE SPEECH COALITION, INC., MG PREMIUM LTD, MG FREESITES LTD, WEBGROUP CZECH REPUBLIC, A.S., NKL ASSOCIATES, S.R.O., SONESTA TECHNOLOGIES, S.R.O., SONESTA MEDIA, S.R.O., YELLOW PRODUCTION S.R.O., PAPER STREET MEDIA, LLC, NEPTUNE MEDIA, LLC, JANE DOE, MEDIAME SRL, MIDUS HOLDINGS, INC., | **CASE NO. 1:23-cv-917** <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| vs. | |
| ANGELA COLMENERO, IN HER OFFICIAL CAPACITY AS INTERIM ATTORNEY GENERAL FOR THE STATE OF TEXAS, | |
| Defendant. | |

Plaintiffs, by their undersigned counsel, bring this Complaint to enjoin the Texas Attorney General from enforcing a newly passed law targeting the free speech rights of internet platforms and individuals that goes into effect September 1, 2023, as it violates both the Constitution of the United States and the federal Communications Decency Act.

## <u>INTRODUCTION</u>

1.     On June 12, 2023, the Texas governor signed into law House Bill 1181 ("the Act"), which goes into effect September 1, 2023. The Act joins a long tradition of unconstitutional—and ultimately failed—governmental attempts to regulate and censor free speech on the internet. The Act in effect requires Plaintiffs to block access to their websites in Texas wholesale, unless they implement a system that requires all visitors to transmit their personal information to verify that they are at least eighteen years old. The Act also purports to compel Plaintiffs to display a lengthy, controversial, and factually false "TEXAS HEALTH AND HUMAN SERVICES WARNING" on their websites—maligning the very constitutionally protected content they feature. Both of the Act's requirements are enforceable by the Texas Attorney General. Both requirements are unconstitutional. Plaintiffs thus seek to enjoin the Attorney General from enforcing the unconstitutional Act.

2.     Pursuant to 42 U.S.C. §§ 1983, 1988 and 28 U.S.C. §§ 2201-02, Plaintiffs seek injunctive and declaratory relief to vindicate rights, privileges, and immunities secured by the Constitution and laws of the United States. The Act violates the First, Eighth, and Fourteenth Amendments to the United States Constitution, as well as section 230 of the Communications Decency Act.

3.     The Act violates the First Amendment in three fundamental ways.

3.1     *First*, the Act's age verification requirement is overbroad and fails strict scrutiny. Despite impinging on the rights of adults to access protected speech, it fails strict scrutiny by employing the *least* effective and yet also the *most* restrictive means of accomplishing Texas's stated purpose of allegedly protecting minors. Indeed, minors can use virtual private networks ("VPNs"), proxy servers, the "Tor" browser, and numerous other circumventions to bypass the

1

Act's verification requirements with ease; the law excludes search engines and most social media sites even though they pose a *greater* risk of exposure to adult content; and protected speech will be chilled as adults refuse to risk sharing and exposing their personal information that could lead to financial or reputational harm. In contrast, content filtering at the browser and/or the device level allows anyone wishing to implement that technology on minors' devices to block access to any unwanted site, including adult sites, without impairing free speech rights or privacy. But such far more effective and far less restrictive means don't really matter to Texas, whose true aim is not to protect minors but to squelch constitutionally protected free speech that the State disfavors.

3.2　*Second*, the Act's "health warning" requirement is a classic example of the State mandating an orthodox viewpoint on a controversial issue. Texas could easily spread its ideological, anti-pornography message through public service announcements and the like without foisting its viewpoint upon others through mandated statements that are a mix of falsehoods, discredited pseudo-science, and baseless accusations.

3.3　*Third*, under the heightened scrutiny required by the First Amendment, the Act is incurably vague as to its fundamental requirements, providing neither a coherent standard for assessing which websites it applies to, nor adequate guidance on what "age verification" entails.

4.　The Act further violates the Supremacy Clause by violating section 230 of the Communications Decency Act, which prohibits treating website operators as if they were responsible for alleged harm caused by content created by third parties.

5.　The Act violates the Fourteenth Amendment in multiple ways, too. *First*, because of its vagueness, it violates the procedural component of the Due Process Clause. *Second*, by destroying Plaintiffs' protected property right in the goodwill of Texan viewers without a rational basis, it violates the substantive component of the Due Process Clause. *Third*, because of its arbitrary exceptions for search engines and most social media sites, it violates the Equal Protection Clause even under rational basis review.

6.     The Act also violates the Excessive Fines Clause of the Eighth Amendment, because it imposes fines that are grossly disproportionate to the unsubstantiated, fabricated harms it purports to protect against.

7.     Accordingly, Plaintiffs seek to have the Texas Attorney General enjoined from enforcing the Act—both preliminarily, pending the hearing and determination of this action, and permanently.  Plaintiffs also seek declaratory relief, as well as damages, costs, and attorneys' fees.

## JURISDICTION AND VENUE

8.     This case presents federal questions within this Court's jurisdiction pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331 and 1343(3).  Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988 (deprivation of rights, privileges, and immunities secured by the Constitution and federal law) and 28 U.S.C. §§ 2201-02 (declaratory judgment as to an actual controversy).

9.     Venue is proper pursuant to 28 U.S.C. § 1391(b).  The challenged law was passed in Austin, Texas, which is also where the Attorney General performs her official duties.

## PARTIES

10.     Defendant Angela Colmenero is a person within the meaning of Section 1983 of Title 42 of the United States Code; and she currently serves as the Interim Attorney General of the State of Texas.  The Office of the Attorney General is in Austin, Texas.  The Act expressly authorizes that, "[i]f the attorney general believes that an entity is knowingly violating or has knowingly violated this chapter and the action is in the public interest, the attorney general may bring an action in a Travis County district court or the district court in the county in which the principal place of business of the entity is located in this state to enjoin the violation, recover a civil penalty, and obtain other relief the court considers appropriate."  Act § 129B.006.  The Attorney General of Texas is thus solely and directly responsible for the enforcement of the Act.

11.     Plaintiff Free Speech Coalition, Inc. ("FSC") is a not-for-profit trade association organized under the laws of California with its principal place of business in Canoga Park, California. FSC assists filmmakers, producers, distributors, wholesalers, retailers, internet

Appx000744

providers, performers, and other creative artists located throughout North America in the exercise of their First Amendment rights and in the vigorous defense of those rights against censorship. Founded in 1991, the Free Speech Coalition represents hundreds of businesses and individuals involved in the production, distribution, sale, and presentation of constitutionally-protected adult content disseminated to consenting adults via the internet. FSC sues on its own behalf and on behalf of its members to vindicate its own constitutional rights, its members' constitutional rights, and the rights of its members' owners, officers, employees, and current and prospective readers, viewers, and customers. Many of FSC's members are individual adult performers gravely concerned about the consequences of the Act, but who fear for their safety should they come forward publicly to challenge the Act in court. FSC's members would directly benefit from an injunction enjoining the enforcement of the Act. The potential harm to FSC's members caused by the recent enactment of state age-verification statutes has caused significant concern among its members. FSC has diverted resources away from its normal day-to-day activity, which has impaired its ability to perform its usual functions. Over the last six months, both FSC's Executive Director and Director of Public Affairs have had to devote more than half their time to tracking legislative developments, meeting with FSC members to discuss risks relating to age-verification statutes, meeting with litigation attorneys and advisors, and otherwise engaging in activities to minimize the risk to its members from the age-verification statutes that states, in particular Texas, have recently enacted.

  12. Plaintiff MG Premium Ltd, is a limited liability company organized under the laws of the Republic of Cyprus, with its principal place of business in Nicosia, Cyprus, that operates SpiceVids.com ("SpiceVids"), a subscription-based website offering high quality adult content uploaded, owned, copyrighted, and controlled by third party content creators. MG Premium Ltd also operates the website Brazzers.com ("Brazzers"), a subscription-based website offering high quality adult content in which MG Premium Ltd holds all the intellectual property rights. For shoots with adult performers, MG Premium Ltd writes the scripts, hires the production team, and does the pre- and post-production work. MG Premium Ltd uploads Brazzers content both to

4

Brazzers.com and to the websites of other Plaintiffs, including Pornhub.com, xvideos.com, xnxx.com, and SpiceVids.  In addition, MG Premium Ltd operates the website FakeTaxi.com ("FakeTaxi"), a subscription-based website offering high quality adult content that is produced and owned by Plaintiff Yellow Production, s.r.o., discussed below.  MG Premium Ltd opposes the restrictions the Act would place on its ability to reach its audience, as well as the government-mandated speech the Act would force it to place on its websites.

13.     Plaintiff MG Freesites Ltd, is a limited liability company organized under the laws of the Republic of Cyprus, with its principal place of business in Nicosia, Cyprus, that operates Pornhub.com ("Pornhub"), a popular free adult entertainment website that hosts content uploaded, owned, copyrighted, and controlled by third party content creators.  MG Freesites Ltd opposes the restrictions the Act would place on the ability of its third party content creators to reach their audience, as well as the government-mandated speech the Act would force it to place on its website.

14.     Plaintiff WebGroup Czech Republic, a.s. ("WebGroup"), is a corporation organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that operates xvideos.com ("XVideos"), a popular free adult entertainment website that hosts content uploaded, owned, copyrighted, and controlled by third party content creators.  WebGroup opposes the restrictions the Act would place on the ability of its third party content creators to reach their audience, as well as the government-mandated speech the Act would force it to place on its website.

15.     Plaintiff NKL Associates, s.r.o. ("NKL"), is a limited liability company organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that operates xnxx.com ("Xnxx"), a popular free adult entertainment website that hosts content uploaded, owned, copyrighted, and controlled by third party content creators. NKL opposes the restrictions the Act would place on the ability of its third party content creators to reach their audience, as well as the government-mandated speech the Act would force it to place on its website.

16.     Plaintiff Sonesta Technologies, s.r.o. ("Sonesta Tech"), is a limited liability company organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that operates the website BangBros.com ("BangBros"), a subscription-based website offering high quality adult content.  Sonesta Tech opposes the restrictions the Act would place on its ability to reach its audience, as well as the government-mandated speech the Act would force it to place on its website.

17.     Plaintiff Sonesta Media, s.r.o., ("Sonesta Media") is a limited liability company organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that produces, and owns the intellectual property rights to, the content on BangBros.com.  It also licenses some of its content to be uploaded to other websites, including Pornhub, XVideos, Xnxx, and SpiceVids.  Sonesta Media opposes the restrictions the Act would place on its ability to reach its audience, as well as the government-mandated speech the Act would force BangBros to place on its website.

18.     Plaintiff Yellow Production, s.r.o. ("Yellow Production") is a limited liability company organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that produces, and owns the intellectual property rights to, the content on FakeTaxi.  It also licenses some of its content to be uploaded to other websites, including Pornhub, Xvideos, Xnxx, and SpiceVids.  Yellow Production opposes the restrictions the Act would place on its ability to reach its audience, as well as the government-mandated speech the Act would force FakeTaxi to place on its website.

19.     Plaintiff Paper Street Media, LLC ("Paper Street"), is a limited liability company organized under the laws of Florida, with its principal place in Miami, Florida, that operates the TeamSkeet adult content network, comprised of numerous subscription-based adult websites offering high quality adult content.  Paper Street owns the content on its network sites and, for shoots with adult performers, writes the scripts, hires the production team, and does the pre- and post-production work.  Paper Street also makes some of the content available on the TeamSkeet network available to other adult websites, including Pornhub, XVideos, Xnxx, and

SpiceVids. Paper Street opposes the restrictions the Act would place on its ability to reach its audience, as well as the government-mandated speech the Act would force it to place on its websites.

20.     Plaintiff Neptune Media, LLC ("Neptune Media"), is a limited liability company organized under the laws of Florida, with its principal place of business in Miami, Florida, that operates the MYLF adult content network, comprised of numerous subscription-based adult websites offering high quality adult content. Neptune Media owns the content on its network sites and, for shoots with adult performers, writes the scripts, hires the production team, and does the pre- and post-production work. Neptune Media also makes some of the content available on the MYLF network available to other adult websites, including Pornhub, XVideos, Xnxx, and SpiceVids. Neptune Media opposes the restrictions the Act would place on its ability to reach its audience, as well as the government-mandated speech the Act would force it to place on its websites.

21.     Plaintiff Jane Doe,[1] a citizen and resident of the State of Oregon, is an adult performer who creates adult content. Their content is featured on numerous adult websites, including Pornhub. They oppose the restrictions the Act would place on their ability to reach their audience, as well as the government-mandated speech that the Act would force adult websites to place on their websites.

22.     Plaintiff MediaME SRL is a limited liability company organized under the laws of Romania, with its principal place of business in Pipera, Romania, that operates the website Porndoe.com, a popular free adult entertainment websites that hosts content uploaded, owned, copyrighted, and controlled by third party content creators.

23.     Plaintiff Midus Holdings, Inc., is a corporation organized under the laws of Florida, with its principal place of business in Coral Springs, Florida, that operates the

---

[1] "Jane Doe" is a pseudonym necessary to protect Plaintiff from retaliation, stalking, and other harms associated with taking legal action to defend the adult industry against the Act. Doe's true name may be provided to the Court under seal or pursuant an appropriate protective order.

websites Letsdoeit.com and Superbe.com, each a subscription-based website offering high quality adult content within the United States.

**FACTS**

**I.      The Act**

24.      During the 2023 legislative session, the Texas Legislature passed House Bill 1181, which amended Section 1, Title 6 of the Texas Civil Practice and Remedies Code by adding Chapter 129B—herein referred to as "the Act."  The Texas Governor signed the bill into law on June 12, 2023, which goes into effect September 1, 2023.  The Act provides:

Chapter 129b. Liability for Allowing Minors to Access Pornographic Material

***Sec. 129b.001. Definitions***.

In this chapter:

(1)      "Commercial entity" includes a corporation, limited liability company, partnership, limited partnership, sole proprietorship, or other legally recognized business entity.

(2)      "Distribute" means to issue, sell, give, provide, deliver, transfer, transmute, circulate, or disseminate by any means.

(3)      "Minor" means an individual younger than 18 years of age.

(4)      "News-gathering organization" includes:

(A)      an employee of a newspaper, news publication, or news source, printed or on an online or mobile platform, of current news and public interest, who is acting within the course and scope of that employment and can provide documentation of that employment with the newspaper, news publication, or news source; and

(B)      an employee of a radio broadcast station, television broadcast station, cable television operator, or wire service who is acting within the course and scope of that employment and can provide documentation of that employment.

(5)      "Publish" means to communicate or make information available to another person or entity on a publicly available Internet website.

(6)      "Sexual material harmful to minors" includes any material that:

(A)     the average person applying contemporary community standards would find, taking the material as a whole and with respect to minors, is designed to appeal to or pander to the prurient interest;

(B)     in a manner patently offensive with respect to minors, exploits, is devoted to, or principally consists of descriptions of actual, simulated, or animated displays or depictions of:

(i)     a person's pubic hair, anus, or genitals or the nipple of the female breast;

(ii)     touching, caressing, or fondling of nipples, breasts, buttocks, anuses, or genitals; or

(iii)     sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, excretory functions, exhibitions, or any other sexual act; and

(C)     taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

(7)     "Transactional data" means a sequence of information that documents an exchange, agreement, or transfer between an individual, commercial entity, or third party used for the purpose of satisfying a request or event. The term includes records from mortgage, education, and employment entities.

### Sec. 129B.002. Publication of Material Harmful to Minors.

(a)     A commercial entity that knowingly and intentionally publishes or distributes material on an Internet website, including a social media platform, more than one-third of which is sexual material harmful to minors, shall use reasonable age verification methods as described by Section 129B.003 to verify that an individual attempting to access the material is 18 years of age or older.

(b)     A commercial entity that performs the age verification required by Subsection (a) or a third party that performs the age verification required by Subsection (a) may not retain any identifying information of the individual.

### Sec. 129B.003.          Reasonable Age Verification Methods.

(c)     In this section, "digital identification" means information stored on a digital network that may be accessed by a commercial entity and that serves as proof of the identity of an individual.

(d)     A commercial entity that knowingly and intentionally publishes or distributes material on an Internet website or a third party that performs age verification under this chapter shall require an individual to:

(1)     display the following notices on the landing page of the Internet website on which sexual material harmful to minors is published or distributed and all advertisements for that Internet website in 14-point font or larger:

"TEXAS HEALTH AND HUMAN SERVICES WARNING: Pornography is potentially biologically addictive, is proven to harm human brain development, desensitizes brain reward circuits, increases conditioned responses, and weakens brain function."

"TEXAS HEALTH AND HUMAN SERVICES WARNING: Exposure to this content is associated with low self-esteem and body image, eating disorders, impaired brain development, and other emotional and mental illnesses."

"TEXAS HEALTH AND HUMAN SERVICES WARNING: Pornography increases the demand for prostitution, child exploitation, and child pornography."; and

(2)     display the following notice at the bottom of every page of the Internet website in 14-point font or larger:

"U.S. SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION HELPLINE:

1-800-662-HELP (4357)

THIS HELPLINE IS A FREE, CONFIDENTIAL INFORMATION SERVICE (IN ENGLISH OR SPANISH) OPEN 24 HOURS PER DAY, FOR INDIVIDUALS AND FAMILY MEMBERS FACING MENTAL HEALTH OR SUBSTANCE USE DISORDERS. THE SERVICE PROVIDES REFERRAL TO LOCAL TREATMENT FACILITIES, SUPPORT GROUPS, AND COMMUNITY-BASED ORGANIZATIONS."

**Sec. 129B.005. Applicability of Chapter.**

(a)     This chapter does not apply to a bona fide news or public interest broadcast, website video, report, or event and may not be construed to affect the rights of a news-gathering organization.

(b)    An Internet service provider, or its affiliates or subsidiaries, a search engine, or a cloud service provider may not be held to have violated this chapter solely for providing access or connection to or from a website or other information or content on the Internet or on a facility, system, or network not under that provider's control, including transmission, downloading, intermediate storage, access software, or other services to the extent the provider or search engine is not responsible for the creation of the content that constitutes sexual material harmful to minors.

### Sec. 129B.005. Applicability of Chapter.

(a)    If the attorney general believes that an entity is knowingly violating or has knowingly violated this chapter and the action is in the public interest, the attorney general may bring an action in a Travis County district court or the district court in the county in which the principal place of business of the entity is located in this state to enjoin the violation, recover a civil penalty, and obtain other relief the court considers appropriate.

(b)    A civil penalty imposed under this section for a violation of Section 129B.002 or 129B.003 may be in an amount equal to not more than the total, if applicable, of:

(1)    $10,000 per day that the entity operates an Internet website in violation of the age verification requirements of this chapter;

(2)    $10,000 per instance when the entity retains identifying information in violation of Section 129B.002(b); and

(3)    if, because of the entity's violation of the age verification requirements of this chapter, one or more minors accesses sexual material harmful to minors, an additional amount of not more than $250,000.

(c)    The amount of a civil penalty under this section shall be based on:

(1)    the seriousness of the violation, including the nature, circumstances, extent, and gravity of the violation;

(2)    the history of previous violations;

(3)    the amount necessary to deter a future violation;

(4)     the economic effect of a penalty on the entity on whom the penalty will be imposed;

(5)     the entity's knowledge that the act constituted a violation of this chapter; and

(6)     any other matter that justice may require.

(d)     The attorney general may recover reasonable and necessary attorney's fees and costs incurred in an action under this section."

25.     Section 2 of the Act establishes that "[t]he Act becomes effective September 1, 2023."

## II.     Communication Over the Internet

26.     The internet is a decentralized, global medium of communication that links people, institutions, corporations, and governments around the world. It is a giant computer network that interconnects innumerable smaller groups of linked computer networks and individuals' computers. The internet connects an estimated 5.39 billion people—or 68% of the world's population[2]—and it is estimated that 77.0% of Texas residents are internet users.[3]

27.     Because the internet merely links together numerous individual computers and computer networks, no single entity or group of entities controls the material made available on the internet or limits the ability of others to access such materials. Rather, the range of digital information available to internet users is individually created, maintained, controlled, and located on millions of separate individual computers around the world.

28.     The internet presents extremely low entry barriers to anyone who wishes to provide or distribute information or gain access to it. Unlike television, cable, radio, newspapers, magazines or books, the internet provides the average citizen and business, whether large or small, with an affordable means for communicating with, accessing, and posting content to a worldwide

---

[2] *See* http://www.internetworldstats.com/stats.htm.
[3] *See* https://www.statista.com/statistics/184691/internet-usage-in-the-us-by-state.

audience. Although the majority of the information on the internet does not depict or describe nudity or sexual activity, such material is indeed widely available on the internet.

