# EXHIBIT HH

# Customer Terms and Conditions

Date Last Modified: August 20, 2023

Before Subscriber's transaction can be completed, Subscriber must read and agree to these terms and conditions. By applying for access and or services from this website, Subscriber is agreeing to these terms and conditions, and is agreeing to be legally bound by them. This agreement is subject to change at any time. Changes are effective when posted on this website without notice upon each subscriber.

## 0. Preamble

1. Subscriber data is for internal use only and will be treated confidential.
2. All transactions are SSL encrypted.
3. Subscriber's credit card will be billed immediately after purchase.
4. After purchase Subscriber will receive an email notification with all payment details. The contract is closed between customer and shop as soon as the order is submitted
5. All orders will be processed immediately.
6. All questions will be answered within two working days.
7. We recommend printing out the transaction data and Terms and Conditions and to keep them at an easily accessible place.
8. Prohibited for people under legal age in their respective country.

## 1. Definitions

1. "**Member**" or "**Membership**" shall mean the subscriber or user of a valid username and password for the website during the term of membership.
2. "**AYLO Billing**" shall mean AYLO Billing Limited, and/or any of the companies billing the Subscriber including any additional billing companies used by AYLO Billing or changes thereof.
3. "**AYLO Premium**" or "**Merchant**" or "**Controller**" shall mean AYLO Premium Ltd, the controller of the Site (as defined below)
4. "**Site**" shall mean the website for which subscriber is purchasing a username and password in order to access the website and its materials and obtain the benefits of membership.
5. "**Subscriber**" shall mean the user of the services of the Site and holder of a valid username and password for the Site.
6. "**Access rights**" shall mean the combination of unique username and password that is used to access the Site. An access rights is a license to use the Site for a period of time that is specified.
7. "**Bookmarking**" shall mean a URL placed into a temporary file on the subscriber's browser so that the subscriber may return to that page at a future date without having to type in its username and password.

## 2. Description of Services

AYLO Premium will provide one access right to access the Site and its materials for which Subscriber is purchasing a membership.

## 3. Billing

Probiller.com, MGBill, Vendo, Segpay, WTS, or others (depending on Subscriber geographical location) may appear on Subscriber's credit card, bank statement, or phone bill for all applicable charges. If multiple venues are joined utilizing any payment method, Subscriber's statement will list each individual purchase comprising the

Appx000842

transaction. AYLO Billing or Controller may include other information on Subscriber statement based on credit card association, telephone regulation, NACHA and any other mandated rules and regulations. If Subscriber elects to use a checking account to purchase a subscription to this Site, a debit will be executed on their checking account.

## 4. Tax

Value-Added Tax (VAT), Sales Tax or other excise tax may be included in, or added to, your purchase depending on your country, state, territory, city, or on other applicable local regulations. Tax rates may vary accordingly.

## 5. Payment / Fee

The Site may impose periodic subscription fees at the time of the initial enrolment for subscription. Subscriber is solely responsible for such fees according to the terms and conditions of such Site.

## 6. Automatic Recurring Billing (If Selected By Subscriber On The Sign-Up Page)

In accordance with the terms and conditions of the Site subscription fees will be automatically renewed at or after the end of the original term selected, unless notice of cancellation is received from the Subscriber. In the event of a failed attempt to charge the Subscriber's payment method (for example, if the payment method has expired or has been declined), AYLO Billing reserves the right to retry charging the Subscriber's payment method for the amount due or an amount lesser than the amount due, provided that any such attempt to charge a lower amount may be made on a one-time basis, and AYLO Billing will resume billing the Subscriber for the subscription at the full amount agreed to upon enrollment. AYLO Billing may suspend or cancel Subscriber's membership if AYLO Billing is unable to successfully charge a valid payment method. An administration fee of up to $2.00 may be applied in order to keep a subscription temporarily active until the next attempt to process the recurring payment.

## 7. Electronic Receipt

Subscribers will receive an email receipt to their email provided upon initial subscription. Subscriber may request a copy of the account of charges of their membership to the Site, but neither Controller nor AYLO Billing guarantee the availability of such records more than 365 days after Subscription date. Requests must be made directly to Controller. To contact the Controller, refer to Customer Support links on the Site, or click here.

## 8. Agreed upon Method of Communication

AYLO Billing and the Subscriber agree that a transaction receipt will be provided via email to the Subscriber's address provided at the time of initial enrolment. Subsequent transactional updates may be communicated to the Subscriber through the members' area on the Site (as applicable) upon login to ensure receipt in the event Subscriber has unsubscribed from email communications.

## 9. Cancellation

At any time, and without cause, subscription to the service may be terminated by either: AYLO Billing, the Controller, or the Subscriber upon notification of the other by electronic or conventional mail, by chat, or by telephone. Subscribers are liable for charges incurred until the date of the termination. Subscribers may cancel at any time by going to https://support.fakehub.com/cancel and clicking on "Cancel Online" or by contacting our

Appx000843

support department through the contact options listed on https://support.fakehub.com or online directly with the Site by following the links provided in their transaction receipts.

# 10. Refunds

Refunds for purchases or recurring charges may be requested by contacting customer support. Refunds or credits will not be issued for partially used Memberships. Cancelation for all future recurring billing may be requested in accordance with Section 9, Cancellation. AYLO Billing reserves the right to grant a refund or a credit applicable to purchases to the Site at its discretion. The decision to refund a charge does not imply the obligation to issue additional future refunds. Should a refund be issued by AYLO Billing for any reason, it will be credited solely to the payment method used in the original transaction. AYLO Billing will not issue refunds by cash, check, or to another payment mechanism.

# 11. Cardholder Disputes/Chargebacks

All chargebacks are thoroughly investigated and may prevent future purchases with AYLO Billing or Controller, given the circumstances. Fraud claims may result in AYLO Billing or Controller contacting Subscriber's issuer to protect Subscriber and prevent future fraudulent charges to Subscriber card.

# 12. Authorization of Use

Subscribers of the Site are hereby authorized a single access right to access the service or material located on the Site. This access rights shall be granted for sole use to one Subscriber. All memberships are provided for personal use and shall not be used for any commercial purposes or by any other third parties. Commercial use of either the Site or any material found within is strictly prohibited unless explicitly authorized by the Site. No material within the Site may be transferred to any other person or entity, whether commercial or non-commercial. No material within the Site may be distributed through peer-to-peer networks or any other file sharing platforms. In addition, materials may not be modified, or altered. Materials may not be displayed publicly, or used for any rental, sale, or display. Materials shall extend to copyright, trademarks, or other proprietary notices there from. AYLO Billing and Controller reserve the right to terminate this access rights at any time if the terms of this agreement are breached. In the case that the terms are breached, subscriber will be required to immediately destroy any information or material printed, downloaded, or otherwise copied from the Site.

# 13. Transfer of Access Rights

Access to the Site is through a combination of a username and a password. Subscribers may not under any circumstances release their access rights to any other person and are required to keep their access rights strictly confidential. Controller will not release passwords for any reason, to anyone other than the Subscriber, except as may be specifically required by law or court order. Unauthorized access to the Site is a breach of this Agreement. Subscribers acknowledge that the controller of the Site may track through the use of special software each Subscriber's entry to the Site. If any breach of security, theft or loss of access rights, or unauthorized disclosure of access rights information occurs, Subscriber must immediately notify AYLO Billing or the Controller of said security breach. Subscriber will remain liable for unauthorized use of service until AYLO Billing or Controller is notified of the security breach by e-mail or telephone.

# 14. Sanction and Approval of Adult Material

This Site contains age-restricted materials including nudity and explicit depictions of sexual activity. If Subscriber is under the age of 18 years, or under the age of majority in the location from where access to the Site

is attempted, Subscriber does not have authorization or permission to enter or access any of its materials. If Subscriber is over the age of 18 years or over the age of majority in the location from where access to the Site is attempted, Subscriber hereby acknowledges and understands the explicit sexual nature of the materials available on this Site, and agrees to comply with these terms and conditions.

You also understand and agree that, after any purchases made on the Site, you may be asked to prove or verify your age. If you are unsuccessful (i.e. you are found to be under eighteen (18) years of age or the age of majority in the location where you are attempting to verify from) or unable to do so, your purchase will be cancelled and a refund may be issued to you, in a discretionary manner. Upon such failure to verify or prove your age we also reserve the right, in our sole and final discretion, to prevent you from entering or re-entering the Site by, for example but not limited to, terminating your account.

# 15. Supplementary Terms and Conditions

The Site may have additional Terms and Conditions that are an integral part of their offering to the Subscriber and are in addition to these Terms and Conditions. Such Terms and Conditions as listed on the Site will in no way invalidate any of the Terms and Conditions listed here. This Agreement shall be construed and enforced in accordance with the laws of the Republic of Cyprus applicable to contracts negotiated, executed, and wholly performed within said country. Disputes arising hereunder shall be settled in the Republic of Cyprus. Transactions are governed by country of merchant of record and use of the membership/websites governed by laws stated in the terms on the website from which the purchase was made.

# 16. Severability

If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid or enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

# 17. Notice

Notices by the Site to subscribers may be given by means of electronic messages through the Site, by a general posting on the Site, or by conventional mail. Notices by subscribers may be given by electronic messages, conventional mail, telephone, or fax unless otherwise specified in the Agreement. All questions, complaints, or notices regarding the Site must be directed to Controller. All cancellations of service to the Site must also be directed to Controller.

## Questions and Contact Information

All questions to Controller regarding these terms and conditions must be directed to:

For billing issues: fakehubbilling@probiller.com
For support/technical issues: fakehubsupport@probiller.com
For marketing issues: support@probiller.com

# 18. Disclaimer

USER UNDERSTANDS THAT THE MERCHANT CANNOT AND DOES NOT GUARANTEE OR WARRANT THAT FILES AVAILABLE FOR DOWNLOADING FROM THE INTERNET WILL BE FREE OF VIRUSES, WORMS, TROJAN HORSES, OR OTHER CODE THAT MAY MANIFEST CONTAMINATING OR DESTRUCTIVE PROPERTIES. USER IS RESPONSIBLE FOR IMPLEMENTING SUFFICIENT

PROCEDURES AND CHECKPOINTS TO SATISFY YOUR PARTICULAR REQUIREMENTS FOR ACCURACY OF DATA INPUT AND OUTPUT, AND FOR MAINTAINING A MEANS EXTERNAL TO THE WEBSITE FOR THE RECONSTRUCTION OF ANY LOST DATA. THE MERCHANT DOES NOT ASSUME ANY RESPONSIBILITY OR RISK FOR YOUR USE OF THE INTERNET.

USERS USE OF THE WEBSITE IS AT THEIR OWN RISK. THE CONTENT IS PROVIDED "AS IS" AND WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESSED OR IMPLIED. THE MERCHANT DISCLAIMS ALL WARRANTIES, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, OR NON-INFRINGEMENT. THE MERCHANT DOES NOT WARRANT THAT THE FUNCTIONS OR CONTENT CONTAINED ON THE WEBSITE WILL BE UNINTERRUPTED OR ERROR-FREE, THAT DEFECTS WILL BE CORRECTED, OR THAT THE WEBSITE OR THE SERVER THAT MAKES IT AVAILABLE ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. THE MERCHANT DOES NOT WARRANT OR MAKE ANY REPRESENTATION REGARDING USE, OR THE RESULT OF USE, OF THE CONTENT IN TERMS OF ACCURACY, RELIABILITY, OR OTHERWISE. THE CONTENT MAY INCLUDE TECHNICAL INACCURACIES OR TYPOGRAPHICAL ERRORS, AND THE WEBSITE MAY MAKE CHANGES OR IMPROVEMENTS AT ANY TIME. USER, AND NOT MERCHANT, ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION IN THE EVENT OF ANY LOSS OR DAMAGE ARISING FROM THE USE OF THE WEBSITE OR ITS CONTENT. THE MERCHANT MAKES NO WARRANTIES THAT YOUR USE OF THE CONTENT WILL NOT INFRINGE THE RIGHTS OF OTHERS AND ASSUMES NO LIABILITY OR RESPONSIBILITY FOR ERRORS OR OMISSIONS IN SUCH CONTENT. THE MERCHANT DOES NOT WARRANT OR MAKE ANY REPRESENTATIONS REGARDING THE CONTENT'S APPROPRIATENESS OR AUTHORIZATION FOR USE IN ALL COUNTRIES, STATES, PROVINCES, COUNTY, OR ANY OTHER JURISDICTIONS. IF YOU CHOOSE TO ACCESS THE WEBSITE, YOU DO SO ON YOUR OWN INITIATIVE AND RISK AND ARE RESPONSIBLE FOR COMPLIANCE WITH ALL APPLICABLE LAWS.

# 19. Subscription Fees and User Communication

Subscription and Membership fees to Site are subject to change at any time at the sole and absolute discretion of AYLO Billing and/or the Controller. The official standard membership rates for the Site shall be set forth at the following link: probiller.com. The current monthly membership rate which will appear on Subscriber credit card bill, will be debited from Subscriber account, charged to Subscriber telephone, etc., depending on Subscriber, choice of payment means.

"OPT-IN AND USER COMMUNICATION" – Subscriber's expressly and specifically acknowledges and agrees that his email address or other means of communicating with subscriber may be used to send him offers, information or any other commercially oriented emails or other means of communications. More specifically, some offers may be presented to the subscriber via email campaigns or other means of communications with the option to express the subscriber's preference by either clicking or entering "accept" (alternatively "yes") or "decline" (alternatively "no"). By selecting or clicking the "accept" or "yes", the subscriber indicates that the subscriber "OPTS-IN" to that offer and thereby agrees and assents that the subscriber's personal information, including its email address and data may be used for that matter or disclosed to third-parties."

"OPT-OUT AND USER COMMUNICATION" – Subscriber's expressly and specifically acknowledges and agrees that his email address or other means of communicating with subscriber may be used to send him offers, information or any other commercially oriented emails or other means of communications. More specifically, other offers may be presented to the subscriber via email campaigns or other means of communications with a pre-selected preference or choice. If the subscriber does not deselect the pre-selected preference of choice (i.e., "OPT-OUT" of the offer) then the Site may transfer the subscriber's personal profile information to the third-party service or content provider making the offer. If the subscriber deselects the pre-selected preference, then no personal information about the subscriber may be disclosed to any third-party service or content provider.

Appx000846

## 20. Sponsors, Advertisers and Third Parties

The Site may provide links to sponsor, advertiser, or other third-party websites that are not owned or controlled by the Merchant. Inclusion of, linking to, or permitting the use or installation of any third-party website, applications, software, content, or advertising does not imply approval or endorsement thereof by the Merchant. The Merchant has no control over, and assumes no responsibility for, the content, privacy policies, or practices of any third parties. By accessing or using the Site, you agree to release The Merchant from any and all liability arising from your use of any third-party website, content, service, or software accessed through the Site. Your communications or dealings with, or participation in promotions of, sponsors, advertisers, or other third parties found through the Site, are solely between you and such third parties. You agree that The Merchant shall not be responsible or liable for any loss or damage of any sort incurred as the result of any dealings with such sponsors, third parties or advertisers, or as the result of their presence in the Site.

Appx000847

# EXHIBIT II

# Customer Terms and Conditions

Date Last Modified: August 20, 2023

Before Subscriber's transaction can be completed, Subscriber must read and agree to these terms and conditions. By applying for access and or services from this website, Subscriber is agreeing to these terms and conditions, and is agreeing to be legally bound by them. This agreement is subject to change at any time. Changes are effective when posted on this website without notice upon each subscriber.

## 0. Preamble

1. Subscriber data is for internal use only and will be treated confidential.
2. All transactions are SSL encrypted.
3. Subscriber's credit card will be billed immediately after purchase.
4. After purchase Subscriber will receive an email notification with all payment details. The contract is closed between customer and shop as soon as the order is submitted
5. All orders will be processed immediately.
6. All questions will be answered within two working days.
7. We recommend printing out the transaction data and Terms and Conditions and to keep them at an easily accessible place.
8. Prohibited for people under legal age in their respective country.

## 1. Definitions

1. "**Member**" or "**Membership**" shall mean the subscriber or user of a valid username and password for the website during the term of membership.
2. "**AYLO Billing**" shall mean AYLO Billing Limited, and/or any of the companies billing the Subscriber including any additional billing companies used by AYLO Billing or changes thereof.
3. "**AYLO Premium**" or "**Merchant**" or "**Controller**" shall mean AYLO Premium Ltd, the controller of the Site (as defined below)
4. "**Site**" shall mean the website for which subscriber is purchasing a username and password in order to access the website and its materials and obtain the benefits of membership.
5. "**Subscriber**" shall mean the user of the services of the Site and holder of a valid username and password for the Site.
6. "**Access rights**" shall mean the combination of unique username and password that is used to access the Site. An access rights is a license to use the Site for a period of time that is specified.
7. "**Bookmarking**" shall mean a URL placed into a temporary file on the subscriber's browser so that the subscriber may return to that page at a future date without having to type in its username and password.

## 2. Description of Services

AYLO Premium will provide one access right to access the Site and its materials for which Subscriber is purchasing a membership.

## 3. Billing

Probiller.com, MGBill, Vendo, Segpay, WTS, or others (depending on Subscriber geographical location) may appear on Subscriber's credit card, bank statement, or phone bill for all applicable charges. If multiple venues are joined utilizing any payment method, Subscriber's statement will list each individual purchase comprising the

transaction. AYLO Billing or Controller may include other information on Subscriber statement based on credit card association, telephone regulation, NACHA and any other mandated rules and regulations. If Subscriber elects to use a checking account to purchase a subscription to this Site, a debit will be executed on their checking account.

## 4. Tax

Value-Added Tax (VAT), Sales Tax or other excise tax may be included in, or added to, your purchase depending on your country, state, territory, city, or on other applicable local regulations. Tax rates may vary accordingly.

## 5. Payment / Fee

The Site may impose periodic subscription fees at the time of the initial enrolment for subscription. Subscriber is solely responsible for such fees according to the terms and conditions of such Site.

## 6. Automatic Recurring Billing (If Selected By Subscriber On The Sign-Up Page)

In accordance with the terms and conditions of the Site subscription fees will be automatically renewed at or after the end of the original term selected, unless notice of cancellation is received from the Subscriber. In the event of a failed attempt to charge the Subscriber's payment method (for example, if the payment method has expired or has been declined), AYLO Billing reserves the right to retry charging the Subscriber's payment method for the amount due or an amount lesser than the amount due, provided that any such attempt to charge a lower amount may be made on a one-time basis, and AYLO Billing will resume billing the Subscriber for the subscription at the full amount agreed to upon enrollment. AYLO Billing may suspend or cancel Subscriber's membership if AYLO Billing is unable to successfully charge a valid payment method. An administration fee of up to $2.00 may be applied in order to keep a subscription temporarily active until the next attempt to process the recurring payment.

## 7. Electronic Receipt

Subscribers will receive an email receipt to their email provided upon initial subscription. Subscriber may request a copy of the account of charges of their membership to the Site, but neither Controller nor AYLO Billing guarantee the availability of such records more than 365 days after Subscription date. Requests must be made directly to Controller. To contact the Controller, refer to Customer Support links on the Site, or click here.

## 8. Agreed upon Method of Communication

AYLO Billing and the Subscriber agree that a transaction receipt will be provided via email to the Subscriber's address provided at the time of initial enrolment. Subsequent transactional updates may be communicated to the Subscriber through the members' area on the Site (as applicable) upon login to ensure receipt in the event Subscriber has unsubscribed from email communications.

## 9. Cancellation

At any time, and without cause, subscription to the service may be terminated by either: AYLO Billing, the Controller, or the Subscriber upon notification of the other by electronic or conventional mail, by chat, or by telephone. Subscribers are liable for charges incurred until the date of the termination. Subscribers may cancel at any time by going to https://support.digitalplayground.com/cancel and clicking on "Cancel Online" or by

contacting our support department through the contact options listed on https://support.digitalplayground.com or online directly with the Site by following the links provided in their transaction receipts.

# 10. Refunds

Refunds for purchases or recurring charges may be requested by contacting customer support. Refunds or credits will not be issued for partially used Memberships. Cancelation for all future recurring billing may be requested in accordance with Section 9, Cancellation. AYLO Billing reserves the right to grant a refund or a credit applicable to purchases to the Site at its discretion. The decision to refund a charge does not imply the obligation to issue additional future refunds. Should a refund be issued by AYLO Billing for any reason, it will be credited solely to the payment method used in the original transaction. AYLO Billing will not issue refunds by cash, check, or to another payment mechanism.

# 11. Cardholder Disputes/Chargebacks

All chargebacks are thoroughly investigated and may prevent future purchases with AYLO Billing or Controller, given the circumstances. Fraud claims may result in AYLO Billing or Controller contacting Subscriber's issuer to protect Subscriber and prevent future fraudulent charges to Subscriber card.

# 12. Authorization of Use

Subscribers of the Site are hereby authorized a single access right to access the service or material located on the Site. This access rights shall be granted for sole value to one Subscriber. All memberships are provided for personal use and shall not be used for any commercial purposes or by any other third parties. Commercial use of either the Site or any material found within is strictly prohibited unless explicitly authorized by the Site. No material within the Site may be transferred to any other person or entity, whether commercial or non-commercial. No material within the Site may be distributed through peer-to-peer networks or any other file sharing platforms. In addition, materials may not be modified, or altered. Materials may not be displayed publicly, or used for any rental, sale, or display. Materials shall extend to copyright, trademarks, or other proprietary notices there from. AYLO Billing and Controller reserve the right to terminate this access rights at any time if the terms of this agreement are breached. In the case that the terms are breached, subscriber will be required to immediately destroy any information or material printed, downloaded, or otherwise copied from the Site.

# 13. Transfer of Access Rights

Access to the Site is through a combination of a username and a password. Subscribers may not under any circumstances release their access rights to any other person and are required to keep their access rights strictly confidential. Controller will not release passwords for any reason, to anyone other than the Subscriber, except as may be specifically required by law or court order. Unauthorized access to the Site is a breach of this Agreement. Subscribers acknowledge that the controller of the Site may track through the use of special software each Subscriber's entry to the Site. If any breach of security, theft or loss of access rights, or unauthorized disclosure of access rights information occurs, Subscriber must immediately notify AYLO Billing or the Controller of said security breach. Subscriber will remain liable for unauthorized use of service until AYLO Billing or Controller is notified of the security breach by e-mail or telephone.

# 14. Sanction and Approval of Adult Material

This Site contains age-restricted materials including nudity and explicit depictions of sexual activity. If Subscriber is under the age of 18 years, or under the age of majority in the location from where access to the Site

is attempted, Subscriber does not have authorization or permission to enter or access any of its materials. If Subscriber is over the age of 18 years or over the age of majority in the location from where access to the Site is attempted, Subscriber hereby acknowledges and understands the explicit sexual nature of the materials available on this Site, and agrees to comply with these terms and conditions.

You also understand and agree that, after any purchases made on the Site, you may be asked to prove or verify your age. If you are unsuccessful (i.e. you are found to be under eighteen (18) years of age or the age of majority in the location where you are attempting to verify from) or unable to do so, your purchase will be cancelled and a refund may be issued to you, in a discretionary manner. Upon such failure to verify or prove your age we also reserve the right, in our sole and final discretion, to prevent you from entering or re-entering the Site by, for example but not limited to, terminating your account.

## 15. Supplementary Terms and Conditions

The Site may have additional Terms and Conditions that are an integral part of their offering to the Subscriber and are in addition to these Terms and Conditions. Such Terms and Conditions as listed on the Site will in no way invalidate any of the Terms and Conditions listed here. This Agreement shall be construed and enforced in accordance with the laws of the Republic of Cyprus applicable to contracts negotiated, executed, and wholly performed within said country. Disputes arising hereunder shall be settled in the Republic of Cyprus. Transactions are governed by country of merchant of record and use of the membership/websites governed by laws stated in the terms on the website from which the purchase was made.