29. An Internet Protocol ("IP") address is a unique address that identifies a connection to a device on the internet or a local network, much like a telephone number is used to connect a telephone to other telephones. In essence, an IP address is the identifier that allows information to be sent between devices on a network. Internet Service Providers ("ISPs") and telecommunications companies control "blocks" of IP addresses, and the location of an internet connection can be very roughly determined according to the geographic region those companies assign to the IP address associated with a connection.

30. Websites can request that their host server block traffic from particular IP address regions ("geoblocking") or target specific regions with different versions of the website using the same technology ("geolocation"). They can also pay for expensive services that rely on GPS and data modeling to increase the accuracy of geoblocking and geolocation. However, satellites and cellular towers do not respect state boundaries, and many IP-address databases are highly inaccurate. The accuracy of geolocation technology is imperfect, and residents of one state, particularly near state borders, may be mistakenly categorized as residents of another. Indeed, some blocks of IP addresses cover multiple States at once, and the accuracy of geolocating an internet user based on IP address can dip as low as 55%.

31. Virtual Private Networks ("VPNs") and proxy servers bypass geoblocking and geolocation by websites. Both function as an intermediary between an individual internet-connected device and the targeted server. They hide the device's actual public IP address and instead "tunnel" traffic between the device and a remote server—the only difference being that communications sent through VPNs are encrypted. Setting up a proxy server is generally free and simple, and the same is true of VPNs. Doing so permits users to obscure their location while browsing the web, whether on wireless or cellular networks. VPNs are extremely common—used both by consumers and businesses to establish secure, remote connections to their home networks. In fact, they are included by default in most consumer antivirus software.

32. The freely available "Tor" browser, which is designed to be easily downloaded and used, also hides a user's IP address when browsing the internet.

33. Even remote and virtual desktop services, which are popular among university students, allow users to appear to internet websites as though they were located wherever the cloud server (in the case of virtual desktops) or the actual computer (in the case of virtual desktops) appears to be located. In all cases, the user can appear to be located in a different state or country whose laws do not require age verification by websites.

### III. The Minimal Benefits of Age Verification under the Act

34. Minors are more at risk of exposure to adult content from social media sites and search engines than traditional adult websites like Plaintiffs.[4] Search engines, by design, enable anyone to access troves of adult images and videos in seconds—content that is no less explicit than that found directly on Plaintiffs' websites. And Facebook alone flagged a staggering **73.3 million** pieces of content under "child nudity and sexual exploitation" from Q1 to Q3 of 2022 alone.[5] Recent research found a majority of children under 13 had their own profile on at least one social media application or site and one-third of children between the ages of 8 and 17 with a social media profile signed up with a false birthdate.[6]

35. Because most social media sites contain so much content that they will not meet the Act's "more than one-third" threshold for "sexual material harmful to minors," the Act effectively exempts most social media sites, in addition to its explicit exemption for search engines.

---

[4] Neil Thurman and Fabian Obster, "The regulation of internet pornography: What a survey of under-18s tells us about the necessity for and potential efficacy of emerging legislative approaches," 13 POLICY & INTERNET 415, 417 (2001).
[5] *See* Paul Bischoff, *The Rising Tide of Child Abuse Content on Social Media*, (Jan. 25, 2023), https://www.comparitech.com/blog/vpn-privacy/child-abuse-online-statistics/.
[6] *See* https://www.ofcom.org.uk/__data/assets/pdf_file/0024/234609/childrens-media-use-and-attitudes-report-2022.pdf.

14

36.    There also are far riskier ways to obtain adult content, such as through the Dark Web (e.g., via the freely downloadable "Tor" browser), which is replete with more extreme adult content and also a range of black markets for ransomware, sex trafficking, drugs, and even hitmen. Those determined to access adult content are likely to be pushed by the Act towards unregulated platforms, which is a more dangerous environment for users, *including* underage users, who would then be exposed to far more problematic and hazardous online environments.

37.    In addition to these alternative pathways to adult content, state-specific restrictions on traditional adult websites can be easily bypassed by VPNs and proxy servers.

38.    All of this is magnified by the fact that minors are more tech-savvy than adults, especially older adults, and therefore will be able easily to evade the age verification requirements of the Act.

## IV.    The Burdens and Risks of Age Verification

### A.    The Risks To Adults

39.    While rapid technological progress might suggest it's easy to verify age, in fact there is no current method that does not carry inherent, unacceptable disadvantages and harms.[7] Nor does technological process excuse First Amendment violations, or make the Act any more effective at protecting kids, or any less invasive of people's privacy, or any less dangerous in light

---

[7] *See, e.g.*, Jason Kelley and Adam Schwartz, *Age Verification Mandates Would Undermine Anonymity Online,* Electronic Frontier Foundation, March 10, 2023, https://www.eff.org/deeplinks/2023/03/age-verification-mandates-would-undermine-anonymity-online (explaining the flaws of age verification systems and why they are the wrong approach to protecting young people online, as they would force websites to require visitors to prove their age by submitting information such as government-issued identification. "This scheme would lead us further towards an internet where our private data is collected and sold by default. The tens of millions of Americans who do not have government-issued identification may lose access to much of the internet. And anonymous access to the web could cease to exist.").

of the highly recognized misuse of any such data[8] and vulnerability to hackers and cybersecurity attacks.

40.    Hackers are targeting information shared on the internet at exponentially high rates, including data kept in the safest locations such as federal and state agencies, which have themselves been subjected to multiple breaches.[9]

41.    Any claimed benefit of age verification imposed by the Act does not justify the burdens imposed on adults—the vast majority of whom value their online privacy and do not wish to expose exploitable personal data simply to view constitutionally-protected material they have every right to view.  The high risk of data breaches and leaks resulting from compliance with the Act serves as an unavoidable barrier preventing adults from divulging their information over the internet.  If that is set as a condition to view legal adult content, adults will simply go elsewhere for that content instead (especially since that content is available elsewhere on the internet, not just on adult entertainment websites targeted by the Act).

42.    Online age-verification is fundamentally different from an employee at a brick-and-mortar store checking a driver's license.  Online and offline age verification do not share the same risks.  Offline age verification does not carry the threat of producing an accessible ledger of adults who view adult content (or adults whose identity has been stolen and used to view adult content) or of creating a digital trail that could expose an individual to financial or reputational harm.

---

[8] *See, e.g.*, a proposed Trade Regulation Rule on Commercial Surveillance and Data Security, https://www.federalregister.gov/documents/2022/08/22 (where the Federal Trade Commission requested public comment on the prevalence of commercial surveillance and data security practices that harm consumers, and inviting comment on whether it should implement new trade regulation rules or other regulatory alternatives concerning the ways in which companies collect, aggregate, protect, use, analyze, and retain consumer data, as well as transfer, share, sell, or otherwise monetize that data in ways that are unfair or deceptive, recognized, among others, that data is regularly collected for one purpose and used for another.).

[9] *See e.g.,* Kevin Collier, *U.S. Government Says Several Agencies Hacked As Part Of Broader Cyberattack,* https://www.nbcnews.com/tech/security/us-govenment-agencies-hacked-cyberattack-moveit-rcna89525 (discussing several U.S. agencies being hacked on June 15, 2023 as part of a broader cyberattack that hit dozens of companies and organizations in recent weeks through a previously unknown vulnerability in popular file sharing software).

Someone can enter a brick-and-mortar adult bookstore or sex shop merely by briefly displaying their license, for a human worker's real-time review. No record is made or kept, and that is the end of the matter. Online age verification, in contrast, carries the real risk that the viewer's digital "fingerprint" will take on a life of its own, enabling a third party to determine the viewer's identity, expose the viewer as a viewer of adult content, and steal the viewer's identity to commit financial fraud, extortion, and other crimes.[10]

43.     This risk is not hypothetical. Louisiana recently passed an age verification law that provides for age verification utilizing a state-maintained database of digital driver's licenses. After going live, that database was breached almost immediately,[11] exposing the information of everyone who enrolled in Louisiana's optional digital identification program for the purposes of accessing adult content. It is no coincidence that the number of identity thefts in Louisiana have increased since the age verification law became effective.

44.     Data minimization is the principle that reducing the amount of data collected in the first place reduces subsequent risk.[12] This is true, for instance, in the case of a disreputable adult site that might take advantage of the age verification law's requirements to force visitors to provide personal information that can be used for marketing, sold to data brokers, or stolen by attackers. This problem is exacerbated for certain vulnerable adult populations, such as the elderly, who are

---

[10] *See, e.g.*, Kim Zetter, *Hackers Finally Post Stolen Ashley Madison Data*, Wired, Aug. 18, 2015, https://www.wired.com/2015/08/happened-hackers-posted-stolen-ashley-madison-data (discussing Ashley Madison data breach and hackers' threat to "release all customer records, including profiles with all the customers' secret sexual fantasies and matching credit card transactions, real names and addresses."). The Ashley Madison breach is associated with at least two suicides. *See* Morgan Sharp, *Two people may have committed suicide after Ashley Madison hack: police*, Reuters, Aug. 24, 2015, https://www.reuters.com/article/us-ashleymadisoncybersecurity-idUSKCN0QT1O720150824//.

[11] *See* https://www.axos.com/local/new-orleans/2023/06/16/louisiana-cyberattack-dmv-moveit

[12] *See, e.g.,* Shoshana Weissmann, *Age-verification legislation discourages data minimization, even when legislators don't intend that*, Rstreet.com, May 24, 2023, https://www.rstreet.org/commentary/age-verification-legislation-discourages-data-minimization-even-when-legislators-dont-intend-that/ (discussing how data minimization lessens the potential of data breach); *see also Data Minimization Principle*, The International Association of Privacy Professionals, https://iapp.org/resources/article/data-minimization-principle/.

more susceptible to online hacks and scams.[13] Online age verification does not comport with the principle of data minimization.

**B. The Risks to Minors**

45. The Act's "solution" is far worse than the purported problem it aims to solve. Today's children are "digital natives." They are more likely than adults to be able to circumvent the Act, and thus be pushed to Tor and the Dark Web, where they will be exposed to illegal activities and more extreme material, including violent pornography and criminal gang activities.[14]

**C. The Burden on Websites**

46. Commercially available age verification services that are reputable are also exorbitantly expensive. For instance, Trustmatic, the cheapest option in the table below, still costs $40,000 per 100,000 verifications and intrusively requires users to upload pictures of their face.

| Vendor | Website (pricing) | $ per verification | 100M verifications | 5M verifications | 100k verifications |
|--------|-------------------|--------------------|---------------------|-------------------|---------------------|
| Yoti | https://www.yoti.com/business/identity-verification/ | £1.20 | £120,000,000 | £6,000,000 | £120,000 |
| Ondato | https://ondato.com/plans-pricing/ | €0.95 | €95,005,180 | €4,750,259 | €95,005 |
| Stripe | https://stripe.com/identity#pricing | $1.50 | $150,000,000 | $7,500,000 | $150,000 |
| Passbase | https://passbase.com/pricing | $2.00 | $200,000,980 | $10,000,049 | $200,001 |
| veriff | https://www.veriff.com/plans | $1.49 | $149,000,000 | $7,450,000 | $149,000 |
| Trustmatic | https://trustmatic.com/pricing | €0.40 | $40,000,000 | $2,000,000 | $40,000 |
| Berbix | https://www.berbix.com/pricing | $0.99 | $99,000,000 | $4,950,000 | $99,000 |
| Facaki | https://apps.facaki.com/pricing | $0.62 | $62,000,000 | $3,100,000 | $62,000 |

47. Faced with such costs, many smaller websites will be forced out of business.

**V. A Less Restrictive Alternative: Blocking and Filtering**

48. Improvements in technology have not made current online age verification methods superior to other alternatives, which do not share the same vulnerabilities and are far more effective in blocking access by minors while placing far lesser burdens on the free speech rights of adults.

---

[13] *See, e.g.,* Emma Fletcher, Federal Trade Commission Consumer Protection, *Older adults hardest hit by tech support scams,* https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2019/03/older-adults-hardest-hit-tech-support-scams (finding that "[o]lder adults face unique barriers to adoption, ranging from physical challenges to a lack of comfort and familiarity with technology.").

[14] *See* https://www.telegraph.co.uk/news/2018/01/05/warning-age-checks-porn-sites-risks-pushing-children-dark-web/.

49.     Content filtering at the browser and/or the device level allows anyone wishing to implement that technology on minors' devices to block access to any unwanted site, including adult sites.  These methods are more effective and less restrictive in terms of protecting minors from adult content.  While adults have every reason to be concerned about providing their personal information online, parents, who should be the first line of protective defense of their children, have many tools available to them to protect their children from inappropriate adult content.

50.     Virtually every available electronic device capable of accessing content online already has built-in parental controls.  Internet service providers are also capable of filtering unwanted content and do so every day.  And there are additional software and apps freely available on the market allowing for more advanced parental control features, including, for example, from https://www.qustodio.com, https://www.bark.u, https://us.norton.com/products/norton-family, https://usa.kaspersky.com/safe-kids, https://kidlogger.net/, https://www.mobicip.com/, https://www.eset.com, https://www.webwatcher.com/, and https://www.spyrix.com/.

51.     There are websites devoted to evaluating different parent control applications, such as parentalcontrolnow.org.[15]  Similarly, buyersguide.org even offers a chart to compare filtering services:

---

[15]     *See, e.g.,* Parental Control Now, "Best Parental Control Apps for 2023," https://parentalcontrolnow.org/best-parental-control-apps-us/?gclid=EAIaIQobChMIqf6xyuKggAMVxgCtBh3m6g3YEAMYASAAEgJXt_D_BwE.



52.     Two widely used personal computer operating systems, Microsoft and Apple, include parental control features by default, straight out of the box, at no additional cost.  All major browsers, including Google Chrome, Mozilla Firefox, Microsoft Edge, and Apple's Safari, likewise have parental control options.  If parents want to add additional parental control features, they may easily purchase supplementary software like Bark or NetNanny or even download additional software for free, including Questodio, Kaspersky Safe Kids, FamilyKeeper, and others. These features enable parents to block access to sexually explicit materials on the Web, prevent minors from giving personal information to strangers by e-mail or in chat rooms, limit a child's screentime, and maintain a log of all online activity on a home computer.  Parents can also use screening software that blocks messages containing certain words, as well as tracking and monitoring software.  A parent also may restrict and observe a child's use of the internet merely by placing a computer in a public space within the home.  All of these methods constitute "less restrictive means" for accomplishing the same ends.

53.     Filtering technology carries an additional benefit, in that a seventeen-year-old is very different than a twelve-year-old.  Parents of an older minor can tailor exceptions for websites that offer, for instance, sexual education materials of clear benefit to an older minor but potentially inappropriate for a younger minor.

54.     Filtering technology is available for smartphones and cellular networks as well, such as on the Android operating system.

55.     Filtering technology includes not only Domain Name System (DNS) filtering, but also artificial intelligence (AI).  DNS filtering blocks websites based on how their domain names are categorized.  This filtering is dynamic in that once the user blocks a category like adult content, the DNS filtering services constantly scan the Internet and update that category with the latest websites.  In fact, uncategorized websites can be blocked as well, given that newly registered websites are among the most common sources of malware, viruses, and other malicious content.  For families, Cisco Systems, one of the largest companies for Internet technologies, provides DNS filtering free of charge via its OpenDNS FamilyShield service.  AI is also being incorporated into filtering technology, enabling dynamic, real-time scanning and filtering of website content to block specific images, videos, and text within a webpage that are identified as falling under a blocked category.

## VI.     A Less Restrictive Alternative: Verifying Age at the Device Level

56.     Allowing parents to verify their child's age at the device level is another viable alternative.  Rather than requiring a user to verify with a website, an application can be installed on children's devices that allows parents to input their child's age.  Requests to visit a website coming from the device can imbed that information and allow the website to reject the request if the child is underage for the website.[16]   The privacy advantages of this are unmistakable, as protecting minors using this system would not rely on collecting even more data that can be used for malicious purposes.

## VII.    The Falsity Of The Required "Health Warnings"

57.     There is no scientific support for the bold assertions required by the Act's mandated "health warnings."  In fact, most are false and based on discredited (or never-credited) "pop culture science," including the statement that pornography causes mental health disorders.

---

[16]   *See* https://cyberscoop.com/age-verfication-schatz-cotton-social-media/.

58.     Furthermore, pornography is a highly controversial topic, with certain religious, political and other groups seeking to censor constitutionally protected adult content under the guise of falsely labeling pornography a public health crisis, on the basis of misconstrued studies and highly selective, self-serving anecdotes.

59.     Plaintiffs strongly disagree with every statement, express and implied, in the speech that the State purports to compel by the Act.

60.     Complying with the Act's requirement to speak messages approved by the Texas government is both impossible and unduly burdensome: impossible, because the Act requires "14-point font," but font size on websites is measured by pixels ("px") not points ("pt"), and unduly burdensome, because the length of the mandated messages would dwarf and drown out the advertisements the Act requires them to accompany.

61.     Moreover, although the messages are labeled "TEXAS HEALTH AND HUMAN SERVICES WARNING," on information and belief these messages were never approved by health professionals at that agency. The Texas Health and Human Services website provides information about Medicare coverage, Men's Health Month, low-income food programs, disaster relief programs, and "hundreds of other programs and services that help more than 7 million Texans a month live better lives."  There is a section devoted solely to mental health and substance abuse issues and provides links to information about adult mental health, adult substance abuse, children's mental health, crisis services, mental health and substance abuse resources, state hospitals, and youth substance abuse.[17] Another section consists entirely of links to data and statistics.[18]  Nowhere on its expansive website does the Texas Health and Human Services make claims that pornography has detrimental effects on adults.

62.     Similarly, the phone number the Act requires websites to published at the bottom of every page is for the US Substance Abuse and Mental Health Services Administration

---

[17] See, https://www.hhs.texas.gov/services/mental-health-substance-use/.
[18] See, https://www.hhs.texas.gov/about/records-statistics/data-statistics/.

(SAMHSA) Hotline. Entering "pornography" into the SAMHSA website's search function returns one result, namely, an Office of Indian Services quarterly newsletter entitled Prevention and Recovery, where the following sentence is found in an article entitled "Fortifying the Circle: Changing the Future for Native Women and Girls": "According to federal statistics, Native American women are more than 2.5 times more likely to be raped or sexually assaulted than other women in the US. Reports have come from Minnesota and South Dakota that Native American girls, have been trafficked into prostitution, pornography, and strip shows over state lines and internationally into Mexico." That's it; nothing more. There is no indication that anyone calling this helpline looking for information about any effects of pornography will receive it there. The required inclusion of these messages is performative and useless.

63. Indeed, so-called "addiction" to pornography is not medically or scientifically supported. The American Psychiatric Association (APA) does not recognize pornography or sexual addiction as a mental health disorder. The DSM-5 TR, the standard manual of classification of mental disorders used by mental health clinicians and physicians, explicitly rejects the concept of sex addiction as unsupported by peer-reviewed evidence. The American Association of Sexuality Educators, Counselors and Therapists (AASECT) and the Association for the Treatment and Prevention of Sexual Abuse (ATSA) have publicly rejected claims of pornography addiction as empirically unsupported.

## VIII. Plaintiffs' Additional Injuries

64. In addition to the "health warnings" required by the Act being false and misleading, this compelled speech deprives Plaintiffs and other adult entertainment providers of the goodwill of their Texan customers by implying that their content poses substantial health risks. The age verification provisions of the Act similarly deprive Plaintiffs and others of the goodwill of their Texan customers, due to the burden age verification imposes and the risks it carries.

## IX. The Act's Vagueness

65. Because many of the terms in the Act are vague, the Act further chills the speech of providers of content online and restricts the availability of certain material to those entitled and

wishing to receive it. The Act is riddled with vague words, phrases, and requirements, including but not limited to the following.

66. The phrase "taken as a whole" in the definition of "sexual material harmful to minors" is vague because what constitutes the "whole" is unclear in the context of the internet generally, or a particular website more specifically. Should one consider only a specific article, certain text, or an individual image on a website? Or should one consider the web page on which that text or image appears? Or the entire website? And should one include linked material? The Act does not say, and Plaintiffs are left only to guess.

67. The application of the Act to websites that publish or distribute material, "more than one-third of which is sexual material harmful to minors," is also vague, insofar as it fails to explain how "total material" is calculated. Is it by the volume of data? The number of posts? What is the proper metric to measure? Gigabytes? Character count? Number of images? Video runtime? Not to mention linked material. May a website avoid the problem altogether by providing a link to all the anodyne content in the local public library? Where a website "distributes" material, is the calculation based on the number of downloads? Where a website both "publishes" and "distributes" material, how is published material calculated vis-à-vis "distributed" material? Again, Plaintiffs can only guess.