## 16. Severability

If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid or enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

## 17. Notice

Notices by the Site to subscribers may be given by means of electronic messages through the Site, by a general posting on the Site, or by conventional mail. Notices by subscribers may be given by electronic messages, conventional mail, telephone, or fax unless otherwise specified in the Agreement. All questions, complaints, or notices regarding the Site must be directed to Controller. All cancellations of service to the Site must also be directed to Controller.

### Questions and Contact Information

All questions to Controller regarding these terms and conditions must be directed to:

For billing issues: digitalplaygroundbilling@probiller.com
For support/technical issues: digitalplaygroundsupport@probiller.com
For marketing issues: support@probiller.com

## 18. Disclaimer

USER UNDERSTANDS THAT THE MERCHANT CANNOT AND DOES NOT GUARANTEE OR WARRANT THAT FILES AVAILABLE FOR DOWNLOADING FROM THE INTERNET WILL BE FREE OF VIRUSES, WORMS, TROJAN HORSES, OR OTHER CODE THAT MAY MANIFEST CONTAMINATING OR DESTRUCTIVE PROPERTIES. USER IS RESPONSIBLE FOR IMPLEMENTING SUFFICIENT

PROCEDURES AND CHECKPOINTS TO SATISFY YOUR PARTICULAR REQUIREMENTS FOR ACCURACY OF DATA INPUT AND OUTPUT, AND FOR MAINTAINING A MEANS EXTERNAL TO THE WEBSITE FOR THE RECONSTRUCTION OF ANY LOST DATA. THE MERCHANT DOES NOT ASSUME ANY RESPONSIBILITY OR RISK FOR YOUR USE OF THE INTERNET.

USERS USE OF THE WEBSITE IS AT THEIR OWN RISK. THE CONTENT IS PROVIDED "AS IS" AND WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESSED OR IMPLIED. THE MERCHANT DISCLAIMS ALL WARRANTIES, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, OR NON-INFRINGEMENT. THE MERCHANT DOES NOT WARRANT THAT THE FUNCTIONS OR CONTENT CONTAINED ON THE WEBSITE WILL BE UNINTERRUPTED OR ERROR-FREE, THAT DEFECTS WILL BE CORRECTED, OR THAT THE WEBSITE OR THE SERVER THAT MAKES IT AVAILABLE ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. THE MERCHANT DOES NOT WARRANT OR MAKE ANY REPRESENTATION REGARDING USE, OR THE RESULT OF USE, OF THE CONTENT IN TERMS OF ACCURACY, RELIABILITY, OR OTHERWISE. THE CONTENT MAY INCLUDE TECHNICAL INACCURACIES OR TYPOGRAPHICAL ERRORS, AND THE WEBSITE MAY MAKE CHANGES OR IMPROVEMENTS AT ANY TIME. USER, AND NOT MERCHANT, ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION IN THE EVENT OF ANY LOSS OR DAMAGE ARISING FROM THE USE OF THE WEBSITE OR ITS CONTENT. THE MERCHANT MAKES NO WARRANTIES THAT YOUR USE OF THE CONTENT WILL NOT INFRINGE THE RIGHTS OF OTHERS AND ASSUMES NO LIABILITY OR RESPONSIBILITY FOR ERRORS OR OMISSIONS IN SUCH CONTENT. THE MERCHANT DOES NOT WARRANT OR MAKE ANY REPRESENTATIONS REGARDING THE CONTENT'S APPROPRIATENESS OR AUTHORIZATION FOR USE IN ALL COUNTRIES, STATES, PROVINCES, COUNTY, OR ANY OTHER JURISDICTIONS. IF YOU CHOOSE TO ACCESS THE WEBSITE, YOU DO SO ON YOUR OWN INITIATIVE AND RISK AND ARE RESPONSIBLE FOR COMPLIANCE WITH ALL APPLICABLE LAWS.

# 19. Subscription Fees and User Communication

Subscription and Membership fees to Site are subject to change at any time at the sole and absolute discretion of AYLO Billing and/or the Controller. The official standard membership rates for the Site shall be set forth at the following link: probiller.com. The current monthly membership rate which will appear on Subscriber credit card bill, will be debited from Subscriber account, charged to Subscriber telephone, etc., depending on Subscriber, choice of payment means.

"OPT-IN AND USER COMMUNICATION" – Subscriber's expressly and specifically acknowledges and agrees that his email address or other means of communicating with subscriber may be used to send him offers, information or any other commercially oriented emails or other means of communications. More specifically, some offers may be presented to the subscriber via email campaigns or other means of communications with the option to express the subscriber's preference by either clicking or entering "accept" (alternatively "yes") or "decline" (alternatively "no"). By selecting or clicking the "accept" or "yes", the subscriber indicates that the subscriber "OPTS-IN" to that offer and thereby agrees and assents that the subscriber's personal information, including its email address and data may be used for that matter or disclosed to third-parties."

"OPT-OUT AND USER COMMUNICATION" – Subscriber's expressly and specifically acknowledges and agrees that his email address or other means of communicating with subscriber may be used to send him offers, information or any other commercially oriented emails or other means of communications. More specifically, other offers may be presented to the subscriber via email campaigns or other means of communications with a pre-selected preference or choice. If the subscriber does not deselect the pre-selected preference of choice (i.e., "OPT-OUT" of the offer) then the Site may transfer the subscriber's personal profile information to the third-party service or content provider making the offer. If the subscriber deselects the pre-selected preference, then no personal information about the subscriber may be disclosed to any third-party service or content provider.

Appx000853

# 20. Sponsors, Advertisers and Third Parties

The Site may provide links to sponsor, advertiser, or other third-party websites that are not owned or controlled by the Merchant. Inclusion of, linking to, or permitting the use or installation of any third-party website, applications, software, content, or advertising does not imply approval or endorsement thereof by the Merchant. The Merchant has no control over, and assumes no responsibility for, the content, privacy policies, or practices of any third parties. By accessing or using the Site, you agree to release The Merchant from any and all liability arising from your use of any third-party website, content, service, or software accessed through the Site. Your communications or dealings with, or participation in promotions of, sponsors, advertisers, or other third parties found through the Site, are solely between you and such third parties. You agree that The Merchant shall not be responsible or liable for any loss or damage of any sort incurred as the result of any dealings with such sponsors, third parties or advertisers, or as the result of their presence in the Site.

Appx000854

# EXHIBIT JJ

Technical Issues | Billing Questions And Cancellations

## BILLING INQUIRIES

### CALL

**TOLL-FREE**
7 DAYS A WEEK

Live agents available
8:00AM – 4:00PM EST

Support agents are currently unavailable

UNITED STATES

+1 - 877 - 237 - 4215
(tel:+1 - 877 - 237 - 4215)

OTHER COUNTRIES AND NUMBERS

### CHAT

Chat live with one of our support specialists

Live agents available
8:00AM – 4:00PM EST

Support agents are currently unavailable

**START CHAT**

### EMAIL

Send us your questions by email.

EMAIL US



# Fast, Friendly & Confidential

Here you will find a number of resources to help you use your Brazzers membership more effectively. We offer safe, secure and confidential online support services to our customers.

PROCESSED BY
**PROBILLER**

# We can help you with the following:

Provide detailed information related to the status of your BRAZZERS membership.

Confirm details of a transaction when the description in your statement does not match the name of a product you recently purchased.

Provide you with professional advice in the event you have been a victim of fraud.

Provide solutions to any technical issues you may have encountered.

## Privacy Policy

We take your privacy seriously. We never share your information with third parties. Read our privacy policy (https://www.brazzers.com/legal/privacy/).

## Terms & Conditions

We ask you review our Terms of Use (http://www.brazzers.com/legal/tos/), which constitute a binding license agreement that you have agreed to when you joined Brazzers.

## Processed by



MG Biling US Corp, 21800 Oxnard St Ste 150 Woodland Hills, CA, 91367-7909 USA

MG Billing Limited, 20000 57 Nicosia-Limassol Road, Dali Industrial Zone 2540, Block 1, Cyprus

# EXHIBIT KK

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

FREE SPEECH COALITION, INC., MG
PREMIUM LTD, MG FREESITES LTD,
WEBGROUP CZECH REPUBLIC, A.S.,
NKL ASSOCIATES, S.R.O., SONESTA
TECHNOLOGIES, S.R.O., SONESTA
MEDIA, S.R.O., YELLOW PRODUCTION
S.R.O., PAPER STREET MEDIA, LLC,
NEPTUNE MEDIA, LLC, JANE DOE,
MEDIAME SRL, MIDUS HOLDINGS,
INC.,

      Plaintiffs,

    v.

ANGELA COLMENERO, IN HER
OFFICIAL CAPACITY AS INTERIM
ATTORNEY GENERAL FOR THE STATE
OF TEXAS

      Defendant.

**CASE NO.** 1:23-cv-917

**JURY TRIAL DEMANDED**

## PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR EXPEDITED PRELIMINARY INJUNCTION

## <u>NOTICE OF MOTION</u>

PLEASE TAKE NOTICE that on the date and time of earliest convenience for the Court, at the United States Courthouse, 501 West 5th Street, Austin, Texas 78701, Plaintiffs will move for expedited preliminary injunctive relief pursuant to Federal Rule of Civil Procedure 65, on the grounds that the recently passed Texas law requiring website operators to perform age verification violates the First Amendment of the U.S. Constitution and, as to a subset of Plaintiffs operating website platforms hosting third party content, Section 230 of the Communications Decency Act. Plaintiffs respectfully ask the Court to set an expedited hearing date and briefing schedule that will allow the Court to enter an Order on Plaintiffs' motion by September 1, 2023. Good cause exists because the law at issue goes into effect on September 1, 2023, and an Order issued after this date will expose Plaintiffs to irreparable harm. Plaintiffs base this motion on the attached memorandum of points and authorities, declarations of Scott Cole, Richard L. Sonnier III, David J. Ley, Andreas Alkiviades Andreou, Alison Boden, Jane Doe, Jonathan Todd, Robert Seifert, and Sadiq Muhamed, and exhibits attached thereto.

DATED: August 4, 2023

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By_____/s/ Scott Cole_____
Scott Cole (Bar No. 00790481)
scottcole@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
201 West 5th Street
11th Floor
Austin, TX 78701
Telephone: (737) 667 6110
Fax: (737) 667 6110

Michael T. Zeller (*pro hac vice* forthcoming)
Derek L. Schaffer (*pro hac vice* forthcoming)
Thomas Nolan (*pro hac vice* forthcoming)
Arian Koochesfahani (*pro hac vice* forthcoming)
michaelzeller@quinnemanuel.com
derekshaffer@quinnemanuel.com
thomasnolan@quinnemanuel.com
ariankoochesfahani@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443 3000
Fax: (213) 443 3100

Jeffrey Keith Sandman (*pro hac vice*
forthcoming)
jeff.sandman@webbdaniel.law
WEBB DANIEL FRIEDLANDER LLP
5208 Magazine St Ste 364
New Orleans, LA 70115
Phone: (978) 886 0639

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..........................................................................................1

BACKGROUND ...........................................................................................................3

LEGAL STANDARD......................................................................................................5

ARGUMENT ...............................................................................................................6

I.      PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE
MERITS .............................................................................................................6

        A.     Plaintiffs Have Standing To Bring A Pre-Enforcement Challenge ......................6

        B.     The Act Violates The First Amendment Because It Is Overbroad And
Imposes Content-Based Regulations That Fail Strict Scrutiny............................7

               1.    The Act's "age verification" requirement is overbroad. ...........................7

               2.    The Act's "age verification" requirement fails strict scrutiny
because it is not narrowly tailored. ...............................................9

               3.    The Act's "age verification" requirement fails strict scrutiny
because it is too underinclusive to further a compelling interest...............11

               4.    The Act violates the First Amendment by compelling websites to
speak a government message. ...................................................13

               5.    The Act is impermissibly vague. ................................................16

        C.     The Act Violates Section 230 Of The CDA ........................................17

II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN
INJUNCTION......................................................................................................19

III.   THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR AN
INJUNCTION......................................................................................................20

IV.   SCOPE OF THE INJUNCTION .................................................................................20

CONCLUSION............................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
    600 U.S. __ (2023) ....................................................................................................16

*ACLU v. Johnson*,
    194 F.3d 1149 (10th Cir. 1999) ..................................................................................7

*ACLU v. Mukasey*,
    534 F.3d 181 (3rd Cir. 2008) ..............................................................................1, 17

*Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*,
    851 F.3d 507 (5th Cir. 2017) .....................................................................................6

*Am. C.L. Union v. Ashcroft*,
    322 F.3d 240 (3d Cir. 2003)......................................................................................17

*Am. C.L. Union v. Gonzales*,
    478 F. Supp. 2d 775 (E.D. Pa. 2007) ...............................................................10, 20

*American Booksellers Foundation v. Coakley*,
    2010 WL 4273802 (D. Mass. 2010) ..........................................................................7

*American Booksellers Foundation v. Dean*,
    342 F.3d 96 (2d Cir. 2003).........................................................................................7

*American Booksellers Foundation v. Sullivan*,
    799 F. Supp. 2d 1078 (D. Alaska 2011) ....................................................................7

*American Library Association v. Pataki*,
    969 F. Supp. 160 (S.D.N.Y. 1997) ............................................................................7

*Ashcroft v. Am. C.L. Union*,
    542 U.S. 656 (2004).............................................................................................9, 10

*Ashcroft v. Free Speech Coal.*,
    535 U.S. 234 (2002)...................................................................................................8

*Backpage.com, LLC v. Cooper*,
    939 F. Supp. 2d 805 (M.D. Tenn. 2013)..................................................................18

*Bennett v. Google, LLC*,
    882 F.3d 1163 (D.C. Cir. 2018)................................................................................18

*Bolger v. Youngs Drug Prod. Corp.*,
    463 U.S. 60 (1983)...................................................................................................15

*Branzburg v. Hanes,*
   408 U.S. 665 (1972) ...........................................................................................13

*Brown v. Ent. Merchants Ass'n,*
   564 U.S. 786 (2011) ......................................................................................13, 14

*Church of Lukumi Babalu Aye, Inc. v. Hialeah,*
   508 U.S. 520 (1993) ...........................................................................................12

*City of Ladue v. Gilleo,*
   512 U.S. 43 (1994) .............................................................................................11

*CTIA - The Wireless Ass'n v. City of Berkeley, California,*
   928 F.3d 832 (9th Cir. 2019) .............................................................................14

*Cyberspace Communications, Inc. v. Engler,*
   238 F.3d 420 (6th Cir. 2000) ...............................................................................7

*De Leon v. Perry,*
   975 F. Supp. 2d 632 (W.D. Tex. 2014)..............................................................19

*Disc. Tobacco City & Lottery, Inc. v. United States,*
   674 F.3d 509 (6th Cir. 2012) .............................................................................14

*Dyroff v. Ultimate Software Grp., Inc.,*
   934 F.3d 1093 (9th Cir. 2019) ...........................................................................17

*Elrod v. Burns,*
   427 U.S. 347 (1976) ...........................................................................................19

*Ent. Software Ass'n v. Blagojevich,*
   469 F.3d 641 (7th Cir. 2006) .............................................................................14

*Fabulous Associates v. Pennsylvania Public Utility Commission,*
   896 F.2d 780 (3d Cir. 1990)..........................................................................10, 11

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,*
   521 F.3d 1157 (9th Cir. 2008) ...........................................................................19

*Florida Med. Ass'n v. United States Dep't of Health, Educ. & Welfare,*
   601 F.2d 199 (5th Cir. 1979) ...............................................................................6

*Fund Texas Choice v. Paxton,*
   2023 WL 2558143 (W.D. Tex. Feb. 24, 2023)...................................................20

*Garden Dist. Book Shop, Inc. v. Stewart,*
   184 F. Supp. 3d 331 (M.D. La. 2016)...................................................................7

*Garrett v. Estelle,*
   556 F.2d 1274 (5th Cir. 1977) ...........................................................................13

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) ....................................................................20

*Gorran v. Atkins Nutritionals, Inc.*,
  464 F. Supp. 2d 315 (S.D.N.Y. 2006),.........................................................15

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972)......................................................................................16

*Henson Patriot Co., LLC v. Medina*,
  2014 WL 4546973 (W.D. Tex. Sept. 11, 2014)...........................................19

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
  804 F.2d 1390 (5th Cir. 1986) .....................................................................19

*Janvey v. Alguire*,
  647 F.3d 585 (5th Cir. 2011) ..........................................................................5

*Langan v. Abbott*,
  518 F. Supp. 3d 948 (W.D. Tex. 2021)...........................................................6

*Ex parte Lo*,
  424 S.W.3d 10 (Tex. Crim. App. 2013)......................................................1, 7

*Matal v. Tam*,
  582 U.S. 218 (2017)................................................................................15, 16

*Miller v. California*,
  413 U.S. 15 (1973)..........................................................................................5

*Miller v. Davis*,
  2015 WL 9460311 (E.D. Ky. Sept. 23, 2015) .............................................20

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  138 S. Ct. 2361 (2018).....................................................................2, 13, 14, 16

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
  591 F.3d 250 (4th Cir. 2009) .......................................................................19

*NetChoice, L.L.C. v. Paxton*,
  49 F.4th 439 (5th Cir. 2022) ........................................................................14

*Opulent Life Church v. City of Holly Springs, Miss.*,
  697 F.3d 279 (5th Cir. 2012) .......................................................................20

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*,
  475 U.S. 1 (1986)..........................................................................................14

*People for Ethical Treatment of Animals v. Hinckley*,
  526 F. Supp. 3d 218 (S.D. Tex. 2021) .........................................................20

*PSINet, Inc. v. Chapman*,
  362 F.3d 227 (4th Cir. 2004) (Virginia) ............................................................7

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155 (2015).........................................................................................9, 11

*Reno v. ACLU*,
  521 U.S. 844 (1997).......................................................................1, 7, 9, 16, 17

*Riley v. National Federation of Blind of N. C., Inc.*,
  487 U.S. 781 (1988)...........................................................................................13

*Serafine v. Branaman*,
  810 F.3d 354 (5th Cir. 2016) ..............................................................................8

*Smith v. Daily Mail Publishing Co.*,
  443 U.S. 97 (1979).............................................................................................12

*Smith v. Goguen*,
  415 U.S. 566 (1974)...........................................................................................16

*Southeast Booksellers v. Ass'n v. McMaster*,
  282 F. Supp. 2d 389 (D.S.C. 2003)......................................................................7

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) ...........................................................................6, 7

*Texas Democratic Party v. Abbott*,
  961 F.3d 389 (5th Cir. 2020) ..............................................................................6

*Texas Ent. Ass'n, Inc. v. Hegar*,
  10 F.4th 495 (5th Cir. 2021) ...............................................................................6

*U.S. v. Williams*,
  553 U.S. 285 (2008)...........................................................................................16

*United States v. Stevens*,
  559 U.S. 460 (2010).............................................................................................7

*Virginia v. Am. Booksellers Ass'n, Inc.*,
  484 U.S. 383 (1988).........................................................................................6, 7

*Whole Woman's Health v. Hellerstedt*,
  579 U.S. 582 (2016)...........................................................................................20

*Williams-Yulee v. Fla. Bar*,
  575 U.S. 433 (2015)...........................................................................................12

*Worth v. Harrington*,
  2023 WL 2745673 (D. Minn. Mar. 31, 2023) ...................................................20

*Zauderer v. Office of Disciplinary Counsel,*
  471 U.S. 626 (1985).............................................................................................14

## Constitutional Provisions

U.S. Const. amend. I ....................................................1, 2, 5, 7, 8, 10, 13, 15, 16, 19, 20

## Statutes

47 U.S.C. § 230(c)(1)...............................................................................................17

47 U.S.C. § 230(e)(3).........................................................................................17, 19

Tex. Civ. Prac. & Rem. Code § 129B *et seq.* ................................................ 1, 3-5, 8, 11

## PRELIMINARY STATEMENT

Plaintiffs, consisting of content creators, internet platforms that host third-party adult content, and studios seek a preliminary injunction preventing the Texas Attorney General from enforcing Tex. Civ. Prac. & Rem. Code § 129B *et seq*. (the "Act"), in violation of the U.S. Constitution. The Act takes effect on September 1, 2023, and on pain of fines and enjoinment, the Act will require website operators that host constitutionally protected adult content to collect personal information verifying that users are at least eighteen years old. The Act also requires many Plaintiffs to transform their websites into billboards for government speech by compelling them to post supposed "health warnings" maligning the content they feature. Both requirements are patently unconstitutional. As set forth below, this Court should enter a preliminary injunction barring enforcement of the Act, because Plaintiffs are overwhelmingly likely to succeed on the merits and the Act's infringement of Plaintiffs' free speech rights constitutes, by definition, irreparable harm.

*First*, court after court has invalided analogous state and federal laws seeking to regulate the publication of material harmful to minors on the internet on First Amendment grounds. *See, e.g. Reno v. ACLU*, 521 U.S. 844 (1997); *ACLU v. Mukasey*, 534 F.3d 181 (3rd Cir. 2008), *cert. denied*, 555 U.S. 1137 (2009); *Ex parte Lo*, 424 S.W.3d 10 (Tex. Crim. App. 2013). As these numerous precedents confirm, the Act is unconstitutionally overbroad, because it sweeps in and penalizes vast amounts of protected speech for adults. It therefore triggers strict scrutiny, which it cannot withstand. First, the Act is not "narrowly tailored" because there are less restrictive alternatives, including the content filtering and blocking of adult content at the level of minors' devices. By contrast, age verification at the level of adult platforms is ineffective because it is easily circumvented, especially by minors. Furthermore, the Act chills protected speech because adult users will avoid compliant websites, while smaller platforms will be forced out of business due to the costs of compliance. Moreover, the age verification requirement serves no "compelling interest," because it is too underinclusive to actually further the purported interest. If the Act's goal were truly to protect minors, it would not exempt search engines and most social media sites,

which teem with adult content. Simply put, the Act unconstitutionally targets websites that host adult content and the protected speech therein.

*Second*, and independently, the Act's "health warning" requirement violates the First Amendment. While guised as promoting public health, it is a classic example of government-compelled speech prescribing orthodoxy on a controversial issue. It, too, is not narrowly tailored, because Texas could spread its message by other means—through a public education campaign, for example, as the Supreme Court has held. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2367 (2018). Nor does any supposed interest in public health withstand scrutiny. The statements required by the "health warnings" lack evidentiary support, and many are demonstrably false. Any attempt to characterize the "health warnings" as mere regulation of commercial speech also fails under settled law. Not only are the warnings unsupported and controversial, their target is not a fungible good like cigarettes, but rather constitutionally protected speech.

*Third*, the Act violates section 230 of the Communications Decency Act as applied to the Plaintiffs that operate online platforms hosting only third-party content. Section 230 bars state-law causes of action against websites if the cause of action would hold those websites responsible for content produced by third parties. The Act's cause of action for the Attorney General does exactly that by imposing liability on platforms for putative harms that flow from the content those platforms passively host. Federal law thus preempts the Act.

*Finally*, Plaintiffs satisfy all the remaining requirements for a preliminary injunction. State infringement of First Amendment rights constitutes irreparable harm as a matter of law. Violations of Section 230 likewise give rise to irreparable harm because the statute confers an immunity from suit that would be lost if the Attorney General enforced the Act. In addition, enforcement will cause economic injury to Plaintiffs that cannot be calculated, particularly through the loss of goodwill, as Texas adults turn away from Plaintiffs to seek adult content on, for example, search engines, to which the Act does not apply; less reputable websites, which will never comply; or even the Dark Web, where the internet's black market thrives. The Act confers no meaningful benefits and inflicts grave constitutional injuries, and thus the balance of harms weighs heavily in

Plaintiffs' favor. The public interest favors an injunction for corresponding reasons. Plaintiffs' motion for a preliminary injunction should be granted.