68. The definition for the term "digital identification" is vague and circular. The Act's age verification can be achieved by "require[ing] an individual to provide digital identification," and the Act defines "Digital identification" as "information stored on a digital network that may be accessed by a commercial entity and that serves as proof of the identity of an individual." Thus, any information on a digital network accessible to commercial entities that is used for age verification is automatically sufficient to age verify users. This is nonsensical.

69. The statutory catch-all permitting "any commercially reasonable method that relies on public or private transactional data" as a means of verifying a user's age provides no guideposts whatsoever, as "commercially reasonable" is a vague term not defined by the Act.

Appx000765

70.     The Act does not even explain how often age verification must occur.  Individuals can access a website more than once, and from different devices and browsers.  Must age verification recur every hour; every time a web browser is closed and reopened; just once, if the website operator can find a way link a particular verification to a particular device; or something else?  The Act is once again silent.

71.     Because of the Act's vagueness, cautious operators of even non-pornographic websites must place the State's anti-pornography messaging on the landing page of their website, as well as on any advertisement for the website. Doing so labels them an "adult business"—resulting not only in potentially less internet traffic, but social stigma in some situations, lost ad revenue, and exclusion from public or private programs or curricula.  If they are a website that processes payments, they may lose the ability to accept major credit cards and be forced to use third-party billing companies that charge fees up to 15% of the purchase price, rather than the 3-5% typically charged by credit card companies.  They also may face difficulty purchasing business liability insurance and hiring employees.

## X.     The Need for Injunctive Relief

72.     The passage of the Act has placed Plaintiffs in reasonable apprehension that, if they continue their current course of conduct as they intend, they will be sued under the Act.  Indeed, the Act squarely targets Plaintiffs.

73.     The Act violates the First Amendment right to access protected speech and expressive conduct.

74.     The Act violates the First Amendment right not to speak orthodox messages dictated by the government.

75.     The Act authorizes a lawsuit in violation of section 230, which provides Plaintiffs with an immunity to court proceedings that will be irretrievably lost if the Attorney General is permitted to enforce the Act.

76.     The Act will destroy Plaintiffs' goodwill in Texas by forcing Plaintiffs to either withdraw from Texas or comply with the Act and nevertheless lose a vast number of  new and

longstanding adult visitors to their websites. The false "health warnings" required by the Act deprives Plaintiffs and other adult entertainment providers of the goodwill of their adult Texan customers by falsely stating and implying that their content poses substantial health risks. The age verification provisions of the Act similarly deprive Plaintiffs and other adult entertainment providers of the goodwill of their Texan customers, due to the burden age verification imposes and the risk it carries.

77.     Plaintiffs thus have no adequate remedy at law.

## CAUSES OF ACTION

### COUNT I: Section 1983 (All Plaintiffs)

### (The First Amendment)

78.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

79.     The Act is facially overbroad in violation of the First Amendment (made applicable to the States through the Fourteenth Amendment) because its age verification requirement is substantially overbroad, is not narrowly tailored, and does not pursue a compelling state interest. It is substantially overbroad because it imposes a barrier to the rights of adults to access speech that is constitutionally protected for them. It not narrowly tailored, because there are at least two superior, less restrictive alternatives: pre-blocking by internet service providers and the use of filtering technology by parents or others at the device level. It does not pursue a compelling state interest because it is easily circumvented and dramatically underinclusive, exempting internet search engines, most social media sites, and news media.

80.     The Act also violates the First Amendment because it compels website operators to speak a controversial government message that is both contrary to their views and false or unsupported.

81.     The Act is further overbroad because it does not satisfy the First Amendment's heightened standards for clarity. It is incurably vague regarding to whom it applies and what it

requires, thus chilling protected speech as website operators seek to avoid liability by steering clear of the law by a wider margin than would otherwise be required.

## COUNT II: Section 1983 (All Plaintiffs)

### (The Fourteenth Amendment)

82.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

83.     The Act violates the rights of Plaintiffs under the Due Process Clause of the Fourteenth Amendment (procedural component) because it is impermissibly vague and fails to provide a person of ordinary intelligence fair notice of what is prohibited.

84.     The Act violates the rights of Plaintiffs under the Due Process Clause of the Fourteenth Amendment (substantive component) because it deprives Plaintiffs of a protected property right, in the form of their goodwill in Texas, without a rational basis.

85.     The Act violates the Equal Protection Clause of the Fourteenth Amendment because, with no rational basis for doing so, it exempts, for example, internet search engines and most social media sites while targeting adult entertainment platforms.

## COUNT III: Section 1983

### (Plaintiffs FSC, MG Premium Ltd as to SpiceVids, MG Freesites Ltd as to Pornhub,

### WebGroup, NKL, and MediaME SRL)

### (The Supremacy Clause and Section 230)

86.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

87.     Under the Supremacy Clause of the United States Constitution, the laws of the United States are "the supreme law of the land."

88.     Federal law confers a right of immunity against proceedings where the theory of liability equates websites with third-party publishers. 47 U.S.C. § 230(c)(1) states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(e)(3) states: "No

cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."

89.     Plaintiffs, as website platforms, are providers of an "interactive computer service" under section 230.

90.     As applied to Plaintiffs, the Act is preempted through the Supremacy Clause as a violation of section 230, because it imposes liability on website operators for putative harm caused by the content of third-party publishers.

## COUNT IV: Section 1983 (All Plaintiffs except Jane Doe)

### (The Eighth Amendment)

91.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

92.     Plaintiffs have a right against Excessive Fines under the Eighth Amendment.

93.     The Act authorizes civil penalties that are grossly disproportionate to any putative harm addressed by the Act.

## COUNT V: Section 1983 & 28 U.S.C. §§ 2201-02  (All Plaintiffs)

### (Declaratory Judgment)

94.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

95.     There is a present and justiciable dispute as to whether enforcement of the Act by Defendant violates the Plaintiffs' rights under the U.S. Constitution and federal law, as stated in Counts I-IV.

96.     The interests of Plaintiffs, on the one hand, and Defendant, on the other, are real and adverse.

97.     Absent court intervention, which would resolve the dispute over the Act's lawfulness, Defendant will proceed to enforce the Act even though the Act is unconstitutional and void.

98. Plaintiffs accordingly seek a declaratory judgment that the Act is unconstitutional and unenforceable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A. Preliminarily and permanently enjoin Defendant, his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with those who receive actual notice of the injunction, from enforcing the Act;

B. Declare the Act unconstitutional and unenforceable, as a violation of the First Amendment, Fourteenth Amendment, Eighth Amendment, and Supremacy Clause of the U.S. Constitution.

C. Award Plaintiffs damages and their reasonable costs and fees pursuant to 42 U.S.C. § 1988; and

D. Grant Plaintiffs such other and further relief as the Court deems just and proper.

DATED:  August 4, 2023                    QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP


                                          By _____/s/ Scott Cole_____
                                              Scott Cole
                                              scottcole@quinnemanuel.com
                                              **QUINN EMANUEL URQUHART &**
                                              **SULLIVAN, LLP**
                                              300 West 6th Street
                                              Suite 2010
                                              Austin, TX 78701
                                              Telephone: (737) 667-6104

                                              Michael T. Zeller (*pro hac vice* forthcoming)
                                              Derek L. Schaffer (*pro hac vice* forthcoming)
                                              Thomas Nolan (*pro hac vice* forthcoming)
                                              Arian Koochesfahani (*pro hac vice* forthcoming)
                                              michaelzeller@quinnemanuel.com
                                              derekshaffer@quinnemanuel.com
                                              thomasnolan@quinnemanuel.com
                                              ariankoochesfahani@quinnemanuel.com
                                              **QUINN EMANUEL URQUHART &**
                                              **SULLIVAN, LLP**
                                              865 South Figueroa Street, 10th Floor
                                              Los Angeles, CA 90017-2543
                                              Telephone: (213) 443 3000
                                              Fax: (213) 443 3100

                                              Jeffrey Keith Sandman (*pro hac vice*
                                              forthcoming)
                                              jeff.sandman@webbdaniel.law
                                              **WEBB DANIEL FRIEDLANDER LLP**
                                              5208 Magazine St Ste 364
                                              New Orleans, LA 70115
                                              Phone: (978) 886 0639

                                              *Attorneys for Plaintiffs*

# EXHIBIT BB

# Customer Terms and Conditions

Date Last Modified: August 20, 2023

Before Subscriber's transaction can be completed, Subscriber must read and agree to these terms and conditions. By applying for access and or services from this website, Subscriber is agreeing to these terms and conditions, and is agreeing to be legally bound by them. This agreement is subject to change at any time. Changes are effective when posted on this website without notice upon each subscriber.

## 0. Preamble

1. Subscriber data is for internal use only and will be treated confidential.
2. All transactions are SSL encrypted.
3. Subscriber's credit card will be billed immediately after purchase.
4. After purchase Subscriber will receive an email notification with all payment details. The contract is closed between customer and shop as soon as the order is submitted
5. All orders will be processed immediately.
6. All questions will be answered within two working days.
7. We recommend printing out the transaction data and Terms and Conditions and to keep them at an easily accessible place.
8. Prohibited for people under legal age in their respective country.

## 1. Definitions

1. "**Member**" or "**Membership**" shall mean the subscriber or user of a valid username and password for the website during the term of membership.
2. "**AYLO Billing**" shall mean AYLO Billing Limited, and/or any of the companies billing the Subscriber including any additional billing companies used by AYLO Billing or changes thereof.
3. "**AYLO Premium**" or "**Merchant**" or "**Controller**" shall mean AYLO Premium Ltd, the controller of the Site (as defined below)
4. "**Site**" shall mean the website for which subscriber is purchasing a username and password in order to access the website and its materials and obtain the benefits of membership.
5. "**Subscriber**" shall mean the user of the services of the Site and holder of a valid username and password for the Site.
6. "**Access rights**" shall mean the combination of unique username and password that is used to access the Site. An access rights is a license to use the Site for a period of time that is specified.
7. "**Bookmarking**" shall mean a URL placed into a temporary file on the subscriber's browser so that the subscriber may return to that page at a future date without having to type in its username and password.

## 2. Description of Services

AYLO Premium will provide one access right to access the Site and its materials for which Subscriber is purchasing a membership.

## 3. Billing

Probiller.com, MGBill, Vendo, Segpay, WTS, or others (depending on Subscriber geographical location) may appear on Subscriber's credit card, bank statement, or phone bill for all applicable charges. If multiple venues are joined utilizing any payment method, Subscriber's statement will list each individual purchase comprising the

transaction. AYLO Billing or Controller may include other information on Subscriber statement based on credit card association, telephone regulation, NACHA and any other mandated rules and regulations. If Subscriber elects to use a checking account to purchase a subscription to this Site, a debit will be executed on their checking account.

## 4. Tax

Value-Added Tax (VAT), Sales Tax or other excise tax may be included in, or added to, your purchase depending on your country, state, territory, city, or on other applicable local regulations. Tax rates may vary accordingly.

## 5. Payment / Fee

The Site may impose periodic subscription fees at the time of the initial enrolment for subscription. Subscriber is solely responsible for such fees according to the terms and conditions of such Site.

## 6. Automatic Recurring Billing (If Selected By Subscriber On The Sign-Up Page)

In accordance with the terms and conditions of the Site subscription fees will be automatically renewed at or after the end of the original term selected, unless notice of cancellation is received from the Subscriber. In the event of a failed attempt to charge the Subscriber's payment method (for example, if the payment method has expired or has been declined), AYLO Billing reserves the right to retry charging the Subscriber's payment method for the amount due or an amount lesser than the amount due, provided that any such attempt to charge a lower amount may be made on a one-time basis, and AYLO Billing will resume billing the Subscriber for the subscription at the full amount agreed to upon enrollment. AYLO Billing may suspend or cancel Subscriber's membership if AYLO Billing is unable to successfully charge a valid payment method. An administration fee of up to $2.00 may be applied in order to keep a subscription temporarily active until the next attempt to process the recurring payment.

## 7. Electronic Receipt

Subscribers will receive an email receipt to their email provided upon initial subscription. Subscriber may request a copy of the account of charges of their membership to the Site, but neither Controller nor AYLO Billing guarantee the availability of such records more than 365 days after Subscription date. Requests must be made directly to Controller. To contact the Controller, refer to Customer Support links on the Site, or click here.

## 8. Agreed upon Method of Communication

AYLO Billing and the Subscriber agree that a transaction receipt will be provided via email to the Subscriber's address provided at the time of initial enrolment. Subsequent transactional updates may be communicated to the Subscriber through the members' area on the Site (as applicable) upon login to ensure receipt in the event Subscriber has unsubscribed from email communications.

## 9. Cancellation

At any time, and without cause, subscription to the service may be terminated by either: AYLO Billing, the Controller, or the Subscriber upon notification of the other by electronic or conventional mail, by chat, or by telephone. Subscribers are liable for charges incurred until the date of the termination. Subscribers may cancel at any time by going to https://support.bangbros.com/cancel and clicking on "Cancel Online" or by contacting our

support department through the contact options listed on https://support.bangbros.com or online directly with the Site by following the links provided in their transaction receipts.

# 10. Refunds

Refunds for purchases or recurring charges may be requested by contacting customer support. Refunds or credits will not be issued for partially used Memberships. Cancelation for all future recurring billing may be requested in accordance with Section 9, Cancellation. AYLO Billing reserves the right to grant a refund or a credit applicable to purchases to the Site at its discretion. The decision to refund a charge does not imply the obligation to issue additional future refunds. Should a refund be issued by AYLO Billing for any reason, it will be credited solely to the payment method used in the original transaction. AYLO Billing will not issue refunds by cash, check, or to another payment mechanism.

# 11. Cardholder Disputes/Chargebacks

All chargebacks are thoroughly investigated and may prevent future purchases with AYLO Billing or Controller, given the circumstances. Fraud claims may result in AYLO Billing or Controller contacting Subscriber's issuer to protect Subscriber and prevent future fraudulent charges to Subscriber card.

# 12. Authorization of Use

Subscribers of the Site are hereby authorized a single access right to access the service or material located on the Site. This access rights shall be granted for sole use to one Subscriber. All memberships are provided for personal use and shall not be used for any commercial purposes or by any other third parties. Commercial use of either the Site or any material found within is strictly prohibited unless explicitly authorized by the Site. No material within the Site may be transferred to any other person or entity, whether commercial or non-commercial. No material within the Site may be distributed through peer-to-peer networks or any other file sharing platforms. In addition, materials may not be modified, or altered. Materials may not be displayed publicly, or used for any rental, sale, or display. Materials shall extend to copyright, trademarks, or other proprietary notices there from. AYLO Billing and Controller reserve the right to terminate this access rights at any time if the terms of this agreement are breached. In the case that the terms are breached, subscriber will be required to immediately destroy any information or material printed, downloaded, or otherwise copied from the Site.

# 13. Transfer of Access Rights

Access to the Site is through a combination of a username and a password. Subscribers may not under any circumstances release their access rights to any other person and are required to keep their access rights strictly confidential. Controller will not release passwords for any reason, to anyone other than the Subscriber, except as may be specifically required by law or court order. Unauthorized access to the Site is a breach of this Agreement. Subscribers acknowledge that the controller of the Site may track through the use of special software each Subscriber's entry to the Site. If any breach of security, theft or loss of access rights, or unauthorized disclosure of access rights information occurs, Subscriber must immediately notify AYLO Billing or the Controller of said security breach. Subscriber will remain liable for unauthorized use of service until AYLO Billing or Controller is notified of the security breach by e-mail or telephone.

# 14. Sanction and Approval of Adult Material

This Site contains age-restricted materials including nudity and explicit depictions of sexual activity. If Subscriber is under the age of 18 years, or under the age of majority in the location from where access to the Site

is attempted, Subscriber does not have authorization or permission to enter or access any of its materials. If Subscriber is over the age of 18 years or over the age of majority in the location from where access to the Site is attempted, Subscriber hereby acknowledges and understands the explicit sexual nature of the materials available on this Site, and agrees to comply with these terms and conditions.

You also understand and agree that, after any purchases made on the Site, you may be asked to prove or verify your age. If you are unsuccessful (i.e. you are found to be under eighteen (18) years of age or the age of majority in the location where you are attempting to verify from) or unable to do so, your purchase will be cancelled and a refund may be issued to you, in a discretionary manner. Upon such failure to verify or prove your age we also reserve the right, in our sole and final discretion, to prevent you from entering or re-entering the Site by, for example but not limited to, terminating your account.

# 15. Supplementary Terms and Conditions

The Site may have additional Terms and Conditions that are an integral part of their offering to the Subscriber and are in addition to these Terms and Conditions. Such Terms and Conditions as listed on the Site will in no way invalidate any of the Terms and Conditions listed here. This Agreement shall be construed and enforced in accordance with the laws of the Republic of Cyprus applicable to contracts negotiated, executed, and wholly performed within said country. Disputes arising hereunder shall be settled in the Republic of Cyprus. Transactions are governed by country of merchant of record and use of the membership/websites governed by laws stated in the terms on the website from which the purchase was made.

# 16. Severability

If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid or enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

# 17. Notice

Notices by the Site to subscribers may be given by means of electronic messages through the Site, by a general posting on the Site, or by conventional mail. Notices by subscribers may be given by electronic messages, conventional mail, telephone, or fax unless otherwise specified in the Agreement. All questions, complaints, or notices regarding the Site must be directed to Controller. All cancellations of service to the Site must also be directed to Controller.

## Questions and Contact Information

All questions to Controller regarding these terms and conditions must be directed to:

For billing issues: bangbrosbilling@probiller.com
For support/technical issues: bangbrossupport@probiller.com
For marketing issues: support@probiller.com

# 18. Disclaimer

USER UNDERSTANDS THAT THE MERCHANT CANNOT AND DOES NOT GUARANTEE OR WARRANT THAT FILES AVAILABLE FOR DOWNLOADING FROM THE INTERNET WILL BE FREE OF VIRUSES, WORMS, TROJAN HORSES, OR OTHER CODE THAT MAY MANIFEST CONTAMINATING OR DESTRUCTIVE PROPERTIES. USER IS RESPONSIBLE FOR IMPLEMENTING SUFFICIENT

PROCEDURES AND CHECKPOINTS TO SATISFY YOUR PARTICULAR REQUIREMENTS FOR ACCURACY OF DATA INPUT AND OUTPUT, AND FOR MAINTAINING A MEANS EXTERNAL TO THE WEBSITE FOR THE RECONSTRUCTION OF ANY LOST DATA. THE MERCHANT DOES NOT ASSUME ANY RESPONSIBILITY OR RISK FOR YOUR USE OF THE INTERNET.

USERS USE OF THE WEBSITE IS AT THEIR OWN RISK. THE CONTENT IS PROVIDED "AS IS" AND WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESSED OR IMPLIED. THE MERCHANT DISCLAIMS ALL WARRANTIES, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, OR NON-INFRINGEMENT. THE MERCHANT DOES NOT WARRANT THAT THE FUNCTIONS OR CONTENT CONTAINED ON THE WEBSITE WILL BE UNINTERRUPTED OR ERROR-FREE, THAT DEFECTS WILL BE CORRECTED, OR THAT THE WEBSITE OR THE SERVER THAT MAKES IT AVAILABLE ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. THE MERCHANT DOES NOT WARRANT OR MAKE ANY REPRESENTATION REGARDING USE, OR THE RESULT OF USE, OF THE CONTENT IN TERMS OF ACCURACY, RELIABILITY, OR OTHERWISE. THE CONTENT MAY INCLUDE TECHNICAL INACCURACIES OR TYPOGRAPHICAL ERRORS, AND THE WEBSITE MAY MAKE CHANGES OR IMPROVEMENTS AT ANY TIME. USER, AND NOT MERCHANT, ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION IN THE EVENT OF ANY LOSS OR DAMAGE ARISING FROM THE USE OF THE WEBSITE OR ITS CONTENT. THE MERCHANT MAKES NO WARRANTIES THAT YOUR USE OF THE CONTENT WILL NOT INFRINGE THE RIGHTS OF OTHERS AND ASSUMES NO LIABILITY OR RESPONSIBILITY FOR ERRORS OR OMISSIONS IN SUCH CONTENT. THE MERCHANT DOES NOT WARRANT OR MAKE ANY REPRESENTATIONS REGARDING THE CONTENT'S APPROPRIATENESS OR AUTHORIZATION FOR USE IN ALL COUNTRIES, STATES, PROVINCES, COUNTY, OR ANY OTHER JURISDICTIONS. IF YOU CHOOSE TO ACCESS THE WEBSITE, YOU DO SO ON YOUR OWN INITIATIVE AND RISK AND ARE RESPONSIBLE FOR COMPLIANCE WITH ALL APPLICABLE LAWS.