## BACKGROUND

Plaintiffs have filed suit against Angela Colmenero, the interim Attorney General for the State of Texas, in her official capacity, seeking injunctive relief against the enforcement of Tex. Civ. Prac. & Rem. Code § 129B *et seq.* (the "Act"). Plaintiffs are entities and individuals who will be harmed and burdened by the Act, including the Free Speech Coalition, Inc. ("FSC"), the adult industry's primary trade association; MG Freesites Ltd, the operator of the popular adult website Pornhub.com; Sonesta Media, s.r.o., which creates the content for BangBros.com; and Jane Doe, an adult performer and content creator. All oppose the restrictions that the Act places on adults' rights to share and enjoy legal adult content, and object to the unsupported, false, harmful messages the Act forces adult websites to display. Declaration of Alison Boden ("Boden Decl.") at ¶ 13; Declaration of Andreas Alkiviades Andreou ("Andreou Decl.") at ¶¶ 4-5, 12, 14; Declaration of Robert Seifert ("Seifert Decl.") at ¶¶ 5-6, 10-11, 17-18; Declaration of Sadiq Muhamed ("Muhamed Decl.") at ¶¶ 4, 6, 11, 13; Declaration of Jonathan Todd ("Todd Decl.") at ¶¶ 4-5; Declaration of Jane Doe ("Doe Decl.") at ¶¶ 5-6.

The Act goes into effect September 1, 2023. *See* Act of June 12, 2023, Ch. 676, § 2 (H.B. 1181) Tex. Sess. Law Serv. (Vernon's). It applies to "commercial entities" that "operate[] an Internet website." §§ 129B.002(a), 006(b)(1). A website operator who "knowingly and intentionally publishes or distributes material on an Internet website, including a social media platform, more than one-third of which is sexual material harmful to minors, shall use reasonable age verification methods . . . to verify that an individual attempting to access the material is 18 years of age or older." § 129B.002(a). To implement "reasonable age verification" under the Act, website operators must require that individuals either "provide digital identification" or "comply with a commercial age verification system" that utilizes "government-issued identification" or "a commercially reasonable method that relies on public or private transactional data." § 129B.0003. The Act defines "transactional data" as any "sequence of information that documents an exchange,

agreement, or transfer between an individual, commercial entity, or third party used for the purpose of satisfying a request or event," including "records from mortgage, education, and employment entities." § 129B.001(7). The entity performing age verification "may not retain any identifying information of the individual." § 129B.002(b).

The Act further requires that website operators subject to the age verification requirement must display—on the website's landing page and on every advertisement for the website—an extensive "TEXAS HEALTH AND HUMAN SERVICES WARNING," as well as a bulletin on every webpage for the "U.S. SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES" helpline. § 129B.004. The Act mandates the "warning" on the landing page to state that "[p]ornography is potentially biologically addictive, is proven to harm human brain development, desensitizes brain reward circuits, increases conditioned responses, and weakens brain function"; that "[e]xposure to this content is associated with low self-esteem and body image, eating disorders, impaired brain development, and other emotional and mental illnesses"; and that "[p]ornography increases the demand for prostitution, child exploitation, and child pornography." § 129B.004(1). The Act additionally requires that every webpage must include the U.S. government's helpline telephone number and state (§ 129B.004(2)):

> THIS HELPLINE IS A FREE, CONFIDENTIAL INFORMATION SERVICE (IN ENGLISH OR SPANISH) OPEN 24 HOURS PER DAY, FOR INDIVIDUALS AND FAMILY MEMBERS FACING MENTAL HEALTH OR SUBSTANCE USE DISORDERS. THE SERVICE PROVIDES REFERRAL TO LOCAL TREATMENT FACILITIES, SUPPORT GROUPS, AND COMMUNITY-BASED ORGANIZATIONS.

The Act exempts search engines and the media. § 129B.005. It "does not apply to a bona fide news or public interest broadcast, website video, report, or event and may not be construed to affect the rights of a news-gathering organization." § 129B.005(a). Nor does it apply to an "Internet service provider, or its affiliates or subsidiaries, a search engine, or a cloud service provider" that solely provides "access or connection to or from a website or other information or content on the Internet or on a facility, system, or network not under that provider's control, including transmission, downloading, intermediate storage, access software, or other services to

the extent the provider or search engine is not responsible for the creation of the content that constitutes sexual material harmful to minors." § 129B.005(b).

The Act defines "sexual material harmful to minors" as "any material" that:

(A) the average person applying contemporary community standards would find, taking the material as a whole and with respect to minors, is designed to appeal to or pander to the prurient interest;

(B) in a manner patently offensive with respect to minors, exploits, is devoted to, or principally consists of descriptions of actual, simulated, or animated displays or depictions of: (i) a person's pubic hair, anus, or genitals or the nipple of the female breast; (ii) touching, caressing, or fondling of nipples, breasts, buttocks, anuses, or genitals; or (iii) sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, excretory functions, exhibitions, or any other sexual act; and

(C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

§ 129B.001(6). This definition attempts to rely on the Supreme Court's definition of obscenity unprotected by the First Amendment, but adds the phrases "with respect to minors" and "for minors." *See Miller v. California*, 413 U.S. 15, 24 (1973). A "minor" is defined as any "individual younger than 18 years of age." § 129B.001(3).

If the Attorney General "believes" that a website operator "knowingly" does not comply with the Act's requirements, the Act empowers the Texas Attorney General to "enjoin [violations], recover a civil penalty, and obtain other relief the court considers appropriate." § 129B.006(a). The Act authorizes civil penalties of up to $10,000 a day, plus an additional amount "up to $250,000" if any minor in fact accesses the website. § 129B.006(b).

## **LEGAL STANDARD**

To obtain preliminary injunctive relief, Plaintiffs must demonstrate "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) the grant of the injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). A stronger showing on one element can

compensate for a weaker showing on another. *See Florida Med. Ass'n v. United States Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979).

<u>ARGUMENT</u>

## I. PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS

### A. Plaintiffs Have Standing To Bring A Pre-Enforcement Challenge

As "an equitable exception to Eleventh Amendment sovereign immunity," plaintiffs can "sue a state official, in his official capacity, in seeking to enjoin enforcement of a state law that conflicts with federal law," *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 515 (5th Cir. 2017), where, as here, the state official is statutorily tasked with enforcing the challenged law. *Texas Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020); *see also Langan v. Abbott*, 518 F. Supp. 3d 948, 953 (W.D. Tex. 2021) (Judge Pitman explaining the same). Plaintiffs also have Article III standing because they face imminent injuries, both to their constitutional rights and in the form of monetary penalties and enjoinment, fairly traceable to the Act and redressable by an injunction barring enforcement by the Attorney General. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020). Indeed, standing is guaranteed because all "[l]itigants ... are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 386, 392–93 (1988) (cleaned up) (permitting booksellers to challenge, on behalf of the general public of book buyers, a law imposing penalties on the display of "visual or written material that depicts sexually explicit nudity . . . which is harmful to juveniles"). As a representative of its members, FSC has associational standing because its "members would otherwise have standing to sue in their own right," the interests FSC seeks to protect fall squarely within its mission, and "neither the claim asserted nor the relief requested requires the participation of individual members." *Texas Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 504 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 2852 (2022) (cleaned up) (claims for injunctive relief do not require individual participation); *see also* Boden

Decl. at ¶¶ 3-7. Plaintiffs' injuries are imminent because "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Speech First*, 979 F.3d at 335 (cleaned up). Moreover, "the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures," which suffices to show pre-enforcement injury. *Virginia*, 484 U.S. at 392.

### B. The Act Violates The First Amendment Because It Is Overbroad And Imposes Content-Based Regulations That Fail Strict Scrutiny

#### 1. The Act's "age verification" requirement is overbroad.

Courts repeatedly have struck down laws, like the Act, that limit adult content in the name of ostensibly protecting minors, because such laws are overbroad and fail strict scrutiny.[1] A statute is overbroad and "may be invalidated . . . if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). While there may be a "governmental interest in protecting children from harmful materials . . . that interest does not justify an unnecessarily broad suppression of speech addressed to adults," who have the "right to receive and to address to one another . . . sexual expression that is indecent but not obscene[.]" *Reno v. Am. C.L. Union*, 521 U.S. 844, 874–75 (1997). Thus, even if the Act constitutionally regulates minors' access to speech—a point Plaintiffs need not address here (*see infra* at pp. 16-17)—the Act still must be invalidated where, as here, it effects an "unnecessarily broad suppression of speech addressed to adults." *Id.* at 875.

---

[1] *See, e.g.*, *Ex Parte Lo*, 424 S.W.3d 10, 23 (Tex. Crim. App. 2013) (Texas); *Garden Dist. Book Shop, Inc. v. Stewart*, 184 F. Supp. 3d 331 (M.D. La. 2016) (Louisiana); *American Booksellers Foundation v. Sullivan*, 799 F. Supp. 2d 1078 (D. Alaska 2011) (Alaska); *American Booksellers Foundation v. Coakley*, 2010 WL 4273802 (D. Mass. 2010) (Mass.); *PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) (Virginia); *American Booksellers Foundation v. Dean*, 342 F.3d 96 (2d Cir. 2003) (Vermont); *Cyberspace Communications, Inc. v. Engler*, 238 F.3d 420 (6th Cir. 2000) (Michigan); *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) (New Mexico); *Southeast Booksellers v. Ass'n v. McMaster*, 282 F. Supp. 2d 389 (D.S.C. 2003) (South Carolina); *American Library Association v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997) (New York).

The first step in an overbreadth analysis is construing the statute. *Serafine v. Branaman*, 810 F.3d 354, 365 (5th Cir. 2016). Here, the Act cannot be construed fully because it is impermissibly vague (*see infra* at pp. 16-17). But this much is plain: the Act provides that a website operator who "knowingly and intentionally publishes or distributes material on an Internet website, including a social media platform, more than one-third of which is sexual material harmful to minors, shall use reasonable age verification methods . . . to verify that an individual attempting to access the material is 18 years of age or older." § 129B.002(a). Regardless of what phrase is modified by the "more than one-third" threshold—whether it is the published "material," or rather the "Internet website" that must comprise more than one-third sexual material harmful to minors—makes no functional difference in this case. The Act applies only to websites whose content in the aggregate meets the threshold. The word "material" functions as a "mass noun," referring to an "aggregation of people or things taken as an indeterminate whole." Bryan A. Garner, The Chicago Guide to Grammar, Usage, and Punctuation 22 (2016). "Material" thus refers to uploads to a website in the aggregate. Indeed, this is the only reasonable interpretation that makes the Act internally consistent.[2] The Act thus applies to websites meeting the "more than one-third" threshold for content harmful to minors as defined in reference to the *Miller* standard for obscenity as applied to minors. § 129B.001(6).

The Act's invocation of the *Miller* standard for obscenity brings the First Amendment problem into stark relief. Although the Act invokes the words of *Miller* to create a veneer of lawfulness, by tailoring that standard to minors it overreaches and violates the First Amendment,

---

[2] If the word "material" instead refers to individual uploads and the "over one-third" threshold modifies the word "material," the Act would require *all* website operators to divide *all* uploads into parts "harmful to minors" and parts not, and to place even one upload that meets the threshold behind an age verification wall. This burdensome exercise cannot be squared with the rest of the Act. It would contradict the Act's definition of "sexual material harmful minors," which commands that materials be "taken as a whole," not divided up. *See also Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 248 (2002) (whether speech is obscene "does not depend on the presence of a single explicit scene"). It would also make the Act's "health warning" requirement even more problematic, by requiring websites with even the tiniest amount of adult content to identify as adult content platforms and to disseminate those "warnings."

because it subjects adults to age verification even when they seek to access content that is not obscene for them. The Act thus qualifies as a content-based restriction subject to strict scrutiny. *See Reno*, 521 U.S. at 879 (applying strict scrutiny after a finding of "facial overbreadth"); *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015) ("[A] speech regulation is content based if the law applies to particular speech because of the topic discussed or the idea or message expressed.") In other words, the Act must be "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163; *see also Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 670 (2004). To pass muster, the Act must not only employ the least restrictive means of protecting minors, *see Reno*, 521 U.S. at 874, but it also must actually serve that goal. *Ashcroft*, 542 U.S. at 670. The government bears the burden of showing both, *id.* at 663, but in this case it can show neither.

### 2. The Act's "age verification" requirement fails strict scrutiny because it is not narrowly tailored.

There are less restrictive alternatives that could produce similar or superior outcomes. First and foremost, Texas could make freely available or require the use or pre-installation of filtering technology on minors' devices. Declaration of Richard Sonnier ("Sonnier Decl.") at ¶¶ 13-44. The Supreme Court explained this less restrictive alternative in *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 666–73 (2004). There, the Court addressed the Child Online Protection Act ("COPA"), which barred the transmission of material harmful to minors over the internet. The Court held that "[b]locking and filtering software is an alternative that is less restrictive than COPA, and, in addition, likely more effective as a means of restricting children's access to materials harmful to them." *Id.* at 666–67. The Court explained that filtering software is less restrictive because "adults without children may gain access to speech they have a right to see without having to identify themselves or provide their credit card information. Even adults with children may obtain access to the same speech on the same terms simply by turning off the filter on their home computers." *Id.* at 667. The Court further explained that filtering is likely more effective than targeting speech at its source, because "a filter can prevent minors from seeing all pornography, not just pornography posted to the Web from America," and "filters are more

effective than age-verification requirements." *Id.*; *see also Am. C.L. Union v. Gonzales*, 478 F. Supp. 2d 775, 815 (E.D. Pa. 2007) (finding that filtering technology is more effective).

Courts have also found that requiring service providers—in this case, internet service providers ("ISPs")—to pre-block adult content, subject to an adult's un-blocking request, is another less restrictive means. The Third Circuit explained this alternative in *Fabulous Associates v. Pennsylvania Public Utility Commission*, 896 F.2d 780, 788 (3d Cir. 1990). There, the court held that phone-sex companies could not be forced to verify the ages of their customers, because the government could instead require telephone companies to block adult content until an adult requests access. *Id.* The state law at issue required phone-sex companies to verify the age of their customers using an "access code" system. *Id.* at 781–82. The court held that the law violated the First Amendment because it burdened phone-sex companies and infringed the right to access speech anonymously. *Id.* at 785–87. As the court explained, there was at least one less restrictive alternative, insomuch as the state could have required telephone companies to pre-block adult content until receiving a request for access from an adult. *Id.* at 788. That approach would have been less restrictive because revealing one's identity "to the telephone company is far less chilling than is loss of anonymity to the message service." *Id.* "[P]re-blocking [would also not] necessitate . . . increased operating costs by the message services[.]" *Id.* The court thus affirmed that responsibility for minors' wellbeing lies "where our society has traditionally placed it—on the shoulders of the parent." *Id.*; *see also* Sonnier Decl. at ¶¶ 37-41.

Here, Texas disregarded less restrictive alternatives in favor of a discredited approach that is far less effective, more dangerous, and more costly. Sonnier Decl. at ¶¶ 18-31. While the Act will do little or nothing specifically to protect minors, it profoundly burdens and harms adults. Most minors are far more tech-savvy than the average adult. Thus, minors who wish to view adult content can and will continue to do so with ease, bypassing the nominal virtual barrier imposed by the Act by, e.g., using freely available VPN services that hide the IP addresses of devices connected to the internet and thereby allow users to appear as though they are operating elsewhere

geographically. Sonnier Decl. at ¶¶ 23-31; Declaration of Scott Cole ("Cole Decl.") (Exh. 1). In addition to turning to less reputable websites, minors might turn to the dark web using the "Tor" browser, exposing themselves to the internet's criminal underbelly. Sonnier Decl. at ¶ 28; Cole Decl. (Exh. 2 at p. 11). Similarly, minors will continue to accidentally encounter adult content at scale, because the Act exempts search engines and most social media sites (*see infra* at pp. 12-13).

As a result, the Act will primarily just force many adults to choose between exercising their constitutional right to access adult content and safeguarding their personal and private information. Sonnier Decl. at ¶¶ 42-43; Boden Decl. at ¶ 6. The Act authorizes age verification by capacious means, including by "records from mortgage, education, and employment entities," yet offers no remedy to individuals harmed by hacks or leaks. § 129B.001(7). While the Act forbids entities performing age verification from retaining personal information, it makes this prohibition enforceable only by the Attorney General. §§ 129B.002(b), 129B.006. Worse yet, the Act's plain wording allows information to be transferred away to third parties *during* the verification process, gutting the Act's already-threadbare "protections" for personal information. And the Act's financial impact on smaller websites will further chill protected speech, as the cost of implementing age verification can be prohibitive. Boden Decl. at ¶ 11; *see also Fabulous Associates*, 896 F.2d at 788 (considering the costs of compliance for distributors of protected speech). Because less restrictive, more effective means exist, the Act cannot withstand strict scrutiny.

3.   The Act's "age verification" requirement fails strict scrutiny because it is too underinclusive to further a compelling interest.

While allegedly aimed at protecting minors, the Act fails this purpose. Instead, it suggests viewpoint discrimination against the adult industry—a "blatant and egregious form of content discrimination" targeting particular speakers. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 168 (2015) (cleaned up). When a statute is dramatically underinclusive, that is a red flag that it pursues forbidden viewpoint discrimination under false auspices, or at a minimum simply does not fit its purported purpose. *See City of Ladue v. Gilleo*, 512 U.S. 43, 52 36 (1994) (explaining that when a law is underinclusive, it "diminish[e]s the credibility of the government's rationale for restricting

speech in the first place"). As the Supreme Court has explained, "underinclusiveness can raise doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint . . . [Thus,] we invalidated a city's ban on ritual animal sacrifices because the city failed to regulate vast swaths of conduct that similarly diminished its asserted interests in public health and animal welfare." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448–49 (2015) (citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. 520, 543–547 (1993)). "Underinclusiveness can also reveal that a law does not actually advance a compelling interest. For example, a State's decision to prohibit newspapers, but not electronic media, from releasing the names of juvenile defendants suggested that the law did not advance its stated purpose of protecting youth privacy." *Id.* (citing *Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 104–105 (1979)).

*Smith v. Daily Mail Publishing Company* is particularly instructive. 443 U.S. 97, 104 (1979). There, the Court struck down a law purporting to protect the identities of juvenile criminal defendants by banning newspapers from publishing their names. *Id.* at 98. As the Court explained, "even assuming the statute served a state interest of the highest order, it does not accomplish its stated purpose." *Id.* at 105. "In this very case, three *radio* stations announced the alleged assailant's name before the Daily Mail decided to publish it." *Id.* (emphasis added). Justice Rehnquist put it bluntly: "It is difficult to take very seriously West Virginia's asserted need to preserve the anonymity of its youthful offenders when it permits other, equally, if not more, effective means of mass communication to distribute this information without fear of punishment." *Id.* at 110.

Just as the law struck down in *Smith* ignored "equally, if not more, effective" mediums of communication, the Act arbitrarily exempts internet search engines—the primary method for accessing content online, including adult content that is just as explicit as the content on adult websites. Sonnier Decl. at ¶ 41. Bing, for example, is the default search engine for the web browser Microsoft Edge. Cole Decl. (Exh. 3 at p. 18). It comes pre-installed in most computers using the Windows operating system. Cole Decl. (Exh. 4 at pp. 23-24). Because Bing is exempted

from the Act, any minor can continue to use Bing to access endless amounts of adult content in seconds. Sonnier Decl. at ¶ 41. Similarly, while the Act singles out adult websites for adverse treatment, it leaves unregulated all the equally explicit adult content found on social media sites whose large volume of non-adult content brings them outside the Act' scope. *See* Cole Decl. (Exh. 5 at p. 31). Such underinclusivity is independently fatal.[3] *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011) (the "regulation is wildly underinclusive when judged against its asserted justification, which in our view is alone enough to defeat it. . . . California has singled out the purveyors of video games for disfavored treatment . . . compared to booksellers, cartoonists, and movie producers[.]"). If the Act pursues a coherent goal at all, it is not protecting minors; it is discriminating against the adult industry and adults who would otherwise patronize it. This is all the more clearly revealed by the Act's "warning label" requirement, discussed below, which bears no relation to protecting minors from viewing adult content.

### 4. The Act violates the First Amendment by compelling websites to speak a government message.

Separate and apart from the Act's unconstitutional *restrictions* on accessing adult content, the Act compels website operators to *affirmatively express* the government's message as their own, contrary to their actual views. Such compulsion of speech poses a separate constitutional violation as a distinct content-based restriction subject to strict scrutiny. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("By compelling individuals to speak a particular message, such notices alter the content of [petitioners'] speech." (citing *Riley v. National Federation of Blind of N. C., Inc.,* 487 U.S. 781, 795 (1988))). This aspect of the Act is similarly incapable of withstanding strict scrutiny. It fails to use the least restrictive means, because Texas could instead convey its message "without burdening a speaker with unwanted speech. . . . Most obviously, it could inform [the public directly] with a public-information campaign." *Id.* at 2376 (cleaned up). Nor does the Act pursue a compelling interest, because it is nonsensical to provide

---

[3] The Act also exempts news media and employees of news media, despite the fact that neither enjoys greater First Amendment rights than the general public. *See Garrett v. Estelle*, 556 F.2d 1274, 1277 (5th Cir. 1977) (citing *Branzburg v. Hanes*, 408 U.S. 665, 684 (1972)).

"health warnings" to protect minors who, by virtue of the "age verification" requirement, should never be on adult websites in the first place. To the extent Texas might here assert (*post hoc*, contrary to the Act's title and premises) a general interest in the health and safety of *all* its citizens, that interest is undeserving of credit where, as here, it is premised on falsehoods, biased statements, and unsupported accusations. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (no compelling interest where state failed to prove the existence of a societal problem by presenting inconclusive evidence linking violent video games to violence in minors); Declaration of David Ley ("Ley Decl.") at ¶ 17. Texas cannot constitutionally hijack private speakers and enlist them as its mouthpieces. *See, e.g., Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1, 4, 21 (1986) (holding California could not force "a privately owned utility company to include in its billing envelopes speech of a third party with which the utility disagrees").[4]

To be clear, there is no analog between what the Act requires and permissible health warnings on cigarette sales and direct advertising of same, as permitted by *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985). *See Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 551 (6th Cir. 2012) (upholding textual warnings on cigarette cartons under *Zauderer*). *Zauderer* established that the government can require disclosures of "purely factual and uncontroversial" information about goods or services to advance a legitimate interest, so long as the disclosures do not unduly burden free speech. *See NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 485 (5th Cir. 2022); *see also Becerra*, 138 S. Ct. at 2372. But the test is conjunctive: a mandated disclosure must be *both* factual *and* uncontroversial. *See, e.g.*, *CTIA - The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 845 (9th Cir. 2019) (explaining *Zauderer* did not apply to forcing anti-abortion clinics to disclose the existence of state-sponsored abortion services because, while factual, the disclosure "took sides in a heated political controversy, forcing the clinic to convey a message fundamentally at odds with its mission"); *see also Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006) (strict scrutiny, not *Zauderer*, applied to a

---

[4] It is also incoherent. The Act demands "14-point font," but text size on webpages is measured by pixel, not font size. Cole Decl. (Exh. 6 at p. 49).

requirement that video game packages display a symbol reflecting the state's definition of "sexually explicit," a "subjective and highly controversial message").

Here, the mandated disclosures are neither factual nor uncontroversial. Ley Decl. at ¶¶ 7-17. Some are pulled from thin air, such as the requirement to place *on every webpage* a bulletin for the U.S. substance abuse and mental health hotline, which thus associates pornography with substance abuse despite the absence of any supporting evidence. *Id.* at ¶¶ 8-12. Some are patently false, such as the inscrutable claim that pornography "weaken[s] brain function" and is associated with mental health disorders. *Id.* at ¶ 8. Yet others, such as the claim that the existence of pornography increases the demand for child pornography, falsely conflate entirely separate issues. *Id.* at ¶¶ 13-14. Every last statement required by the Act is controversial, taking sides in political disputes over lawful adult content. *See* Cole Decl. (Exh. 7 at p. 58).