# 19. Subscription Fees and User Communication

Subscription and Membership fees to Site are subject to change at any time at the sole and absolute discretion of AYLO Billing and/or the Controller. The official standard membership rates for the Site shall be set forth at the following link: probiller.com. The current monthly membership rate which will appear on Subscriber credit card bill, will be debited from Subscriber account, charged to Subscriber telephone, etc., depending on Subscriber, choice of payment means.

"OPT-IN AND USER COMMUNICATION" – Subscriber's expressly and specifically acknowledges and agrees that his email address or other means of communicating with subscriber may be used to send him offers, information or any other commercially oriented emails or other means of communications. More specifically, some offers may be presented to the subscriber via email campaigns or other means of communications with the option to express the subscriber's preference by either clicking or entering "accept" (alternatively "yes") or "decline" (alternatively "no"). By selecting or clicking the "accept" or "yes", the subscriber indicates that the subscriber "OPTS-IN" to that offer and thereby agrees and assents that the subscriber's personal information, including its email address and data may be used for that matter or disclosed to third-parties."

"OPT-OUT AND USER COMMUNICATION" – Subscriber's expressly and specifically acknowledges and agrees that his email address or other means of communicating with subscriber may be used to send him offers, information or any other commercially oriented emails or other means of communications. More specifically, other offers may be presented to the subscriber via email campaigns or other means of communications with a pre-selected preference or choice. If the subscriber does not deselect the pre-selected preference of choice (i.e., "OPT-OUT" of the offer) then the Site may transfer the subscriber's personal profile information to the third-party service or content provider making the offer. If the subscriber deselects the pre-selected preference, then no personal information about the subscriber may be disclosed to any third-party service or content provider.

# 20. Sponsors, Advertisers and Third Parties

The Site may provide links to sponsor, advertiser, or other third-party websites that are not owned or controlled by the Merchant. Inclusion of, linking to, or permitting the use or installation of any third-party website, applications, software, content, or advertising does not imply approval or endorsement thereof by the Merchant. The Merchant has no control over, and assumes no responsibility for, the content, privacy policies, or practices of any third parties. By accessing or using the Site, you agree to release The Merchant from any and all liability arising from your use of any third-party website, content, service, or software accessed through the Site. Your communications or dealings with, or participation in promotions of, sponsors, advertisers, or other third parties found through the Site, are solely between you and such third parties. You agree that The Merchant shall not be responsible or liable for any loss or damage of any sort incurred as the result of any dealings with such sponsors, third parties or advertisers, or as the result of their presence in the Site.

# EXHIBIT CC






## Anthony Penhale

Chief Legal Officer at MindGeek

Montreal, Quebec, Canada

3K followers · 500+ connections

See your mutual connections

Join to view profile

MindGeek

Université de Montréal

Company Website ↗

## About

Experienced Chief Legal Officer with a demonstrated history of solving complex problems and proposing creative solutions. Dynamic and strategic leader striving on challenges requiring competence, rigor, initiative and collaboration. Excellent business acumen, good analytic and problem-solving skills and ability to quickly master strategic issues and propose practical solutions, while managing legal risks proactively with support beyond the sole legal ramifications.

 

## Activity

We are proud to announce that Stéphanie Lachance, LL.B., ICD.D, Partner and Head of Sustainable Investment, Fiera Comox, has been named one of...

Liked by ⬛⬛⬛enhale

Hey CFA L-01 Aspirants,  I know how challenging it can be to keep track of all those equations and concepts. That's why I've meticulously compiled...

Liked by ⬛⬛⬛enhale

I am honored and excited to take over the leadership of our Private Capital sector and to have the opportunity to continue to build our practice.

Liked by ⬛⬛⬛enhale

 

# Experience

### Chief Legal Officer
MindGeek

Feb 2014 - Present · 9 years 8 months

Montreal, Canada Area

MindGeek drives the state of technology forward, developing industry-leading solutions enabling faster, more efficient delivery of content every second to millions of customers worldwide. MindGeek is committed to enhancing its technological capabilities and thrives on a sustainable growth trajectory built on innovation and excellence.

With over 1000 employees worldwide, MindGeek continues its expansion with the acquisition and licensing of some of the most iconic brands in entertainment...

Show more

### Partner
Heenan Blaikie LLP

Jan 2010 - Feb 2014 · 4 years 2 months

Montreal, Quebec

### Partner
Stikeman Elliott LLP

Jan 2000 - Dec 2009 · 10 years




### Université du Montréal
Bachelor of Civil Laws (B.C.L) · Law

1989 – 1992

### Université de Sherbrooke
-

1988 – 1989

### Bishop's University
Bachelor of Business Administration (B.B.A.)

1985 – 1988

---

## Projects

**Vision Globale acquires Cité du Cinéma (Mel) Inc., Locations Michel Trudel Inc. and Génératrices Star Inc.**

Dec 2012

Represented Vision Globale A.R. Ltée in its acquistion of substantially all of the assets Cité du Cinéma (Mel) Inc., Locations Michel Trudel Inc. and Génératrices Star Inc




See project

## Languages

**French**
Native or bilingual proficiency

**English**
Native or bilingual proficiency

## More activity by Anthony

Au-delà de ma passion pour le droit de l'immigration, le droit du sport et l'arbitrage, je me suis aussi donné pour mission de contribuer à...

Liked by ⬛⬛⬛ ⬛enhale




Finished grading my exams tonight. I traditionally share the final exam question. Here it is. A bit less insane than previous years, but I was...

Liked by ███████ enhale

Aujourd'hui est une journée bien spéciale pour nous au bureau 😊 ██ ██████ comme notaire au service de notre belle communauté à Bromont pour mon dad...

Liked by ███████ enhale

## View Anthony's full profile

See who you know in common

Get introduced

Contact Anthony directly

**Join to view full profile**







◀        ▶

## People also viewed



**Angely Losada Briceño**
Lead Content Formatter (Ops) - Mindgeek
Greater Montreal Metropolitan Area

➤+ Connect



**Sorina Florea**
International Legal Counsel
Bucharest, Romania

➤+ Connect



**Scott Montgomer**
Chief Executive Officer at mindgeek
Silverdale, WA

➤+ Connect



**Alyssa Manzone**
Team Lead - Senior Accountant at MindGeek
Greater Montreal Metropolitan Area

Connect

**Michelle Houjeily**
Helping orgs foster a culture of learning & development

 

### Katrina Zhang

Montreal, QC

Connect

### Maria Godoy

Privacy & Data Protection | Lawyer | LL.M Information Technology Law | ISO 27701 Lead Implementer | FIP | CIPP/C | CDPO/BR | CIPM

Montreal, QC

Connect

### Arpan Patel, CPA

Manager - Corporate Reporting at Mindgeek

Greater Montreal Metropolitan Area

Connect

### Noah Gitelman

Technical Software Development Manager at MindGeek

Montreal, QC

Connect

### Eric Amzallag

Digital Marketing Expert

Montreal, QC

Connect

Show more profiles

## Explore collaborative articles

We're unlocking community knowledge in a new way. Experts add insights directly into each article, started with the help of AI.

 

# Others named **Anthony Penhale**

### Tony Penhale
Laborer at Glass
Greater Melbourne Area

1 other named Anthony Penhale is on LinkedIn

See others named **Anthony Penhale**

# Add new skills with these courses

Understanding Capital Markets

Emerging Financial Risk Management

Excel for Banking Professionals

See all courses



Include this LinkedIn profile on other websites

---

**Anthony Penhale**
Chief Legal Officer at MindGeek

Chief Legal Officer at MindGeek

Université de Montréal

View profile

---




✸ 2023

Accessibility

Privacy Policy

Cookie Policy

Brand Policy

Community Guidelines

About

User Agreement

Your California Privacy Choices

Copyright Policy

Guest Controls

Language

# EXHIBIT DD

VENABLE LLP
William Andrew Hector (SBN 298490)
101 California Street, Suite 3800
San Francisco, CA 94111
Telephone: 415-653-3750
Facsimile: 415-653-3755
Email: wahector@venable.com

Frank M. Gasparo (*Pro Hac Vice forthcoming*)
Ralph A. Dengler (*Pro Hac Vice forthcoming*)
Ian G. Paquette (*Pro Hac Vice forthcoming*)
Parker G. Zimmerman (*Pro Hac Vice forthcoming*)

151 West 42nd Street, 49th Fl.
New York, NY 10036
Telephone: 212-307-5500
Facsimile: 212-307-5598
Email: fmgasparo@venable.com
     radengler@venable.com
     igpaquette@venable.com
     pgzimmerman@venable.com

*Attorneys for Plaintiff MG Freesites Ltd*

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO CA 94111
415-653-3750

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MG FREESITES LTD,<br><br>        Plaintiff,<br><br>   v.<br><br>DISH TECHNOLOGIES L.L.C. and<br>SLING TV L.L.C.<br><br>        Defendants. | Case No. 3:23-cv-03674<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT** |

Plaintiff MG Freesites Ltd ("MG Freesites") for its Complaint for Declaratory Judgment of Non-Infringement against DISH Technologies L.L.C. and Sling TV L.L.C. (collectively "Defendants") by and through its attorneys, alleges as follows:

## NATURE OF THE ACTION

1. This is an action for declaratory judgment of noninfringement arising under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.* and the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and for other relief the Court deems just and proper.

2. This Declaratory Judgment action seeks a determination that the Pornhub streaming service, http://www.pornhub.com (the "Accused Website"), does not infringe and has not infringed, either directly or indirectly (literally or under the doctrine of equivalents), under 35 U.S.C. § 271 (or any sub-section thereof) at least:

- Claim 10 of United States Patent No. 10,469,555 ("the '555 Patent") (Exhibit 1);
- Claim 1 of United States Patent No. 10,757,156 ("the '156 Patent") (Exhibit 2); and
- Claim 14 of United States Patent No. 11,470,138 ("the '138 Patent") (Exhibit 3).

(collectively "the Asserted Patents").

3. MG Freesites respectfully requests this relief because on July 7, 2023, DISH Network L.L.C. ("DISH Network") sent MG Freesites a communication accusing the Accused Website, or the "Pornhub Application," of infringing at least the above claims. This communication attached three claim charts and stated, "Please find attached exemplary claim charts showing how three of DISH's ABR patents read on MindGeek's streaming services." Exhibit 4. The attached claim charts purport to show that the Accused Website infringes claim 10 of the '555 Patent, claim 1 of the '156 Patent, and claim 14 of the '138 Patent.

**PARTIES**

4. MG Freesites is a private limited company organized and existing under the laws of the Republic of Cyprus, with a place of business located at 195-197 Old Nicosia-Limassol Road, Block 1 Dali Industrial Zone, Cyprus 2540.

5. MG Freesites operates the Accused Website.

6. Upon information and belief, DISH Technologies L.L.C. f/k/a EchoStar Technologies L.L.C. ("DISH Technologies") is a limited liability company organized and existing under the laws of the State of Colorado, with a place of business at 9601 South Meridian Blvd, Englewood, CO 80112.

7. DISH Technologies purports to be the sole owner of at least the '555 Patent and the '156 Patent. *See DISH Technologies L.L.C v. ICON Health & Fitness, Inc*., No. 1-21-cv-00531, D.I. 1, at 3-4 (D. Del.). Additionally, DISH Technologies is listed as the assignee of the '138 Patent on the patent's front page. Exhibit 3 at 1. Lastly, the assignment records at the United States Patent

and Trademark Office show that the Asserted Patents are allegedly assigned to DISH Technologies. Exhibit 5.

8. Upon information and belief, Sling TV L.L.C. ("Sling TV") is a limited liability company organized and existing under the laws of the state of Colorado, with a place of business at 9601 South Meridian Blvd, Englewood, CO 80112. *See DISH Technologies L.L.C v. ICON Health & Fitness, Inc*., No. 1-21-cv-00531, D.I. 1, at 1 (D. Del.).

9. Sling TV purportedly is the exclusive licensee of at least the '555 Patent and the '156 Patent. *Id.* at 3-4.

### JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction over this action, which arises under the Patent Laws of the United States (35 U.S.C. § 1, *et seq.*), under 28 U.S.C. §§ 1331 and 1338(a) and under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, based on an immediate definite and concrete, real and substantial, justiciable controversy between MG Freesites and Defendants for declaratory judgment of noninfringement of the Asserted Patents.

11. This Court has personal jurisdiction over Defendants pursuant to the laws of the State of California, including California's long-arm statute (California Code of Civil Procedure § 410.10).

12. Specifically, Defendants have purposefully availed themselves of the privilege of conducting activities within this State by filing a patent infringement lawsuit against Jadoo TV, Inc. ("Jadoo"), a California corporation, in this District, asserting that Jadoo infringed related patents that share the same specifications as the Asserted Patents, namely: United States Patent Nos. 7,818,444; 8,402,156; 9,071,668; and 9,407,564). *See DISH Technologies L.L.C. and Sling TV L.L.C. v. Jadoo TV, Inc.*, No. 5:18-cv-05214-EJD, D.I. 1, ¶¶ 7-12, 26-139 (NDCA) ("Jadoo Litigation").

13. This lawsuit was later dismissed pursuant to a Consent Judgment and Stipulation Injunction Pursuant to Stipulation of the Parties on May 28, 2021. *Id.*, D.I. 97.

14. Thus, Defendants have purposefully directed their enforcement activity in the Northern District of California against a California corporation by asserting the related patents against Jadoo in the Northern District of California, then located at "5880 West Las Positas Boulevard Suite 37,

Pleasanton, California 94588." *DISH Technologies L.L.C. and Sling TV L.L.C. v. Jadoo TV, Inc.*, No. 5:18-cv-05214-EJD, D.I. 1, ¶3 (N.D. Cal.). Upon information and belief, Jadoo now resides at a different address in the Northern District of California.

15. By filing the Jadoo Litigation in this District, Defendants have purposefully availed themselves of the benefits and protections of California's laws such that they should reasonably anticipate being haled into court in this District.

16. This Complaint for Declaratory Judgement thus arises out of the Defendants' activities in the State of California enforcing patents, including patents in the same family as the Asserted Patents.

17. Defendants have also purposefully availed themselves of the protections of the State of California by negotiating a resolution of the Jadoo Litigation with a then (and now) California resident Jadoo and entering into a Consent Judgment and Stipulation Injunction Pursuant to Stipulation of the Parties on May 28, 2021. *Id.*, D.I. 97.

18. For instance, Defendants agreed that, "This Court has and shall retain personal jurisdiction over the Parties with respect to the above captioned matter, subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1338, and jurisdiction to enforce this Consent Judgment." *Id.*, ¶1.

19. Additionally, Defendants retained at least one Baker Botts L.L.P. attorney located in this District for the Jadoo Litigation. *Id.*, 1.

20. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(c).

21. Venue for purposes of a declaratory-judgment action regarding noninfringement of a patent does not fall under § 1400(b), but instead falls under the general venue provisions of 28 U.S.C. § 1391.

22. Under 28 U.S.C. § 1391(b)(1), venue is proper in any judicial district where a defendant resides. A corporate defendant "reside[s] . . . in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." *Id.* § 1391(c)(2).

23. Because Defendants are subject to the personal jurisdiction of the Northern District of

California for this action as discussed above, Defendants are deemed to reside in the Northern District of California under 28 U.S.C. § 1391(c)(2) for purposes of venue.

24. Defendants also admitted venue was proper in the Jadoo Litigation, specifically in the Consent Judgment and Stipulation Injunction Pursuant to Stipulation of the Parties on May 28, 2021. *Id.*, D.I. 97, ¶2 ("Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1400(b)").

25. Thus, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1).

## FACTUAL BACKGROUND

### Initial Correspondence

26. On March 17, 2023, DISH Network's counsel sent to "MindGeek Montreal" a letter stating that "DISH owns a portfolio of patent assets directed to adjustable bit-rate video streaming technology," as well as contending that MindGeek's technology "appears to be covered by, for example, claim 1 of the '156 Patent" and "MindGeek would benefit from a license to the '156 Patent and other DISH patents in this portfolio . . . ." Exhibit 6.

27. In the March 17 letter, DISH Network directed MindGeek to a recent ITC investigation "finding that products being imported into the U.S. are infringing the '156 Patent and other patents in this portfolio." *Id.*

28. On April 13, 2023, counsel for MG Freesites responded to DISH Network's that "We are reviewing DISH's letter, and the allegations therein, and will be in touch." Exhibit 7.

### Infringement Allegations

29. On July 7, 2023, DISH Network sent counsel for MG Freesites an email stating, "I write to follow-up regarding the potential licensing of DISH's ABR patent portfolio. Please find attached exemplary **claim charts showing how three of DISH's ABR patents read on MindGeek's streaming services**. Are you available next week to discuss terms for a license to DISH's portfolio?" Exhibit 4 (emphasis added).

30. The DISH claim charts purport to show that the Accused Website infringes claim 10 of '555 Patent, claim 1 of the '156 Patent, and claim 14 of the '138 Patent.

31. Despite the general references to "DISH" in the letters and claim charts, on information

Appx000795

and belief, DISH Technologies is the sole owner of the Asserted Patents and Sling TV purportedly is the exclusive licensee of at least the '555 Patent and the '156 Patent of the Asserted Patents. *See DISH Technologies L.L.C and Sling TV L.L.C. v. ICON Health & Fitness, Inc.*, No. 1-21-cv-00531-GBW, D.I. 1, at 1-4 (D. Del.); *see also* Paragraphs 7, 9; Exhibits 1-3, 5.

### Defendants' District Court Patent Enforcement Campaign

32. In addition to Defendants' prior litigation in this District of patents related to the Asserted Patents (*see* Paragraphs 12-14 above), Defendants have also filed lawsuits to enforce the '555 Patent, '156 Patent, and other related patents in district courts. *See DISH Technologies L.L.C and Sling TV L.L.C. v. ICON Health & Fitness, Inc.*, No. 1:21-cv-00531-GBW (D. Del.) (asserting claim 10 of the '555 Patent and claim 1 the '156 Patent as well as family members Patent Nos. 9,407,564; 10,469,554; and 10,951,680); *DISH Technologies L.L.C and Sling TV L.L.C. v. Lululemon Athletica Inc. et al*, No. 1:21-cv-00532-GBW (D. Del.) (same); *DISH Technologies L.L.C and Sling TV L.L.C. v. Peloton Interactive, Inc.*, No. 2-21-cv-00132-RJG (E.D. Tex.) (same); *see also DISH Technologies L.L.C. and Sling TV L.L.C. v. Univision Communications Inc.*, No. 1:19-cv-00144-LPS (D. Del.) (asserting family member Patent Nos. 7,818,444; 8,402,156; 9,071,668; and 9,407,564).

### ITC Investigation

33. Defendants and DISH DBS Corporation have also filed an ITC investigation. *Certain Fitness Devices, Streaming Components Thereof, and Systems Containing Same*, Inv. No. 337-TA-1265 (ITC) (asserting claims 10, 11-17, 26, and 27 of the '555 Patent and claims 1 and 2-12 of the '156 Patent as well as family member Patent Nos. 9,407,564; 10,469,554; and 10,951,680).

34. Certain Respondents in that investigation have appealed the ITC's determination to the Federal Circuit, and that appeal is pending. *See iFIT Inc. (f/k/a ICON Health & Fitness, Inc.), FreeMotion Fitness, Inc., and NordicTrack, Inc. v. ITC and DISH DBS Corporation, DISH Technologies L.L.C., and Sling TV L.L.C.*, No. 2023-1965.

### The '555 Patent

35. The '555 Patent issued on November 5, 2019, and is entitled "Apparatus, System, and Method for Multi-Bitrate Content Streaming." *See* Exhibit 1.