More fundamentally, "the core notion of commercial speech [is] speech which does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66 (1983) (cleaned up). By no means do Plaintiffs' websites answer to that description. Andreou Decl. at ¶¶ 3, 9, 10, 11; Seifert Decl. at ¶¶ 3, 9; Muhamed Decl. at ¶¶ 3, 10. Further, government compulsion cannot hold sway when a plaintiff "advertises an activity itself protected by the First Amendment." *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 68 n.14 (1983). Just so here: the "health warnings" do not target a fungible consumer product like a pack of cigarettes, but instead target *constitutionally protected speech*. *Cf. Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 325, 328 (S.D.N.Y. 2006), *aff'd*, 279 F. App'x 40 (2d Cir. 2008) (speech found on a website does not give rise to product liability, because it is protected by the First Amendment). "[I]t is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys." *Matal v. Tam*, 582 U.S. 218, 221 (2017). As the court in *Volokh v. James* explained, a New York law requiring social media sites to disclose a "policy for responding to complaints of hateful content . . . [is] different in character and kind from commercial speech and amounts to more than mere disclosure of factual information, such as caloric information or mercury content[.]" 2023 WL 1991435, at *8

(S.D.N.Y. Feb. 14, 2023) (enjoining New York's "hate speech" law). Thus, because the service provided by social media sites is to facilitate protected speech, including hate speech, the court rejected New York's attempted invocation of the lower standard for commercial speech to justify disclosures specifically attaching to such speech. *Id.* The same principle applies here. Regardless of the purported societal ills Texas points to—all of which are false or unsupported—Texas cannot constitutionally turn adult websites into government billboards waging a governmental war against adult content. *See 303 Creative LLC v. Elenis*, 600 U.S. __, __ (2023) (slip op., at 8) ("the government may not compel a person to speak its own preferred messages"). The extension of the "health warning" requirement to online advertisements is also unduly burdensome because the required statements will dwarf the advertisements themselves, drowning out private speech in favor of government speech. *See Becerra*, 138 S. Ct. at 2376–77; *see also* Andreou Decl. at ¶ 13; Muhamed Decl. at ¶¶ 5, 12.

### 5. The Act is impermissibly vague.

The Act is overbroad in yet another way. "If a law is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974) (cleaned up). "[W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (cleaned up); *see also Reno*, 521 U.S. at 870 ("Regardless of whether the CDA is so vague that it violates the Fifth Amendment, the many ambiguities concerning the scope of its coverage render it problematic for purposes of the First Amendment."). Accordingly, "[t]o avoid the chilling effect a vague law might have on speech," laws must "give persons reasonable notice of what is prohibited." *U.S. v. Williams*, 553 U.S. 285, 304 (2008).

The Act fails even to make clear to whom it applies. The Act is silent about how to perform the "over one-third" calculation, because it is silent about what counts as an individual instance of material on an Internet website. Indeed, the Act is vague as to whether the unit of counting is whole videos, seconds of a video, file size, or something else. Do duplicates of a video found on

different webpages count twice?  If a webpage hyperlinks to another webpage, does the material on the linked page count?  One can only speculate.  Further, although the Act purports to address speech that is obscene for minors, the phrase "with respect to minors" has no one meaning.  *See Am. C.L. Union v. Mukasey*, 534 F.3d 181, 205 (3d Cir. 2008).  The Act defines "minors" as persons of all ages under 18.  Yet "[t]he type of material that might be considered harmful to a younger minor is vastly different—and encompasses a much greater universe of speech—than material that is harmful to a minor just shy of seventeen years old. . . . [S]ex education materials may have 'serious value' for, and not be 'patently offensive' as to, sixteen-year-olds. The same material, however, might well be considered 'patently offensive' as to, and without 'serious value' for, children aged, say, ten to thirteen[.]"  *Am. C.L. Union v. Ashcroft*, 322 F.3d 240, 268 (3d Cir. 2003), *affirmed in relevant part*, 542 U.S. 656 (2004).  Under the Act, it is impossible for website operators to know what standard to use.  Nor does the Act make clear what it demands.  The Act says nothing about how often age verification must be performed.  The Act is silent as to whether website access may be granted on an hourly basis, for a single browsing session, forever on the same device, or something else.  In short, the Act contains multiple "ambiguities concerning the scope of its coverage," making the statute void for vagueness under the First Amendment's heightened standard for clarity.  *Reno*, 521 U.S. at 870.

### C.     The Act Violates Section 230 Of The CDA

The Communications Decency Act ("CDA") provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  As courts uniformly hold, "[w]ebsites are the most common interactive computer services."  *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019).  The statute further provides that, "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).  "The intent of the CDA is . . . to promote rather than chill internet speech . . . [paving] the way for a robust new forum for public speech as

well as a trillion-dollar industry centered around user-generated content." *Bennett v. Google, LLC*, 882 F.3d 1163, 1166 (D.C. Cir. 2018) (cleaned up).

In *Doe v. MySpace, Inc.*, the Fifth Circuit held that "Congress provided broad immunity under the CDA to Web-based service providers for *all claims* stemming from their publication of information created by third parties[.]" 528 F.3d 413, 418 (5th Cir. 2008) (emphasis added); *see also, e.g.*, *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 813, 828 (M.D. Tenn. 2013) (applying section 230 to a Tennessee law "criminaliz[ing] the sale of certain sex-oriented advertisements"). Under section 230, "[p]arties complaining that they were harmed by a Web site's publication of user-generated content . . . may sue the third-party user who generated the content." *MySpace*, 528 F.3d at 419. But they cannot sue "the interactive computer service that enabled them to publish the content online." *Id.* Thus, when a state law holds a website responsible for failing to protect minors from harm allegedly caused by adult content, the law does what section 230 forbids: it treats the website as the publisher who should be held responsible for that content. *See id.* at 419–20.

*MySpace* governs here. In that case, the plaintiff sued the interactive social media site "MySpace" for negligence in failing to take precautions to prevent sexual predators from communicating with minors. *Id.* at 416. Specifically, the plaintiff accused MySpace of "declining to implement age-verification software[.]" *Id.* at 422. But that claim was barred by Section 230. *Id.* at 420. As the Court of Appeals explained, "notwithstanding their assertion that they only seek to hold MySpace liable for its failure to implement measures that would have prevented Julie Doe from communicating with Solis . . . [t]heir allegations are merely another way of claiming that MySpace was liable for publishing the communications[.]" *Id.* Here, just as in *MySpace*, the Act would hold platforms liable for not implementing age verification protocols; the root cause of the alleged harm to minors would be content created by third parties; and enforcement of the Act would be just "another way" of trying to hold platforms—precisely the Plaintiffs that are website operators hosting third-party content here—responsible for that harm. Under *MySpace*, the

Appx000885

Attorney General's cause of action under the Act is barred and preempted. *See* 47 U.S.C. § 230(e)(3).

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

To show irreparable harm, "[t]he plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Here, the Act poses a significant threat of imminent injury to constitutional rights across the board (*see supra* at pp. 7-17). It is axiomatic that money damages cannot fully repair constitutional injuries. *De Leon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014) ("Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law."). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Independently, the Act's violations of section 230 pose irreparable harm because section 230 creates an immunity from court proceedings. The statute expressly provides that "*[n]o cause of action may be brought* and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3) (emphasis added). Thus, courts have held that "section 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008). Since section 230 creates "an immunity from suit" that would be "effectively lost if a case is erroneously permitted to go to trial," irreparable harm follows. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (cleaned up).

"[I]mmeasurable loss [of] goodwill" constitutes further irreparable harm. *Henson Patriot Co., LLC v. Medina*, 2014 WL 4546973, at *4 (W.D. Tex. Sept. 11, 2014). Here, Plaintiffs will suffer loss of goodwill as Texas adults abandon Plaintiffs' platforms in response to the demand that they reveal personal information and the false "health warnings" the Act requires.

## III. THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR AN INJUNCTION

Given these irreparable harms, Texas "would need to present powerful evidence of harm to its interests to prevent [Plaintiffs] from showing that the threatened injury outweighs any harm [Texas] would suffer as a result of the injunction." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012). Texas cannot overcome this burden, not least because it has no legitimate interests at stake (*see supra* at pp. 11-13) and minors can easily circumvent the Act's restrictions. And "[w]here constitutional rights are concerned, 'enforcement of an unconstitutional law is always contrary to the public interest.'" *Fund Texas Choice v. Paxton*, 2023 WL 2558143, at *27 (W.D. Tex. Feb. 24, 2023) (Judge Pitman) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)).

## IV. SCOPE OF THE INJUNCTION

"[I]f the arguments and evidence show that a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is proper." *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, (2016) (cleaned up), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). A statute that is unconstitutional on its face "is invalid *in toto*—and therefore incapable of any valid application." *People for Ethical Treatment of Animals v. Hinckley*, 526 F. Supp. 3d 218, 226 (S.D. Tex. 2021) (cleaned up); *see also, e.g.*, *Am. C.L. Union v. Gonzales*, 478 F. Supp. 2d 775, 821 (E.D. Pa. 2007) (enjoining enforcement "at any time for any conduct."); *Fund Texas Choice v. Paxton*, 2023 WL 2558143, at *27 (W.D. Tex. Feb. 24, 2023) (similar). Likewise, an injunction for as-applied challenges should reach similarly situated parties. *See, e.g.*, *Worth v. Harrington*, 2023 WL 2745673, at *22 (D. Minn. Mar. 31, 2023); *Miller v. Davis*, 2015 WL 9460311, at *2 (E.D. Ky. Sept. 23, 2015). Here, an injunction as to Plaintiffs' First Amendment challenge should enjoin the law *in toto*, while an injunction based on Plaintiffs' section 230 challenge should enjoin the law as applied to the Plaintiffs whose websites host third-party content and similarly situated platforms.

## CONCLUSION

Plaintiffs respectfully request that this Court preliminarily enjoin enforcement of the Act.

DATED:  August 4, 2023

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By          /s/    *Scott L. Cole*


Scott L. Cole (Bar No. 00790481)
scottcole@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
300 West 6th Street
Suite 2010
Austin, TX 78701
Telephone: (737) 667 6110
Fax: (737) 667 6110

Michael T. Zeller (*pro hac vice* forthcoming)
Derek L. Schaffer (*pro hac vice* forthcoming)
Thomas Nolan (*pro hac vice* forthcoming)
Arian Koochesfahani (*pro hac vice*
forthcoming)
michaelzeller@quinnemanuel.com
derekshaffer@quinnemanuel.com
thomasnolan@quinnemanuel.com
ariankoochesfahani@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443 3000
Fax: (213) 443 3100

Jeffrey Keith Sandman (*pro hac vice*
forthcoming)
jeff.sandman@webbdaniel.law
WEBB DANIEL FRIEDLANDER LLP
5208 Magazine St Ste 364
New Orleans, LA 70115
Phone: (978) 886 0639

# EXHIBIT LL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC., et al., | § § § | No. 1:23-CV-917-DAE |
| Plaintiffs, | § § § | |
| vs. | § § | |
| ANGELA COLMENERO, in her official capacity as Interim Attorney General for the State of Texas, | § § § § | |
| Defendant. | § § | |
| _____ | § § § § § | |

## ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Before the Court is Plaintiff Free Speech Coalition, et al.'s ("Plaintiffs")

motion for a preliminary injunction (Dkt. # 5). On August 23, the Court held a

hearing on the matter. Upon careful consideration of the arguments raised by the

parties in the briefing and at the hearing, the Court—for reasons that follow—

**GRANTS** Plaintiffs' motion as to their First Amendment claims and **GRANTS** the

motion in part as to their Section 230 claims. Defendant Colmenero is

preliminarily **ENJOINED** from enforcing H.B. 1181.

## I. BACKGROUND

This case concerns a law passed by the State of Texas that restricts access to pornographic websites by requiring digital age verification methods and warnings about the alleged harms caused by pornography. *See* Act of June 12, 2023, Ch. 676, § 2 (H.B. 1181) Tex. Sess. Law Serv. (Vernon's) (hereinafter, "HB 1181"). Plaintiffs, comprised of online pornography websites, performers, and advocates, bring suit to stop the law from being enforced before it takes effect on September 1, 2023.

### A. The Parties

Plaintiffs can largely be split into three categories. First is Free Speech Coalition, Inc. ("Free Speech Coalition"), a nonprofit trade association of adult content performers, producers, distributors, and retailers. (Compl., Dkt. # 1, at 4). Free Speech Coalition assists its members in their First Amendment expression, and its members include adult content performers and businesses that produce and sell adult content. (Id.) Free Speech Coalition alleges that "many of [its] members are . . . gravely concerned about the consequences of [H.B. 1181], but who fear for their safety should they come forward to challenge [H.B. 1181] in court." (Id.). Free Speech Coalition also alleges that it has been forced to divert resources from its normal day-to-day activities in order to track legislation, meet with attorneys,

2

and engage in risk-management to minimize the harm that age-verification statutes like H.B. 1181 pose to their members.

Second, several Plaintiffs are companies that produce, sell, and license adult content. Many of these are incorporated abroad, while others are U.S.-based companies. Plaintiff MG Premium Ltd. is a Cypriot company that operates SpiceVids.com, Brazzers.com, and FakeTaxi.com, all of which are subscription-based adult-content websites. (Id. at 4–5). MG Premium Ltd writes, hires, and does pre- and post-production work for the adult videos, uploading them to their own sites and to others. (Id. at 5). Similarly, Plaintiff MG Freesites Ltd operates Pornhub.com, which hosts uploaded content owned, copyrighted, and controlled by third parties. (Id.) Plaintiff WebGroup Czech Republic, a.s., operates xvideos.com, a free website that hosts adult videos. (Id.) Plaintiff NKL Associates, s.r.o, operates xnxx.com, which similarly hosts free adult videos. (Id.) Plaintiff Sonesta Technologies, s.r.o. operates BangBros.com, a subscription-based website offering adult videos. (Id. at 6). Plaintiff Yellow Production, s.r.o. owns and produces FakeTaxi and licenses its content to other adult websites, including Pornhub, Xvideos, Xnxx, and SpiceVids.

Three website Plaintiffs reside and principally operate in the United States. Plaintiff Paper Street Media, LLC resides in Florida and operates TeamSkeet, a network of subscription-based adult websites. Paper Street owns the intellectual

Appx000892

property rights to these videos, and shoots with adult performers, writes the scripts, and hires and employs the production teams. (Id.) Plaintiff Neptune Media likewise resides in Florida and operates the MYLF adult content network, which is similarly comprised of several adult-content subscription services and websites. (Id. at 7). Plaintiffs MediaME SRL, a Romanian company, hosts free adult entertainment websites, while Plaintiff Midus Holdings, Inc., another Florida company, operates subscription-based sites. (Id. at 7–8). These companies operating in and outside the United States (collectively, "the Adult Video Companies") oppose H.B. 1181 and allege that it would unconstitutionally restrict their free expression and compel them to post government-mandated speech. They also oppose the law on the basis that it violates the immunity vested on website publishers by Section 230 of the Communications Decadency Act ("CDA").

Third and finally, Plaintiff Jane Doe is an adult performer whose content is featured on several adult websites, including Pornhub.com, as well as CamSoda, Sextpanther, and MyFreeCams. (Id.; Doe Decl., Dkt. 5-6).[1] Doe opposes the restrictions that H.B. 1181 would place on their ability to reach audiences and is

---

[1] As of the date of this order, Defendant has not challenged Jane Doe's pseudonymity. Because her standing is not independently necessary for Plaintiffs' motion to succeed and because Doe has presented facially legitimate concerns regarding intimidation, the Court will allow her to proceed pseudonymously at this early and expedited stage. See U.S. Navy SEALs 1-26 v. Austin, 594 F. Supp. 3d 767, 782 n.5 (N.D. Tex. 2022) (allowing preliminary injunction to proceed before resolving question of anonymity), stay pending appeal denied by 27 F.4th 336 (5th Cir. 2022), appeal dismissed as moot 72 F.4th 666 (5th Cir. 2023). However, the Court will order briefing on Doe's ability to proceed pseudonymously following the issuance of this order.

against the messages websites would have to convey about the purported harmful effects of pornography. (Id.)

Defendant Angela Colmenero is sued in her official capacity as Interim Attorney General for the State of Texas. Plaintiffs bring suit against her under the *Ex parte Young* exception to sovereign immunity, arguing that she has the authority to enforce H.B. 1181. (Id. at 3).

B.    H.B. 1181

On June 12, 2023, Texas Governor Greg Abbott signed H.B. 1181 into law. (Id. at 8). H.B. 1181 is set to take effect on September 1, 2023. H.B. 1181 contains two requirements, both of which are challenged in this litigation. First, the law requires websites to use "reasonable age verification methods . . . to verify that an individual attempting to access the material is 18 years of age or older." H.B. 1181 § 129B.002. Second, the law requires adult content websites to post a warning about the purported harmful effects of pornography and a national helpline for people with mental health disorders. H.B. 1181 § 129B.003.

The law defines "sexual material harmful to minors" as including any material that "(A) the average person applying contemporary community standards would find, taking the material as a whole is and designed to appeal or pander to the prurient interest" to minors, (B) is patently offensive to minors, and (C) "taken

as a whole, lacks serious literary, artistic, political, or scientific value for minors." Id. § 129b.001.

The law regulates a "commercial entity that knowingly and intentionally publishes or distributes material on an Internet website, including a social media platform, more than one-third of which is sexual material harmful to minors . . . ." Id. § 129B.002. H.B. 1181 requires these companies to "comply with a commercial age verification system that verifies age using: (A) government-issued identification; or (B) a commercially reasonable method that relies on public or private transactional data to verify the age of an individual." H.B. 1181 § 129B.003. "Transactional data" refers to a "sequence of information that documents an exchange . . . used for the purpose of satisfying a request or event. The term includes records from mortgage, education, and employment entities." Id. H.B. 1181 does not allow the companies or third-party verifiers to "retain any identifying information of the individual." Id. § 129B.002.

In addition to the age verification, H.B. 1181 requires adult content sites to post a "public health warning" about the psychological dangers of pornography. In 14-point font or larger, sites must post:

> TEXAS HEALTH AND HUMAN SERVICES WARNING:
> Pornography is potentially biologically addictive, is proven to harm human brain development, desensitizes brain reward circuits, increases conditioned responses, and weakens brain function.

6

> TEXAS HEALTH AND HUMAN SERVICES
> WARNING:
> Exposure to this content is associated with low self-esteem
> and body image, eating disorders, impaired brain
> development, and other emotional and mental illnesses.
> TEXAS HEALTH AND HUMAN SERVICES
> WARNING:
> Pornography increases the demand for prostitution, child
> exploitation, and child pornography.

Id. § 129B.004.

Although these warnings carry the label "Texas Health and Human

Services," it appears that the Texas of Health and Human Services Commission has

not made these findings or announcements.

Finally, the law requires that websites post the number of a mental health

hotline, with the following information:

> 1-800-662-HELP (4357) THIS HELPLINE IS A FREE,
> CONFIDENTIAL INFORMATION SERVICE (IN
> ENGLISH OR SPANISH) OPEN 24 HOURS PER DAY,
> FOR INDIVIDUALS AND FAMILY MEMBERS
> FACING MENTAL HEALTH OR SUBSTANCE USE
> DISORDERS. THE SERVICE PROVIDES REFERRAL
> TO LOCAL TREATMENT FACILITIES, SUPPORT
> GROUPS, AND COMMUNITY BASED
> ORGANIZATIONS.

Id.

H.B. 1181 authorizes the Texas Attorney General to bring an action in state

court to enjoin the violation and recover up to $10,000.00 for each day of a

violation, if it is "in the public interest." Id. § 129B.005. If a minor accesses sexual

material, the Attorney General may seek an additional amount up to $250,000.00 per violation. Id.

## II. LEGAL STANDARDS

A.      Preliminary Injunction

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. Valley v. Rapides Par. Sch. Bd., 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. PCI Transp. Inc. v. W. R.R. Co., 418 F.3d 535, 545 (5th Cir. 2005).

## III. DISCUSSION – LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs' motion and Defendant's response raise four merits issues: (1) do Plaintiffs have standing to bring suit, (2) is the age verification requirement unconstitutional, (3) is the health warning unconstitutional, and (4) does Section 230 of the CDA preempt the law? The Court will address each in turn.

A.  <u>Standing</u>

Plaintiffs have standing to bring suit. To have Article III standing, a plaintiff

must "(1) have suffered an injury in fact, (2) that is fairly traceable to the

challenged action of the defendant, and (3) that will likely be redressed by a

favorable decision." <u>Speech First, Inc. v. Fenves</u>, 979 F.3d 319, 330 (5th Cir. 2020)

*as revised* (Oct. 30, 2020) (citing <u>Lujan v. Def's. of Wildlife</u>, 504 U.S. 555, 560–61

(1992)). Here, Plaintiffs bring a pre-enforcement challenge to a statute that

threatens substantial civil penalties. In the context of pre-enforcement challenges,

an injury-in-fact is established when the plaintiff "(1) has an intention to engage in

a course of conduct arguably affected with a constitutional interest, (2) his intended

future conduct is arguably proscribed by the policy in question, and (3) the threat

of future enforcement of the challenged policies is substantial." <u>Fenves</u>, 979 F.3d at

330 (quoting <u>Susan B. Anthony List v. Driehaus</u>, 573 U.S. 149, 158 (2014)).

i.  <u>Injury in Fact</u>

Plaintiffs' expression is afforded a constitutional interest. Plaintiffs seek to

produce, distribute, and post legal adult content online, free of overbroad

restrictions and without being compelled to speak about the purported harms of

sexually explicit videos. Jane Doe and members of Free Speech Coalition seek to

continue performances in adult videos with wide audiences. This conduct is

regulated by H.B. 1181, which sets restrictions on when and how adult videos can

9

be posted. Beyond the restrictions on speech, the law interferes with the Adult

Video Companies' ability to conduct business, and risks deterring adults from

visiting the websites. Finally, "the law is aimed directly at plaintiffs, who . . . will

have to take significant and costly compliance measures," which suffices to show

pre-enforcement injury. <u>Virginia v. Am. Booksellers Ass'n, Inc.</u>, 484 U.S. 383, 386,

392 (1988). The compliance costs here are substantial, because commercially

available age verifications services are costly, even prohibitively so. Plaintiffs'

complaint includes several commercial verification services, showing that they

cost, at minimum, $40,000.00 per 100,000 verifications.

 As to the required disclosures, compelled speech necessarily involves a

constitutional interest. <u>Janus v. Am. Fed'n. of State, Cnty., and Mun. Employees,</u>

<u>Council 31</u>, 138 S. Ct. 2448 (2018) ("When speech is compelled, however,

additional damage is done. In that situation, individuals are coerced into betraying

their convictions."); *see also* <u>W. Virginia State Bd. of Educ. v. Barnette</u>, 319 U.S.

624, 633 (1943) (noting that a law commanding "involuntary affirmation" of

objected-to beliefs would require "even more immediate and urgent grounds" than

a law demanding silence).

 H.B. 1181 imposes substantial liability for violations, including $10,000.00

per day for each violation, and up to $250,000.00 if a minor is shown to have

viewed the adult content. Finally, the threat of future enforcement is substantial—

10

the Attorney General has not disavowed enforcement of the law, and there is no

reason to believe that the law will not be enforced against those who violate it.

"[W]hen dealing with pre-enforcement challenges to recently enacted (or, at least,

non-moribund) statutes that facially restrict expressive activity by the class to

which the plaintiff belongs, courts will assume a credible threat of prosecution in

the absence of compelling contrary evidence." *Speech First*, 979 F.3d at 335

(cleaned up).

Free Speech Coalition has associational standing. An association has

standing to bring claims on behalf of its members when "(1) individual members

would have standing, (2) the association seeks to vindicate interests germane to its

purpose, and (3) neither the claim asserted nor the relief requested requires the

individual members' participation." Students for Fair Admissions, Inc. v. Univ. of

Tex. at Austin, 37 F.4th 1078, 1084 (5th Cir. 2022). Free Speech Coalition's

members would have standing to sue in their own right, as they suffer the same

injuries as the named Adult Video Companies. These interests fall within Free

Speech Coalition's mission, which is to advocate for the distribution of adult

videos and the First Amendment rights of its performers and producers. *See* Nat'l

Ass'n for Advancement of Colored People v. Button, 371 U.S. 415, 429 (1963)

("[T]he First Amendment also protects vigorous advocacy, certainly of lawful ends,

against governmental intrusion.").