36. Asserted claim 10 of the '555 Patent is reproduced below.

10. A content player device to stream a video over a network from a server for playback of the video, the content player device comprising:

a processor;

a digital processing apparatus memory device comprising non-transitory machine-readable instructions that, when executed, cause the processor to:

establish one or more network connections between the client module and the server, wherein the server is configured to access at least one of a plurality of groups of streamlets;

wherein the video is encoded at a plurality of different bitrates to create a plurality of streams including at least a low quality stream, a medium quality stream, and a high quality stream, wherein each of the low quality stream, the medium quality stream, and the high quality stream comprises a streamlet that encodes the same portion of the video at a different one of the plurality of different bitrates;

wherein at least one of the low quality stream, medium quality stream, and high quality stream is encoded at a bit rate of no less than 600 kbps; and

wherein the streamlet encoding the same portion of the video in the low quality stream has an equal playback duration as the streamlet encoding the same portion of the video in the high quality stream;

select a specific one of the streams based upon a

-7-

1        determination by the client module to select a higher or

2        lower bitrate version of the streams;

3        place a streamlet request to the server over the one or more

4        network connections for the selected stream;

5        receive the requested streamlets from the server via the one

6        or more network connections; and

7        provide the received streamlets for playback of the video.

8

9     The '156 Patent

10    37. The '156 Patent issued on August 25, 2020, and is entitled "Apparatus, System, and

11 Method for Adaptive-Bitrate Shifting of Streaming Content." *See* Exhibit 2.

12    38. Asserted claim 1 of the '156 Patent is reproduced below.

13        1. An apparatus for rendering a video that is adaptively received as

14        a digital stream from a video server over a network, the apparatus

15        comprising;

16        a media player operating on the apparatus, wherein the media

17        player is configured to stream the video from the video server

18        via at least one transmission control protocol (TCP) connection

19        over the network, wherein the video server stores multiple

20        different copies of the video encoded at different bit rates as

21        multiple sets of streamlets, wherein each of the streamlets

22        yields a different portion of the video on playback, wherein the

23        streamlets across the different copies yield the same portions of

24        the video on playback, and wherein the streamlets in the

25        different copies are aligned in time such that the streamlets that

26        play back the same portion of the video for the different copies

27        each begin at the same playback time in relation to the

28        beginning of the video, and wherein the media player streams

-8-

the video by:

requesting sequential streamlets of one of the copies from the

video server according to the playback times of the streamlets

by transmitting hypertext transport protocol (HTTP) GET

requests that identify the selected streamlets stored by the

video server, wherein the sequential streamlets are selected by

the media player from the based upon successive

determinations to shift the playback quality to a higher or lower

quality one of the different copies of the video;

repeatedly generating, by the media player, a factor relating to

the performance of the network that is indicative of an ability

to sustain the streaming of the video;

adapting the successive determinations to shift the playback

quality based on the factor to achieve continuous playback of

the video using the streamlets of the highest quality copy of the

video that is determined to be sustainable at that time; and

presenting the video for playback by providing the requested

streamlets in order of ascending start time.


The '138 Patent

39. The '138 Patent issued on October 11, 2022, and is entitled "Apparatus, System, and Method for Multi-Bitrate Content Streaming." *See* Exhibit 3.

40. Asserted claim 14 of the '138 Patent is reproduced below.

14. An end user station to stream a video over a network from a

server for playback of the video, the end user station comprising:

a processor;

a digital processing apparatus memory device comprising non-

transitory machine-readable instructions that, when executed,

cause the processor to:

establish an internet connection between the end user

station and the server, wherein the server is configured to

access at least one of a plurality of groups of streamlets;

wherein the video is encoded at a plurality of different

bitrates to create a plurality of streams including at least

a low quality stream, a medium quality stream, and a

high quality stream, each of the low quality stream, the

medium quality stream, and the high quality stream

comprising a group of streamlets encoded at the same

respective one of the different bitrates, each group

comprising at least first and second streamlets, each of

the streamlets corresponding to a portion of the video;

wherein at least one of the low quality stream, the

medium quality stream, and the high quality stream is

encoded at a bitrate of no less than 600 kbps; and

wherein the first streamlets of each of the low quality

stream, the medium quality stream and the high quality

stream each has an equal playback duration and each of

the first streamlets encodes the same portion of the

video at a different one of the different bitrates;

select a specific one of the low quality stream, the medium

quality stream, and the high quality stream based upon a

determination by the end user station to select a higher or

lower bitrate version of the streams;

place a streamlet request to the server over the internet

connection for the first streamlet of the selected stream;

receive the requested first streamlet from the server via the

internet connection; and

provide the received first streamlet for playback of the
video.

## COUNT I

**(DECLARATORY JUDGMENT OF NONINFRINGEMENT OF THE '555 PATENT)**

41. MG Freesites repeats and re-alleges the allegations in Paragraphs 1-40 as though fully set forth here in their entirety.

42. By virtue of DISH Network's claim chart asserting infringement, and Defendants' litigation history involving the '555 Patent and related patents, an actual controversy exists between MG Freesites and Defendants as to whether MG Freesites infringes claim 10 of the '555 Patent.

43. A valid and justiciable controversy thus has arisen and exists between MG Freesites and Defendants within the meaning of 28 U.S.C. § 2201.

44. Specifically, in its July 7, 2023 letter, DISH Network provided a claim chart contending that the Accused Website infringes claim 10 of the '555 Patent. *See* Exhibit 4.

45. In a prior letter, DISH Network directed MindGeek to review its recent success at the ITC. *See* Exhibit 6.

46. At the ITC, Defendants asserted claims 10 and 26 of the '555 Patent. *See Certain Fitness Devices, Streaming Components Thereof, and Systems Containing Same*, Inv. No. 337-TA-1265.

47. As discussed in Paragraph 32, Defendants have also asserted claim 10 of the '555 Patent in the District of Delaware and in the Eastern District of Texas.

48. MG Freesites has not infringed and does not infringe at least claim 10 of the '555 Patent, either directly or indirectly, literally or under the doctrine of equivalents, including through its making, use, sale, or offer for sale in, or importation into the United States of at least the Accused Website.

49. By way of example only, Defendants cannot show that the Accused Website practices at least the following limitations of claim 10 of the '555 Patent: "place a streamlet request to the

-11-

server over the one or more network connections for the selected stream," "receive the requested streamlets from the server via the one or more network connections," and "provide the received streamlets for playback of the video."

50. For example, the Accused Website does not request multiple streamlets in a single request.

51. Additionally, and by way of further example only, Defendants cannot show that the Accused Website practices at least the following limitations of claim 10 of the '555 Patent: "[a] content player device to stream a video over a network from a server for playback of the video, the content player device comprising: a processor; a digital processing apparatus memory device comprising non-transitory machine-readable instructions that, when executed, cause the processor to, . . ."

52. For example, the Accused Website does not include a "content player device" with "processor" and "digital processing apparatus memory device" because the Accused Website is a website and MG Freesites does not provide such hardware to end users.

## COUNT II

### (DECLARATORY JUDGMENT OF NONINFRINGEMENT OF THE '156 PATENT)

53. MG Freesites repeats and re-alleges the allegations in Paragraphs 1-52 as though fully set forth here in their entirety.

54. By virtue of DISH Network's claim chart asserting infringement, and Defendants' litigation history involving the '156 Patent and related patents, an actual controversy exists between MG Freesites and Defendants as to whether MG Freesites infringes claim 1 of the '156 Patent.

55. A valid and justiciable controversy has arisen and exists between MG Freesites and Defendants within the meaning of 28 U.S.C. § 2201.

56. Specifically, in its July 7, 2023 letter, DISH Network provided a claim chart contending that the Accused Website infringes claim 1 of the '156 Patent. *See* Exhibit 4.

57. In a prior letter, DISH Network directed MindGeek to review its recent success at the ITC. *See* Exhibit 6.

-12-

58. At the ITC, Defendants asserted claim 1 of the '156 Patent. *See Certain Fitness Devices, Streaming Components Thereof, and Systems Containing Same*, Inv. No. 337-TA-1265.

59. As discussed in Paragraph 32, Defendants have also asserted claim 1 of the '156 Patent in the District of Delaware and in the Eastern District of Texas.

60. MG Freesites has not infringed and does not infringe at least claim 1 of the '156 Patent, either directly or indirectly, literally or under the doctrine of equivalents, including through its making, use, sale, or offer for sale in, or importation into the United States of at least the Accused Website.

61. By way of example only, Defendants cannot show that the Accused Website practices at least the following limitations and/or elements of claim 1 of the '156 Patent:

- "[a]n apparatus for rendering a video that is adaptively received as a digital stream from a video server over a network,"

- "a media player . . . configured to stream the video from the video server via at least one transmission control protocol (TCP) connection,"

- "wherein the video server stores multiple different copies of the video encoded at different bit rates as multiple sets of streamlets," and

- "requesting sequential streamlets of one of the copies from the video server according to the playback times of the streamlets by transmitting hypertext transport protocol (HTTP) GET requests that identify the selected streamlets stored by the video server."

62. For example, MG Freesites does not have a single server performing each limitation of claim 1, including the above limitations. *Salazar v. AT&T Mobility LLC*, 64 F.4th 1311, 1317 (Fed. Cir. 2023) ("while the claim term 'a microprocessor' does not require there be only one microprocessor, the subsequent limitations referring back to 'said microprocessor' require that at

-13-

least one microprocessor be capable of performing each of the claimed functions.").

63. Further, and by way of example only, Defendants cannot show that the Accused Website practices at least the following limitations of claim 1 of the '156 Patent: "requesting sequential streamlets of one of the copies from the video server according to the playback times . . . that identify the selected streamlets stored by the video server, wherein the sequential streamlets are selected by the media player from the based upon successive determinations to shift the playback quality to a higher or lower quality one of the different copies of the video"

64. For instance, the Accused Website does not request multiple streamlets in a single request.

## COUNT III

## (DECLARATORY JUDGMENT OF NONINFRINGEMENT OF THE '138 PATENT)

65. MG Freesites repeats and re-alleges the allegations in Paragraphs 1-64 as though fully set forth here in their entirety.

66. By virtue of DISH Networks' claim chart asserting infringement of claim 14 of the '138 Patent, and Defendants' litigation history involving the family members of the '138 Patent, an actual controversy exists between MG Freesites and Defendants as to whether MG Freesites infringes claim 14 of the '138 Patent.

67. A valid and justiciable controversy has arisen and exists between MG Freesites and Defendants within the meaning of 28 U.S.C. § 2201.

68. Specifically, in its July 7, 2023 letter, DISH Network provided a claim chart contending that the Accused Website infringes claim 14 of the '138 Patent. *See* Exhibit 4.

69. In a prior letter, DISH Network directed MindGeek to review its recent success at the ITC. *See* Exhibit 6.

70. MG Freesites has not infringed and does not infringe at least claim 14 of the '138 Patent, either directly or indirectly, literally or under the doctrine of equivalents, including through its making, use, sale, or offer for sale in, or importation into the United States of at least the Accused Website.

71. By way of example only, Defendants cannot show that the Accused Website practices at

1    least the following limitations of claim 14 of the '138 Patent: "[a]n end user station to stream a

2    video over a network from a server for playback of the video, the end user station comprising: a

3    processor; a digital processing apparatus memory device comprising non-transitory machine-

4    readable instructions that, when executed, cause the processor to, . . . select a specific one of the

5    low quality stream, the medium quality stream, and the high quality stream based upon a

6    determination by the end user station to select a higher or lower bitrate version of the streams"

7        72. For example, the Accused Website does not include an "end user station" with

8    "processor" and "digital processing apparatus memory device" because the Accused Website is a

9    website and MG Freesites does provide such hardware to end users.

10    **DEMAND FOR JURY TRIAL**

11        Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, MG Freesites demands a

12    jury trial on all issues and claims so triable.

13    **REQUEST FOR RELIEF**

14        WHEREFORE, MG Freesites respectfully requests the Court to enter judgment in its favor

15    and against Defendants and grant the following relief:

16        A.    A declaration that the Accused Website does not infringe, either directly or

17    indirectly, under 35 U.S.C. § 271 (or any sub-section thereof) claim 10 of the '555 Patent, claim 1

18    of the '156 Patent, and claim 14 of the '138 Patent, either literally or under the doctrine of

19    equivalents;

20        B.    A declaration that MG Freesites has not infringed and does not infringe, either

21    directly or indirectly, under 35 U.S.C. § 271 (or any sub-section thereof) the above claims, either

22    literally or under the doctrine of equivalents, based on MG Freesites' purported making, having

23    made, using, offering for sale, selling, and/or importing of the Accused Website;

24        C.    That this case be found exceptional within the meaning of 35 U.S.C. § 285;

25        D.    An award of costs, expenses, and reasonable attorneys' fees incurred in connection

26    with this action; and

27        E.    Such other and further relief as the Court deems just and proper.

28

-15-

1    VENABLE LLP

2  Dated: July 25, 2023              /s/ *William A. Hector*

                          By: _____
3                                William A. Hector (SBN 298490)
                                 Frank M. Gasparo (*Pro Hac Vice*
4                                *forthcoming*)
                                 Ralph A. Dengler (*Pro Hac Vice*
5                                *forthcoming*)
                                 Ian G. Paquette (*Pro Hac Vice*
6                                *forthcoming*)
                                 Parker G. Zimmerman (*Pro Hac Vice*
7                                *forthcoming*)

8                                *Attorneys for Plaintiff MG Freesites Ltd*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-16-

# EXHIBIT EE

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**Before the Honorable David P. Shaw**
**Administrative Law Judge**

|  |  |
|---|---|
| **In the Matter of**<br><br>**CERTAIN FITNESS DEVICES,**<br>**STREAMING COMPONENTS**<br>**THEREOF, AND SYSTEMS**<br>**CONTAINING SAME** | **Investigation No. 337-TA-1265** |

## JOINT CLAIM CONSTRUCTION CHART

Pursuant to the Procedural Schedule (Order No. 6) and Amended Ground Rule 6.d (Order No. 12), Complainants DISH DBS Corporation, DISH Technologies L.L.C., and Sling TV L.L.C. (collectively, "Complainants"); Respondents iFit Inc. f/k/a ICON Health & Fitness, Inc. and its subsidiaries Free Motion Fitness, Inc. and NordicTrack, Inc., lululemon athletica inc. and its subsidiary Curiouser Products Inc. d/b/a MIRROR, and Peloton Interactive, Inc. (collectively, "Respondents"); and the Commission Investigative Attorney ( "Staff") jointly submit this Joint Claim Construction Chart.

## I.   AGREED UPON CONSTRUCTIONS

The following table sets forth the agreed construction of Complainants, Respondents, and the Staff (collectively, the "Parties'"):

| Term | Asserted Claims | Agreed Construction |
|---|---|---|
| Preambles | '564 Patent:<br>Claims 1, 8 | Preambles for these claims are limiting |

## II.   DISPUTED CLAIM TERMS

1) During briefing, the Parties combined the terms into seven related groups, with each group having a common issue in dispute: "streamlets"

2) "place a streamlet request to the server over the one or more network connections for the selected stream; receive the requested streamlets from the server via the one or more network connections"

3) "virtual timeline"

4) "virtual times" terms

   a) "place at least one virtual timeline request for at least one virtual times based on the selected one of the he low quality stream, the medium quality stream, and the high quality stream" / "placing a virtual time request over one or more internet connections from the one or more end user stations to retrieve at least one virtual timeline corresponding to the currently selected one of the low quality stream, the medium quality stream, and the high quality stream"

5) Quality Terms

   a) "low quality stream" / "medium quality stream" / "high quality stream" / "low quality streamlets"

   b) "selecting, by the content player device, a currently selected one of the low quality stream, the medium quality stream, and the high quality stream based upon a determination by the end user station to select a higher or lower bitrate version of the [live event video / video]"

6) Factor Terms

   a) "a factor indicative of the current ability to sustain the streaming" / "a factor relating to the performance of the network that is indicative of an ability to sustain the streaming of the video"

   b) "repeatedly generating a factor"

   c) "successive determinations"

7) Device Terms

   a) "content player device" / "end user station(s)" / "client module"

 

The following table sets forth the Parties proposed construction for each disputed term, which are arranged by group in the order briefed by the Parties:

| Disp. | Term | Asserted Claims[1] | DISH | Respondents | Staff |
|---|---|---|---|---|---|
| 1. | "streamlet(s)" | '554 Patent: Claims 1, 2, 4, 5, 7, 8, 10, 16, 17, 19-23, 26, 27, 29, 30 '555 Patent: Claims 1, 3, 4, 7, 10, 11, 13, 15, 16, 18, 19, 22-24, 26, 27 '156 Patent: Claims 1-5, 7, 9-10 '680 Patent: Claims 1, 5, 7, 9, 14-16, 22-24, 28, 29 | "any sized portion(s) of the content file" | "any sized portion of a content file each of which is stored separately" | "any sized portion(s) of the content file" |
| 2. | "place a streamlet request to the server over the one or more network connections for the selected stream; receive the requested streamlets from the server via the one or more network connections" | '555 Patent: Claims 10, 26 | Plain and ordinary meaning (*e.g.*, request a plurality of streamlets over the one or more network connections for the selected stream; and receive the requested streamlets from the server via the one or more network connections) | "request a plurality of streamlets simultaneously over the one or more network connections for the selected stream; and subsequently receive the plurality of streamlets from the server via the one or more network connections" | Plain and ordinary meaning (*e.g.*, request a plurality of streamlets over the one or more network connections for the selected stream; and receive the requested streamlets from the server via the one or more network connections) |
| 3. | "virtual | '554 Patent: | Plain and | "playlist of | "a playlist of |

---

[1] The Asserted Claims identified in this column include technical domestic industry claims that were not identified in the Complaint, but were included by Complainants in their technical domestic industry contentions. Respondents dispute that such claims were timely added and are properly part of this Investigation.

| Disp. | Term | Asserted Claims[1] | DISH | Respondents | Staff |
|---|---|---|---|---|---|
| | timeline" | Claims 11-14, 23-25 '680 Patent: Claims 1, 8, 10-12, 14, 15, 18, 19, 22, 28, 29 | ordinary meaning (*e.g.*, file that defines a playlist for a user to view)[2] | multiple or repeated entire content files" | one or more content files" |
| | | | **"virtual times" Terms** | | |
| 4. | "place at least one virtual timeline request for at least one virtual times based on the selected one of the he low quality stream, the medium quality stream, and the high quality stream" | '680 Patent: Claim 14 | "place at least one virtual timeline request for at least one virtual times based on the selected one of the low quality stream, the medium quality stream, and the high quality stream" | Indefinite. | Indefinite (*e.g.*, under 112(2) re "virtual time(s)").[3] |
| | "placing a virtual time request over one or more internet connections from the one or more end user stations to retrieve at least one virtual timeline | '680 Patent: Claim 28 | "placing a virtual timeline request over one or more internet connections from the one or more end user stations to retrieve at least one virtual | Indefinite. | Indefinite (*e.g.*, under 112(2) re "virtual time(s)"). |

[2] Complainants have attempted to change their claim construction in their rebuttal claim construction brief by adding the language in the parenthetical after "plain and ordinary meaning." Respondents are prejudiced by the late modification of this construction because Respondents have no opportunity to respond, including because the *Markman* hearing was canceled. Respondents reserve the right to seek any appropriate relief, including moving to strike these untimely positions. This also applies to the parentheticals added by Complainants to the Quality Terms, the Factor Terms, and the Device Terms.