Defendant contends that Free Speech Coalition lacks associational standing because it has not identified one member with individual standing in its motion for a preliminary injunction. (Def.'s Resp., Dkt. # 27, at 5 (citing <u>NAACP v. City of Kyle</u>, 626 F.3d 233, 237 (5th Cir. 2010)). While an association does have to identify a member with individual standing, it need not do so in the preliminary injunction motion in addition to the complaint. In Plaintiffs' complaint, they identify members of the association, including directors, distributors, and actors. And in their reply, Plaintiffs identify Paper Street Media, LLC, an American company, as a member. (Boden Decl., Dkt. # 28-5, at 2). <u>NAACP v. City of Kyle</u> itself examined associational standing based upon the "evidence in the record," and Plaintiffs likewise identified a member with individual standing in their reply brief. 626 F.3d at 237; *see also* <u>All. for Hippocratic Med. v. U.S. Food & Drug Admin.</u>, 23-10362, 2023 WL 5266026, at *11–14 (5th Cir. Aug. 16, 2023) (discussing associational standing based in part on declarations made in support of preliminary injunction).

Beyond their own First Amendment injuries, Plaintiffs have standing for their overbreadth challenge. <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 612 (1973) ("Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court

12

to refrain from constitutionally protected speech or expression."); <u>Sec. of State of Md. v. Joseph H. Munson Co., Inc.</u>, 467 U.S. 947, 956 (1984) ("[W]hen there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.").

ii.    <u>Foreign Websites have First Amendment Protection for Domestic Operations</u>

Defendant repeatedly emphasizes that the foreign website Plaintiffs "have no valid constitutional claims" because they reside outside the United States. (Def.'s Resp., Dkt. # 27, at 6–7). First, it is worth noting that this argument, even if successful, would not bar the remaining Plaintiffs within the United States from bringing their claims. Several website companies, including Midus Holdings, Inc., Neptune Media, LLC, and Paper Street Media, LLC, along with Jane Doe and Free Speech Coalition (with U.S. member Paper Street Media, LLC), are United States residents. Defendant, of course, does not contest that these websites and Doe are entitled to assert rights under the U.S. Constitution. Regardless of the foreign websites, the domestic Plaintiffs have standing.

As to the foreign websites, Defendant cites <u>Agency for Intl. Dev. v. All. for Open Socy. Intl., Inc.</u>, 140 S. Ct. 2082 (2020) ("<u>AOSI</u>"), which reaffirmed the principle that "foreign citizens outside U.S. territory do not possess rights under

the U.S. Constitution." Id. at 2086. AOSI's denial of standing is distinguishable from the instant case. That case involved foreign nongovernmental organizations ("NGOs") that received aid—outside the United States—to distribute outside the United States. These NGOs operated abroad and challenged USAID's ability to condition aid based on whether an NGO had a policy against prostitution and sex trafficking. The foreign NGOs had no domestic operations and did not plan to convey their relevant speech into the United States. Under these circumstances, the Supreme Court held that the foreign NGOs could not claim First Amendment protection. Id.

AOSI differs from the instant litigation in two critical ways. First, Plaintiffs do not seek to challenge rule or policymaking with extraterritorial effect, as the foreign plaintiffs did in AOSI. By contrast, the foreign Plaintiffs here seek to exercise their First Amendment rights only as applied to their conduct inside the United States and as a preemptive defense to civil prosecution. Indeed, courts have typically awarded First Amendment protections to foreign companies with operations in the United States with little thought. *See, e.g.*, Manzari v. Associated Newspapers Ltd., 830 F.3d 881 (9th Cir. 2016) (in a case against British newspaper, noting that defamation claims "are significantly cabined by the First Amendment"); Mireskandari v. Daily Mail and Gen. Tr. PLC, CV1202943MMMSSX, 2013 WL 12114762 (C.D. Cal. Oct. 8, 2013) (explicitly

14

noting that the First Amendment applied to foreign news organization); <u>Times Newspapers Ltd. v. McDonnell Douglas Corp.</u>, 387 F. Supp. 189, 192 (C.D. Cal. 1974) (same); <u>Goldfarb v. Channel One Russia</u>, 18 CIV. 8128 (JPC), 2023 WL 2586142 (S.D.N.Y. Mar. 21, 2023) (applying First Amendment limits on defamation to Russian television broadcast in United States); <u>Nygård, Inc. v. Uusi-Kerttula</u>, 159 Cal. App. 4th 1027, 1042 (2008) (granting First Amendment protections to Finnish magazine); <u>United States v. James</u>, 663 F. Supp. 2d 1018, 1020 (W.D. Wash. 2009) (granting foreign media access to court documents under the First Amendment). It would make little sense to allow Plaintiffs to exercise Frist Amendment rights as a defense in litigation but deny them the ability to raise a pre-enforcement challenge to imminent civil liability on the same grounds.

Second, unlike the foreign plaintiffs in <u>AOSI</u>, the foreign website Plaintiffs in the instant case *do* operate in the United States for all purposes relevant to this litigation. As regulated by H.B. 1181, their speech and conduct occurs in Texas. Their pre-enforcement challenge, by definition, requires Plaintiffs to show that the risk of civil prosecution in Texas is concrete and imminent. <u>AOSI</u> itself reaffirmed that "foreign citizens in the United States may enjoy certain constitutional rights . . . ." <u>Id.</u> at 2086. To the extent their conduct "operates" in the United States and

subjects them to real or imminent liability here, the foreign website Plaintiffs

receive First Amendment protection.[2]

The constitutional rights of foreign companies operating in the United States

is particularly important in the First Amendment context. "The First Amendment

protects speech for the sake of both the speaker and the recipient." Thunder

Studios, Inc. v. Kazal, 13 F.4th 736, 743–44 (9th Cir. 2021), *cert. denied* 142 S. Ct.

1674 (2022). "It is now well established that the Constitution protects the right to

receive information and ideas. This right to receive information and ideas,

regardless of their social worth, is fundamental to our free society." Stanley v.

Georgia, 394 U.S. 557, 564 (1969) (citations omitted); *see also* Va. State Bd. of

---

[2] Defendant repeatedly suggests that Plaintiffs should not able to avail themselves of First Amendment protections when they have not availed themselves of personal jurisdiction in Texas. (Def.'s Resp., Dkt. #27, at 7, 21). To this end, they rely on a single district court opinion where a foreign plaintiff was determined not to be subject to personal jurisdiction for posting online pornography as related to child sex-trafficking claims. Doe v. WebGroup Czech Republic, No. 221CV02428VAPSKX, 2022 WL 982248 (C.D. Cal. Jan. 13, 2022). Although personal jurisdiction is not strictly before us, the Court is skeptical of this analysis as applied to H.B. 1181. Unlike child sex-trafficking claims, viewing pornography in a state is more directly related to the claims that would be brought by the Attorney General under H.B. 1181. *See* Luv N'care, Ltd. v. Insta-Mix, Inc., 438 F.3d 465, 469 (5th Cir. 2006) (examining, among other things, whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts). And foreign pornography websites have been held subject to U.S. jurisdiction in other contexts. Hydentra HLP Int. Ltd. v. Sagan Ltd., 783 Fed. Appx. 663 (9th Cir. 2019) (unpublished); George S. May Intern. Co. v. Xcentric Ventures, LLC, 409 F. Supp. 2d 1052 (N.D. Ill. 2006) (holding out-of-state defendant subject to personal jurisdiction in similar analysis); AMA Multimedia LLC v. Sagan Ltd., CV-16-01269-PHX-DGC, 2016 WL 5946051 (D. Ariz. Oct. 13, 2016). But if there was any doubt, purposeful availment would likely be established when a website knowingly accepts driver's license data from a state resident, transmits that data to the state, and then proceeds to grant that visitor access to the site, as H.B. 1181 requires. *See* Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) (examining website interactivity as keystone for personal jurisdiction); *see also* Johnson v. TheHuffingtonPost.com, Inc., 21 F.4th 314, 318 (5th Cir. 2021) (noting that courts in the circuit use the Zippo test). At any rate, it is the threat of enforcement, not the existence of personal jurisdiction, that would lead to First Amendment chill.

16

Pharmacy, 425 U.S. 748, 756 (1976) ("[W]here a speaker exists, the protection afforded is to the communication, to its source and to its recipients both."). To hold otherwise would drastically expand the government's ability to restrict ideas based on their content or viewpoint. States could ban, for example, the Guardian or the Daily Mail based on their viewpoint, because those newspapers are based in the United Kingdom. Alternatively, those websites could be subject to relaxed defamation laws without any First Amendment protection. This is not the law, and the Court does not read AOSI to abrogate First Amendment protection for speech occurring in the United States and directed at the United States but hosted by foreign entities. *See* Thunder Studios, Inc., 13 F.4th at 743–44 (extending First Amendment rights to foreign plaintiff for purposes of civil lawsuit in the United States); Kleindienst v. Mandel, 408 U.S. 753 (1972) (acknowledging the First Amendment rights of listeners in the United States but noting that they do not override discretionary immigration decisions).

### iii.  Traceability and Redressability

Plaintiffs' injuries are traceable to Defendant, and Defendant does not contest this in her response. (Def.'s Resp., Dkt. # 27). The Texas Attorney General is tasked with bringing civil prosecutions under H.B. 1181. Their injuries will be redressed by an injunction or declaration that the law is unconstitutional. *See* Natl. Press Photographers Assn. v. McCraw, 594 F. Supp. 3d 789, 800–01 (W.D. Tex.

17

2022), *appeal docketed* No. 22-500337 (May 3, 2022) ("[A] declaratory judgment will have the practical effect of allowing them to exercise their First Amendment rights by removing the fear of prosecution . . . .") (citing *Utah v. Evans*, 536 U.S. 452, 464 (2002)).

    B.    <u>Sovereign Immunity</u>

    While Plaintiffs raise the issue of sovereign immunity in their preliminary injunction motion, Defendant does not contest the issue in her response. (Def.'s Resp., Dkt. # 27). Because the issue is jurisdictional, the Court will briefly address it. *See, e.g.*, <u>FDIC v. Meyer</u>, 510 U.S. 471, 475 (1994). The Eleventh Amendment typically deprives federal courts of jurisdiction over "suits against a state, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it." <u>Moore v. La. Bd. of Elementary & Secondary Educ.</u>, 743 F.3d 959, 963 (5th Cir. 2014). Under the <u>Ex parte Young</u> exception to sovereign immunity, lawsuits may proceed in federal court when a plaintiff requests prospective relief against state officials in their official capacities for ongoing federal violations. 209 U.S. 123, 159–60 (1908). "For the [Ex parte Young] exception to apply, the state official, 'by virtue of his office,' must have 'some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and

18

thereby attempting to make the state a party.'" <u>City of Austin v. Paxton</u>, 943 F.3d

993, 997 (5th Cir. 2019) (quoting <u>Young</u>, 209 U.S. at 157).

      Neither a specific grant of enforcement authority nor a history of

enforcement is required to establish a sufficient connection. <u>City of Austin</u>, 943

F.3d 993 at 1001; <u>Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers'</u>

<u>Comp.</u>, 851 F.3d 507, 519 (5th Cir. 2017). There need be only a "scintilla of

enforcement by the relevant state official" for <u>Ex parte Young</u> to apply. <u>City of</u>

<u>Austin</u>, 943 F.3d at 1002 (quotations omitted). Actual threat of or imminent

enforcement is "not required." <u>Air Evac</u>, 851 F.3d at 519.

      Colmenero is plainly tasked with enforcing H.B. 1181. Section 129B.006

vests the Attorney General with the exclusive authority to bring an action. H.B.

1181 § 129B.006(a) ("If the attorney general believes that an entity is knowingly

violating . . . this chapter[,] the attorney general may bring an action . . . to enjoin

the violation, recover a civil penalty, and obtain other relief the court considers

appropriate."). Moreover, the attorney general "may recover reasonable and

necessary attorney's fees and costs incurred in an action under this section." <u>Id.</u> §

129B.006(b)(6).

      Once it is clear that the named defendant is proper, the Court conducts a

<u>Verizon</u> "straightforward inquiry into whether the complaint alleges an ongoing

violation of federal law and seeks relief properly characterized as prospective."

19

<u>Verizon Maryland, Inc. v. Pub. Serv. Commn. of Maryland</u>, 535 U.S. 635, 645 (2002). The complaint meets these requirements. It alleges a violation of the United States Constitution through the First, Fifth, and Fourteenth Amendments. And the complaint further alleges that the law is preempted by Section 230 of the CDA. The relief is prospective because Plaintiffs seek an injunction prohibiting future enforcement of the law. Plaintiffs' relief falls under the <u>Ex parte Young</u> exception.

     C.    <u>The Age Verification Requirement is Subject to Strict Scrutiny</u>

          i.    <u>Strict Scrutiny Applies</u>

First, the Court must determine which level of scrutiny to apply. H.B. 1181 differentiates between sexual and non-sexual material for minors, so a short overview of historical regulations on minors' access to pornography is helpful. In 1968 in <u>Ginsberg v. State of New York</u>, the Supreme Court upheld a conviction of a person under a state statute that criminalized knowingly providing obscene materials "for minors" to minors. 390 U.S. 629, 638 (1968). Because obscene materials fell outside the scope of First Amendment protection, the Court analyzed the statute under rational basis scrutiny and upheld the law. <u>Id.</u>

However, beginning in the 1990s, use of the "for minors" language came under more skepticism as applied to internet regulations. In <u>Reno v. ACLU</u>, the Supreme Court held parts of the CDA unconstitutional under strict scrutiny. 521

U.S. 844, 850 (1997). The Court noted that the CDA was a content-based regulation that extended far beyond obscene materials and into First Amendment protected speech, especially because the statute contained no exemption for socially important materials for minors. Id. at 865. The Court noted that accessing sexual content online requires "affirmative steps" and "some sophistication," noting that the internet was a unique medium of communication, different from both television broadcast and physical sales. Id. at 854. The Court held Ginsberg distinct on four separate grounds and largely found it inapplicable to digital regulations like the CDA. Id. at 864–68.

After Reno v. ACLU, the federal government tried again, passing the Child Online Protection Act ("COPA"), which restricted the ability to post content online that was harmful to minors for commercial purposes. Ashcroft v. ACLU, 535 U.S. 564 (2002); Child Online Protection Act, 47 U.S.C. § 231 (1998). In separate decisions, the Third Circuit held that the law was similarly unconstitutional under strict scrutiny. Am. Civ. Liberties Union v. Ashcroft, 322 F.3d 240 (3d Cir. 2003), aff'd and remanded, 542 U.S. 656 (2004); Am. Civ. Liberties Union v. Mukasey, 534 F.3d 181 (3d Cir. 2008), cert denied 555 U.S. 1137 (2009). Most notably, the Third Circuit held COPA subject to strict scrutiny because its "definition of harmful material is explicitly focused on minors, it automatically impacts non-obscene, sexually suggestive speech that is otherwise protected for adults." ACLU

21

v. Ashcroft, 322 F.3d at 252. COPA has remained enjoined since the Third Circuit
and Supreme Court's <u>ACLU</u> decisions.

Just like COPA, H.B. 1181 regulates beyond obscene materials. As a result,
the regulation is based on whether content contains sexual material. Because the
law restricts access to speech based on the material's content, it is subject to strict
scrutiny. <u>Id.; Ent. Software Ass'n v. Blagojevich</u>, 469 F.3d 641, 649–50 (7th Cir.
2006) (noting courts have applied strict scrutiny to "a number of statutes . . . that
included the <u>Miller</u> language or some hybrid of <u>Miller</u> and <u>Ginsberg</u>"); <u>ACLU v.
Reno</u>, 521 U.S. at 864–68.

Defendant largely concedes that strict scrutiny applies, (Def.'s Resp., Dkt. #
27, at 6, 9), but hopes that H.B. 1181 should "be subject to a lower standard of
judicial scrutiny because it regulates only 'commercial entities, publication and
distribution of material harmful to minors." (<u>Id.</u> at 9 (citing <u>Ashcroft v. ACLU</u>, 542
U.S. at 676 (Scalia, J., dissenting))). As Defendant tacitly acknowledges, a district
court is not at liberty to disregard existing Supreme Court precedent in favor of a
dissenting opinion. Nor is Defendant entitled to contest Plaintiffs' likelihood of
success based on the possibility that the Supreme Court may revisit its precedent.
This Court cannot reduce the applicable level of scrutiny based on a non-binding,
dissenting opinion.

22

In a similar vein, Defendant argues that Plaintiffs' content is "obscene" and therefore undeserving of First Amendment coverage. (Id. at 6). Again, this is precedent that the Supreme Court may opt to revisit, but we are bound by the current Miller framework. Miller v. California, 413 U.S. 15, 24 (1973).[3] Moreover, even if we were to abandon Miller, the law would still cover First Amendment-protected speech. H.B. 1181 does not regulate obscene content, it regulates all content that is prurient, offensive, and without value *to minors*. Because most sexual content is offensive to young minors, the law covers virtually all salacious material. This includes sexual, but non-pornographic, content posted or created by Plaintiffs. *See* (Craveiro-Romão Decl., Dkt. # 28-6, at 2; Seifert Decl., Dkt. # 28-7, at 2; Andreou Decl., Dkt. # 28-8, at 2). And it includes Plaintiffs' content that is sexually explicit and arousing, but that a jury would not consider "patently offensive" to adults, using community standards and in the context of online webpages. (Id.); *see also* United States v. Williams, 553 U.S. 285, 288 (2008); Ashcroft v. Free Speech Coal., 535 U.S. 234, 252 (2002). Unlike Ginsberg, the regulation applies regardless of whether the content is being knowingly distributed to minors. 390 U.S. at 639. Even if the Court accepted that many of Plaintiffs' videos are obscene to adults—a question of fact typically reserved for juries—the

---

[3] In particular, Miller requires that patently offensive material be so defined by the applicable state statute. Id. That cannot be the case here for H.B. 1181, which defines material only with reference to whether it is obscene for minors.

law would still regulate the substantial portion of Plaintiffs' content that is not "patently offensive" to adults.[4] Because H.B. 1181 targets protected speech, Plaintiffs can challenge its discrimination against sexual material.

Defendant also suggests that the Court consider H.B. 1181 a "time, place, and manner" restriction. (Def.'s Resp., Dkt. # 27, at 6 ("A law requiring porn sites to turn away children is no different than one that prohibits a strip club from operating next to an elementary school or allowing a 13-year-old to enter.")). Again, this seems to be inserted largely for the purposes of Supreme Court review as the notion is plainly foreclosed by <u>ACLU v. Reno</u>. There, the Supreme Court held that a law that "applies broadly to the entire universe of cyberspace" and seeks to protect children from offensive speech "is a content-based blanket restriction on speech, and, as such, cannot be 'properly analyzed as a form of time, place, and manner regulation.'" <u>ACLU v. Reno</u>, 521 U.S. at 868 (quoting <u>Renton v. Playtime Theatres</u>, 475 U.S. 41, 46 (1986)).[5] And while Defendant and amici[6]

---

[4] *See, e.g.*, <u>United States v. Cary</u>, 775 F.3d 919, 926 (7th Cir. 2015) ("[A]dult pornography, unlike child pornography, generally has First Amendment protection."); <u>Farrell v. Burke</u>, 449 F.3d 470, 497 (2d Cir. 2006) ("Pornographic materials—at least those that are not obscene—receive full First Amendment protection when in the possession of ordinary adults . . . ."); <u>United States v. Eaglin</u>, 913 F.3d 88, 99 (2d Cir. 2019) (same).

[5] It is worth further noting that H.B. 1181 does not operate like the sort of "strip club" restriction that Defendant analogizes to. It does not just regulate the virtual equivalent of strip clubs or adult DVD stores. Rather, a more apt analogy would be that H.B. 1181 forces movie theaters to catalog all movies that they show, and if at least one-third of those movies are R-rated, H.B. 1181 would require the movie theater to screen everyone at the main entrance for their 18+ identification, regardless of what movie they wanted to see. Defendant is fully entitled to seek appellate review and reconsideration of existing precedent. But the law is still broader than even those time, place, and manner restrictions.

[6] (Amicus Br., Dkt. # 29-2).

24

argue that H.B. 1181 is akin to a time, place, and manner restriction because of pornography's secondary effects, they ignore the well-established precedent that "'[r]egulations that focus on the direct impact of speech on its audience' are not properly analyzed under <u>Renton</u>." <u>Boos v. Barry</u>, 485 U.S. 312, 321 (1988); *see also* <u>ACLU v. Reno</u>, 521 U.S. at 868 (same); <u>Forsyth County v. Nationalist Movement</u>, 505 U.S. 123, 134 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation.").

Because the law regulates speech based upon the content therein, including content deserving of First Amendment protection, it must survive strict scrutiny. To endure strict scrutiny, H.B. 1181 must: (1) serve a compelling governmental interest, (2) be narrowly tailored to achieve it, and (3) be the least restrictive means of advancing it. <u>Sable Commc'ns of Cal., Inc. v. Fed. Commc'ns Comm'n</u>, 492 U.S. 115, 126 (1989).

ii.     <u>H.B. 1181 Nominally Protects a Compelling State Interest</u>

Plaintiffs concede for the purposes of this motion that Defendant's stated interest here is compelling. It is uncontested that pornography is generally inappropriate for children, and the state may regulate a minor's access to pornography. <u>Ginsberg</u>, 390 U.S. at 63. The strength of that interest alone, however, is not enough for a law to survive strict scrutiny. The state must still show

25

that H.B. 1181 is narrowly tailored and the least restrictive means of advancing that interest. It fails on both these grounds.

      D.      <u>The Statute is not Narrowly Tailored</u>

            i.      <u>The law is underinclusive</u>

Although the state defends H.B. 1181 as protecting minors, it is not tailored to this purpose. Rather, the law is severely underinclusive. When a statute is dramatically underinclusive, that is a red flag that it pursues forbidden viewpoint discrimination under false auspices, or at a minimum simply does not serve its purported purpose. *See* <u>City of Ladue v. Gilleo</u>, 512 U.S. 43, 52 (1994).

H.B. 1181 will regulate adult video companies that post sexual material to their website. But it will do little else to prevent children from accessing pornography. Search engines, for example, do not need to implement age verification, even when they are aware that someone is using their services to view pornography. H.B. 1181 § 129B.005(b). Defendant argues that the Act still protects children because they will be directed to links that require age verification. (Def.'s Resp., Dkt. # 27, at 12). This argument ignores visual search, much of which is sexually explicit or pornographic, and can be extracted from Plaintiffs' websites regardless of age verification. (Sonnier Decl., Dkt. # 31-1, at 1–2). Defendant's own expert suggests that exposure to online pornography often begins with "misspelled searches[.]" (Dines Decl., Dkt. # 27-1, at 2).

26

Even more problematic is that H.B. 1181 applies only to the subset of pornographic websites that are subject to personal jurisdiction in Texas. Indeed, Defendant implicitly concedes this when they argue that the foreign Adult Video Company Plaintiffs are not subject to jurisdiction in the United States. If foreign websites are not subject to personal jurisdiction in Texas, then H.B. 1181 will have no valid enforcement mechanism against those websites, leaving minors able to access any pornography as long as it is hosted by foreign websites with no ties to the United States.

In addition, social media companies are de facto exempted, because they likely do not distribute at least one-third sexual material. This means that certain social media sites, such as Reddit, can maintain entire communities and forums (i.e., subreddits), dedicated to posting online pornography with no regulation under H.B. 1181. (Sonnier Decl., Dkt. # 31-1, at 5). The same is true for blogs posted to Tumblr, including subdomains that only display sexually explicit content. (Id.) Likewise, Instagram and Facebook pages can show material which is sexually explicit for minors without compelled age verification. (Cole Decl., Dkt. # 5-1, at 37–40). The problem, in short, is that the law targets websites as a whole, rather than at the level of the individual page or subdomain. The result is that the law will likely have a greatly diminished effect because it fails to reduce the online

27

pornography that is most readily available to minors. (Id. at 36–38; Dines Decl., Dkt. # 27-1, at 2).