[3] Claim 14 should be corrected as follows: "place at least one virtual timeline request for at least one virtual times based on the selected one of the **he** low quality stream, the medium quality stream, and the high quality stream"

| Disp. | Term | Asserted Claims[1] | DISH | Respondents | Staff |
|---|---|---|---|---|---|
| | corresponding to the currently selected one of the low quality stream, the medium quality stream, and the high quality stream" | | timeline corresponding to the currently selected one of the low quality stream, the medium quality stream, and the high quality stream." | | |
| | **Quality Terms** | | | | |
| 5. | "low quality streamlets" | '156 Patent: Claim 10 | Plain and ordinary meaning (*e.g.*, streamlets encoded at a bitrate/quality that is lower than the "medium" and "high" quality streams) | Indefinite. | "streamlets of a stream encoded and compressed to a bit rate that is lower than a medium quality stream (*i.e.*, a bit rate between approximately 0 and 100 kilobits per second)" |
| | "low quality stream" | '554 Patent: Claims 1, 2, 4, 7, 8, 10, 12, 16, 17, 20, 21, 24, 26, 27, 29, 30 '555 Patent: Claims 1, 3, 4, 7, 8, 10-13, 15, 16, 18-20, 22-24, 26, 27 '680 Patent: Claims 1, 5, 7, 9, 10, 14, 16, 18, 22-24, 28 | Plain and ordinary meaning (*e.g.*, encoded at a bitrate/quality that is lower than the "medium" and "high" quality streams) | Indefinite. | "a stream encoded and compressed to a bit rate that is lower than a medium quality stream (*i.e.*, a bit rate between approximately 0 and 100 kilobits per second)" |

| Disp. | Term | Asserted Claims[1] | DISH | Respondents | Staff |
|-------|------|-------------------|------|-------------|-------|
| | "medium quality stream" | <u>'554 Patent</u>: Claims 1, 2, 4, 7, 8, 10, 12, 16, 17, 20, 21, 24, 26, 27, 29, 30 <u>'555 Patent</u>: Claims 1, 3, 4, 7, 8, 10-13, 15, 16, 20, 22-24, 26 <u>'680 Patent</u>: Claim 1, 5, 7, 9, 10, 14, 16, 18, 22-24, 28 | Plain and ordinary meaning (*e.g.*, encoded at a bitrate/quality level that is higher than the "low" and lower than the "high" quality stream) | Indefinite. | "a stream encoded and compressed to a bit rate that is lower than a high quality stream and higher than a low quality stream (*i.e.*, a bit rate between approximately 100 and 600 kilobits per second)" |
| | "high quality stream" | <u>'554 Patent</u>: Claims 1, 2, 4, 7, 8, 10, 12, 16, 17, 20, 21, 24, 26, 27, 29, 30 <u>'555 Patent</u>: Claims 1, 3, 4, 7, 8, 10-12, 15, 16, 18-20, 22-24, 26, 27 <u>'680 Patent</u>: Claim 1, 5, 7, 9, 10, 14, 16, 18, 22-24,  28 | Plain and ordinary meaning (*e.g.*, encoded at a bitrate/quality level that is higher than the "low" and "medium" quality streams) | Indefinite. | "a stream encoded and compressed to a bit rate that is higher than a medium quality stream (*i.e.*, a bit rate of approximately 600 kilobits per second or faster)" |
| | "selecting, by the content player device, a currently selected one of the low quality stream, the medium quality | <u>'554 Patent</u>: Claim 30 <u>'680 Patent</u>: Claim 28 | Plain and ordinary meaning (*e.g.*, selecting one of the low quality stream, the medium quality stream, | Indefinite. | Indefinite (*e.g.*, under 112(2) re "a currently selected…" and/or "selecting, by **the content player** device |

6

| Disp. | Term | Asserted Claims[1] | DISH | Respondents | Staff |
|---|---|---|---|---|---|
| | stream, and the high quality stream based upon a determination by the end user station to select a higher or lower bitrate version of the [live event video / video]" | | and the high quality stream based upon a determination whether to switch to a higher or lower bitrate version of the live event video / video, wherein the streaming already would be in progress when the selection is made) | | … based upon a determination by **the end user station**") |
| | | | **Factor Terms** | | |
| 6. | "a factor indicative of the current ability to sustain the streaming" | '564 Patent: Claims 1, 8 | Plain and ordinary meaning (*e.g.*, one or more factors relating to the performance of the network that is indicative of an ability to sustain the streaming of the video)) | Indefinite. | Plain and ordinary meaning (*e.g.*, one or more factors relating to the performance of the network that is indicative of an ability to sustain the streaming of the video) |
| | "a factor relating to the performance of the network that is indicative of an ability to sustain the streaming of the video" | '156 Patent: Claim 1 | Plain and ordinary meaning (*e.g.*, one or more factors relating to the performance of the network that is indicative of an ability to sustain the | Indefinite. | Plain and ordinary meaning (*e.g.*, one or more factors relating to the performance of the network that is indicative of an ability to sustain the |

7

| Disp. | Term | Asserted Claims[1] | DISH | Respondents | Staff |
|---|---|---|---|---|---|
| | | | streaming of the video)) | | streaming of the video) |
| | "successive determinations" | '564 Patent: Claims 1, 8, 10 '156 Patent: Claim 1 | Plain and ordinary meaning (*e.g.*, more than one determination) | Indefinite. | "more than one determination" |
| | "repeatedly generating a factor" | '564 Patent: Claims 1, 8, 10 '156 Patent: Claim 1 | "generating a factor more than once" | Indefinite. | "generating a factor more than once" |
| | **Device Terms** | | | | |
| 7. | "content player device" | '554 Patent: Claims 16, 30 '680 Patent: Claims 14, 28-29 | Plain and ordinary meaning (*e.g.*, network-connected client device that is configured to play content) | Indefinite for lack of antecedent basis and to the extent it is equated to "end user station(s)" in the identified claims. | Plain and ordinary meaning (*e.g.*, a device that plays content); identified claims are indefinite; preambles are limiting in the identified independent claims. |
| | "end user station(s)" | '554 Patent: Claims 16-25, 30 '680 Patent: Claims 14-16, 18-21, 28, 29 | Plain and ordinary meaning (*e.g.*, network-connected client device that is configured to play content) | Indefinite for lack of antecedent basis and to the extent it is equated to "content player device" in the identified claims. | Plain and ordinary meaning (e.g., a network-connected electronic system configured to present content to a user); identified claims are indefinite; preambles are |

8

| Disp. | Term | Asserted Claims[1] | DISH | Respondents | Staff |
|---|---|---|---|---|---|
| | | | | | limiting in the identified independent claims. |
| | "client module" | '555 Patent: Claims 10, 26 | Plain and ordinary meaning (*e.g.*, subcomponent of the content player device / end user station) | Indefinite for lack of antecedent basis. | "the part of the end user station that interacts with one or more servers and plays content" |

Of these disputed terms, Respondents believe that the 7 disputed issues should be ranked

in order of significance as follows (most significant first):

1) "virtual timeline" – Respondents believe this term to be dispositive as to all asserted claims of the '680 patent and Claims 11-14, 23-25 of the '554 patent

2) "place a streamlet request to the server over the one or more network connections for the selected stream; receive the requested streamlets from the server via the one or more network connections" – Respondents believe this term to be dispositive as to all asserted claims of the '555 patent.

3) "streamlets"

4) Quality Terms – These terms are dispositive if they are found indefinite.

5) "virtual times" Terms – These terms are dispositive if they are found indefinite.

6) Factor Terms – These terms are dispositive if they are found indefinite.

7) Device Terms – These terms are dispositive if they are found indefinite.

Respectfully Submitted,                                   Date: September 22, 2021

/s/*Lisa M. Kattan*

Lisa M. Kattan
Jamie R. Lynn
Thomas C. Martin
Lauren J. Dreyer
Samuel L. Kassa
Christopher J. Hong
**BAKER BOTTS L.L.P.**
700 K Street, NW
Washington, DC 20001
Phone: 202.639.7700

G. Hopkins Guy, III
**BAKER BOTTS L.L.P.**
1001 Page Mill Road
Building One, Suite 200
Palo Alto, California 94304
Phone: 650.739.7500

Ali Dhanani
Bradley Bowling
**BAKER BOTTS L.L.P.**
910 Louisiana Street
Houston, Texas 77002
Phone: 713.229.1234

Bethany R. Salpietra
**BAKER BOTTS L.L.P.**
2001 Ross Avenue, Suite 900
Dallas, Texas 75201
Phone: 214.953.6500

Email: DISHABRITC@BakerBotts.com

*Attorneys for Complainants DISH DBS Corporation, DISH Technologies L.L.C., and Sling TV L.L.C.*

/s/*Brian M. Buroker*

Josh A. Krevitt
Katherine Q. Dominguez
Allen Kathir
**GIBSON, DUNN & CRUTCHER L.L.P.**
200 Park Avenue, 47th Floor
New York, New York 10166-0193

/s/*Jared J. Braithwaite*

Charles S. Barquist
**MASCHOFF BRENNAN**
300 South Grand Ave., Suite 1400
Los Angeles, California 90071
Phone: 949.202.1900

David R. Wright
Jared J. Braithwaite
Taylor J. Wright
**MASCHOFF BRENNAN**
111 South Main Street, Suite 600
Salt Lake City, Utah 84111
Phone: 801.297.1850

Tyson K. Hottinger
Christina L. Trinh
**MASCHOFF BRENNAN**
100 Spectrum Center Drive, Suite 1200
Irvine, California 92618
Phone: 949.202.1900

Email: ICON_MB_DISH@MaBr.com

Daniel E. Yonan
Dallin G. Glenn
**STERNE, KESSLER, GOLDSTEIN & FOX PLLC**
1100 New York Ave., NW, Suite 600
Washington, DC 20005
Phone: 202.371.2600

Email: ICON-ITC@SterneKessler.com

*Attorneys for Respondents ICON Health & Fitness, Inc., FreeMotion Fitness, Inc., and NordicTrack, Inc.*

/s/*Stephen R. Smith*

Stephen R. Smith
Phillip E. Morton
Emily E. Terrell
Naina Soni
Elizabeth Shrieves
**COOLEY L.L.P.**

10

Phone: 212.351.4000

Y. Ernest Hsin
**GIBSON, DUNN & CRUTCHER L.L.P.**
555 Mission Street
San Francisco, CA 94105-0921
Phone: 415.393.8224

Brian M. Buroker
Shuo Josh Zhang
**GIBSON, DUNN & CRUTCHER L.L.P.**
1050 Connecticut Avenue NW
Washington, DC 20036-5306
Phone: 202.955.8500

Ryan K. Iwashashi
**GIBSON, DUNN & CRUTCHER L.L.P.**
1881 Page Mill Road
Palo Alto, CA 94304-1211
Phone: 650.849.5389

Email: GDC-Peloton-ITC@GibsonDunn.com

*Attorneys for Respondent Peloton
Interactive, Inc.*

1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
Phone: 202.842.7800

Heidi Keefe
Cameron C. Vanderwall
**COOLEY L.L.P.**
3175 Hanover Street
Palo Alto, California 94304
Phone: 650.843.5000

Michael Rhodes
**COOLEY L.L.P.**
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Phone: 415.693.2000

Email: MIRROR-ITC@Cooley.com

*Attorneys for Respondents lululemon athletica
inc. and Curiouser Products Inc. d/b/a
MIRROR*

/s/*Aaron D. Rauh*
Margaret D. Macdonald, Director
Anne Goalwin, Superviso1y Attorney Aaron
D. Rauh, Investigative Attorney
**OFFICE OF UNFAIR IMPORT INVESTIGATIONS**
U.S. International Trade Commission
500 E. Street, S.W., Suite 401
Washington, D.C. 20436
Phone: 202-205-2025

11

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **JOINT CLAIM CONSTRUCTION CHART** has been filed and served on this 22nd day of September, 2021, on the following:

### *United States International Trade Commission*

| | |
|---|---|
| The Honorable Lisa R. Barton<br>Secretary to the Commission<br>U.S. INTERNATIONAL TRADE COMMISSION<br>500 E Street, SW, Room 112<br>Washington, D.C. 20436 | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via EDIS |
| The Honorable David P. Shaw<br>Administrative Law Judge<br>U.S. International Trade Commission<br>500 E Street, SW<br>Washington, DC 20436<br>Email: Shaw337@usitc.gov | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>(by Next Business Day)<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |
| Joseph Speyer<br>Attorney Advisor to the Honorable David P. Shaw<br>U.S. International Trade Commission<br>500 E Street, SW, Suite 317<br>Washington, DC 20436<br>Email: Joseph.Speyer@usitc.gov | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>(by Next Business Day)<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |

### *Office of Unfair Import Investigations*

| | |
|---|---|
| Aaron Rauh, Esq.<br>Commission Investigative Attorney<br>Office of Unfair Import Investigations<br>U.S. International Trade Commission<br>500 E Street, S.W., Room<br>Washington, D.C. 20436<br>Email: Aaron.Rauh@USITC.com | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail<br>☒ Via Box |

### *Respondents ICON Health & Fitness, Inc.; FreeMotion Fitness, Inc.; and NordicTrack, Inc.*

| | |
|---|---|
| Charles S. Barquist<br>**MASCHOFF BRENNAN**<br>300 South Grand Ave., Suite 1400<br>Los Angeles, CA  90071<br><br>David R. Wright<br>Jared J. Braithwaite<br>Taylor J. Wright<br>**MASCHOFF BRENNAN**<br>111 South Main Street, Suite 600<br>Salt Lake City, UT  84111 | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |

Page 1 of 3

| Tyson K. Hottinger<br>Christina L. Trinh<br>**MASCHOFF BRENNAN**<br>100 Spectrum Center Drive, Suite 1200<br>Irvine, CA  92618<br><br>Email: icon_mb_dish@mabr.com | |

**Respondents ICON Health & Fitness, Inc.; FreeMotion Fitness, Inc.; and NordicTrack, Inc.**

| Daniel E. Yonan<br>Dallin G. Glenn<br>**STERNE, KESSLER, GOLDSTEIN & FOX PLLC**<br>1100 New York Ave., N.W., Suite 600<br>Washington, D.C.  20005<br><br>Email: icon-itc@sternekessler.com | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |

**Respondents lululemon athletica inc. and Curiouser Products Inc. d/b/a MIRROR**

| Stephen R. Smith<br>Phillip E. Morton<br>Emily E. Terrell<br>Naina Soni<br>Elizabeth Shrieves<br>**COOLEY LLP**<br>1299 Pennsylvania Avenue, N.W.<br>Suite 700<br>Washington, D.C.  20004-2400<br><br>Heidi Keefe<br>Cameron C. Vanderwall<br>**COOLEY LLP**<br>3175 Hanover Street<br>Palo Alto, California 94304<br><br>Michael Rhodes<br>**COOLEY LLP**<br>101 California Street, 5th Floor<br>San Francisco, CA  94111-5800<br><br>Email: MIRROR-ITC@cooley.com | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail |

**Respondent Peloton Interactive, Inc.**

| Josh A. Krevitt<br>Katherine Q Dominguez<br>Allen Kathir | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier |

| | |
|---|---|
| **GIBSON, DUNN & CRUTCHER LLP**<br>200 Park Avenue, 47th Floor<br>New York, NY 10166<br><br>Y. Ernest Hsin<br>**GIBSON, DUNN & CRUTCHER LLP**<br>555 Mission Street<br>San Francisco, CA 94105-0921<br><br>Brian M. Buroker<br>Shuo Josh Zhang<br>**GIBSON, DUNN & CRUTCHER LLP**<br>1050 Connecticut Ave., N.W.<br>Washington, D.C. 20036-5306<br><br>Ryan K. Iwahashi<br>**GIBSON, DUNN & CRUTCHER LLP**<br>1881 Page Mill Road<br>Palo Alto, CA 94304-1211<br><br>Email: GDC-Peloton-ITC@gibsondunn.com | ☒ Via Electronic Mail |

_/s/ Stanley M. Bryant_
Stanley M. Bryant

Page 3 of 3

# EXHIBIT FF



# EXHIBIT GG

# Acceptance of the Terms of Service

**Last Modified: [August 20th, 2023]**

By accessing, using or visiting www.spicevids.com (the "**Website**"), any of its content, functionalities and services, you signify your agreement to these Terms of Service and our Privacy Policy and incorporated herein by reference.

These Terms of Service apply to all users of the Website, including Content Partners (collectively "**you**", "**User**" or "**Users**" as the context requires), whether accessed via computer, mobile device, or other technology, manner, or means.

"**Content Partners**" means users of the Website who contribute to the content of the Website.

If you do not agree to any of these Terms of Service or our Privacy Policy, please do not access or use the Website.

You consent to entering these Terms of Service electronically, and to storage of records related to these Terms of Service in electronic form.

**Ability to Accept Terms of Service**

This Site contains age-restricted materials including nudity and explicit depictions of sexual activity. You affirm that you are at least 18 years of age or the age of majority in the jurisdiction you are accessing the Website from and are fully able and competent to enter into the terms, conditions, obligations, affirmations, representations, and warranties set forth in these Terms of Service, and to abide by and comply with these Terms of Service. If Subscriber is under the age of 18 years, or under the age of majority in the location from where access to the Site is attempted, Subscriber does not have authorization or permission to enter or access any of its materials. You also represent that the jurisdiction from which you access the Website does not prohibit the receiving or viewing of sexually explicit content. If Subscriber is under the age of 18 years, or under the age of majority in the location from where access to the Site is attempted, Subscriber does not have authorization or permission to enter or access any of its materials. If Subscriber is over the age of 18 years or over the age of majority in the location from where access to the Site is attempted, Subscriber hereby acknowledges and understands the explicit sexual nature of the materials available on this Site, and agrees to comply with these terms and conditions.

You also understand and agree that, after any purchases made on the Spicevids, you may be asked to prove or verify your age. If you are unsuccessful (i.e. you are found to be under eighteen (18) years of age or the age of majority in the location where you are attempting to verify from) or unable to do so, your purchase will be cancelled and a refund may be issued to you, in a discretionary manner. Upon such failure to verify or prove your age we also reserve the right, in our sole and final discretion, to prevent you from entering or re-entering the Spicevids by, for example but not limited to, terminating your account." For more information on how this information is processed, please review our Privacy Policy.

**Changes to the Terms of Service**

We reserve the right to amend these Terms of Service at any time and without notice, and it is your responsibility to review these Terms of Service for any changes. Your use of the Website following any amendment of these Terms of Service will signify your assent to and acceptance of its revised terms.

The updated version of the Terms of Service supersedes any prior versions immediately upon being posted, and the prior version(s) shall have no continuing legal effect. You should periodically review the most up-to-date version of the Terms of Service found at https://www.spicevids.com/legal/tos.

Appx000825

## About The Website

The Website allows for general viewing of adult-oriented content by registered Users.

The Website may contain links to third party sites that are not owned or controlled by the Website or its operator. The Website has no control over, and assumes no responsibility for, the content, privacy policies, or practices of any third-party sites. You expressly relieve us from all liability arising from your use of any third-party sites you may be redirected to from our Website and accordingly, we encourage you to be aware when you leave the Website and to read the terms, conditions, and privacy policies of the third party sites that you visit.

The Website is for your personal use and shall not be used for any commercial endeavor except those specifically endorsed or approved by the Website.

The Website is for adult-oriented content. Other categories of content may be rejected or deleted in our sole discretion. We may, in our sole discretion and at any time, remove any Content on the Website.

You understand and acknowledge that when using the Website, you will be exposed to content from a variety of sources, and that the Website is not responsible for the accuracy, usefulness, safety, or intellectual property rights of or relating to such content. You further understand and acknowledge that you may be exposed to content that is inaccurate, offensive, indecent, or objectionable, and you agree to waive, and hereby do waive, any legal or equitable rights or remedies you have or may have against the Website with respect thereto, and agree to indemnify and hold the Website, its operator, its parent corporation, its affiliates, licensors, service providers, officers, directors, employees, agents, successors and assigns, harmless to the fullest extent allowed by law regarding all matters related to your use of the Website.

## Communication Preferences

By using and registering as a User of the Website, you expressly and specifically consent to receiving electronic communications from us relating to your account. These communications may involve sending emails to your email address provided during registration, or posting communications on the Website (for example, through the members' area on the Website upon login to ensure receipt in the event you have unsubscribed from email communications), or in the "My Account" or "My Profile" page and may include notices about your account (such as upcoming payment notifications, change in password or payment method, confirmation emails) and other transactional information) and are part of your relationship with us. You agree that any notices, agreements, disclosures or other communications that we send to you electronically will satisfy any legal communication requirements, including that such communications be in writing. You should maintain copies of electronic communications by printing a paper copy or saving an electronic copy.

### Purchasing Content, Subscriptions, Free Trials, Promotion Subscriptions, Billing and Cancellation

### Use of Third-Party Internet Payment Service Providers

Payment for subscriptions to the Website can be made by a current, valid, accepted method of payment including but not limited to credit cards, and when available, by debit cards (as such may be updated from time to time, "**Payment Method**") and are processed through our third-party Internet payment service providers or other payment processors. By purchasing a subscription to the Website, you hereby consent to and agree to abide by such third-party Internet payment service providers' or payment processors' customer terms and conditions, and policies, and understand that we have no control whatsoever on such customer terms and conditions, and policies. If you cannot agree to such third-party internet payment service providers' or payment processors' customer terms and conditions or policies, do not purchase a subscription to the Website.

## Subscriptions to the Website

Your subscription to the Website, which may start with a free trial or promotional subscription, will continue unless and until you cancel, or we terminate it in accordance with these Terms of Service. You must provide us

with Payment Method to use our services. The applicable subscription fee will be billed using the Payment Method of your choosing. You must cancel your subscription before it renews in order to avoid billing of the next period's subscription fees to your Payment Method.

We may offer a number of subscription plans, including special promotional plans or subscriptions with differing conditions and limitations. You can find specific details regarding your subscription with us by verifying the email receipt issued upon your sign-up or by contacting us in one of the manners described at https://support.spicevids.com. Some promotional subscriptions may be offered by third parties in conjunction with the provision of their own products and services. We are not responsible for the products and services provided by such third parties. We reserve the right to modify, terminate or otherwise amend, in our sole discretion, our offered subscription plans.