The compelled disclosures are especially underinclusive. H.B. 1181's health warnings apply to websites with one-third sexual material, but these websites will already screen out minors through age verification. By contrast, websites with less than one-third sexual material do not need to post any warning at all, even though they have no age verification requirement. The result is that a health disclaimer, ostensibly designed for minors, will be seen by adults visiting Pornhub, but not by minors visiting pornographic subreddits.

In sum, the law is severely underinclusive. It nominally attempts to prevent minors' access to pornography, but contains substantial exemptions, including material most likely to serve as a gateway to pornography use. Williams-Yulee v. Fla. Bar, 575 U.S. 433, 448–49 (2015) ("[U]nderinclusiveness can raise doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint . . . ."); Brown v. Ent. Merchants Ass'n, 564 U.S. 786, 802 (2011) ("[The] regulation is wildly underinclusive when judged against its asserted justification, which in our view is alone enough to defeat it . . . ."). The Court need not determine whether the under-inclusiveness is independently fatal at this stage. Rather, it is one of many elements of H.B. 1181 that show the law is not narrowly tailored.

ii.    The statute's sweep is unclear

The statute's tailoring is also problematic because of several key ambiguities in H.B. 1181's language. Although the Court declines to rest its holding on a vagueness challenge, those vagueness issues still speak to the statute's broad tailoring. First, the law is problematic because it refers to "minors" as a broad category, but material that is patently offensive to young minors is not necessarily offensive to 17-year-olds. As previously stated, H.B. 1181 lifts its language from the Supreme Court's holdings in Ginsberg and Miller, which remains the test for obscenity. H.B. 1181 § 129B.001; Miller, 413 U.S. at 24; Ginsberg, 390 U.S. at 633. As the Third Circuit held, "The type of material that might be considered harmful to a younger minor is vastly different—and encompasses a much greater universe of speech—than material that is harmful to a minor just shy of seventeen years old. . . ." ACLU v. Ashcroft, 322 F.3d at 268.[7] H.B. 1181 provides no guidance as to what age group should be considered for "patently offensive" material. Nor does the statute define when material may have educational, cultural, or scientific value "for minors," which will likewise vary greatly between 5-year-olds and 17-year-olds.

---

[7] H.B. 1181 is even more problematic than COPA, because it defines "minor" as all individuals under 18, while COPA set the limit at 17. See ACLU v. Reno, 521 U.S. at 865–66 (noting that CDA was problematic because it defined minors to include 17-year-olds).

Appx000918

The result of this language as applied to online webpages is that constitutionally protected speech will be chilled. A website dedicated to sex education for high school seniors, for example, may have to implement age verification measures because that material is "patently offensive" to *young* minors and lacks educational value for *young* minors. Websites for prurient R-rated movies, which likewise are inappropriate and lacking artistic value for minors under the age of 17, would need to implement age verification (and more strangely, warn visitors about the dangers of pornography).

Second, H.B. 1181 is subject to multiple interpretations as to the scope of its liability. H.B. 1181 limits its coverage to a "commercial entity that knowingly and intentionally publishes or distributes material on an Internet website, including a social media platform, more than one-third of which is sexual material harmful to minors." H.B. 1181 § 129B.002(a). But it is unclear whether "one-third" modifies "material" or "website." Does "material" refer to all content posted on a site, or does it apply to any single piece of content? By example, if a small fraction of YouTube's videos contain sexual material, does it need to verify user's ages with the State? The law's text is vague on this point, but risks enormous financial harm, including fines up to $250,000 per violation if Defendant opts for the broader

interpretation.[8] And the law offers no guidance as to how to calculate the "one-third"—whether it be the number of files, total length, or size.

Third, H.B. 1181 similarly fails to define proper age verification with sufficient meaning. The law requires sites to use "any commercially reasonable method that relies on public or private transactional data" but fails to define what "commercially reasonable" means. Id. § 129B.03(b)(2)(B). "Digital verification" is defined as "information stored on a digital network that may be accessed by a commercial entity and that serves as proof of the identify of an individual." Id. § 129B.003(a). As Plaintiffs argue, this definition is circular. In effect, the law defines "identity verification" as information that can verify an identity. Likewise, the law requires "14-point font," but text size on webpages is typically measured by pixels, not points. See Erik D. Kennedy, The Responsive Website Font Size Guidelines, Learn UI Design Blog (Aug. 7, 2021) (describing font sizes by pixels) (Dkt. # 5-1 at 52–58). Overall, because the Court finds the law unconstitutional on other grounds, it does not reach a determination on the vagueness question. But the failure to define key terms in a comprehensible way in the digital age speaks to the

---

[8] This interpretation is problematic because it is severely underinclusive. If the Attorney General adopts the narrower definition, then a website could quite easily evade the law by simply adding non-sexual material up to the point that it constitutes at least two-thirds of the site. Indeed, the cost of hosting additional content may be much lower than the costs of age verification and compelled speech. See (Compl., Dkt. # 1, at 24 (raising the possibility that "a link to all the anodyne content in the local public library" could circumvent the law)). And at that point, the law would effectively become moot, doing little to regulate adult video companies beyond forcing them to host non-sexual materials. If the Attorney General opts for the broader interpretation, then the law encounters other grave challenges by sweeping far beyond its purported effects.

lack of care to ensure that this law is narrowly tailored. *See* <u>Reno</u>, 521 U.S. at 870

("Regardless of whether the CDA is so vague that it violates the Fifth Amendment,

the many ambiguities concerning the scope of its coverage render it problematic

for purposes of the First Amendment.").

> ### iii. The law is overbroad, even under narrow constructions

Even if the Court were to adopt narrow constructions of the statute, it would

overburden the protected speech of both sexual websites and their visitors. Indeed,

Courts have routinely struck down restrictions on sexual content as improperly

tailored when they impermissibly restrict adult's access to sexual materials in the

name of protecting minors. *See, e.g.*, <u>Ex Parte Lo</u>, 424 S.W.3d 10, 23 (Tex. Crim.

App. 2013) (striking down restrictions on "grooming" as overbroad and not

narrowly tailored); <u>Garden Dist. Book Shop, Inc. v. Stewart</u>, 184 F. Supp. 3d 331,

338–40 (M.D. La. 2016) (striking down law that criminalized publication of

"material harmful to minors" under strict scrutiny); <u>Am. Booksellers Found. for</u>

<u>Free Expression v. Sullivan</u>, 799 F. Supp. 2d 1078 (D. Alaska 2011) (striking down

law that restricted dissemination of material depicting sexual activity under strict

scrutiny); <u>ACLU v. Johnson</u>, 194 F.3d 1149, 1158–60 (10th Cir. 1999)

(distinguishing <u>Ginsberg</u> and following <u>Reno</u> to find a statute criminalizing

dissemination of material harmful to minors was overbroad); <u>PSINet, Inc. v.</u>

<u>Chapman</u>, 362 F.3d 227, 234–36 (4th Cir. 2004) (same).

32

Plaintiffs are likely to succeed on their overbreadth and narrow tailoring challenge because H.B. 1181 contains provisions largely identical to those twice deemed unconstitutional in COPA. *See* <u>ACLU v. Ashcroft</u>, 322 F.3d 240 (3d Cir. 2003), *aff'd and remanded*, 542 U.S. 656 (2004); <u>ACLU v. Mukasey</u>, 534 F.3d 181 (3d Cir. 2008), *cert denied* 555 U.S. 1137 (2009).[9] COPA defined material "harmful to minors" as:

> (A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest; (B) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and (C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

*ACLU v. Mukasey*, 534 F.3d at 191 (citing 47 U.S.C. § 231(e)(6)).

By comparison, H.B. 1181 defines material "harmful to minors" as:

> (A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to or pander to the prurient interest; (B) in a manner patently

---

[9] The Supreme Court's affirmance of the Third Circuit's decision in <u>ACLU v. Ashcroft</u> focused on the type of restriction used, not whether the law was narrowly tailored. *See* <u>Ashcroft v. ACLU</u>, 542 U.S. at 665 ("[W]e decline to consider the correctness of the other arguments relied on by the Court of Appeals."). However, upon remand, the Third Circuit again held that the law was not narrowly tailored in a final decision on the merits. <u>ACLU v. Mukasey</u>, 534 F.3d at 197–98 ("[W]e are quite certain that . . . the Government has not met its burden of showing that [the law] is narrowly tailored so as to survive strict scrutiny analysis and thereby permit us to hold it constitutional."). The Supreme Court declined a petition for writ of certiorari as to the nationwide permanent injunction. Accordingly, while the ACLU discussion of narrow tailoring is not strictly binding authority, the Court affords it substantial weight.

Appx000922

offensive with respect to minors, exploits, is devoted to, or principally consists of descriptions of actual, simulated, or animated display or depiction of: (i) a person's pubic hair, anus, or genitals or the nipple of the female breast; (ii) touching, caressing, or fondling of nipples, breasts, buttocks, anuses, or genitals; or (iii) sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, excretory functions, exhibitions, or any other sexual act; and (C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

H.B. 1181 § 129B(6)(B).

The statutes are identical, save for Texas's inclusion of specific sexual offenses. Unsurprisingly, then, H.B. 1181 runs into the same narrow tailoring and overbreadth issues as COPA. In particular, the use of "for minors" and "with respect to minors" has been held overbroad in the context of internet speech. As ACLU v. Ashcroft held:

> The term "minor," as Congress has drafted it, thus applies in a literal sense to an infant, a five-year old, or a person just shy of age seventeen. In abiding by this definition, Web publishers who seek to determine whether their Web sites will run afoul of COPA cannot tell which of these "minors" should be considered in deciding the particular content of their Internet postings. Instead, they must guess at which minor should be considered in determining whether the content of their Web site has "serious ... value for [those] minors." 47 U.S.C. § 231(e)(6)(C). Likewise, if they try to comply with COPA's "harmful to minors" definition, they must guess at the potential audience of minors and their ages so that the publishers can refrain from posting material that will trigger the prurient interest, or be patently offensive with respect to those minors who may be deemed to have such interests.

34

322 F.3d at 254.

Despite this decades-long precedent, Texas includes the exact same drafting language previously held unconstitutional. H.B. 1181 only exempts sexual material that "taken as a whole, lacks serious literary, artistic, political, or scientific value for minors." H.B. 1181 § 129B.001(6)(C). Material that is sexual will likely satisfy H.B. 1181's test, because it is inappropriate for minors, even though it is not obscene for adults. Any prurient material risks being regulated, because it will likely be offensive to minors and lack artistic or scientific value to them. Although this may be permissible when someone knowingly sells material to a minor, such as in Ginsberg, it is constitutionally problematic applied to online speech, where the speech is necessarily broadcast widely. *See* ACLU v. Ashcroft, 535 U.S. at 568; Am. Booksellers Found. for Free Expression v. Sullivan, 799 F. Supp. 2d 1078, 1082 (D. Al. 2011) (noting an online statute is "dramatically different" from another statute that "applies only to personally directed communication between an adult and a person that the adult knows or should know is a minor."); Ent. Software Ass'n, 469 F.3d at 649–50 (noting that "a number of statutes have been found unconstitutional that included the Miller language or some hybrid of Miller and Ginsberg" in the context of restrictions on material for minors).

Defendant argues that its language is permissible because the Supreme Court in Sable allowed the government to protect minors from non-obscene material.

35

(Def.'s Resp., Dkt. # 27, at 17 (citing <u>Sable Commun. of California, Inc.</u>, 492 U.S. at 126)). Defendant stretches the holding of <u>Sable</u> too far. While <u>Sable</u> upheld the government's interest in "shielding minors from the influence of literature that is not obscene by adult standards," it still noted that those restrictions must survive strict scrutiny. <u>Sable</u>, 492 U.S. at 126. Nothing in <u>Sable</u> or Defendant's response differentiates this analysis or restricts the broad scope of H.B. 1181. Moreover, in the <u>ACLU</u> decisions, the Third Circuit found that the addition of "for minors" was constitutionally problematic because it chills substantial speech for adults based on whether it is inappropriate for minors. 322 F.3d at 266–71; 534 F.3d at 190–93, 205–07. And the Supreme Court reaffirmed in <u>Reno v. ACLU</u> that the government may not "reduce the adult population to only what is fit for children." 521 U.S. 875 (cleaned up) (quoting <u>Denver Area Ed. Telecommunications Consortium, Inc. v. FCC</u>, 518 U.S. 727, 759 (1996)).

Accordingly, the <u>ACLU</u> decisions control here. The law sweeps far beyond obscene material and includes all content offensive to minors, while failing to exempt material that has cultural, scientific, or educational value to adults only. At the same time, the law allows other websites to show and display explicit material,

36

as long as they have two-thirds non-obscene content. The result is that H.B. 1181's age verification is not narrowly tailored and fails strict scrutiny.[10]

E.     H.B. 1181 is Overly Restrictive

To endure strict scrutiny, a statute must employ the least restrictive means of protecting minors. Reno, 521 U.S. at 874 ("That burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve."). The government bears the burden to show that less restrictive means would not be as effective. Ashcroft v. ACLU, 542 U.S. at 669. Again, because H.B. 1181 substantially restricts adults' protected speech, it is not sufficiently tailored. Nonetheless, the Court also finds that the age verification enforcement mechanism is overly restrictive.

i.     Compelled verification chills protected speech

Like the narrow tailoring, this issue has been addressed by the Third Circuit and Supreme Court regarding COPA. In particular, whereas the Supreme Court did

---

[10] Plaintiffs also ask the Court to hold that H.B. 1181 is unconstitutionally overbroad. In general, "[t]he overbreadth doctrine is strong medicine" that should be employed "only as a last resort." Los Angeles Police Dept. v. United Reporting Pub. Corp., 528 U.S. 32, 39 (1999). Plaintiffs have standing to challenge H.B. 1181 under strict scrutiny. The law is unconstitutional as it regulates Plaintiffs' websites because it discriminates broadly and uses restrictive means to do so. Plaintiffs' websites are the target of the H.B. 1181, which cannot constitutionally regulate their sites. It necessarily follows, then, that "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." United States v. Stevens, 559 U.S. 460, 473 (2010); Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 HARV. L. REV. 1321, 1344–48. (2000) (suggesting that certain doctrinal tests logically lead to the conclusion that a statute is facially invalid). It is the structure of the law, and not its application to any particular Plaintiff, that renders it unconstitutional.

not discuss COPA's overbreadth, its did discuss less restrictive means, making it binding precedent. Id. at 666–73. As the district court found, and the Supreme Court affirmed, "Blocking and filtering software is an alternative that is less restrictive than COPA, and, in addition, likely more effective as a means of restricting children's access to materials harmful to them." Id. The Court elaborated that filtering software is less restrictive because "adults without children may gain access to speech they have a right to see without having to identify themselves or provide their credit card information. Even adults with children may obtain access to the same speech on the same terms simply by turning off the filter on their home computers." Id. at 667.

Defendant argues that Ashcroft v. ACLU's analysis no longer applies because it was based on the evidentiary record made by the district court in 1999, which is not applicable to the instant case and of limited relevance to modern internet usage. (Def.'s Resp., Dkt. # 27, at 8–12). As Defendant argues, H.B. 1181 uses more secure information, requires companies to delete their data, and is designed for convenience and privacy protection. (Id. at 11). The Court does not dispute that online interactions have changed since the Supreme Court's decisions in 1997 and 2004. See Reno v. ACLU, 521 U.S.; Ashcroft v. ACLU, 542 U.S. But as determined by the facts on the record and presented at the hearing, age verification laws remain overly restrictive. Despite changes to the internet in the

38

past two decades, the Court comes to the same conclusion regarding the efficacy and intrusiveness of age verification as the <u>ACLU</u> courts did in the early 2000s.

First, the restriction is constitutionally problematic because it deters adults' access to legal sexually explicit material, far beyond the interest of protecting minors. The Third Circuit's holding regarding COPA applies equally to H.B. 1181:

> "[The law] will likely deter many adults from accessing restricted content because they are unwilling to provide identification information in order to gain access to content, especially where the information they wish to access is sensitive or controversial. People may fear to transmit their personal information, and may also fear that their personal, identifying information will be collected and stored in the records of various Web sites or providers of adult identification numbers."

<u>ACLU v. Ashcroft</u>, 322 F.3d at 259.[11]

Indeed, as the Third Circuit noted, the "Supreme Court has disapproved of content-based restrictions that require recipients to identify themselves affirmatively before being granted access to disfavored speech . . . ." <u>Id.</u> (collecting cases). The same is true here—adults must affirmatively identify themselves before accessing controversial material, chilling them from accessing that speech. Whatever changes have been made to the internet since 2004, these privacy concerns have not gone away, and indeed have amplified.

---

[11] If anything, the language from <u>ACLU v. Ashcroft</u> is more relevant to today than it was when it was written, given the ubiquity of modern technology.

Privacy is an especially important concern under H.B. 1181, because the government is not required to delete data regarding access, and one of the two permissible mechanisms of age-verification is through government ID. People will be particularly concerned about accessing controversial speech when the state government can log and track that access. By verifying information through government identification, the law will allow the government to peer into the most intimate and personal aspects of people's lives. It runs the risk that the state can monitor when an adult views sexually explicit materials and what kind of websites they visit. In effect, the law risks forcing individuals to divulge specific details of their sexuality to the state government to gain access to certain speech. Such restrictions have a substantial chilling effect. _See_ Denver Area Educ. Telecomm. Consortium, Inc., 518 U.S. at 754 ("[T]he written notice requirement will further restrict viewing by subscribers who fear for their reputations should the operator, advertently or inadvertently, disclose the list of those who wish to watch the patently offensive channel.").

The deterrence is particularly acute because access to sexual material can reveal intimate desires and preferences. No more than two decades ago, Texas sought to criminalize two men seeking to have sex in the privacy of a bedroom. Lawrence v. Texas, 539 U.S. 558 (2003). To this date, Texas has not repealed its

law criminalizing sodomy. [12] Given Texas's ongoing criminalization of homosexual intercourse, it is apparent that people who wish to view homosexual material will be profoundly chilled from doing so if they must first affirmatively identify themselves to the state.[13]

Defendant contests this, arguing that the chilling effect will be limited by age verification's ease and deletion of information. This argument, however, assumes that consumers will (1) know that their data is required to be deleted and (2) trust that companies will actually delete it. Both premises are dubious, and so the speech will be chilled whether or not the deletion occurs. In short, it is the deterrence that creates the injury, not the actual retention. Moreover, while the commercial entities (e.g., Plaintiffs) are required to delete the data, that is not true for the data in transmission. In short, any intermediary between the commercial websites and the third-party verifiers will not be required to delete the identifying data.

Even beyond the capacity for state monitoring, the First Amendment injury is exacerbated by the risk of inadvertent disclosures, leaks, or hacks. Indeed, the State of Louisiana passed a highly similar bill to H.B. 1181 shortly before a vendor

---

[12] The attorney general has explicitly taken the position that state laws remain in place even when held unconstitutional. Fund Texas Choice v. Paxton, 1:22-CV-859-RP (W.D. Tex. filed Aug. 24, 2022) (Def.'s Resp., Dkt. # 33, at 28 (citing Pidgeon v. Turner, 538 S.W.3d 73, 88 n.21 (Tex. 2017)).

[13] See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 756 (1976) ("[T]he protection afforded [by the First Amendment] is to the communication, to its source and to its recipients both.").

41

for its Office of Motor Vehicles was breached by a cyberattack. In a related challenge to a similar law, Louisiana argues that age-verification users were not identified, but this misses the point. *See* Free Speech Coalition v. Leblanc, No. 2:23-cv-2123 (E.D. La. filed June 20, 2023) (Defs.' Resp., Dkt. # 18, at 10). The First Amendment injury does not just occur if the Texas or Louisiana DMV (or a third-party site) is breached. Rather, the injury occurs because individuals know the information is at risk. Private information, including online sexual activity, can be particularly valuable because users may be more willing to pay to keep that information private, compared to other identifying information. (Compl. Dkt. # 1, at 17); Kim Zetter, *Hackers Finally Post Stolen Ashley Madison Data*, Wired, Aug. 18, 2015, https://www.wired.com/2015/08/happened-hackers-posted-stolen-ashley-madison-data (discussing Ashley Madison data breach and hackers' threat to "release all customer records, including profiles with all the customers' secret sexual fantasies and matching credit card transactions, real names and addresses."). It is the threat of a leak that causes the First Amendment injury, regardless of whether a leak ends up occurring.

In short, while the internet has changed since 2004, privacy concerns have not. Defendant offers its digital verification as more secure and convenient than the ones struck down in COPA and the CDA. This simply does not match the evidence and declarations supported in the parties' briefing. Users today are more cognizant

of privacy concerns, data breaches have become more high-profile, and data related to users' sexual activity is more likely to be targeted. (Sonnier Decl., Dkt. #5-2, at 44–56; Allen Decl., Dkt. # 27-4, at 4–5). The risks of compelled digital verification are just as large, if not greater, than those in ACLU v. Ashcroft. 322 F.3d at 259.

### ii.    Less restrictive alternatives are available

Plaintiffs offer several alternatives that would target minor's access to pornography with fewer burdens on adults' access to protected sexually explicit materials. First, the government could use internet service providers, or ISPs, to block adult content until the adults opt-out of the block. This prevents the repeated submission of identifying information to a third party, and operating at a higher level, would not need to reveal the specific websites visited. If implemented on a device-level, sexual information would be allowed for adults' devices but not for children when connected to home internet.

In addition, Plaintiffs propose adult controls on children's devices, many of which already exist and can be readily set up. This "content filtering" is effectively the modern version of "blocking and filtering software" that the Supreme Court proposed as a viable alternative in Ashcroft v. ACLU. 542 U.S. at 666–73. Blocking and filtering software is less restrictive because adults may access information without having to identify themselves. And the Court agreed with the

finding that "filters are more effective than age-verification requirements." <u>Id.</u> at

667. Nor is this cabined to the early 2000s—a 2016 district court in Louisiana

likewise expressed a preference for blocking and filtering over age verification.

<u>Garden Dist. Book Shop, Inc.</u>, 184 F. Supp. 3d at 339.

(a) <u>Defendant's expert highlights alternatives that H.B. 1181</u>

<u>does not allow</u>

Defendant's own expert shows how H.B. 1181 is unreasonably intrusive in

its use of age verification. Tony Allen, a digital technology expert who submitted a

declaration on behalf of Defendant, suggests several ways that age-verification can

be less restrictive and costly than other measures. (Allen Decl., Dkt. # 26-6). For

example, he notes that age verification can be easy because websites can track if

someone is already verified, so that they do not have to constantly prove

verification when someone visits the page. But H.B. 1181 contains no such

exception, and on its face, appears to require age verification for each visit. H.B.

1181 § 129B.003. Commercial age verification systems must use "public or private

transactional data" which by its definition includes "records from mortgage,

education, and employment entities" but does include third-party verification. <u>Id.</u> §

129B.001. The same goes for Allen's discussion of "vouching"—where age is

verified based on others' credibility. (Allen Decl., Dkt. # 26-6, at 12). H.B. 1181

44

does not appear to allow for vouching because it is not based on transactional data. H.B. 1181 § 129B.003.

Similarly, Allen discusses how websites may check age using age estimation based on a user's voice or face. (Allen Decl., Dkt. # 26-6, at 8, 10–12). But it is not clear that "transactional" data includes biometric verification. H.B. 1181 § 129B.003. Allen also suggests digital identity apps can make the process easier, but then acknowledges that "Texas does not yet have a state issued digital identification card or app." (Id. at 9). In short, Allen identifies multiple ways that age verification can be less intrusive on users and websites. But H.B. 1181 does not allow these methods.