**Free Trials and Promotional Subscriptions to the Website**

Your subscription to the Website may start with a free trial or promotional subscription. The free trial period of your subscription may last for a fixed period of seven days, or as otherwise specified during sign-up. For combinations with other offers, restrictions may apply. Free trials or promotional subscriptions are for new subscribers. We reserve the right, in our sole discretion, to determine your eligibility for free trial or promotional subscription.

We will begin billing your Payment Method for monthly subscription fees at the end of the free trial period of your subscription or at the end of your promotional subscription unless you cancel prior to the end of the applicable period. To view the specific details of your subscription, including monthly subscription price and end date of your free trial period or promotional subscription, please verify the email receipt issued upon your sign-up or contact us in one of the manners described at https://support.spicevids.com. We may authorize your Payment Method through various methods, including authorizing it up to an amount equal to or similar to the amount of the monthly subscription fee as soon as you register. In some instances, your available balance or credit limit may be reduced to reflect the authorization during your free trial period. However, you will not be charged during your free trial period for the subscription fee.

**Billing for Subscriptions to the Website**

By starting your subscription to the Website and providing or designating a Payment Method, you authorize us to charge you a recurring subscription fee at the then current rate, and any other charges you may incur in connection with your use of our services to your Payment Method.

We reserve the right to adjust pricing for our service or any components thereof in any manner and at any time as we may determine in our sole discretion. Except as otherwise expressly provided for in these Terms of Service, any material price increases to your service will take effect following notice to you.

The subscription fee for our services will be billed at the beginning of the paying portion of your subscription and each period thereafter unless and until you cancel your subscription. We automatically bill your Payment Method each period on or near the calendar day corresponding to the commencement of your paying subscription, if your Payment Method allows for automatic billing. We reserve the right to change the timing of our billing, in particular, as indicated below, if your Payment Method has not successfully been processed. If your subscription began on a day not contained in a given month, we may bill your Payment Method on a day in the applicable month or such other day as we deem reasonably appropriate. Your renewal date may change due to changes in your subscription. We may authorize your Payment Method in anticipation of subscription or service-related charges. If your Payment Method does not successfully process a charge for a subscription fee, you authorize us to charge you an administration fee up to $1.99 in order to keep your subscription temporarily active until the full subscription fee can be processed successfully and your full term renewed.

AYLO Billing Ltd, AYLO Billing US Corp., Probiller.com, MGBill, Vendo, Segpay, WTS, EPOCH, or others (depending on your geographical location) may appear on your credit card statement, bank statement, or phone bill for all applicable charges. If multiple websites are joined utilizing any Payment Method, your statement will

Appx000827

list each individual purchase comprising the transaction. AYLO Billing Ltd or AYLO Billing US Corp. may include other information on your statement based on requirements of credit card association, telephone regulation, National Automated Clearinghouse Association or any other mandated rules and regulations. If you elect to use a checking account to purchase a subscription to the Website, a debit will be executed to your checking account.

## Taxes

Value-Added Tax or VAT, sales tax or other excise tax may be included in, or added to, the price for subscription fee for the Website depending on your country, state, territory, city, or on other applicable local regulations. Tax rates may vary accordingly.

## Refund Policy

Payments are nonrefundable and there are no refunds or credits for partially used periods.

In the event we terminate your rights to use any of the Website because of a breach of these Terms of Service, you shall not be entitled to the refund of any part of the subscription fees. Additionally, you may be entitled to a partial refund for any unused portion of subscription fees, or subscription extension, should the website be unavailable for an extended period of time. Our decisions about such refunds are made on a case-by-case basis and depend on the facts and circumstances of the particular issue. All refunds are made without admission of liability.

At any time, and for any reason, we may provide a refund, discount, or other consideration to some or all of our subscribers, at our sole and entire discretion. The amount and form of such refund, discount, or other consideration, and the decision to provide them, are in our sole discretion. The provision of such refund, discount, or other consideration in one instance does not entitle you to refunds, discounts, or other consideration in the future for similar instances, nor does it obligate us to provide refunds, discounts, or other consideration in the future, under any circumstance.

## Payment Methods

You may edit your Payment Method information by contacting our Customer Care in one of the manners described at https://support.spicevids.com. If a payment is not successfully processed, due to expiration, insufficient funds, or otherwise, and you do not edit your Payment Method information or cancel your account, you remain responsible for any uncollected amounts and authorize us to continue billing the Payment Method, as it may be updated. This may result in a change to your payment billing dates. For certain Payment Methods, the issuer of your Payment Method may charge you a transaction fee or other charges, for which you are solely responsible.

## Cancellation of Subscription

At any time, and without cause, subscription to the Website may be terminated by either the Website, its affiliates AYLO Billing Ltd or AYLO Billing US Corp., or a registered User upon notification of the other by electronic or conventional mail, by chat, or by telephone. More particularly, a registered User may cancel its account at any time and for any reason, using any of the following methods: email, telephone, chat, or online cancelation For an online cancellation, a registered User may cancel at any time by accessing the Website support page and clicking on "Manage Account or Cancel Online" and then clicking on "cancel account" or contacting the Website support via chat or telephone listed on https://support.spicevids.com, or via email by submitting a ticket on https://support.spicevids.com/technical/. For any avoidance of doubts, Subscribers are liable for charges incurred until the date of the termination.

## Cardholder Disputes/Chargebacks

All chargebacks are thoroughly investigated and disputed and may prevent future purchases with our third-party Internet payment service providers given the circumstances. Fraud claims may result in our third-party Internet payment service providers contacting your card issuer to protect you and prevent future fraudulent charges to your payment method.

## Electronic Receipt

You will receive an email receipt to the email provided upon initial registration, as the same may be changed by you over time. You may request a copy of the account of charges to your account but we cannot guarantee the availability of such records more than 365 days after a subscription or purchase date. Requests must be made directly to AYLO Billing Ltd or AYLO Billing US Corp. To contact AYLO Billing Ltd or AYLO Billing US Corp., refer to our Customer Care in one of the manners described at https://support.spicevids.com.

## Accessing the Website and Account Security

We reserve the right to withdraw or amend the Website, and any service or material we provide on the Website, in our sole discretion without notice. We will not be liable if for any reason all or any part of the Website is unavailable at any time or for any period. From time to time, we may restrict access to some parts of the Website, or the entire Website, to Users.

You are responsible for:

- making all arrangements necessary for you to have access to the Website, and

- ensuring that all persons who access the Website through your internet connection are aware of these Terms of Service and comply with them.

To access the Website or some of the resources it offers, you may be asked to provide certain registration details or other information. For more information on information required to use the Website please refer to the Privacy Policy. It is a condition of your use of the Website that all the information you provide on the Website is correct, current and complete. You agree that all information you provide to register with the Website or otherwise, including but not limited to through the use of any interactive features on the Website, is governed by our Privacy Policy, and you consent to all actions we take with respect to your information consistent with our Privacy Policy.

If you choose, or are provided with, a user name, password or any other piece of information as part of our security procedures, you must treat such information as confidential, and you must not disclose it to any other person. You are fully responsible for all activities that occur under your user name or password. You also acknowledge that your account is personal to you and agree not to provide any other person with access to the Website or portions of the Website using your user name, password or other security information. You agree to notify us immediately of any unauthorized access to or use of your user name or password or any other breach of security by contacting us at support@spicevids.com. You also agree to ensure that you exit from your account at the end of each session. You should use particular caution when accessing your account from a public or shared computer so that others are not able to view or record your password or other personal information. Although the Website will not be liable for your losses caused by any unauthorized use of your account, you may be liable for the losses of the Website or others due to such unauthorized use.

If you interact with us or with third-party service providers, and you provide information, including account or credit card or other payment information, you agree that all information that you provide will be accurate, complete, and current. You will review all policies and agreements applicable to use of third party services. In the event you use our Website over mobile devices, you hereby acknowledge that your carrier's normal rates and fees, such as excess broadband fees, will still apply.

We have the right to disable any user name, password or other identifier, whether chosen by you or provided by us, at any time in our sole discretion for any or no reason, including if, in our opinion, you have violated any

provision of these Terms of Service.

You acknowledge that the Websites reserve the right to charge fees for their services and Websites access and to change their fees in their sole discretion.

## Limited, Conditional License to Use Our Intellectual Property

SpiceVids.com, SpiceVids and associated logos and brands are our trademarks and/or service marks. Other trademarks used on the Website, which are not the property of the Websites and its affiliates, such as the trademarks associated with third party Content Partners, are the trademarks of their respective owners. You are granted no rights with respect to any of the aforesaid trademarks.

The inclusion of images or text containing the trademarks or the name or likeness of any person, including any celebrity, does not constitute an endorsement, express or implied, by any such person, of by the Website or vice versa.

The Website and certain materials available on or through the Website are content we own, authored, created, purchased, or licensed (collectively, our **"Works"**). Our Works may be protected by copyright, trademark, patent, trade secret, and/or other laws, and we reserve and retain all rights in our Works and the Website.

We grant you a conditional, revocable, non-sublicensable, non-transferable and non-exclusive and limited license to access and use our Website and Works solely for your personal use, conditioned upon your compliance with these Terms of Service , and to not use ad blocking software of any kind. This limited license is further conditioned upon your agreement not to use any information obtained from or through the Website to block or interfere with the display of any advertising on the Website, or for the purpose of implementing, modifying, or updating any software or filter lists that block or interfere with the display of any advertising on the Website. Interference with the display of any advertising on the Website, use of ad blocking software to block or disable any advertising while viewing the Website, or use of information obtained from or through the Website to update any ad blocking software or filter lists, is prohibited, violates the conditions of your limited license to view the Website and Works and constitutes copyright infringement.

You may not otherwise reproduce, distribute, communicate to the public, make available, adapt, publicly perform, link to, or publicly display the Website and Works or any adaptations thereof unless expressly set forth herein. Such conduct would exceed the scope of your license and constitute copyright infringement.

The above described license is conditioned on your compliance with these Terms of Service, including, specifically, your agreement to view the Website whole and intact as presented by the Website's host, complete with any advertising, and shall terminate upon termination of these Terms of Service. If you breach any provision of these Terms of Service, any license you have obtained will be automatically rescinded and terminated. In order to protect our rights, some Content made available on the Website may be controlled by digital rights management technologies, which will restrict how you may use the Content. You must not circumvent, remove, delete, disable, alter, or otherwise interfere with any digital rights management technology. Such conduct is prohibited by law.

You are not allowed to reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise copy or reproduce our Works or Content that does not belong to you, in whole or in part.

## Rules Applicable to All Content Partners on the Website

In order to upload Content to the Website, you must be registered as a Content Partners

Content Partners represent and warrant that with respect to all content on the Website:

1. the content does not contravene to any applicable laws and does not subject the Website to any claims, demands, lawsuits, regulatory actions or any actual, potential or risk of liability, or any threats thereof;

2. it own the rights to use the content on the Website and that the content does not infringe on the rights (including intellectual property rights) of a third party and,

3. that Content Partner have obtained the consent and release for every individual appearing in your Content, including the right for you to use and upload the Content on the Website;

4. for every individual appearing in the content, the Content Partner have carefully ascertained and examined a valid governmental photo identification demonstrating that they are at least 18 years of age on the day they are photographed, filmed or otherwise appearing in such content (this applies to all individuals, whether identifiable or not, or whether nude or not);

5. That you have maintained the records required under 18 U.S.C. § 2257 et. seq., as modified from time to time in compliance with the rules and regulations set forth in 28 C.F.R. § 75 et. seq., and any other applicable records keeping or age verification laws;

6. the content is not a duplicate of another piece of content uploaded by you;

7. the content complies with the Website's Terms of Service, including its Child Sexual Abuse Material Policy, and its Non-Consensual Content Policy.

Failure to comply with these Terms of Services, or should we determine that any of the statements above is untrue, or not complied with, we may, in our sole discretion, refuse to include the content or any part thereof or any references to such content on the Website, remove the content in question from the Website, terminate your account and take any measures necessary to minimize or eliminate any liability.

We may, in our sole discretion, terminate your account if you breach any of the Terms of Service or at any time for any reason even without cause.

If we believe that Content Partners content violates any criminal laws, the Website's Child Sexual Abuse Material Policy, the Website's Non-Consensual Content Policy, Content Partner's account will immediately be terminated, banned from the Website without notice and reported to law enforcement authorities.

**Obligation for Content Partners to comply with Records Keeping Requirements under 18 U.S.C. §2257.** Content Partners certify that the content on the Website has been produced and records are being kept in accordance with 18 U.S.C. § 2257 *et. seq.*, and 28 C.F.R. § 75 *et. seq.*, as modified from time to time, and any other applicable records keeping or age verification laws. Upon our request, Content Partners shall promptly deliver us legible copies (as may be lawfully redacted), of valid (as of the date of production of the content) recognizable governmental photo identifications for any or all individuals appearing in any or all of Content Partner's content (demonstrating that each were at least 18 years of age on the day the Content was produced) together with the required identification forms, documents and releases. In this context, when we refer to all individuals appearing in the content, we mean, without limitation, photographed individuals or individuals otherwise appearing in the content, whether appearing nude, semi-nude or fully clothed, engaging in simulated or actual sexual intercourse (including solo scenes). Content Partner's failure to promptly deliver the requested information upon request, may lead to the temporary or permanent suspension of its account. Content Partner will, at its own expense, indemnify, defend and hold us harmless from, any and all liabilities, losses, damages, fines, fees, penalties, costs and expenses (including reasonable attorneys' fees) incurred or suffered by us from any claim arising or resulting from your failure or negligence to comply with maintenance of any legally mandated records.

You acknowledge that you are solely responsible for the activity that occurs on your account. Please note that you may not permit any other person to use your account and that you must immediately inform us of any apparent breach of security, such as loss, theft or unauthorized disclosure or use of a screen name or password. You may never use anyone else's account, just as no one can ever use yours.

You will be liable for any losses incurred by us due to the unauthorized use of your account. We are not liable for your losses caused by any unauthorized use of your account and you specifically waive any such claim and agree to defend and indemnify us against any such claims made against your account by third parties.

To the extent you voluntarily create a user profile to participate in certain select services offered by us, your profile (and its contents) may be searchable by other Users registered through the Website and others partnered or networked with us. Likewise, your profile (and its contents) may be searchable by publicly available search engines.

We are not responsible for any content that violates community standards in your community. If you are seeking information regarding any illegal or inappropriate activities, you agree to leave the Website immediately. We cannot enforce every jurisdiction's laws for all content that is posted to the Website. As such, we are not responsible for the content of the Website.

You must evaluate, and bear all risks associated with, the use of any content, including any reliance on the accuracy, completeness, or usefulness, or lawfulness of such content. In this regard, you acknowledge that you may not rely on any content transmitted to the Website.

Content Partners agree and understand that the Website's operator (and its successors and affiliates) may make use of your content for promotional or commercial purposes and to render the services pursuant to these Terms of Services. For clarity, you retain all of your ownership rights in your content.

The Website does not permit copyright infringing activities and infringement of intellectual property rights on the Website, and the Website will remove all content if properly notified that such content infringes on another's intellectual property rights. The Website reserves the right to remove Content without prior notice.

**Use of Website**

You agree that you will only use the Website and our services for the lawful purposes expressly permitted and contemplated by these Terms of Service. You may not use the Website and our services for any other purposes, including but not limited to commercial purposes, without our express written consent.

You agree that you will view the Website and its content unaltered and unmodified. You acknowledge and understand that you are prohibited from modifying the Website or eliminating any of the content of the Website, including ads. You must not circumvent, remove, delete, disable, alter, or otherwise interfere with any age verification processes, technologies or security tools used anywhere on the Website or in connection with our services. By using the Website, you expressly agree to accept advertising served on and through the Website and to refrain from using ad blocking software or to disable ad blocking software before visiting the Website.

Content is provided to you AS IS. You may access content for your information and personal use solely as intended through the provided functionality of the Website and as permitted under these Terms of Service. You shall not download, copy, reproduce, distribute, transmit, broadcast, display, sell, license, or otherwise exploit any Content which are not permitted in the Terms of Service.

**Prohibited Uses for Users**

You agree that you will not use or attempt to use any method, device, software, or routine to harm others or interfere with the functioning of the Website, or use and/or monitor any information in or related to the Website for any unauthorized purpose.

In addition to the general restrictions above, the following restrictions and conditions apply specifically to your use of the Webiste or the content. Any determination regarding breach of any of the following is final. Please review the following list of prohibited uses carefully before using the Website. Specifically, you agree not to use any of the Website to:

Appx000832

- violate any law or encourage or provide instructions to another to do so;

- act in a manner that negatively affects other Users' ability to use the Website, including without limitation by engaging in conduct that is harmful, threatening, abusive, inflammatory, intimidating, violent or encouraging of violence to people or animals, harassing, stalking, invasive of another's privacy, or racially, ethnically, or otherwise objectionable;

- use the Website in any way that promotes or facilitates prostitution, solicitation of prostitution, human trafficking, or sex trafficking;

- use the Website to arrange any in-person meetings for purposes of sexual activity for hire;

- deploy programs, software, or applications designed to interrupt, destroy or limit the functionality of any computer software or hardware or telecommunications equipment, including by engaging in any denial of service attack or similar conduct;

- deploy or use programs, software or applications designed to harm, interfere with the operation of, or access in an unauthorized manner, services, networks, servers, or other infrastructure;

- exceed your authorized access to any portion of the Website;

- remove, delete, alter, circumvent, avoid, or bypass any digital rights management technology, encryption or security tools used anywhere on the Website or in connection with our services;

- remove, delete, alter, circumvent, avoid, or bypass any age verification processes, technologies or security tools used anywhere on the Website or in connection with our services;

- collect or store personal data about anyone;

- alter or modify without permission any part of the Website or its content, including ads;

- obtain or attempt to access or otherwise obtain any Content or information through any means not intentionally made available or provided for through the Website;

- exploit errors in design, features which are not documented, and/or bugs to gain access that would otherwise not be available.

Additionally, you agree not to:

- use the Website in any manner that could disable, overburden, damage, or impair the site or interfere with any other party's use of the Website, including their ability to engage in real time activities through the Website;

- use any robot, spider, or other automatic device, process, or means to access the Website for any purpose, including monitoring or copying any of the material on the Website without our prior written consent;

- use any manual process to download, monitor or copy any of the material on the Website or for any other unauthorized purpose;

- use any information obtained from or through the Website to block or interfere with the display of any advertising on the Website, or for the purpose of implementing, modifying or updating any software or filter lists that block or interfere with the display of any advertising on the Website;

- use any device, bots, scripts, software, or routine that interferes with the proper working of the Website or that shortcut or alter Website functions to run or appear in ways that are not intended by the Website's design;

- introduce or upload any viruses, Trojan horses, worms, logic bombs, time bombs, cancelbots, corrupted files or any other similar software, program, or material which is malicious or technologically harmful or that that may damage the operation of another's property or of the Website's or our services;

- attempt to gain unauthorized access to, interfere with, damage, or disrupt any parts of the Website, the server on which the Website are stored, or any server, computer, or database connected to the Website;

- remove any copyright or other proprietary notices from our Website or any of the materials contained therein;

- attack the Website via a denial-of-service attack or a distributed denial-of-service attack;

- otherwise attempt to interfere with the proper working of the Website.

## Monitoring and Enforcement; Termination

We have the right but not the obligation to:

- monitor any communication occurring on or through the Website to confirm compliance with these Terms of Service, the security of the Website, or any legal obligation;

- take any action with respect to any Content that we deem necessary or appropriate in our sole discretion, including if we believe that such Content violates these Terms of Service, infringes any intellectual property right or other right of any person or entity, threatens the personal safety of Users of the Website or the public, or could create liability for us;

- take appropriate legal action, including without limitation, referral to law enforcement, for any illegal or unauthorized use of the Website;

- terminate or suspend your access to all or part of the Website for any or no reason, including without limitation, any violation of these Terms of Service.

Without limiting the foregoing, we have the right to fully cooperate with any law enforcement authorities or court order requesting or directing us to disclose the identity or other information of anyone posting any Content on or through the Website. YOU WAIVE AND HOLD US, OUR OFFICERS, DIRECTORS, EMPLOYEES, SUCCESSORS, AND ASSIGNS HARMLESS FROM ANY CLAIMS RESULTING FROM ANY ACTION TAKEN BY US AS A CONSEQUENCE OF DISCOLSING PERSONAL INFORMATION IN RELATION TO DATA DISCLOSURE REQUESTS FROM LAW ENFORCEMENT AUTHORITIES.