(b) Defendant's scientific research emphasizes the benefits of parental-led content filtering

Beyond Defendant's technical expert, one of their medical surveys also suggests that content filtering can be effective compared to legal bans. The position, taken from a literature review of medical research on children's access to online sexual material, is worth quoting at length:

> In order to contain the risk of inadvertent exposure for children, some technical measures may be adopted by websites, social networks, Internet search engines and Internet providers. **Most search engines offer options for safe browsing and are able to block pop-up ads, which are one of the most prominent causes of unintended exposition to age-inappropriate content**. However, **many authors agree that despite the existence of legal**

45

**bans for minors' use of adult sites and the implementation of these measures, it is concretely extremely difficult to block access**. Although the web is indeed the major source of pornographic material, the problem can hardly be solved by simply adopting technical limitations. Instead, its deep social roots stress the importance of education and communication with parents, teachers and healthcare professionals.

The literature divides strategies of parental approach in mainly two categories: restrictive mediation and active mediation. Restrictive mediation mostly consists of defining rules about the use of Internet in terms of timing, setting and type of online activity, and possibly making use of the aforementioned technical aids. Active mediation, on the contrary, requires a sharper awareness from parents who qualify themselves as promoters of a safe and responsible use of Internet. This kind of mediation seems to be favoured by Italian parents (56%) and mostly chosen when dealing with younger boys and girls. **These mediation strategies have been shown their effectiveness in contrasting the use of [sexually explicit material], and many studies confirm that careful parental control and supervision remain key protective factors**.

(Def.'s Resp., Dkt. # 27-2, at 9–10 (citing Niccolò Principi, et al., *Consumption of sexually explicit internet material and its effects on minors' health: latest evidence from the literature*,74 Minerva Pediatr., 332 (June 2022) ("Principi Article") (internal citations omitted) (emphasis added)).

In short, Defendant's own study suggests several ways that H.B. 1181 is flawed. As the study points out, pop-up ads, not pornographic websites, are the most common forms of sexual material encountered by adolescents. The study also

confirms that blocking pornographic websites and material altogether is extremely difficult to accomplish through "legal bans." And most crucially, the study highlights the importance of content filtering alongside parental intervention as the most effective method of limiting any harm to minors. Defendant cannot claim that age-verification is narrowly tailored when one of their own key studies suggests that parental-led content-filtering is a more effective alternative.

(c) Content filtering is more tailored to sexual material than age verification

Content-filtering also helps address the under-inclusivity issue. At the hearing, Defendant argued that if H.B. 1181 covered more websites, such as search engines, then Plaintiffs would instead argue that it is overbroad. The point is well-taken, but it misses a crucial aspect: the law would be overbroad because age verification is a broad method of enforcement. Under H.B. 1181, age verification works by requiring a user's age at a website's landing page. This forces Texas (and other states) to choose some broad threshold (e.g., one-third) for what percentage of a website must be sexual before requiring age verification. But this is not true for content filtering, which applies to the material on a webpage, not just the site as a whole. So users can browse Reddit, but will be screened from the sexual material within the site by the content filter. (Sonnier Decl., Dkt. # 31-1, at 3–4). Similarly, a user can search Google, but not encounter pornographic images. (Id.) This is the

47

definition of tailoring: content filtering, as opposed to age verification, can more precisely screen out sexual content for minors without limiting access to other speech.

Content filtering is especially tailored because parents can choose the level of access. In other words, parents with an 8-year-old can filter out content inappropriate for an 8-year-old, while parents with a 17-year-old can filter out content inappropriate for a 17-year-old. Using age verification, a 17-year-old will be denied access to material simply because it might be inappropriate for a young minor. Content filtering, by contrast, allows for much more precise restrictions within age groups.

In general, content filtering also comports with the notion that parents, not the government, should make key decisions on how to raise their children. *See* United States v. Playboy Ent. Grp., Inc., 529 U.S. 803, 824–25 (2000) ("A court should not assume a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act."). Likewise, even as it upheld obscenity laws, Ginsberg affirmed that "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." 390 U.S. at 639.

Content filtering allows parents to determine the level of access that their children should have, and it encourages those parents to have discussions with their children regarding safe online browsing. As the Principi article notes, it is this combination that is most effective for preventing unwanted exposure to online pornography. (Principi article, Dkt. # 27-2, at 9–10). Age verification, by contrast, places little to no control in the hands of parents and caretakers.[14] Thus, content filtering keeps the "parents' claim to authority in their own household to direct the rearing of their children . . . ." Id.: *see also* Brown, 564 U.S. at 832–35 (2011) (detailing the Founding Era's attitudes towards raising children and noting that the "history clearly shows a founding generation that believed parents to have complete authority over their minor children and expected parents to direct the development of those children.") (Thomas, J., dissenting).

(d) Content filtering is less burdensome and more effective

Again, changes to the internet since 2003 have made age verification more—not less—cumbersome than alternatives. Parental controls are commonplace on devices. They require little effort to set up and are far less restrictive because they do not target adults' devices.

---

[14] Parents may only allow access through age verification by providing their ID or credentials to a minor. This is unlikely in light of the obvious awkwardness of a teenager asking their parents' permission each time they wish to view sexual content.

Moreover, content filtering is likely to be more effective because it will place a more comprehensive ban on pornography compared to geography-based age restrictions, which can be circumvented through a virtual private network ("VPN") or a browser using Tor. Adult controls, by contrast, typically prevent VPNs (or Tor-capable browsers) from being installed on devices in the first place. (*See* Sonnier Decl., Dkt. # 31-1, at 3–4). And minors who wish to access pornography are more likely to know how to use Tor or VPNs. (Sonnier Decl., Dkt. # 5-1, at 45).

In addition, content filtering blocks out pornography from foreign websites, while age verification is only effective as far as the state's jurisdiction can reach. This is particularly troublesome for Texas because, based on the parties here alone, foreign websites constitute some of the largest online pornographic websites globally. If they are not subject to personal jurisdiction in the state, they will have no legal obligation to comply with the H.B. 1181. Age verification is thus limited to Texas's jurisdictional reach. Content filtering, by contrast, works at the device level and does not depend on any material's country of origin.

Defendant disputes the effects of content filtering and argues that it is only as effective as the caretakers' ability to implement it. But even as Defendant's technical expert noted at the hearing, content filtering is designed for parents and caretakers to be easy to use in a family. The technical knowledge required to

implement content-filtering is quite basic, and usually requires only a few steps. (Sonnier Decl., Dkt. # 31-1, at 3–4; Dkt. # 5-2, at 15–17). And the legislature made no findings regarding difficulty of use when it passed the law.

At the hearing, Defendant's expert repeatedly emphasized that parents often fail to implement parental controls on minors' devices. But Defendant has not pointed to any measures Texas has taken to educate parents about content filtering. And more problematically, the argument disregards the steps Texas *could* take to ensure content filtering's use, including incentives for its use or civil penalties for parents or caretakers who refuse to implement the tool. Indeed, draft bills of H.B. 1181 included such a measure, but it was abandoned without discussion. (Pls.' Reply, Dkt. # 31, at 7). In <u>Ashcroft v. ACLU</u>, the Supreme Court gave this precise argument "little weight," noting that the government has ample means of encouraging content filtering's use. 542 U.S. at 669–70. In short, Texas cannot show that content filtering would be ineffective when it has detailed no efforts to promote its use.

### (e) <u>Texas has not met its burden</u>

In sum, Plaintiffs have shown that content filtering offers a more tailored, less restrictive method of ensuring that minors do not access adult sexual content. This finding is not surprising, because Defendant offers zero evidence that the legislature even considered the law's tailoring or made any effort whatsoever to

51

choose the least-restrictive measure. To satisfy strict scrutiny, Texas must provide evidence supporting the Legislature's judgments. *See* <u>Turner Broad. Sys., Inc. v. F.C.C.</u>, 520 U.S. 180, 195–96 (1997). This is Texas's burden to meet—not Plaintiffs'. <u>Reed v. Town of Gilbert, Ariz.</u>, 576 U.S. 155, 171 (2015). But it is virtually impossible for Texas to make this showing when the Legislature did not consider the issue at all. *See, e.g.*, <u>Ass'n of Club Executives of Dallas, Inc. v. City of Dallas, Texas</u>, 604 F. Supp. 3d 414, 426 (N.D. Tex. 2022) ("[N]o evidence was presented that the City considered less restrictive means of achieving its stated interest"); <u>Brewer v. City of Albuquerque</u>, 18 F.4th 1205, 1255 (10th Cir. 2021) ("[W]hile such a less-restrictive-means analysis need not entail the government affirmatively proving that it tried less-restrictive mean . . . it does entail the government giving serious consideration to such less-restrictive means before opting for a particular regulation."). The state cannot show that it made *any* analysis as to the differences between age verification and content filtering, despite established Supreme Court precedent favoring the latter. <u>Ashcroft v. ACLU</u>, 542 U.S. at 668. The complete failure of the legislature to consider less-restrictive alternatives is fatal at the preliminary injunction stage.

Based on the evidence in the parties' briefing, declarations, and hearing testimony, it is clear that age verification is considerably more intrusive while less

effective than other alternatives. For that reason, it does not withstand strict scrutiny.

    F.    <u>H.B. 1181 Unconstitutionally Compels Speech</u>

    There is no doubt that H.B. 1181 forces the adult video companies into compelled speech. The law requires that they post three disclaimers, calling pornography "potentially biologically addictive [and] proven to harm human brain development" among other purported neurological issues. H.B. 1181 § 129B.004(1). The sites must also state, "Exposure to this content is associated with low self-esteem and body image, eating disorders, impaired brain development, and other emotional and mental illnesses." <u>Id.</u> It must also state, "Pornography increases the demand for prostitution, child exploitation, and child pornography." <u>Id.</u> Finally, sites must provide the number of a national mental health illness hotline. <u>Id.</u>

    This is compelled speech. The government is forcing commercial sites to speak and broadcast a proposition that they disagree with. The Supreme Court has "held time and again that freedom of speech includes both the right to speak freely and the right to refrain from speaking at all." <u>Janus</u>, 138 S. Ct. at 2463 (collecting cases) (quotations omitted). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command . . . ." <u>Id.</u>; *see also* <u>Nat'l Inst. of Fam. & Life Advocs. v. Becerra</u>, 138 S. Ct. 2361, 2371 (2018)

53

("NIFLA"). Even if, as Defendant argues, the law compels only commercial

speech, it does not pass constitutional muster.

      i.     <u>Strict Scrutiny Applies to the Disclosures</u>

         (a) <u>The law targets speech by its content, not its commercial</u>
            <u>nature</u>

Although H.B. 1181 targets for-profit websites, the speech it regulates is

likely non-commercial. First, H.B. 1181's compelled disclosures are content-based,

regardless of whether they regulate commercial activity. *See* <u>Cincinnati v.</u>

<u>Discovery Network</u>, 507 U.S. 410, 429–30 (1993) ("It is the absence of a neutral

justification . . . that prevents the city from defending its [] policy as content

neutral."); <u>Sorrell v. IMS Health Inc.</u>, 564 U.S. 552, 565 (2011) ("Government's

content-based burdens must satisfy the same rigorous scrutiny as its content-based

bans. . . . Commercial speech is no exception."); <u>Intl. Outdoor, Inc. v. City of Troy,</u>

<u>Michigan</u>, 974 F.3d 690, 706 (6th Cir. 2020) (applying strict scrutiny standard to

content-based commercial regulations); <u>Reed</u>, 576 U.S. at 166 ("Because strict

scrutiny applies either when a law is content based on its face or when the purpose

and justification for the law are content based, a court must evaluate each question

before it concludes that the law is content neutral and thus subject to a lower level

of scrutiny."). H.B. 1181 targets speech based upon the "subject matter [and] its

content." <u>Reed</u>, 576 U.S. at 163. Speakers who promote the regulated subject

54

matter must then place disclosures on their advertisements and landing pages. The threshold inquiry examines the content of a website, not whether something is an advertisement. H.B. 1181 cannot have effect without reference to content. Therefore, because the law targets speech based on its content, it is subject to strict scrutiny. Discovery Network, 507 U.S. at 429–30; Reed, 576 U.S. at 166.

Separately, the regulation is also content-based under the logic of NIFLA. The heath disclosure notice "compel[s] individuals to speak a particular message" and "such notices alter the content of their speech." NIFLA, 138 S. Ct. at 2371 (cleaned up). As in NIFLA, individuals must "provide a government-drafted script" regarding the controversial effects of pornography, "as well as contact information" for mental health services. Id. And just like NIFLA, the speakers must provide information that is "devoted to opposing" the speaker's actual preferred message. Id. Because the compelled disclosure alters the content of Plaintiffs' speech, H.B 1181 is content-based under NIFLA.[15] The logic of NIFLA demands that the law be subject to strict scrutiny.

(b) The proposed targets are not commercial transactions

Even setting aside Discovery Network and Reed, H.B. 1181 does not regulate commercial transactions related to speech. "[T]he core notion of commercial speech [is] speech which does no more than propose a commercial

---

[15] This applies even if, as Defendant argues, Plaintiffs produce only obscene material.

transaction." <u>Bolger v. Youngs Drug Prod. Corp.</u>, 463 U.S. 60, 66 (1983) (cleaned up). Alternatively, speech may be commercial if it constitutes "expression related solely to the economic interests of the speaker and its audience." <u>Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York</u>, 447 U.S. 557, 561 (1980). Unlike cigarettes, lightbulbs, or food content, where compelled disclosures have been upheld, sexual material is not a fungible consumer good. Rather, "[s]exual expression which is indecent but not obscene is protected by the First Amendment." <u>ACLU v. Reno</u>, 521 U.S. at 875. At the outset, then, doctrines surrounding commercial speech disclosures likely do not apply, because the law regulates First Amendment-protected activity beyond "propos[ing] a commercial transaction." And while performers may earn money on sexual expression, they do not have a "sole" economic interest in that performance.

<u>Volokh v. James</u> is helpful. 22-CV-10195 (ALC), 2023 WL 1991435, at *7–8 (S.D.N.Y. Feb. 14, 2023). There, the court dealt with a requirement that certain online platforms create a mechanism to file complaints about "hateful speech" and disclose the policy for dealing with the complaints. <u>Id.</u> at *1–2. The court found that the disclosures did not constitute commercial speech because "the policy requirement compels a social media network to speak about the range of protected speech it will allow its users to engage (or not engage) in." <u>Id.</u> at 7. The court noted that "lodestars in deciding what level of scrutiny to apply to a compelled statement

56

must be the nature of the speech taken as a whole and the effect of the compelled statement thereon." Id. at *8 (citing Riley, 487 U.S. at 796). "Where speech is 'inextricably intertwined with otherwise fully protected speech, it does not retain any of its potential commercial character.'" Id. Like Volokh, the law targets protected speech based on its content outside of commercial applications. The lessened commercial speech standard does not apply.

Defendant argues that the speech is commercial because the landing pages for the paid subscription sites "is nothing more than a place to click and then follow a prompt to enter your payment information . . . ." (Def.'s Resp., Dkt. # 27, at 16). Again, this ignores the content-based nature of the regulation in the first place. But even setting that aside, the argument is dubious. First, existing subscribers will have already paid, so the "proposed commercial transaction" will only apply to new visitors. For returning subscribers, the page is not proposing a transaction. Second, by way of example, several newspapers offer landing pages (or paywalls) that force visitors to purchase a subscription before reading an article. Yet it is doubtful that these websites would have diminished First Amendment rights as a result.[16] It is the content the websites offer, and not the existence of a paywall, that should determine its commercial nature, because paid

---

[16] Similarly, it is doubtful that the government could regulate shrink-wrapped books in a bookstore differently than others because those books require a transaction before accessing the content therein.

Appx000946

access that makes speech commercially viable is "inextricably intertwined" with the speech itself. <u>Riley</u>, 487 U.S. at 796.

Defendant is on slightly stronger footing as to the requirements for advertisements, but the Court still finds them to be inextricably intertwined with non-commercial speech. Plainly, the advertisements by themselves are commercial, to the extent they link to paid-subscription websites, because they propose a transaction. Under <u>Bolger</u>, courts should examine (1) an advertising format, (2) reference to a specific product, and (3) economic motivation for publication. <u>Bolger v. Youngs Drug Prods. Corp.</u>, 463 U.S. 60, 66 (1983).

Setting aside the content-based nature of H.B. 1181 as a whole, the advertisements likely constitute commercial speech, even when those advertisements relate to protected speech. <u>Id.</u> at 66. Plainly, they meet the first and third criteria of <u>Bolger</u>. However, it is a close call whether those advertisements are inextricably intertwined with protected speech. *See* <u>Dex Media W., Inc. v. City of Seattle</u>, 696 F.3d 952, 958 (9th Cir. 2012) ("[T]he inextricably intertwined test operates as a narrow exception to the general principle that speech meeting the <u>Bolger</u> factors will be treated as commercial speech."); <u>Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore</u>, 879 F.3d 101, 108–09 (4th Cir. 2018). Assuming that the law is not content based as a whole, the compelled disclosures are likely commercial as applied to advertising. However,

58

the difficulty regarding the "inextricably intertwined" standard shows why the compelled disclosures must be considered content-based at the outset. To ignore the content-based nature of the regulation overall would be to allow the government to regulate disfavored speech with less scrutiny, so long as the government only targets the commercial aspects of that speech. Nonetheless, because Defendant considers the disclosures commercial speech, the Court will also analyze them under commercial speech precedent.

###### ii.   The compelled disclosures do not survive strict scrutiny

Assuming that strict scrutiny applies, the compelled disclosures do not pass constitutional muster. Under strict scrutiny, the law must be narrowly tailored to serve a compelling government interest. *See, e.g.*, Playboy Entm't Grp., Inc., 529 U.S.at 813 (2000). As previously stated, the state has a compelling interest in preventing minors from accessing pornography. However, for many reasons, the disclosures are not narrowly tailored. First, and most critically, the disclosures do not target a minor's access to pornography because a minor will be screened out by the age-verification mechanism. Assuming age-verification works, minors will not be able to access the content on pornographic websites. As a result, the law targets the group *outside* the state's interest (i.e., adults who wish to view legal explicit

59

materials).[17] A law cannot be narrowly tailored to the state's interest when it targets the group exactly outside of the government's stated interest.

More generally, the state has not met its burden that the disclosures are narrowly tailored in general. They require large fonts, multiple warnings, and phone numbers to mental health helplines. But the state provides virtually no evidence that this is an effective method to combat children's access to sexual material. The messages themselves do not mention health effects on minors. And the language requires a relatively high reading level, such as "potentially biologically addictive," "desensitizes brain development," and "increases conditioned responses." H.B. 1181 § 129B.004. Quite plainly, these are not disclosures that most minors would understand. Moreover, the disclosures are restrictive, impinging on the website's First Amendment expression by forcing them to speak government messages that have not been shown to reduce or deter minors' access to pornography. *See* 303 Creative LLC v. Elenis, 143 S. Ct. 2298, 2312 (2023) ("[T]he government may not compel a person to speak its own preferred messages."). Under strict scrutiny, the disclosures do not survive.

     iii.    H.B. 1181 Fails as a Commercial Speech Regulation

---

[17] The state has not argued a compelling interest in preventing *adults* from accessing pornography. Indeed, Defendant argues that the law is permissible precisely because it *does not* restrict adult access. (Def.'s Resp., Dkt. # 27, at 13).

60

### (a) The regulations do not directly advance a substantial government interest

Even using commercial speech standards, the disclosures do not pass muster. For a commercial speech regulation to survive, it must directly advance a substantial government interest and be narrowly tailored so as not to be more extensive than necessary. Cent. Hudson, 447 U.S. at 566. For the same reasons that the law fails strict scrutiny, it fails the more relaxed commercial speech standard. Although the compelled disclosures apply almost exclusively to adults, the state claims its interest is in "protecting children from porn." (Def.'s Resp., Dkt. # 27, at 16). This is not "directly advancing" the interest because only adults can access the material on websites that post this warning. Moreover, the disclosures are plainly more excessive than necessary, requiring the parties to post in all caps, three times, "TEXAS HEALTH AND HUMAN SERVICES WARNING." H.B. 1181 § 129.B.004. And, as discussed below, the disclosures state scientific findings as a matter of fact, when in reality, they range from heavily contested to unsupported by the evidence. See infra, Section III.F.iii.b.

In its response, the state does not assert an interest in protecting *adults* from non-obscene pornography, who will be the actual target of the messages. It is likely that this interest would not be substantial or permissible. The mere fact that non-obscene pornography greatly offends some adults does not justify its restriction to

Appx000950

all adults. *See* <u>Carey v. Population Services Int'l</u>, 431 U.S. 678, 701 (1977)

("[W]here obscenity is not involved, we have consistently held that the fact that

protected speech may be offensive to some does not justify its suppression.");

<u>Matal v. Tam</u>, 582 U.S. 218, 243–44 ("Giving offense is a viewpoint. We have said

time and time again that the public expression of ideas may not be prohibited

merely because the ideas are themselves offensive to some of their hearers.")

(cleaned up); *see also* Robert C. Post, *Cultural Heterogeneity and Law:*

*Pornography, Blasphemy, and the First Amendment,* 76 Cal. L. Rev. 297, 325–26

(1988) ("[T]he government would acquire enormous and intolerable powers of

censorship if it were to be given the authority to penalize any speech that would

tend to induce in an audience disagreeable attitudinal changes with respect to

future conduct.").

    This applies equally to commercial speech. <u>C. Hudson</u>, 447 U.S. at 578 ("No

differences between commercial speech and other protected speech justify

suppression of commercial speech in order to influence public conduct through

manipulation of the availability of information.") (Blackmun, J., concurring);

<u>Zauderer v. Off. of Disc. Counsel of S. Ct. of Ohio</u>, 471 U.S. 626, 651 (1985)

(differentiating government regulations meant to protect consumers from those that

seek to "prescribe what shall be orthodox in politics, nationalism, religion, or other

62

matters of opinion") (quoting W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943)).

In short, if the interest is in protecting children, then it may arguably be substantial, but it is advanced indirectly. If the interest is in changing adults' attitudes on porn and sexuality, then the state cannot claim a valid, substantial interest. Either way, the compelled messages fail under Central Hudson.

(b) Zauderer does not apply

Defendant argues that H.B. 1181 regulates commercial speech in a manner that is "truthful, non-misleading, and [requires] relevant disclosures" and is therefore constitutional. (Def.'s Resp., Dkt. # 27, at 13 (citing Texas Med. Providers Performing Abortion Servs. v. Lakey, 667 F.3d 570, 577 (5th Cir. 2012)). But Texas Med. Providers dealt with speech regarding abortion, and the case adopted its language from since-overruled abortion precedent regarding "undue burdens." Texas Med. Providers, 667 F.3d at 577 (citing Planned Parenthood of S.E. Pennsylvania v. Casey, 505 U.S. 833 (1992), *overruled by* Dobbs v. Jackson Women's Health Org., 142 S. Ct. 2228 (2022)). It does not apply to other forms of commercial speech. Instead, the relaxed standard for certain compelled disclosures applies if they contain "purely factual and uncontroversial information." Zauderer, 471 U.S. at 651. If the information is "purely factual and uncontroversial," the government must only show that the compelled disclosures reasonably relate to a

63

substantial government interest and are not "unjustified or unduly burdensome."
Id.

At the initial stage, H.B. 1181 still fails, because the government lacks a substantial interest that reasonably relates to the regulation. It is unreasonable to warn *adults* about the dangers of legal pornography in order to protect *minors*. But even assuming this was a cognizable interest, Zauderer would still not apply. First, H.B. 1181's messages are unduly burdensome. The requirement requires no fewer than four distinct messages to be presented each time a person visits the landing page or advertisement. The disclosures must be in 14-point font size, which is again unclear and burdensome because digital fonts on webpages are not measured in points. This is particularly difficult for advertisements, because they rarely take up an entire page. Often, online advertisements are limited to a small sliver of a webpage. Requiring large font sizes in the context of advertisements would likely be overly burdensome because they risk swallowing up the entire advertisement itself. *See* Ibanez v. Fla. Dept. of Bus. and Prof. Reg., Bd. of Accountancy, 512 U.S. 136, 146 (1994) (holding a compelled message was unconstitutional when it "effectively rule[d] out" the initial message). And the warnings themselves are somewhat deceptive. Defendant has not shown that the Texas Health and Human Services Commission has actually endorsed the message or made the relevant medical findings, despite requiring speakers to display "TEXAS HEALTH AND

64

HUMAN SERVICES WARNING" three separate times in all caps.[18] Because of the size and repeated nature of the warnings, as well as their potential for misleading visitors, they are likely to be unduly burdensome.