The Website takes a powerful stand against any form of child exploitation or human trafficking. If we discover that any Content involves underage individuals, or any form of force, fraud, or coercion, we will remove the Content and submit a report to the proper law enforcement authorities. If you become aware of any such Content, you agree to report it to the Website by contacting legal@spicevids.com.

## Account Termination Policy

If you violate the letter or spirit of these Terms of Service, or otherwise create risk or possible legal exposure for us, we can terminate access to the Website or stop providing all or part of the Website to you for any reasons at our convenience.

## Copyrights and Other Intellectual Property

The Website operates a clear Copyright Policy in relation to any Content alleged to infringe the copyright of a third party. If you believe that any Content violates your copyright, please see our Copyright Policy for instructions on sending us a notice of copyright infringement.

We encourage trademark owners to resolve any dispute directly with the Content Partner in question or seek any resolution in court or by other judicial means. If you want to report content on the Website that you believe infringes your trademark, you can do so by contacting us here. Only the trademark owner or their authorized representative may file a report of trademark infringement.

### Abuse Reporting

The Website does not permit any form of revenge porn, blackmail, or intimidation. Violations of this policy can be reported through this link.

### Reliance on Information Posted

The Website includes Content provided by third parties,. All statements and/or opinions expressed in these materials, are solely the opinions and the responsibility of the person or entity providing those materials. These materials do not necessarily reflect our opinion. We are not responsible, or liable to you or any third party, for the content or accuracy of any materials provided by any third parties.

### Changes to the Website

We may update the content on the Website from time to time, but its content is not necessarily complete or up-to-date. Any of the material on the Website may be out of date at any given time, and we are under no obligation to update such material.

### Information about You and Your Visits to the Website

All information we collect on the Website is subject to our Privacy Policy. By using the Website, you acknowledge that you have read and understand the terms of the Privacy Policy and that you consent to all actions taken by us with respect to your information in compliance with the Privacy Policy.

### Collection and Use of Your Usage Information by Advertisers and Others

The Website allows others to display advertisements using the Website. These third parties use technology to deliver advertisements you see using the Website directly to your browser. In doing so, they may automatically receive your Internet Protocol or "IP" address. Others that place advertising using the Website may have the ability to use cookies and/or web beacons to collect information, including information about your usage of the Website. We do not control the processes that advertisers use to collect information. However, IP addresses, cookies and web beacons alone generally cannot be used to identify individuals, only machines. Therefore, advertisers and others whose advertisements or content may be provided through the service generally will not know who you are unless you provide additional information to them by responding to an advertisement, by entering into an agreement with them, or by some other means.

### Linking to the Website and Social Media Features

You may link to the Website, provided you do so in a way that is fair and legal and does not damage our reputation or take advantage of it, but you must not establish a link in such a way as to suggest any form of association, approval, or endorsement on our part without our express written consent.

The Website may provide certain social media features that enable you to:

- link from your own or certain third-party websites to certain content on the Website;

- send emails or other communications with certain content, or links to certain content, on the Website;

- cause limited portions of content on the Website to be displayed or appear to be displayed on your own or certain third-party websites.

- You may use these features solely as they are provided by us and solely with respect to the content they are displayed with and otherwise in accordance with any additional terms and conditions we provide with respect to such features. Subject to the foregoing, you must not cause the Website or portions of the Website to be displayed, or appear to be displayed by, for example, framing, deep linking or in-line linking, on any other site, otherwise take any action with respect to the materials on the Website that is inconsistent with any other provision of these Terms of Service.

The sites from which you are linking, or on which you make certain content accessible, must comply in all respects with the content standards set out in these Terms of Service.

You agree to cooperate with us in causing any unauthorized framing or linking immediately to cease. We reserve the right to withdraw linking permission without notice.

We may disable all or any social media features and any links at any time without notice in our sole discretion.

## Links from the Website

If the Website contains links to other sites and resources provided by third parties, these links are provided for your convenience only. This includes links contained in advertisements, including banner advertisements and sponsored links. We have no control over, and assume no responsibility for, the contents, privacy policies, or practices of those sites or resources, and accept no responsibility for them or for any loss or damage that may arise from your use of them. Inclusion of, linking to, or permitting the use or installation of any third party site, applications, software, content, or advertising does not imply approval or endorsement thereof by us. If you decide to access any of the third party sites linked to the Website, you do so entirely at your own risk and subject to the terms and conditions of use for such sites. Further, you agree to release us from any and all liability arising from your use of any third-party website, content, service, or software accessed through the Website.

Your communications or dealings with, or participation in promotions of, sponsors, advertisers, or other third parties found through the Website, are solely between you and such third parties. You agree that the Website shall not be responsible or liable for any loss or damage of any sort incurred as the result of any dealings with such sponsors, third parties or advertisers, or as the result of their presence on the Website.

## Permitted Disclosures of Personal Information

The Website generally does not collect personally identifiable information (data such as your name, email address, password, and the content of your communications) unless you register with us in order to use certain features of the Website. The Website will not disclose any personally identifiable information it collects or obtains except: (i) as described in these Terms of Service or our Privacy Policy; (ii) after obtaining your permission to a specific use or disclosure; (iii) if the Website is required to do so in order to comply with any valid legal process or governmental request (such as a court order, search warrant, subpoena, civil discovery request, or statutory requirement) and may in our sole discretion advise you of such process or request; (iv) as required to protect the Website's property, safety, or operations, or the property or safety of others; (v) to a person that acquires the Website, or the assets of the Website's operator in connection with which such information has been collected or used; or (vi) as otherwise required by law. If the Website is required to respond to or comply with any of these information requests, we reserve the right to charge you with the cost of responding to or complying with such information request, including, but not limited to, costs of research, copies, media storage, mail, and document delivery, as well as any applicable legal fees.

The Website will have access to all information that you have submitted or created for as long as reasonably required to comply with or investigate any information requests, or to protect the Website. In order to enforce these Terms of Services, to protect intellectual property rights, to comply with legal processes and the law, and to protect the Website, you agree to allow the Website to access your information.

## Indemnification

To the extent permitted by applicable law, you agree to defend, indemnify and hold harmless the Website, its site operator, its parent corporation, its affiliates, licensors, service providers, officers, directors, employees, agents, successors and assigns from and against any and all claims, damages, judgments, awards, obligations, losses, liabilities, costs or debt, and expenses (including but not limited to attorney's fees) arising from: (i) your use of and access to the Website; (ii) your violation of any term of these Terms of Service; (iii) your violation of any third party right, including without limitation any copyright, property, or privacy righty. This defense and indemnification obligation will survive these Terms of Service and your use of the Website. You agree that we shall have the sole right and obligation to control the legal defense against any such claims, demands, or litigation, including the right to select counsel of our choice and to compromise or settle any such claims, demands, or litigation.

**Disclaimers**

YOU USE THE WEBSITE AT YOUR SOLE RISK. WE PROVIDE THE WEBSITE "AS IS" AND "AS AVAILABLE". TO THE FULLEST EXTENT PERMITTED BY LAW, THE WEBSITE, DISCLAIM ALL WARRANTIES OF ANY KIND RELATED TO THE WEBSITE AND GOODS OR SERVICES OBTAINED THROUGH THE WEBSITE, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. YOU WILL BE SOLELY RESPONSIBLE FOR ANY DAMAGE TO YOUR COMPUTER SYSTEM OR LOSS OF DATA THAT RESULTS FROM YOUR USE OF THE WEBSITE. WE MAKE NO WARRANTY OR REPRESENTATION ABOUT THE ACCURACY OR COMPLETENESS OF THE WEBSITE'S CONTENT OR THE CONTENT OF ANY SITES LINKED TO THE WEBSITE OR THAT THE WEBSITE WILL MEET YOUR REQUIREMENTS AND ASSUME NO LIABILITY OR RESPONSIBILITY FOR ANY (I) ERRORS, MISTAKES, OR INACCURACIES OF CONTENT, (II) PERSONAL INJURY OR PROPERTY DAMAGE, OF ANY NATURE WHATSOEVER, RESULTING FROM YOUR ACCESS TO AND USE OF THE WEBSITE OR OUR SERVICES, (III) ANY UNAUTHORIZED ACCESS TO OR USE OF OUR SECURE SERVERS AND/OR ANY AND ALL PERSONAL INFORMATION AND/OR FINANCIAL INFORMATION STORED THEREIN, (IV) ANY INTERRUPTION OR CESSATION OF TRANSMISSION TO OR FROM THE WEBSITE OR OUR SERVICES, (IV) ANY BUGS, VIRUSES, TROJAN HORSES, OR THE LIKE WHICH MAY BE TRANSMITTED TO OR THROUGH THE WEBSITE OR OUR SERVICES BY ANY THIRD PARTY, AND/OR (V) ANY ERRORS OR OMISSIONS IN ANY CONTENT OR FOR ANY LOSS OR DAMAGE OF ANY KIND INCURRED AS A RESULT OF THE USE OF ANY CONTENT POSTED, EMAILED, TRANSMITTED, OR OTHERWISE MADE AVAILABLE VIA THE WEBSITE OR OUR SERVICES. THE WEBSITE DOES NOT WARRANT, ENDORSE, GUARANTEE, OR ASSUME RESPONSIBILITY FOR ANY PRODUCT OR SERVICE ADVERTISED OR OFFERED BY A THIRD PARTY THROUGH THE WEBSITE OR OUR SERVICES OR ANY HYPERLINKED SERVICES OR FEATURED IN ANY BANNER OR OTHER ADVERTISING, AND, THE WEBSITE WILL NOT BE A PARTY TO OR IN ANY WAY BE RESPONSIBLE FOR MONITORING ANY TRANSACTION BETWEEN YOU AND THIRD-PARTY PROVIDERS OF PRODUCTS OR SERVICES. AS WITH THE PURCHASE OF A PRODUCT OR SERVICE THROUGH ANY MEDIUM OR IN ANY ENVIRONMENT, YOU SHOULD USE YOUR BEST JUDGMENT AND EXERCISE CAUTION WHERE APPROPRIATE.

NO INFORMATION OBTAINED BY YOU FROM US OR THROUGH THE WEBSITE SHALL CREATE ANY WARRANTY NOT EXPRESSLY STATED IN THESE TERMS.

**Limitation of Liability**

IN NO EVENT SHALL THE WEBSITE, ITS OFFICERS, DIRECTORS, OR EMPLOYEES BE LIABLE TO YOU FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES WHATSOEVER RESULTING FROM ANY (I) ERRORS, MISTAKES, OR INACCURACIES OF CONTENT, (II) PERSONAL INJURY OR PROPERTY DAMAGE, OF ANY NATURE WHATSOEVER, RESULTING FROM YOUR ACCESS TO AND USE OF OUR WEBSITE OR SERVICES, (III) ANY UNAUTHORIZED ACCESS TO OR USE OF OUR SECURE SERVERS AND/OR ANY AND ALL PERSONAL INFORMATION AND/OR FINANCIAL INFORMATION STORED THEREIN, (IV) ANY INTERRUPTION OR CESSATION OF TRANSMISSION TO OR FROM OUR WEBSITE, (IV) ANY BUGS,

VIRUSES, TROJAN HORSES, OR THE LIKE, WHICH MAY BE TRANSMITTED TO OR THROUGH OUR WEBSITE OR SERVICES BY ANY THIRD PARTY, (V) ERRORS OR OMISSIONS IN ANY CONTENT OR FOR ANY LOSS OR DAMAGE OF ANY KIND INCURRED AS A RESULT OF YOUR USE OF ANY CONTENT POSTED, EMAILED, TRANSMITTED, OR OTHERWISE MADE AVAILABLE VIA OUR WEBSITE OR SERVICES, AND/OR (VI) INTERACTIONS YOU HAVE WITH THIRD-PARTY ADVERTISEMENTS OR SERVICE PROVIDERS, OR THIRD-PARTY SITES, FOUND ON OR THROUGH THE WEB SITES, INCLUDING PAYMENT AND DELIVERY OF RELATED GOODS OR SERVICES, AND ANY OTHER TERMS, CONDITIONS, POLICIES, WARRANTIES OR REPRESENTATIONS ASSOCIATED WITH SUCH DEALINGS, WHETHER BASED ON WARRANTY, CONTRACT, TORT, OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT THE WEBSITE OR ITS SITE OPERATOR ARE ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING LIMITATION OF LIABILITY SHALL APPLY TO THE FULLEST EXTENT PERMITTED BY LAW IN THE APPLICABLE JURISDICTION.

YOU SPECIFICALLY ACKNOWLEDGE THAT THE WEBSITE OFFICERS, DIRECTORS, EMPLOYEES, SHALL NOT BE LIABLE FOR CONTENT OR FOR THE DEFAMATORY, OFFENSIVE, OR ILLEGAL CONDUCT OF ANY THIRD PARTY, AND THAT THE RISK OF HARM OR DAMAGE FROM THE FOREGOING RESTS ENTIRELY WITH YOU.

YOU FURTHER ACKNOWLEGE THAT ANY CONTENT UPLOADED TO THE SITE MAY BE VIEWED, DOWNLOADED, REPUBLISHED, AND DISTRIBUTED – POTENTIALLY IN VIOLATION OF YOUR RIGHTS OR THIS AGREEMENT – AND THAT YOU ASSUME SUCH RISKS AS A MATERIAL PART OF THESE TERMS OF SERVICE.

YOU AGREE NOT TO FILE ANY ARBITRATION CLAIM, LAWSUIT OR PROCEEDING INCONSISTENT WITH THE FOREGOING LIABILITY LIMITATIONS.

Any claim by you that may arise in connection with these Terms of Service will be compensable by monetary damages, and you will in no event be entitled to injunctive or other equitable relief.

**Limitation on Time to File Claims**

REGARDLESS OF ANY STATUTE OR LAW TO THE CONTRARY, ANY CAUSE OF ACTION OR CLAIM YOU MAY HAVE ARISING OUT OF OR RELATING TO THESE TERMS OF SERVICE OR THE WEBSITE MUST BE COMMENCED WITHIN ONE (1) YEAR AFTER THE CAUSE OF ACTION ACCRUES, OTHERWISE, SUCH CAUSE OF ACTION OR CLAIM IS PERMANENTLY BARRED.

**Your Comments and Concerns**

The Website is operated by AYLO Premium Ltd, Block 1, 195-197 Old Nicosia-Limassol Road, Dali Industrial zone, Cyprus 2540. All notices of copyright infringement claims should be sent to the copyright agent designated in our Copyright Policy in the manner and by the means set forth therein.

All other feedback, comments, requests for technical support and other communications relating to the Website should be directed to: support@spicevids.com.

**Assignment**

These Terms of Service, and any rights and licenses granted hereunder, may not be transferred or assigned by you, but may be assigned by us without restriction.

**Arbitration Agreement & Waiver of Certain Rights**

Except as set forth hereinabove, you and we agree that we will resolve any disputes between us (including any disputes between you and a third-party agent of ours) through binding and final arbitration instead of through court proceedings. You and we hereby waive any right to a jury trial of any Claim (defined below). All

controversies, claims, counterclaims, or other disputes arising between you and us or you and a third-party agent of ours (each a "**Claim**") shall be submitted for binding arbitration in accordance with the Rules of the American Arbitration Association ("**AAA Rules**"). The arbitration will be heard and determined by a single arbitrator. The arbitrator's decision in any such arbitration will be final and binding upon the parties and may be enforced in any court of competent jurisdiction. You and we agree that the arbitration proceedings will be kept confidential and that the existence of the proceeding and any element of it (including, without limitation, any pleadings, briefs or other documents submitted or exchanged and any testimony or other oral submissions and awards) will not be disclosed beyond the arbitration proceedings, except as may lawfully be required in judicial proceedings relating to the arbitration, by applicable disclosure rules and regulations of securities regulatory authorities or other governmental agencies, or as specifically permitted by state law. The Federal Arbitration Act and federal arbitration law apply to this agreement. However, the Arbitrator, and not any federal, state, or local court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of these Terms of Service including, but not limited to, a claim that all or any part of these Terms of Service is void or voidable.

If you demonstrate that the costs of arbitration will be prohibitive as compared to the costs of litigation, we will pay as much of the administrative costs and arbitrator's fees required for the arbitration as the arbitrator deems necessary to prevent the cost of the arbitration from being prohibitive. In the final award, the arbitrator may apportion the costs of arbitration and the compensation of the arbitrator among the parties in such amounts as the arbitrator deems appropriate.

This arbitration agreement does not preclude either party from seeking action by federal, state, or local government agencies. You and we also have the right to bring qualifying claims in small claims court. In addition, you and we retain the right to apply to any court of competent jurisdiction for provisional relief, including pre-arbitral attachments or preliminary injunctions, and any such request shall not be deemed incompatible with these Terms of Service, nor a waiver of the right to have disputes submitted to arbitration as provided in these Terms of Service.

Neither you nor we may act as a class representative or private attorney general, nor participate as a member of a class of claimants, with respect to any Claim. Claims may not be arbitrated on a class or representative basis. The arbitrator can decide only your and/or our individual Claims. The arbitrator may not consolidate or join the claims of other persons or parties who may be similarly situated. The arbitrator may award in the arbitration the same damages or other relief available under applicable law, including injunctive and declaratory relief, as if the action were brought in court on an individual basis. Notwithstanding anything to the contrary in the foregoing or herein, the arbitrator may not issue a "public injunction" and any such "public injunction" may be awarded only by a federal or state court. If either party seeks a "public injunction," all other claims and prayers for relief must be adjudicated in arbitration first and any prayer or claim for a "public injunction" in federal or state court stayed until the arbitration is completed, after which the federal or state court can adjudicate the party's claim or prayer for "public injunctive relief." In doing so, the federal or state court is bound under principles of claim or issue preclusion by the decision of the arbitrator.

If any provision of this Section is found to be invalid or unenforceable, then that specific provision shall be of no force and effect and shall be severed, but the remainder of this Section shall continue in full force and effect. No waiver of any provision of this Section of the Terms of Service will be effective or enforceable unless recorded in a writing signed by the party waiving such a right or requirement. Such a waiver shall not waive or affect any other portion of this Terms of Service. This Section of the Terms will survive the termination of your relationship with us.

This present Section entitled "Arbitration" shall only apply to Users located in the United States of America.

THIS SECTION LIMITS CERTAIN RIGHTS, INCLUDING THE RIGHT TO MAINTAIN A COURT ACTION, THE RIGHT TO A JURY TRIAL, THE RIGHT TO PARTICIPATE IN ANY FORM OF CLASS OR REPRESENTATIVE CLAIM, THE RIGHT TO ENGAGE IN DISCOVERY EXCEPT AS PROVIDED IN AAA RULES, AND THE RIGHT TO CERTAIN REMEDIES AND FORMS OF RELIEF. OTHER RIGHTS THAT YOU OR WE WOULD HAVE IN COURT ALSO MAY NOT BE AVAILABLE IN ARBITRATION.

**Miscellaneous**

These Terms of Service, your use of the Website, and the relationship between you and us shall be governed by the laws of Cyprus, without regard to conflict of law rules. Nothing contained in these Terms of Service shall constitute an agreement to the application of the laws of any other nation to the Website. You agree that the Website shall be deemed a passive Website that does not give rise to personal jurisdiction over us, either specific or general, in jurisdictions other than Cyprus. The sole and exclusive jurisdiction and venue for any action or proceeding arising out of or related to these Terms of Service shall be in an appropriate court located in Limassol, Cyprus. You hereby submit to the jurisdiction and venue of said Courts.

No waiver by us of any term or condition set forth in these Terms of Service shall be deemed a further or continuing waiver of such term or condition or a waiver of any other term or condition, and any failure by us to assert a right or provision under these Terms of Service shall not constitute a waiver of such right or provision.

If any provision of these Terms of Service is deemed invalid by a court of competent jurisdiction, the invalidity of such provision shall not affect the validity of the remaining provisions of these Terms of Service, which shall remain in full force and effect.

The Terms of Service, our Privacy Policy, our Copyright Policy and any documents they expressly incorporate by reference constitute the sole and entire agreement between you and us with respect to the Website.

We may terminate these Terms of Service for any or no reason at any time by notifying you through a notice on the Website, by email, or by any other method of communication. Any such termination will be without prejudice to our rights, remedies, claims, or defenses hereunder. Upon termination of the Terms of Service, you will no longer have a right to access your account.

MG Billing US Corp, 21800 Oxnard St Ste 150 Woodland Hills, CA, 91367-7909 USA

MG Billing Limited, 195-197 Old Nicosia-Limassol Road, Dali Industrial Zone 2540, Block 1, Cyprus