Second, the disclosures are deeply controversial. To receive the more lenient Zauderer standard, the message at issue must be "purely factual and uncontroversial information." Id. Outside of factual and non-controversial information, Zauderer's relaxed standard does not apply. *See* Hurley v. Irish–Am. Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U.S. 557, 573 (1995). The warnings are controversial, both as a matter of fact and opinion.

The Court assumes, at the preliminary injunction stage, that the health disclosures—as opposed to the mental health hotline—are "purely factual."[19] Regardless of their accuracy, the health disclosures purport to show scientific findings. The mental health line, however, is not factual. It does not assert a fact, and instead requires companies to post the number of a mental health hotline. The implication, when viewers see the notice, is that consumption of pornography (or any sexual material) is so associated with mental illness that those viewing it

---

[18] Ironically, while Zauderer allowed the government to regulate deceptive speech, here, it is the government's message that is potentially deceptive. 471 U.S. at 651.

[19] In particular, whether the disclosures are "purely factual" depends on whether scientifically contested statements are still "factual." *See, e.g.*, Nat'l Ass'n of Manufacturers v. S.E.C., 800 F.3d 518, 528 (D.C. Cir. 2015); Am. Meat Inst. v. U.S. Dep't of Agric., 760 F.3d 18, 22 (D.C. Cir. 2014); Am. Beverage Ass'n v. City & Cnty. of San Francisco, 916 F.3d 749, 763 (9th Cir. 2019) (Ikuta, J., concurring in part and dissenting in part). But the Court reserves the "purely factual" question for a later stage, because factual or not, the disclosures are plainly controversial.

65

should consider seeking professional crisis help. The statement itself is not factual, and it necessarily places a severe stigma on both the websites and its visitors.[20]

Much more seriously, however, is the deep controversy regarding the benefits and drawbacks of consumption of pornography and other sexual materials. Just like debates involving abortion, pornography is "anything but an uncontroversial topic." Natl. Inst. of Fam. and Life Advocates v. Becerra, 138 S. Ct. 2361, 2372 (2018). Defendant's own exhibit admits this. (Principi article, Dkt. # 27, at 2 ("Scientific evidence supporting the negative effects of exposure to [sexually explicit internet material] is controversial, and studies addressing this topic are difficult because of important methodological discrepancies.")). As a political, religious, and social matter, consumption of pornography raises difficult and intensely debated questions about what level and type of sexual exposure is dangerous or healthy. See, e.g., Jeneanne Orlowski, *Beyond Gratification: The Benefits of Pornography and the Demedicalization of Female Sexuality*, 8 Modern Am. 53 (Fall 2012) (arguing for constitutional protection of non-obscene pornography); Andrea Dworkin, *Against the Male Flood: Censorship, Pornography, and Equality*, 8 Harv. Women's L.J. 1 (1985) (arguing, among other

---

[20] For an expression to be purely factual, "it must be information with an objective truth or existence." R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin., 6:20-CV-00176, 2022 WL 17489170 (E.D. Tex. Dec. 7, 2022) (appeal docketed, Feb. 6, 2023) (citing Lawrence Solum, Legal Theory Lexicon: Fact and Value, https://lsolum.typepad.com/legaltheory/2019/07/legal-theory-lexicon-fact-and-value.html (July 7, 2019)).

things, that pornography depicts and leads to the subordination of women);

Athanasia Daskalopoulou & Maria Carolina Zanette, *Women's Consumption of Pornography: Pleasure, Contestation, and Empowerment*, 54 Sociology 969 (2020) (noting that female consumption of pornography is both "empowering and disciplining" for women); Samuel L. Perry, *Banning Because of Science or In Spite of it? Scientific Authority, Religious Conservatism, and Support for Outlawing Pornography, 1984–2018*, 100 Social Forces 1385 (March 2022) (examining scientific citations in anti-pornography advocacy and suggesting that the anti-pornography movement is growing "more connected to religious conservatism than views about scientific authority"). The intense debate and endless sociological studies regarding pornography show that it is a deeply controversial subject. The government cannot compel a proponent of pornography to display a highly controversial "disclosure" that is profoundly antithetical to their beliefs.

Beyond the differing moral values regarding pornography, the state's health disclosures are factually disputed. Plaintiffs introduce substantial evidence showing that Texas's health disclosures are either inaccurate or contested by existing medical research. Dr. David Ley, for example, is a clinical psychologist in the states of New Mexico and North Carolina who specializes in treating sexuality issues. (Ley Decl., Dkt # 5-3, at 1–4). As Ley states, "There currently exists no generally accepted, peer-reviewed research studies or scientific evidence which

67

indicate that viewing adult oriented erotic material causes physical, neurological, or psychological damage such as 'weakened brain function' or 'impaired brain development.'" (Id.) Included in Ley's declaration are more than 30 psychological studies and metanalyses contradicting the state's position on pornography. (Id.) Moreover, Ley points out that the mental health hotline number is unsupported because the standard manual of classification of mental disorders, the DSM-5-TR, does not consider pornography addiction as a mental health disorder, and in fact, explicitly rejected that categorization as unsupported in 2022. (Id. at 5–6). Finally, the hotline, which links to the Substance Abuse and Mental Health Services Administration helpline, will be of little to no aid because they are likely not trained to deal with pornographic use or addiction. (Id. at 5–7).

Defendant, meanwhile, introduces evidence suggesting that pornography *is* dangerous for *children* to consume. One study of boys in Belgium, for example, suggests that "an increased use of Internet pornography decreased boys' academic performance six months later." (Bouché Decl. Dkt. # 26-8, at 2). Another meta-analysis suggests that pornography is harmful to adolescents but encourages parental intervention alongside content filtering to mitigate these harms. (Principi Article, Dkt. #. 27-6, at 9–10). These studies, however, are inapplicable to the compelled disclosures, which make no mention of the effects on children and are primarily targeted at adults.

68

Each portion of the compelled message is politically and scientifically controversial. This is a far cry from cigarette warnings. Unlike cigarettes, pornography is the center of a moral debate that strikes at the heart of a pluralistic society, involving contested issues of sexual freedom, religious values, and gender roles. And the relevant science, shows, at best, substantial disagreement amongst physicians and psychologists regarding the effects of pornography.[21] Even if the disclosures are commercial speech, Zauderer cannot apply.

G.     Section 230

Separate from the First Amendment claim, Plaintiffs argue that Section 230 of the CDA preempts H.B. 1181. (Mot. Prelim. Inj., Dkt. # 5, at 17–18). The CDA states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). "Websites are the most common interactive computer services." Dyroff v. Ultimate Software Grp., Inc., 934 F.3d 1093, 1097 (9th Cir. 2019).

In Doe v. MySpace, Inc., the Fifth Circuit held that "Congress provided broad immunity under the CDA to Web-based service providers for all claims

---

[21] At worst for Texas, the science shows that many of their claims are entirely without support. For example, one disclosure requires websites to state that pornography "desensitizes brain reward circuits [and] increases conditioned responses" for viewers. H.B. 1181 129B.004. Defendant's study, however, shows that "sensation seeking" is predictive of pornography consumption, not the other way around. (Bouché Decl. Dkt. # 26-8, at 2). No other studies appear to support the position.

stemming from their publication of information created by third parties[.]" 528

F.3d 413, 418 (5th Cir. 2008). This includes sexual materials. *See, e.g.*,

Backpage.com, LLC v. Cooper, 939 F. Supp. 2d 805, 813, 828 (M.D. Tenn. 2013)

(applying section 230 to a Tennessee law "criminaliz[ing] the sale of certain sex-

oriented advertisements"). Under section 230, "[p]arties complaining that they

were harmed by a Web site's publication of user-generated content . . . may sue the

third-party user who generated the content." MySpace, 528 F.3d at 419. But they

cannot sue "the interactive computer service that enabled them to publish the

content online." Id.

Defendant seeks to differentiate MySpace because the case dealt with a

negligence claim, which she characterizes as an "individualized harm." (Def.'s

Resp., Dkt. # 27, at 19). MySpace makes no such distinction. The case dealt with a

claim for individualized harm but did not limit its holding to those sorts of harms.

Nor does it make sense that Congress's goal of "[paving] the way for a robust new

forum for public speech" would be served by treating individual tort claims

differently than state regulatory violations. Bennett v. Google, LLC,

882 F.3d 1163, 1166 (D.C. Cir. 2018) (cleaned up). The text of the CDA is clear:

"No cause of action may be brought and no liability may be imposed under any

State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

"[A]ny" state law necessarily includes those brought by state governments, so

70

Defendant's distinction between individual vs. regulatory claims is without merit.[22]

The Fifth Circuit "and other circuits have consistently given [Section 230(c)] a wide scope." <u>Google, Inc. v. Hood</u>, 822 F.3d 212, 220-21 (5th Cir. 2016) (quoting <u>MySpace</u>, 528 F.3d at 418). "The expansive scope of CDA immunity has been found to encompass state tort claims, alleged violations of state statutory law, requests for injunctive relief, and purported violations of federal statutes not specifically excepted by § 230(e)." <u>Hinton v. Amazon.com.dedc, LLC</u>, 72 F. Supp. 3d 685, 689 (S.D. Miss. 2014) (citing cases).

Next, Defendant argues that Section 230 does not apply because only the domestic websites are protected by the law, and those websites only post their own content—not those of third parties. (Def.'s Resp., Dkt. # 27, at 19–20 (citing <u>AOSI</u>, 140 S. Ct. at 2087)). <u>AOSI</u> does not deal with protection under Section 230, and the Supreme Court's dicta regarding extraterritoriality deals with the statutory rights of "foreign citizens *abroad*"—not those speaking within the country. <u>AOSI</u>, 140 S. Ct. at 2087. Cases that do discuss Section 230, dealing with conduct that occurs domestically, have extended the law's protection to foreign publishers. *See* <u>Force v. Facebook, Inc.</u>, 934 F.3d 53, 74 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2761 (2020); <u>Fairfield Sentry Ltd. (In Liquidation) by and through Krys v.</u>

---

[22] Even if Section 230 did apply exclusively to individual harms, the law would still be preempted, because H.B. 1181 creates increased penalties when an individual minor accesses a violating website. H.B. 1181 § 129B.006(b). Pure regulatory violations lead to $10,000.00 in damages, but the state imposes an additional $240,000.00 in damages for a minor's access to the website.

71

Citibank, N.A. London, 630 F. Supp. 3d 463, 495 (S.D.N.Y. 2022).[23] As the Second

Circuit held in Force:

> "[W]e conclude from the text of Section 230, particularly the words "shall be treated," that its primary purpose is limiting civil liability in American courts. The regulated conduct—the litigation of civil claims in federal courts— occurs entirely domestically in its application here. We thus hold that the presumption against extraterritoriality is no barrier to the application of Section 230(c)(1) in this case."

934 F.3d at 74.

Thus, the foreign website Plaintiffs may claim the protection of Section 230

when failing to do so would subject them to imminent liability for speech that

occurs in the United States. Force, 934 F.3d at 74. Because the foreign website

Plaintiffs host content provided by other parties, they receive protection under

Section 230. MySpace, 528 F.3d at 419.

As Defendant notes, the second element of immunity under § 230(c)

"requires that the claims are all based on content provided by *another* information

content provider." Wells v. YouTube, LLC, 3:20-CV-2849-S-BH, 2021 WL

2652966, at *3 (N.D. Tex. May 17, 2021) (emphasis added), *adopted* 3:20-CV-

2849-S-BH, 2021 WL 2652514 (N.D. Tex. June 28, 2021). To the extent that the

---

[23] The Ninth Circuit came to a similar conclusion, finding that the "relevant conduct occurs where immunity is imposed . . . ." Gonzalez v. Google LLC, 2 F.4th 871, 888 (9th Cir. 2021). The Supreme Court granted cert, but declined to reach the Section 230 analysis because it found that the statute at issue did not apply to the Defendants' conduct. Gonzalez v. Google LLC, 598 U.S. 617 (2023); Twitter, Inc. v. Taamneh, 598 U.S. 471 (2023).

domestic website Plaintiffs and foreign website Plaintiffs create or develop the content they themselves post, they are not entitled to immunity. 47 U.S.C. § 230(c)(1); *id.* § 230(f)(3). Based on Plaintiffs' pleadings, it is clear that certain websites create their own content to be posted. For example, MG Premium Ltd owns the website Brazzers.com and creates content for the site. Those Plaintiffs that develop and post their own content are not entitled to an injunction on Section 230 grounds. Still, other Plaintiffs, such as WebGroup, which operates XVideos, only hosts third-party content, and therefore is entitled to Section 230 protection.

Because certain Plaintiffs are likely to succeed on the Section 230 claims, they are entitled to a preliminary injunction. "[S]ection 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles." Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC, 521 F.3d 1157, 1175 (9th Cir. 2008); Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 254 (4th Cir. 2009) ("[I]mmunity is an immunity from suit rather than a mere defense to liability and . . . is effectively lost if a case is erroneously permitted to go to trial."). Because Section 230 provides immunity, rather than a simple defense to liability, those Plaintiffs are entitled to an injunction.

73

Specifically, Plaintiffs MG Freesites LTD, WebGroup Czech Republic, NKL Associates, s.r.o., and MediaMe SRL shall be entitled to an injunction under Section 230.

IV. DISCUSSION – HARM AND EQUITIES

A.    <u>Irrepable Harm</u>

Plaintiffs are likely to suffer irreparable harm in the absence of an injunction. To show irreparable harm, "[t]he plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." <u>Humana, Inc. v. Avram A. Jacobson, M.D., P.A.</u>, 804 F.2d 1390, 1394 (5th Cir. 1986). In addition, ongoing, non-recoverable compliance costs constitute irreparable harm, even where the district court does not consider evidence of the costs credible, so long as the harm is more than de minimis. <u>Rest. L. Ctr. v. U.S. Dept. of Lab.</u>, 66 F.4th 593 (5th Cir. 2023).

Without a preliminary injunction, Plaintiffs will suffer several types of irreparable harm. First, they will endure non-recoverable compliance costs. Under Fifth Circuit precedent, "[N]onrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." <u>Id.</u> (citing <u>Louisiana v. Biden</u>, 55 F.4th 1017, 1034 (5th Cir. 2022)). "Complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable

74

compliance costs." Id. A court should emphasize compliance costs' recoverability, rather than their magnitude. Id.

Defendant's argument directly contradicts the Fifth Circuit's instruction in Restaurant Law. Defendant states that "Plaintiffs provide insufficient evidence to show that any alleged monetary losses are significant" in light of their large global operations. (Def.'s Resp., Dkt. # 27, at 22). This runs headfirst into the Restaurant Law's holding that "the key inquiry is 'not so much the magnitude but the irreparability.'" 66 F.4th at 597 (citing Texas v. EPA, 829 F.3d 405, 433 (5th Cir. 2016)). Like Restaurant Law, Plaintiffs' monetary injuries are nonrecoverable—Defendant does not contend otherwise. And they are more than de minimis, because Plaintiffs will have to find, contract with, and integrate age verification systems into their websites. These services come at substantial cost—at the cheapest around $40,000.00 per 100,000 visits. (Compl., Dkt. # 1, at 18; Sonnier Decl., Dkt. # 5-2, at 54). Under Restaurant Law, the ongoing compliance costs constitute irreparable harm.

Second, Plaintiffs will incur irreparable harm through violations of their First Amendment rights. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). In ACLU v. Ashcroft, the Third Circuit considered this issue so obvious that it devoted no more than a footnote to the

75

question. 322 F.3d at 251 n.11 (noting that likelihood of success on the merits "is the only [prong] about which any real debate exists"). A party cannot speak freely when they must first verify the age of each audience member, and this has a particular chilling effect when the identity of audience members is potentially stored by third parties or the government.

Irreparable harm is particularly acute in the context of compelled speech because the association of a speaker with the compelled message cannot be easily undone. *See* Barnette, 319 U.S. at 633 (noting that a law commanding "involuntary affirmation" of objected-to beliefs would require "even more immediate and urgent grounds" than a law demanding silence). This harm includes, as Plaintiffs argue, a loss of goodwill. H.B. 1181 will force Plaintiffs to display a controversial position as though it were scientific fact, and this will result in incalculable damages to their goodwill and reputation. Wright & Miller, Federal Practice and Procedure: Civil § 2948.1 ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable.").

Defendant argues that these losses are "compensable." (Def.'s Resp., Dkt. # 27, at 21–22). But to be compensable, damages must be capable of calculation or estimation. Innovative Manpower Sols., LLC v. Ironman Staffing, LLC, 929 F. Supp. 2d 597, 620 (W.D. La. 2013). Here, they are not, because the loss of goodwill and visitors may endure for years beyond this litigation. Second, and

more seriously, Defendant ignores that the state is entitled to sovereign immunity from monetary claims. VanDerStok v. Garland, No. 4:22-CV-00691-O, 2022 WL 4809376, at *3 (N.D. Tex. Oct. 1, 2022) (citing Wages & White Lion Invs., L.L.C. v. FDA, 16 F.4th 1130, 1142 (5th Cir. 2021)); Kimel v. Florida Bd. of Regents, 528 U.S. 62, 72–73 (2000). Because the monetary losses are significant and non-recoverable, their imminent occurrence constitutes irreparable harm.

Finally, in the context of Section 230, Plaintiffs will suffer irreparable harm by having to expend non-recoverable resources litigating lawsuits where federal law expressly prohibits causes of action from being brought. 47 U.S.C. § 230(e)(3).

In short, Plaintiffs have shown that their First Amendment rights will likely be violated if the statute takes effect, and that they will suffer irreparable harm absent an injunction. Defendant suggests this injury is speculative and not-imminent, (Def.'s Resp., Dkt. # 27, at 21–23), but this is doubtful. H.B. 1181 takes effect on September 1—mere days from today. That is imminent. Nor is the harm speculative. The Attorney General has not disavowed enforcement. To the contrary, her brief suggests a genuine belief that the law should be vigorously enforced because of the severe harms purportedly associated with what is legal pornography. (Id. at 1–5). It is not credible for the Attorney General to state that "[p]orn is absolutely terrible for our kids" but simultaneously claim that they will not enforce a law ostensibly aimed at preventing that very harm. Because the threat of

enforcement is real and imminent, Plaintiffs' harm is non-speculative. It is axiomatic that a plaintiff need not wait for actual prosecution to seek a pre-enforcement challenge. *See* <u>Babbitt v. United Farm Workers Nat. Union</u>, 442 U.S. 289, 298 (1979). In short, Plaintiffs have more than met their burden of irreparable harm.

 B. <u>The Balance of Harms and Public Interest Favor an Injunction</u>

 "[E]nforcement of an unconstitutional law is always contrary to the public interest." <u>Gordon v. Holder</u>, 721 F.3d 638, 653 (D.C. Cir. 2013). "Injunctions protecting First Amendment freedoms are always in the public interest." <u>Opulent Life Church v. City of Holly Springs, Miss.</u>, 697 F.3d 279, 298 (5th Cir. 2012) (quoting <u>Christian Legal Soc'y v. Walker</u>, 453 F.3d 853, 859 (7th Cir. 2006)). The Fifth Circuit recently reaffirmed this principle, explicitly noting that although the government "suffers a form of irreparable injury" when it is enjoined from enforcing its statutes, it likewise has no "interest in enforcing a regulation that violates federal law." <u>All. for Hippocratic Med.</u>, 2023 WL 5266026, at \*28 (quoting <u>Maryland v. King</u>, 567 U.S. 1301, 1303 (2012)). As the circuit court noted, when assessing the state's interest in a law that conflicts with federal statutes or the Constitution, the "government/public-interest analysis collapses with the merits." <u>Id.</u> Because H.B. 1181 is likely unconstitutional, the state cannot claim an interest in its enforcement. <u>Id.</u>

Appx000967

C.    <u>Scope of the Injunction</u>

The Court finds that H.B. 1181 is unconstitutional on its face. The statute is not narrowly tailored and chills the speech of Plaintiffs and adults who wish to access sexual materials. "[I]f the arguments and evidence show that a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is proper." <u>Whole Woman's Health v. Hellerstedt</u>, 579 U.S. 582, (2016) (cleaned up), *abrogated on other grounds by* <u>Dobbs v. Jackson Women's Health Org.</u>, 142 S. Ct. 2228 (2022). A statute that is unconstitutional on its face "is invalid in toto— and therefore incapable of any valid application." <u>People for Ethical Treatment of Animals v. Hinckley</u>, 526 F. Supp. 3d 218, 226 (S.D. Tex. 2021) (cleaned up). H.B. 1181 is unconstitutional on its face. The text of the law is facially content based because it screens out sexual content for regulation. *See infra*, Section III.C.i. And the law is not narrowly tailored because it substantially regulates protected speech, is severely underinclusive, and uses overly restrictive enforcement methods. *See infra*, Section III.D. "As the foregoing analysis confirms, the Court cannot resolve this case on a narrower ground without chilling" protected speech. <u>Citizens United v. Fed. Election Commn.</u>, 558 U.S. 310, 329 (2010); Fallon, *supra* note 10, at 1344–48; *see also* <u>Am. Civ. Liberties Union v. Mukasey</u>, 534 F.3d (affirming nationwide injunction against Attorney General for enforcement of COPA as unconstitutional on its face), *cert denied* 129 S. Ct. 1033. Accordingly, the Court

79

will enjoin Defendant Colmenero from taking any enforcement action under H.B. 1181 pending further order or final judgment.[24]

## V. CONCLUSION

At the core of Defendant's argument is the suggestion that H.B. 1181 is constitutional if the Supreme Court changes its precedent on obscenity. Defendant may certainly attempt a challenge to <u>Miller</u> and <u>Reno</u> at the Supreme Court. But it cannot argue that it is likely to succeed on the merits as they currently stand based upon the mere possibility of a change in precedent. Nor can Defendant argue that the status quo is maintained at the district court level by disregarding Supreme Court precedent. The status quo has been—and still is today—that content filtering is a narrower alternative than age verification. <u>Ashcroft v. ACLU</u>, 542 U.S. at 667.

The Court agrees that the state has a legitimate goal in protecting children from sexually explicit material online. But that goal, however crucial, does not negate this Court's burden to ensure that the laws passed in its pursuit comport with established First Amendment doctrine. There are viable and constitutional means to achieve Texas's goal, and nothing in this order prevents the state from pursuing those means. *See* <u>ACLU v. Gonzales</u>, 478 F. Supp. 2d 775 (E.D. Pa. 2007), *aff'd*, 534 F.3d 181. ("I may not turn a blind eye to the law in order to

---

[24] As previously stated, the injunction for Plaintiffs' Section 230 claims shall apply only to Plaintiffs MG Freesites LTD, WebGroup Czech Republic, NKL Associates, s.r.o., and MediaMe SRL.

attempt to satisfy my urge to protect this nation's youth by upholding a flawed statute, especially when a more effective and less restrictive alternative is readily available[.]").

Because the Court finds that H.B. 1181 violates the First Amendment of the United States Constitution, it will **GRANT** Plaintiffs' motion for a preliminary injunction, (Dkt. # 5), as to their First Amendment claims and **GRANT** the motion in part and **DENY** the motion in part as to their Section 230 claims.

Defendant Angela Colmenero, in her official capacity as Attorney General for the State of Texas, is preliminarily **ENJOINED** from enforcing any provision of H.B. 1181.

 **IT IS SO ORDERED.**

 **DATED:** Austin, Texas, August 31, 2023.

David Alan Ezra
Senior United States District Judge

81