# EXHIBIT MM

# ENFORCEMENT OF FOREIGN JUDGMENTS

## Cyprus



**LEXOLOGY**
**Getting The Deal Through**

Consulting editor
*Latham & Watkins LLP*

# Enforcement of Foreign Judgments

Consulting editors

**Oliver Browne, Georgie Blears**

*Latham & Watkins LLP*

Quick reference guide enabling side-by-side comparison of local insights into relevant treaties, conventions and other sources of law; limitation periods; types of enforceable order; competent courts; separation of recognition and enforcement; opposition; jurisdiction of the foreign court; awards and security for appeals; enforcement and pitfalls; and recent trends.

Generated 26 August 2022

The information contained in this report is indicative only. Law Business Research is not responsible for any actions (or lack thereof) taken as a result of relying on or in any way using information contained in this report and in no event shall be liable for any damages resulting from reliance on or use of this information.  © Copyright 2006 - 2022 Law Business Research

# Table of contents

**LEGISLATION**

Treaties

Intra-state variations

Sources of law

Hague Convention requirements

**BRINGING A CLAIM FOR ENFORCEMENT**

Limitation periods

Types of enforceable order

Competent courts

Separation of recognition and enforcement

**OPPOSITION**

Defences

Injunctive relief

**REQUIREMENTS FOR RECOGNITION**

Basic requirements for recognition

Other factors

Procedural equivalence

**JURISDICTION OF THE FOREIGN COURT**

Personal jurisdiction

Subject-matter jurisdiction

Service

Fairness of foreign jurisdiction

**EXAMINATION OF THE FOREIGN JUDGMENT**

Vitiation by fraud

Public policy

Conflicting decisions

Enforcement against third parties

Alternative dispute resolution

Favourably treated jurisdictions

Alteration of awards

Lexology GTDT - Enforcement of Foreign Judgments

## AWARDS AND SECURITY FOR APPEALS
**Currency, interest, costs**

**Security**

## ENFORCEMENT AND PITFALLS
**Enforcement process**

**Pitfalls**

## UPDATE AND TRENDS
**Hot topics**

LEXOLOGY
**Getting The Deal Through**
© Copyright 2006 - 2021 Law Business Research

Appx000975

# Contributors

## Cyprus



**Kyriakos Karatsis**
kkaratsis@pirilides.com
*N. Pirilides & Associates LLC*

**Antonia Argyrou**
aargyrou@pirilides.com
*N. Pirilides & Associates LLC*



## LEGISLATION

### Treaties

Is your country party to any bilateral or multilateral treaties for the reciprocal recognition and enforcement of foreign judgments? What is the country's approach to entering into these treaties, and what, if any, amendments or reservations has your country made to such treaties?

Cyprus has signed several bilateral agreements relating to legal and judicial cooperation and it is a party to various multilateral treaties relating to the recognition and enforcement of foreign judgments. The bilateral treaties Cyprus is bound by are with:

- the Czech Republic (Law No. 68/82);
- Hungary (Law No. 7/83);
- Bulgaria (Law No. 18/84;
- Greece (Law No. 55/84);
- Syria (Law No. 160/86);
- the Russian Federation (Law No.172/86);
- Ukraine (Law No. 8(III)/05);
- the states of former Yugoslavia (Serbia and Slovenia) (Law No. 179/86);
- Egypt (Law No. 32(III)/96);
- China (Law No. 19(III)/95);
- Poland (Law No. 10(III)/97); and
- Germany (Law No. 5/84).

Regarding multilateral treaties on the reciprocal recognition and enforcement of foreign judgments, Cyprus is bound by, inter alia, the following:

- the Hague Convention on the Recognition and Enforcement of Foreign Judgments in Civil and Commercial Matters;
- the Hague Convention on Choice of Court Agreements 2005;
- the Convention on the Recovery Abroad of Maintenance;
- the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards; and
- the European Convention on Certain International Aspects of Bankruptcy.

Since Cyprus became an EU member state, it has been bound by the following EU Regulations relating to the recognition and enforcement of judgments issued by courts in the European Union:

- Regulation (EU) No. 1215/2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters;
- Regulation (EC) No. 805/2004 of the European Parliament and of the Council of 24 April 2004 creating a European Enforcement Order for uncontested claims;
- Regulation (EC) No. 1896/2006 of the European Parliament and of the Council of 12 December 2006 creating a European order for payment procedure; and
- Regulation (EC) No. 861/2007 of the European Parliament and of the Council of 11 July 2007 establishing a European Small Claims Procedure.

Further, regarding judgments obtained in the United Kingdom, their registration is governed by the Foreign Judgments (Reciprocal Enforcement) Law of 1935, Chapter 10 . This legislation is of particular importance following the exit of the United Kingdom from the European Union. Moreover, on 1 January 2021 the United Kingdom rejoined the Hague Convention on Choice of Court Agreements 2005, which provides for the enforcement of judgments relating to agreements made between parties to international commercial contracts; thus, such judgments obtained in the United Kingdom may be enforced in Cyprus.

*Law stated - 30 June 2022*

## Intra-state variations

Is there uniformity in the law on the enforcement of foreign judgments among different jurisdictions within the country?

There is no uniformity in the laws of Cyprus regarding the enforcement of foreign judgments, thus different procedural mechanisms apply depending mainly on the nationality of the court that issued the judgment. A foreign judgment may be enforceable in Cyprus under:

- EU Regulations;
- bilateral treaties;
- an action or a counterclaim at common law; or
- a statute via the process of registration under the Foreign Judgments (Reciprocal Enforcement) Law.

*Law stated - 30 June 2022*

## Sources of law

What are the sources of law regarding the enforcement of foreign judgments?

As Cyprus is an EU member state, the main source of law is Regulation (EU) No. 1215/2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters. The national rules concerning the procedure on recognition and enforcement of foreign judgments are contained in the Foreign Courts (Recognition, Registration and Enforcement by Convention) Law of 2000, Law No. 121(1)/2000 and the Foreign Judgments (Reciprocal Enforcement) Law. In addition to domestic case law on the matter, Cypriot courts also take into consideration Court of Justice of the European Union case law.

*Law stated - 30 June 2022*

## Hague Convention requirements

To the extent the enforcing country is a signatory of the Hague Convention on Recognition and Enforcement of Foreign Judgments in Civil and Commercial Matters, will the court require strict compliance with its provisions before recognising a foreign judgment?

Cyprus signed the Hague Convention on Recognition and Enforcement of Foreign Judgments in Civil and Commercial Matters in 1971 and it was ratified with Law No. 11/1976. However, the Hague Convention has no practical effect on its own since, according to article 21 of the Convention, judgments rendered in a contracting state will not be recognised or enforced in another contracting state unless the two states, being parties to the Convention, have signed a

supplementary agreement to this effect.

*Law stated - 30 June 2022*

## BRINGING A CLAIM FOR ENFORCEMENT

### Limitation periods

What is the limitation period for enforcement of a foreign judgment? When does it commence to run? In what circumstances would the enforcing court consider the statute of limitations of the foreign jurisdiction?

Limitation periods are not provided for in Regulation (EU) No. 1215/2012 or any other relevant EU Regulation, or Law No. 121(1)/2000 or the Foreign Judgments (Reciprocal Enforcement). Generally, judgments must still be enforceable in the state in which they were given to be enforced in Cyprus.

Where a judgment is enforced at common law (ie, through the initiation of an action), the relevant limitation period according to article 10 of the Limitation of Actionable Rights Law of 2012 (Law No. 66(I)/2012) is 15 years from the date on which the foreign judgment became final.

*Law stated - 30 June 2022*

### Types of enforceable order

Which remedies ordered by a foreign court are enforceable in your jurisdiction?

The types of enforceable remedies ordered by a foreign court are usually specified in the bilateral or multilateral treaties to which Cyprus is a party but in general, and provided that there is no explicit provision in the applicable bilateral or multilateral treaty that excludes a particular type of remedy, any monetary judgment, interim and permanent injunctions and orders for specific performance are enforceable in Cyprus.

*Law stated - 30 June 2022*

### Competent courts

Must cases seeking enforcement of foreign judgments be brought in a particular court?

There is no particular court in Cyprus to which enforcement of foreign judgment proceedings should be brought. The competent court can be any district court of Cyprus where the judgment debtor resides or where he or she has or is expected to have assets, or where the property to which the judgment relates is situated.

The rules concerning the procedure on recognition and enforcement of foreign judgments issued by a foreign court with which Cyprus has concluded a bilateral or multilateral treaty to the same effect are contained in Law No. 121(1)/2000, article 2, which provides that Cypriot courts will assume jurisdiction to adjudicate applications for the recognition of foreign judgments only when at least one of the parties is resident within Cyprus.

*Law stated - 30 June 2022*

### Separation of recognition and enforcement



**To what extent is the process for obtaining judicial recognition of a foreign judgment separate from the process for enforcement?**

In Cyprus, both procedures are considered to be interconnected to a great extent. However, as a general rule, a foreign judgment must be recognised in Cyprus to be enforceable as a Cypriot court judgment.

Under Regulation (EU) No. 1215/2012, judgments must be recognised in Cyprus before they become enforceable. Under article 36 of the Regulation, no special procedure is required for the recognition of a judgment given in an EU member state. However, article 45 of the Regulation provides the respondent with an opportunity to oppose recognition on certain limited grounds. Once a foreign judgment has been registered in Cyprus, it will be enforced in the same way as a judgment obtained in Cyprus.

There is no separation of the recognition and enforcement process under Regulation (EC) No. 1896/2006 (European order for payment) and EC Regulation No. 861/2007 (European small claims procedure), since they do not require registration before enforcement.

Article 5(2) of Law No. 121 (1)/2000, which regulates the recognition and enforcement of non-EU judgments issued by a court of a country with which Cyprus has concluded a bilateral agreement for the reciprocal recognition and enforcement of court judgments or arbitral awards, provides that a judgment creditor is entitled to apply simultaneously for both recognition and enforcement of a foreign judgment or its recognition only.

*Law stated - 30 June 2022*

## OPPOSITION

### Defences

**Can a defendant raise merits-based defences to liability or to the scope of the award entered in the foreign jurisdiction, or is the defendant limited to more narrow grounds for challenging a foreign judgment?**

A defendant in proceedings in Cyprus for the recognition or enforcement of a foreign judgment is not able to raise any merits-based defences as to his or her liability or to the scope of the award entered in the foreign jurisdiction as Cypriot courts will usually give effect to a validly obtained foreign judgment and will not question or enquire into errors of fact or law in the original decision.

Article 52 of Regulation (EU) No. 1215/2012 explicitly prohibits the review of a judgment from an EU member state as to its substance in the EU member state addressed. The grounds that a defendant may invoke to object to the recognition and enforcement of an EU judgment are limited to those listed in article 45 of the Regulation, supporting and aligning with the policy of making judgments easily enforceable between EU member states.

Regulation (EC) No. 1896/2006 and Regulation (EC) No. 861/2007 do not provide for a similar procedure for the defendant to challenge enforcement of judgments for a European order for payment or a European small claims procedure, respectively, since no recognition is needed before enforcement, except where the judgment conflicts with an existing determination between the same parties.

If recognition is sought under common law (ie, through the filing of an action by the foreign judgment creditor), then Cypriot courts will have the discretion of whether to recognise the judgment debt. Cypriot courts will not recognise debt claims based on a judgment of a foreign court:

- that lacked jurisdiction;

●●● LEXOLOGY
●●● **Getting The Deal Through**
© Copyright 2006 - 2021 Law Business Research

Appx000980

- that was obtained by fraud;
- that is contrary to public policy in Cyprus or to the requirements of natural justice;
- against which an appeal is pending or the debtor is entitled to and intends to appeal against the judgment; or
- that has been wholly satisfied at the date of the application for its recognition in Cyprus.

If the foreign judgment creditor applies in Cyprus for recognition or enforcement of the foreign judgment under Law No. 121(1)/2000, the defendant may only raise various procedural objections that are limited to those contained in subsection 1(e) of article 5 of the aforesaid Law, namely:

- the lack of jurisdiction of the Cypriot courts under article 2 of that Law (that none of the parties is resident within Cyprus);
- that the foreign judgment in question has been wholly satisfied by the defendant; or
- that the requirements imposed by the applicable bilateral treaty have not been met by the applicant.

*Law stated - 30 June 2022*

### Injunctive relief

**May a party obtain injunctive relief to prevent foreign judgment enforcement proceedings in your jurisdiction?**

No authority in Cyprus has recognised the issue of an anti-enforcement injunction restraining the judgment creditor from applying for enforcement of a foreign judgment. However, where there is no Cypriot case law on the matter, the Cypriot courts apply English common law under article 29(1)(c) of Law No. 14/60 (the Courts Law). Therefore, if a foreign judgment debtor applies to the Cypriot courts for an anti-enforcement injunction, the courts may rely on English case law, under which UK courts have the power to restrain persons from enforcing a foreign judgment in the United Kingdom when such a judgment has been obtained in breach of a contractual term as to the choice of court or by fraud. However, this power to restrain enforcement has been used rarely by UK courts and we expect the Cypriot courts to take the same approach.

In any event, there would be no real need for a potential judgment debtor to apply for an anti-enforcement injunction to restrain enforcement in Cyprus as the Cypriot courts will only allow enforcement of a foreign judgment following an inter partes hearing in which the defendant may challenge enforcement by raising any relevant issues for which enforcement in Cyprus can be denied.

*Law stated - 30 June 2022*

## REQUIREMENTS FOR RECOGNITION

### Basic requirements for recognition

**What are the basic mandatory requirements for recognition of a foreign judgment?**

Generally, the basic requirements that a court in Cyprus will consider in an application for recognition of a foreign judgment in Cyprus are:

- whether the court that issued the judgment has had jurisdiction to issue the judgment in question;
- whether recognition is contrary to Cypriot public policy or the requirements of natural justice; and
- whether it has been obtained by fraud.

For recognition under Regulation (EU) No. 1215/12, a court in Cyprus must consider all the grounds listed in article 45 of the Regulation as well as any other typical requirements provided by the Regulation, whereas for recognition under a bilateral treaty each case may differ according to the provisions of the treaty. Further, since Law No. 121(1)/2000 applies for the recognition in Cyprus of any foreign judgment from a country with which Cyprus has signed a bilateral treaty relating to legal and judicial cooperation, Cypriot courts should additionally consider whether they have jurisdiction to proceed with the requested recognition as, according to the aforesaid Law, either the applicant or the respondent must be resident within Cyprus irrespective of the existence of a bilateral treaty between Cyprus and the country that issued the foreign judgment.

*Law stated - 30 June 2022*

## Other factors

May other non-mandatory factors for recognition of a foreign judgment be considered and, if so, what factors?

We are not aware of any Cypriot case law or even a first instance court's judgment that considered non-mandatory factors. Provided that all the basic mandatory requirements have been met, Cypriot courts do not have the discretion to recognise a foreign judgment by considering other factors.

*Law stated - 30 June 2022*

## Procedural equivalence

Is there a requirement that the judicial proceedings where the judgment was entered correspond to due process in your jurisdiction and, if so, how is that requirement evaluated?

Cypriot courts in an action for recognition and enforcement of a foreign judgment will opt not to engage in analysing whether there is a procedural equivalence of the original court's processes for the following reasons:

- the system provided by Regulation (EU) No. 1215/12 is founded on the assumption that a basic minimum standard of adequate process will be achieved across all EU member states; and
- the originating court's processes will have been considered by Cyprus at the time of entering into the relevant bilateral treaty relating to legal and judicial cooperation.

However, as a general rule, the judicial proceedings where the judgment was entered should correspond to the basic principles of due process in Cypriot procedural law.

*Law stated - 30 June 2022*

## JURISDICTION OF THE FOREIGN COURT

### Personal jurisdiction

Will the enforcing court examine whether the court where the judgment was entered had personal jurisdiction over the defendant and, if so, how is that requirement met?

Concerning judgments issued by EU member states, article 45(3) of Regulation (EU) No. 1215/2012 provides that the

jurisdiction of the court of origin may not be reviewed; consequently, the personal jurisdiction of the defendant of the EU member state court that issued the judgment will not be examined by the enforcing court.

Concerning judgments issued by states that are not members of the European Union, but with which Cyprus has a bilateral treaty (which invokes the provisions of Law No. 121(I)/2000), the examination (or not) of the jurisdiction requirement depends on the provisions of the bilateral treaty or convention applicable under the circumstances.

Regarding judgments that fall under the scope of Chapter 10 of the Foreign Judgments (Reciprocal Enforcement) Law of 1935 (Chapter 10), the issue of personal jurisdiction over the defendant is one that Cypriot courts may examine in an application to set aside the recognised or enforced foreign judgment.

Under common law, Cypriot courts will consider whether the court that issued the foreign judgment had personal jurisdiction over the defendant under the conflict of laws rules applicable in Cyprus.

*Law stated - 30 June 2022*

### Subject-matter jurisdiction

Will the enforcing court examine whether the court where the judgment was entered had subject-matter jurisdiction over the controversy and, if so, how is that requirement met?

Concerning judgments issued by EU member states, article 52 of Regulation (EU) No. 1215/2012 provides that a judgment issued in an EU member state may not be reviewed as to its substance; therefore, the subject-matter jurisdiction of the EU member state that issued the judgment will not be examined by the enforcing court.

Regarding judgments issued by states that are not members of the European Union, but with which Cyprus has a bilateral treaty (which invokes the provisions of Law No. 121(I)/2000), the examination (or not) of the jurisdiction requirement depends on the provisions of the bilateral treaty or convention applicable under the circumstances.

According to Chapter 10 (article 6(1)), the issue of subject-matter jurisdiction is one of the grounds under which a foreign judgment recognised in Cyprus may be set aside.

*Law stated - 30 June 2022*

### Service

Must the defendant have been technically or formally served with notice of the original action in the foreign jurisdiction, or is actual notice sufficient? How much notice is usually considered sufficient?

Under Regulation (EU) No. 1215/2012 (article 45(1)(b)), concerning judgments issued by EU member states, the defendant must be served with the document that instituted the proceedings or with an equivalent document in sufficient time and in such a way to enable him or her to arrange for his or her defence.

Concerning non–EU judgments, whereby Law No. 121(I)/2000 is applicable, this issue will be examined (or not) in light of the specific provisions of the bilateral treaty or convention applicable under the circumstances.

If the recognition or enforcement of a foreign judgment is sought under Chapter 10, such recognition or enforcement may be set aside if it is shown that the defendant was not duly notified of the initial foreign proceedings.

There is no available case law on the matter concerning common law enforcement in Cyprus; however, we believe that the issue of service of the original action in the foreign jurisdiction is one that the Cypriot courts would examine.

*Law stated - 30 June 2022*

### Fairness of foreign jurisdiction

Will the court consider the relative inconvenience of the foreign jurisdiction to the defendant as a basis for declining to enforce a foreign judgment?

No, the courts will not examine whether the foreign jurisdiction was the most convenient for the defendant as the principle of forum non conveniens do not provide a basis for denying the recognition or enforcement of a foreign judgment.

*Law stated - 30 June 2022*

## EXAMINATION OF THE FOREIGN JUDGMENT

### Vitiation by fraud

Will the court examine the foreign judgment for allegations of fraud upon the defendant or the court?

Fraud is not listed in articles 45 and 46 of Regulation (EU) No. 1215/2012 as a ground for refusal for recognition and enforcement of a judgment issued in an EU member state. Similarly, fraud is not an element to be examined under the provisions of Law No. 121(I)/2000. Nevertheless, the bilateral treaty or convention that will be invoked may include such an element to be examined by the enforcing court.

If the recognition or enforcement of a judgment is sought under Chapter 10 of the Foreign Judgments (Reciprocal Enforcement) Law of 1935 (Chapter 10), the court will examine whether the judgment to be recognised or enforced was obtained by fraud (article 6(1)(a)(iv)). The same rule applies under common law.

*Law stated - 30 June 2022*

### Public policy

Will the court examine the foreign judgment for consistency with the enforcing jurisdiction's public policy and substantive laws?

Under articles 45 and 46 of Regulation (EU) No. 1215/2012, the registration or enforcement of an EU member state judgment must not be manifestly contrary to public policy. This only applies in exceptional cases and it cannot be used as a back-door way to attack the jurisdiction of the original court. According to the judgment of the Court of Justice of the European Union in Krombach v Bamberski (Case C-7/98), the public policy argument would only apply where recognition of enforcement of a judgment of another EU member state infringed a fundamental principle of the legal order of the state in which recognition was sought.

Concerning judgments of non-EU member states, whereby the recognition or enforcement of the judgment is sought under Law No. 121(I)/2000, the examination of the public policy element will be relevant (or not) depending on the wording of any applicable bilateral treaty or convention.

Under Chapter 10, the court will examine whether such recognition or enforcement will be contrary to Cypriot public policy (article 6(1)(a)(v)).

*Law stated - 30 June 2022*

**LEXOLOGY**
**Getting The Deal Through**
© Copyright 2006 - 2021 Law Business Research

Appx000984

## Conflicting decisions

**What will the court do if the foreign judgment sought to be enforced is in conflict with another final and conclusive judgment involving the same parties or parties in privity?**

When a judgment issued in an EU member state is considered, articles 45 and 46 of Regulation (EU) No. 1215/2012 prohibit the recognition or enforcement of a judgment if it is irreconcilable with a judgment given between the same parties in the EU member state addressed or if it is irreconcilable with an earlier judgment given in another EU member state, or a third state involving the same cause of action and between the same parties, provided that the earlier judgment fulfils the conditions necessary for its recognition in the EU member state addressed.

Similarly, under Regulation (EC) No. 805/2004 (European Enforcement Order), Regulation (EC) No. 861/2007 (European small claims procedure) and Regulation (EC) No. 1896/2006 (European order for payment procedure), the existence of an irreconcilable Cyprus judgment provides sufficient grounds for challenging enforcement.

If the recognition or enforcement of a judgment has been sought under Chapter 10, the court may set aside the recognition or enforcement if a final judgment regarding the same matter in issue has already been issued (ie, before the issue of the original judgment) in another court (section 6(1)(b) of Chapter 10).

Generally, and similarly to the approach under Regulation (EU) No. 1215/2012 and Chapter 10, a foreign judgment will not be recognised or enforced in Cyprus if there is a conflicting Cypriot judgment between the same parties involving the same cause of action, as this will be against the principle of res judicata, which is applicable in Cyprus.

*Law stated - 30 June 2022*

## Enforcement against third parties

**Will a court apply the principles of agency or alter ego to enforce a judgment against a party other than the named judgment debtor?**

Generally, in recognition and enforcement proceedings in Cyprus, the courts will not apply the principles of agency or alter ego since the foreign judgment should be treated as if it creates a contract debt between the parties and will be only enforceable against the judgment debtor or party to which it is addressed.

Concerning corporate defendants, although there is no relevant case law in Cyprus, we consider that under particular circumstances those principles might be applicable, as a result of which Cypriot courts will find another person liable for the judgment debt of a corporate defendant.

*Law stated - 30 June 2022*

## Alternative dispute resolution

**What will the court do if the parties had an enforceable agreement to use alternative dispute resolution, and the defendant argues that this requirement was not followed by the party seeking to enforce?**

As a general rule, the Cypriot courts cannot review the substance or merits of a foreign judgment at the stage of recognition and enforcement and, therefore, if the foreign judgment was issued irrespective of the existence and non-adherence to such an alternative dispute resolution clause, the Cypriot court will not examine this issue.

Nevertheless, if the applicable law for recognition or enforcement is Chapter 10, the Cypriot courts are obliged to

●●● LEXOLOGY
●●● **Getting The Deal Through**
●●●
© Copyright 2006 - 2021 Law Business Research

examine this matter under section 6(3)(b) of Chapter 10.

*Law stated - 30 June 2022*

## Favourably treated jurisdictions

Are judgments from some foreign jurisdictions given greater deference than judgments from others? If so, why?

The EU scheme, the bilateral treaties to which Cyprus is a party and Chapter 10 each apply to specified nations whose judgments are thereby more readily enforceable, through the procedures set out in those instruments, than those of other jurisdictions.

*Law stated - 30 June 2022*

## Alteration of awards

Will a court ever recognise only part of a judgment, or alter or limit the damage award?

Generally, Cypriot courts will recognise or enforce a lawfully obtained judgment as it is, provided that the remedies awarded are recognised in Cyprus, with no alterations or limitations as to the damages award.

Under article 54 of Regulation (EU) No. 1215/2012, if a judgment includes a measure or an order that is not known in the law of the EU member state addressed, that measure or order will be adapted to a measure or an order that is known in the law of that EU member state, to the extent possible. The 'new' measure or order must have equivalent effects and must pursue similar aims and interests. However, the adaptation must not result in effects going beyond those provided for in the law of the EU member state of origin.

*Law stated - 30 June 2022*

## AWARDS AND SECURITY FOR APPEALS

### Currency, interest, costs

In recognising a foreign judgment, does the court convert the damage award to local currency and take into account such factors as interest and court costs and exchange controls? If interest claims are allowed, which law governs the rate of interest?

Where the sum payable under a foreign judgment that is to be registered to Cyprus is expressed in a currency other than the currency of Cyprus, the judgment shall be registered as if it were a judgment for such sum in the currency of Cyprus (based on the rate of exchange prevailing at the date of the judgment of the original court) as is equivalent to the sum payable.

Under Regulation (EC) No. 805/2004 (European Enforcement Order), where a judgment creditor applies in Cyprus to enforce an order that is expressed in a currency other than the euro, the application must contain a certificate of the equivalent in euros of the judgment's amount at the close of business of the nearest date preceding the application.

An award for costs will generally be enforced by the Cypriot courts in the same manner as a damages award.

*Law stated - 30 June 2022*

### Security

Is there a right to appeal from a judgment recognising or enforcing a foreign judgment? If so, what procedures, if any, are available to ensure the judgment will be enforceable against the defendant if and when it is affirmed?

Yes, there is a right to appeal from a judgment recognising or enforcing a foreign judgment, within six weeks of the date of the judgment.

In the case of filing an appeal against a Cyprus judgment recognising and enforcing a foreign judgment, the judgment creditor or respondent to the appeal may proceed with the execution of the foreign judgment under the execution methods available under Cyprus law or equity, unless the execution has been stayed by a court order following an application for stay of execution filed by a judgment debtor or appellant. Even if the judgment debtor or appellant issues an order for stay of execution, a security or guarantee must be deposited by the judgment debtor or appellant and it will be subject to execution if the Cypriot judgment for recognition and enforcement is finally affirmed by the appellate court.

*Law stated - 30 June 2022*

## ENFORCEMENT AND PITFALLS

### Enforcement process

Once a foreign judgment is recognised, what is the process for enforcing it in your jurisdiction?

Once a foreign judgment is recognised by the Cypriot courts and consequently becomes enforceable as a Cypriot court judgment, the judgment creditor has several options under the Civil Procedure Law, Chapter 6, as to how to proceed with the execution of the judgment against the judgment debtor.

Under Chapter 6, the following methods of execution are available:

- a writ of execution for the sale of movables;
- a writ for sale of immovable property or registration of a charging order ('memo') over the property;
- a writ of sequestration of immovable property;
- a garnishee order;
- an order to the judgment debtor to make payments over the debt every month;
- a writ of possession, ordering immovable property to be delivered to the judgment creditor; and
- a writ of delivery, ordering movable property to be delivered to the judgment creditor.

Further, based on the Encumbering Orders Law of 1992 (Law No. 31(I)/1992), an order encumbering the interest of the judgment debtor on shares and other stock owned may be requested and issued.

*Law stated - 30 June 2022*

### Pitfalls

What are the most common pitfalls in seeking recognition or enforcement of a foreign judgment in your jurisdiction?

Lexology GTDT - Enforcement of Foreign Judgments

No case law identifies common pitfalls.

*Law stated - 30 June 2022*

## UPDATE AND TRENDS

**Hot topics**

Are there any emerging trends or hot topics in foreign judgment enforcement in your jurisdiction?

At present, there are no emerging trends or hot topics concerning the matter of enforcing foreign judgments in Cyprus.

*Law stated - 30 June 2022*

Lexology GTDT - Enforcement of Foreign Judgments

# Jurisdictions

| | | |
|---|---|---|
| | **Austria** | WEBER & CO. |
| | **Bahrain** | Charles Russell Speechlys |
| | **Brazil** | Kobre & Kim LLP |
| | **China** | DeHeng Law Offices |
| | **Cyprus** | N. Pirilides & Associates LLC |
| | **Egypt** | Soliman, Hashish & Partners |
| | **Germany** | Willkie Farr & Gallagher LLP |
| | **Greece** | PotamitisVekris |
| | **Indonesia** | Assegaf Hamzah & Partners |
| | **Italy** | Ughi e Nunziante |
| | **Japan** | TMI Associates |
| | **Jordan** | Hammouri & Partners |
| | **Luxembourg** | Pinsent Masons |
| | **Nigeria** | Streamsowers & Köhn |
| | **Philippines** | SyCip Salazar Hernandez & Gatmaitan |
| | **Switzerland** | Walder Wyss Ltd |
| | **Turkey** | Gün + Partners |
| | **United Arab Emirates** | Charles Russell Speechlys |
| | **United Arab Emirates - Abu Dhabi** | Charles Russell Speechlys |
| | **United Arab Emirates - DIFC** | Charles Russell Speechlys |
| | **United Kingdom** | Latham & Watkins LLP |
| | **USA** | Freshfields Bruckhaus Deringer |

Accessed at: https://www.pirilides.com/assets/modules/ppp/publications/230/docs/2023_enforcement_of_foreign_judgments_cyprus.pdf

**LEXOLOGY**
**Getting The Deal Through**
© Copyright 2006 - 2021 Law Business Research

Appx000989

# EXHIBIT NN



# Cross-Border Enforcement Center - Czech Republic

## Judgments



# Contents

To generate table of contents, right-click here and select **Update Field.**



## With which jurisdictions does this country have reciprocal arrangements for enforcement of judgments?

**Brussels Regulations:**

Austria, Belgium, Bulgaria, Croatia, Cyprus, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, Netherlands, Portugal, Poland, Romania, Slovakia, Slovenia, Spain, Sweden, United Kingdom

**Lugano Convention 2007:**

Denmark, Iceland, Norway, Switzerland

**Hague Choice of Court Convention 2005:**

Austria, Belgium, Bulgaria, Croatia, Cyprus, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, Mexico, Montenegro, Netherlands, Poland, Portugal, Romania, Singapore, Slovakia, Slovenia, Spain, Sweden, United Kingdom

**Bilateral:**

Brussels and Lugano Regime countries, Afghanistan, Switzerland, Tunisia, Mongolia, Russia, Belarus, Kyrgyzstan, Georgia, Moldova, Ukraine, Albania, Algeria, Bosnia and Herzegovina, Montenegro, People's Republic of Korea, Kosovo, Cuba, Northern Macedonia, Syria, Uzbekistan, Vietnam

## If there is no reciprocal arrangement, is it still possible to enforce a foreign judgment by means of a writ on the judgment, declaration of enforceability or similar mechanism?

Yes, provided that reciprocity is guaranteed.

## What is the approximate time required to register and enforce a foreign judgment if unopposed?

Brussels and Lugano Regime: approx. 6 months

Copyright 2023
Appx000993



Other countries: approx. 12 months

## What is the approximate time required to register and enforce a foreign judgment if opposed?

Brussels and Lugano Regime: approx. 1-2 years

Other countries: approx. 2 years

## What is the approximate cost of registering and enforcing a foreign judgment (including court fees and other disbursements) if unopposed?

The costs vary depending on whether the creditor chooses to enforce the judgment by judicial enforcement or execution enforcement. In both cases the creditor must cover the costs for the official translation into Czech language and lawyer's fee. The court fee is 5% of the claimed amount. In the execution enforcement, the executor's remuneration is 15% of the amount actually recovered. There is no court fee for the application, but the creditor may be charged a deposit for the costs of execution.

## What is the approximate cost of registering and enforcing a foreign judgment (including court fees and other disbursements) if opposed?

The costs vary depending on whether the creditor chooses to enforce the judgment by judicial enforcement or execution enforcement. In both cases the creditor must cover the costs for the official translation into Czech language and lawyer's fee. The court fee is 5% of the claimed amount. In the execution enforcement, the executor's remuneration is 15% of the amount actually recovered. There is no court fee for the application, but the creditor may be charged a deposit for the costs of execution.

## Are there any unusual difficulties in enforcing a foreign judgment?

The process of enforcing foreign judgements in the Czech Republic is quite unpredictable, as the possibility of enforcement depends on many factors, for example, the country of origin of the judgement, arrangements on reciprocity, communication with the foreign authorities, etc. We are not

Copyright 2023
Appx000994



aware of any particular difficulties apart from the fact that the process may be, in some cases, time consuming.

©Copyright © 2023 Baker & McKenzie. All rights reserved. **Ownership**: This documentation and content (Content) is a proprietary resource owned exclusively by Baker McKenzie (meaning Baker & McKenzie International and its member firms). The Content is protected under international copyright conventions. Use of this Content does not of itself create a contractual relationship, nor any attorney/client relationship, between Baker McKenzie and any person. **Non-reliance and exclusion**: All Content is for informational purposes only and may not reflect the most current legal and regulatory developments. All summaries of the laws, regulations and practice are subject to change. The Content is not offered as legal or professional advice for any specific matter. It is not intended to be a substitute for reference to (and compliance with) the detailed provisions of applicable laws, rules, regulations or forms. Legal advice should always be sought before taking any action or refraining from taking any action based on any Content. Baker McKenzie and the editors and the contributing authors do not guarantee the accuracy of the Content and expressly disclaim any and all liability to any person in respect of the consequences of anything done or permitted to be done or omitted to be done wholly or partly in reliance upon the whole or any part of the Content. The Content may contain links to external websites and external websites may link to the Content. Baker McKenzie is not responsible for the content or operation of any such external sites and disclaims all liability, howsoever occurring, in respect of the content or operation of any such external websites. **Attorney Advertising**: This Content may qualify as "Attorney Advertising" requiring notice in some jurisdictions. To the extent that this Content may qualify as Attorney Advertising, PRIOR RESULTS DO NOT GUARANTEE A SIMILAR OUTCOME. **Reproduction**: Reproduction or copying of the Content on this Site without express written authorization is strictly prohibited.

# EXHIBIT OO

**BAKER BOTTS L.L.P.**
G. Hopkins Guy, III (SBN 124811)
hop.guy@bakerbotts.com
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA 94304
Telephone: 650.739.7500
Facsimile: 650.739.7699

Ali Dhanani (pro hac vice)
ali.dhanani@bakerbotts.com
One Shell Plaza
910 Louisiana Street
Houston, TX 77002
Telephone: 713.229.1108
Facsimile: 713.229.2808

*Attorneys for Plaintiffs DISH TECHNOLOGIES
L.L.C. AND SLING TV L.L.C.*

Mark Punzalan (CA Bar No. 247599)
Email: mark@chanpunzalan.com
Nicole Daryanani (CA Bar No. 328068)
Email: nicole@chanpunzalan.com
Shinhong Byun (CA Bar No. 264129)
Email: shinhong@chanpunzalan.com
CHAN PUNZALAN LLP
22 Battery Street, Suite 401
San Francisco, CA 94111

*Counsel for Defendant
JadooTV, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DISH TECHNOLOGIES L.L.C. AND SLING TV L.L.C. | Case No. 5:18-cv-05214 - EJD |
| Plaintiffs, | |
| v. | **[PROPOSED]** FINAL CONSENT JUDGMENT AND STIPULATED INJUNCTION PURSUANT TO STIPULATION OF THE PARTIES |
| JADOO TV, INC., | |
| Defendant. | |

BAKER BOTTS L.L.P.

Plaintiff DISH Technologies L.L.C. and Sling TV L.L.C. (collectively, "DISH"), having filed Civil Action 5:18-cv-05214 – EJD against Jadoo TV, Inc. ("Jadoo"), alleging that Jadoo infringed DISH's Patents, U.S. Patent Nos. 7,818,444, 8,402,156, 9,071,668, and 9,407,564 ("the Asserted Patents"), and Defendant Jadoo having agreed upon a resolution of this matter prior to a trial on the merits, hereby consent to the entry of judgment in favor of Plaintiff DISH and against Defendant Jadoo as follows:

1.      This Court has and shall retain personal jurisdiction over the Parties with respect to the above captioned matter, subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1338, and jurisdiction to enforce this Consent Judgment.

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1400(b).

3.      Jadoo acknowledges DISH's ownership and standing to sue for infringement of the Asserted Patents.

4.      Jadoo admits that all claims of the Asserted Patents are valid and enforceable, until such time that all claims of the Asserted Patents are found invalid or non-enforceable by a final, non-appealable judgment by a Court of competent jurisdiction.

5.      Jadoo, including any of its subsidiaries, parent companies, successors, and assigns, and those persons and entities in active concert or participation with them (the "Enjoined Parties"), are hereby permanently restrained, enjoined, and prohibited from infringing all claims of the Asserted Patents by making, using, selling, offering to sell, or distributing products and services that infringe the Asserted Patents (the "Infringing Products") in the United States or by importing Infringing Products into the United States.

6.      The Enjoined Parties are also permanently restrained, enjoined, and prohibited from inducing others to make, use, offer for sale, sell within the United States, or import into the United States, any of the Infringing Products or any products not more than colorably different from the Infringing Products.

7.      The Enjoined Parties are also hereby permanently restrained, enjoined, and prohibited from selling the Infringing Products, or any products not more than colorably different from the Infringing Products, to anyone outside the United States under circumstances that

Defendants know[1] will result in those products themselves being imported into or used in the United States or being incorporated into other products that will be thereafter imported into or used in the United States.

8.     For the avoidance of doubt, Jadoo is enjoined from providing within or from the United States, or importing into the United States, under any circumstances, adaptive bitrate streaming on any (i) Jadoo Application (including the JadooTV App or other Jadoo provided app installed on SmartTVs or other media players or mobile devices, mobile phones, or tablet devices) or (ii) Jadoo Set-Top boxes (including current and future set-top boxes ("STBs") or over-the-top ("OTT") devices offered, supported, sold, or developed by Jadoo), such as by using the HTTP Live Streaming protocol or other similar adaptive bitrate streaming protocols in conjunction with multiple bitrate and/or resolution versions of the same video (collectively, "ABR Technology").

A.     As to the Jadoo Application identified in Paragraph (8)(i), Jadoo is enjoined from providing, under any circumstances, adaptive bitrate streaming from a Jadoo server, or any CDN under contract or controlled by Jadoo, and must provide only a single bitrate stream and/or resolution version of the same video and cannot provide multiple bitrate streams and/or resolution versions of the same video.  To the extent that any Jadoo customer installs any Android App or other software that uses ABR Technology offered by a third party who is not an Enjoined Party ("Third-Party App Supplier") without the inducement, encouragement, instruction, support, direction or guidance of the Enjoined Parties, such activity shall not be a violation of this consent judgment and injunction.

B.     As to the Jadoo Set-Top boxes identified in Paragraph (8)(ii), Jadoo is to deploy a firmware update to its STBs or OTT devices that will permanently remove any software that uses any bandwidth characteristic to request and/or change to a different data rate, packet size, streamlet size, slice size or segment size for subsequently transmitted packets, segments, or chunks ("Firmware Update").  The Firmware Update must be mandatory and any user who does not update his or her set-top box with the Firmware Update will be blocked from using JadooTV's

---

[1] With respect to this provision, knowledge may be satisfied by actual knowledge or willful blindness as provided in *Global–Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011).

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

1  service.  Jadoo may display to any user a screen that states that the Firmware Update is mandatory

2  and until the user updates to the Firmware Update, the user will not be able to access any Jadoo

3  channels.  The parties agree and stipulate that Jadoo Firmware Version V002M8B01_20210422

4  (Jadoo4 QuadCore);  V001S901_20210422 (Jadoo5S);  V001S901_20210422 (Jadoo5);

5  V003S901_20201104 (Jadoo7) meet the above requirements and that DISH may retain a copy of

6  all Jadoo Firmware Updates.

7       9.    This injunction shall continue as to each claim of each of the Asserted Patents,

8  respectively, for the life of each such claim, or until such time as such claim of the Asserted Patents

9  is admitted by DISH or otherwise caused to be invalid or unenforceable through reissue,

10  disclaimer, or otherwise, or held invalid or unenforceable under a final, non-appealable order from

11  the Court, a Federal District or Appellate Court, the United States Patent and Trademark Office,

12  or another governmental authority of competent jurisdiction, whichever comes first.

13       10.    If DISH has a reasonable basis for believing that Jadoo is using adaptive bitrate

14  streaming or otherwise infringing the Asserted Patents after the date of this order, DISH may

15  initiate an audit by providing written notice to Jadoo, providing the basis for its belief in the notice.

16  Upon 30 days written notice, Jadoo will produce any then current source code or information and

17  documents sufficient to show compliance with the injunction and that Jadoo has not changed the

18  software to reinsert the ABR Technology.  The Parties acknowledge that DISH shall retain the

19  right to compare prior versions of the source code and any then current code or software upon a

20  showing that Jadoo is using ABR Technology in violation of this injunction.

21       11.    Within fourteen (14) business days following entry of this Consent Judgment, or

22  within fourteen (14) business days following Jadoo's retention of a new CDN supplier, ad

23  insertion partner, or content provider, Jadoo will provide a copy of the injunction to each of its

24  current or future CDN suppliers, ad insertion partners, and content providers with whom Jadoo

25  has contracted or will contract with in the future, including but not limited to Vidillion Inc. and

26  Eros Now and advise each that the supplier or partner is not, under any circumstances, to provide

27  adaptive bitrate streaming of Jadoo streams, such as by using the HTTP Live Streaming protocol

28  or other similar adaptive bitrate streaming protocols.

BAKER BOTTS L.L.P.

12. Compliance with this Consent Judgment may be enforced by DISH and its successors in interests or assigns.

13. Should Defendant violate any term or condition of this Consent Judgment, DISH in its sole discretion, shall be entitled to petition the Court for an Order of Contempt. To the extent Defendant knowingly violates or refuses to correct a violation of any term or condition of this Consent Judgment, DISH shall further be entitled to recover all attorneys' fees incurred (i) as a result of Defendant's violation of this Consent Judgment, and/or (ii) enforcing any term or condition of this Consent Judgment.

14. Notwithstanding any terms or conditions of this Consent Judgment, DISH shall have the right to pursue all of its equitable and legal remedies arising from or relating to any violation of this Consent Judgment or any future infringement or other wrongdoing by Defendant.

15. DISH retains all rights to pursue any Third-Party App Supplier. Jadoo shall, to the best of its ability and in good faith, cooperate with any enforcement of the Asserted Patents against such Third-Party App Supplier and shall not cooperate or consent to any suggestion or claim by such party that any infringing activity is protected including any claim of protection under patent exhaustion, except as is required by law or court order.

16. All rights contained in this Consent Judgment, including, but not limited to, the right to enforce it, shall be freely assignable to the fullest extent permitted by law and shall apply to the Parties' successors and assigns, as well as their respective officers, directors, members, agents and/or representatives.

17. DISH and Jadoo waive any right to appeal herefrom, and consent to entry of this Consent Judgment without further notice.

18. Each Party is to bear its own attorneys' fees and costs as to the patent case only (Case No. 5:18-CV-05214) up to the date of the dismissal of the above-captioned case and not as to any relief recoverable in Paragraph 15 above.

19. Subject to this foregoing Consent Judgment and Stipulated Injunction, the above-captioned case is dismissed.

20. For the avoidance of doubt, the co-pending copyright case *DISH Network L.L.C. v.*



*Jadoo TV, Inc.* et al. Case No. 2:18-CV-9768-FMO-KS is not dismissed, released or affected in any manner by this Consent Judgment and Stipulated Injunction.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BAKER BOTTS L.L.P.

JOINT STIPULATION AND [PROPOSED] FINAL
CONSENT JUDGMENT

5

CASE NO. 5:18-CV-05214 - EJD

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

DATED: 5-24-2021 _____

_____
Attorneys for Plaintiff

DATED: 5-24-2021 _____

/s/ _____
Attorneys for Defendant

PURSUANT TO STIPULATION, IT IS SO ORDERED.

DATED: May 28, 2021 _____

_____
EDWARD J. DAVILA
United States District Judge

BAKER BOTTS L.L.P.

JOINT STIPULATION AND [PROPOSED] FINAL
CONSENT JUDGMENT

6

CASE NO. 5:18-CV-05214 - EJD

# EXHIBIT PP

ETHICAL
CAPITAL
PARTNERS

Home     About     Team     Advisory Board     News     Careers     Contact

# Unlocking value through ethics-first investing.

Ethical Capital Partners (ECP) is a private equity firm managed by a multi-disciplinary advisory team with legal, regulatory, law enforcement, public engagement, capital markets and investment banking experience.

We seek out investment and advisory opportunities in industries that require principled ethical leadership. ECP invests in opportunities that focus on technology, have legal and regulatory complexity and that put a value on transparency and accountability.

ECP's philosophy is rooted in identifying properties amenable to our responsible investment approach and that have the potential to create attractive returns over a compelling time horizon.

### Ethics-first investing

We seek out investment opportunities in industries that require principled ethical leadership. We do not shy away from legal and regulatory complexity. We deliver value for investors by prioritizing trust, safety and compliance.

### A multi-disciplinary advisory team

The ECP team is well-equipped to navigate complex investing challenges.

Our strength is rooted in our diverse backgrounds. With expertise in private and public investing, regulatory compliance, communications and law enforcement. Moreover, with each investment we make, our team continues to grow our real world practical experience that is critical to helping our partners create value. Advising corporations in this manner provides us with up to date knowledge of various industries which informs our investment decisions and sets us apart.

### Compliance

We know that a proactive approach to compliance means more than just following the rules. Our legal expertise, combined with our team's experience in government relations and law enforcement, allows us to plot a course forward in an ever-changing regulatory landscape.

### Areas of interest

- Online content creation

Appx001005

- Digital spaces
- Payment processing
- Streaming video on demand
- Advertising platforms

© 2023 by Ethical Capital Partners.

# EXHIBIT QQ



ΚΥΠΡΙΑΚΗ ΔΗΜΟΚΡΑΤΙΑ
REPUBLIC OF CYPRUS

**HE   253744**                                                                                                          **HE 44**

THE COMPANIES LAW, CAP. 113
Section 15(1)

**CERTIFICATE OF INCORPORATION**

IT IS HEREBY CERTIFIED that,

**FROYTAL SERVICES LTD**

has this day been incorporated under the Companies Law, Cap. 113 as a Limited

Liability Company.

 Given under my hand in Nicosia on the 13th of  August,  2009

.....................................................
Registrar of Companies

TRANSLATED TRUE COPY

 for Registrar of Companies
 24 August, 2023

There have been changes of the name



ΚΥΠΡΙΑΚΗ   ΔΗΜΟΚΡΑΤΙΑ
REPUBLIC   OF CYPRUS

HE  253744                                                                  HE 46

THE COMPANIES LAW, CAP. 113
<u>Section 19(3)</u>

**CERTIFICATE OF CHANGE OF NAME**

IT IS HEREBY CERTIFIED that,

**FROYTAL SERVICES LTD**

has changed its name by Special Resolution and is hereby named

**MG PREMIUM LTD**

and that the new name has been entered on the Register of Companies

 Given under my hand in Nicosia on the 9th of  July,  2014

....................................................
Registrar of Companies

TRANSLATED TRUE COPY

 for Registrar of Companies
 24 August, 2023

Organization number: 381744, Record number: 35951076
Appx001009



ΚΥΠΡΙΑΚΗ
REPUBLIC

ΔΗΜΟΚΡΑΤΙΑ
OF CYPRUS

**HE  253744**                                                                              **HE 46**

THE COMPANIES LAW, CAP. 113
<u>Section 19(3)</u>

**CERTIFICATE OF CHANGE OF NAME**

IT IS HEREBY CERTIFIED that,

**MG PREMIUM LTD**

has changed its name by Special Resolution and is hereby named

**AYLO PREMIUM LTD**

and that the new name has been entered on the Register of Companies

 Given under my hand in Nicosia on the 17th of  August,  2023

....................................................
Registrar of Companies

TRANSLATED TRUE COPY

 for Registrar of Companies
 24 August, 2023

Organization number: 381744, Record number: 35951076
Appx001010

# EXHIBIT RR

1   BENJAMIN M. SADUN (287533)
2   benjamin.sadun@dechert.com
    DECHERT LLP
3   US Bank Tower, 633 West 5th Street,
4   Suite 4900
    Los Angeles, CA 90071-2013
5   Phone: (213) 808-5721; Fax: (213) 808-5760

6   KATHLEEN N. MASSEY (*admitted pro hac vice*)
7   kathleen.massey@dechert.com
8   Three Bryant Park
    1095 Avenue of the Americas
9   New York, NY 10036
    Phone: (212) 698-3500; Fax: (212) 698 3599
10

11  *Attorneys for Defendants*

12              UNITED STATES DISTRICT COURT
13              CENTRAL DISTRICT OF CALIFORNIA
                     SOUTHERN DIVISION
14

15  SERENA FLEITES,                    CASE NO. 2:21-CV-04920-CJC-ADS

16              Plaintiff,             Judicial Officer: Cormac J. Carney
                                       Courtroom: 9B
17  v.

18  MINDGEEK S.À R.L.; MG              **DECLARATION OF ANDREAS**
    FREESITES, LTD; MINDGEEK USA       **ALKIVIADES ANDREOU IN**
19  INCORPORATED; MG PREMIUM           **SUPPORT OF THE MINDGEEK**
                                       **DEFENDANTS' MOTION TO**
20  LTD.; MG GLOBAL                    **DISMISS**
    ENTERTAINMENT INC.; 9219-5618
21  QUEBEC Inc.; BERND BERGMAIR;       Hearing:    August 8, 2022
22  FERAS ANTOON; DAVID TASSILLO;      Time:       1:30 p.m.
    COREY URMAN; VISA INC.;
23  COLBECK CAPITAL DOES 1-5;
24  BERGMAIR DOES 1-5

25              Defendants.

26

27

28

DECLARATION IN SUPPORT OF MOTION TO DISMISS

1    I, Andreas Alkiviades Andreou, hereby declare as follows:

2    1.    I am employed by MG CY Holdings Ltd as Director of Corporate

3    Finance, a position which I have held since 2013. I have also served as a Class A

4    manager (the equivalent of a director) for MindGeek S.à r.l. since 2016.

5    2.    Through my employment and experience, I am familiar with the

6    corporate structure and operations of the MindGeek corporate entities named in

7    Plaintiff's Amended Complaint – MindGeek S.à r.l., MG Freesites Ltd, MindGeek

8    USA Incorporated, MG Premium Ltd, MG Global Entertainment Inc. and 9219-

9    1568 Quebec Inc. (the "MindGeek corporate entities") – since 2014, the year

10   Plaintiff alleges she learned a video depicting her had been uploaded to Pornhub, a

11   website operated by MG Freesites Ltd.  Almost every day since 2016, as part of my

12   regular job responsibilities, I have dealt and continue to deal with issues involving

13   the corporate structure of these legal entities and their affiliates (collectively

14   "MindGeek") in some capacity and therefore have personal knowledge of their

15   corporate histories.

16   PLAINTIFF'S ALLEGATIONS ABOUT CORPORATE IMPROPRIETIES ARE
17   BASELESS.

18   3.    I have reviewed the Amended Complaint filed in the instant action and

19   am familiar with the allegations made regarding the structure and operations of the

20   MindGeek corporate entities.  The allegations about MindGeek comprising sham

21   companies or a sham structure are baseless.

22   4.    I understand Plaintiff claims MindGeek's corporate operations are

23   illegal based upon the opening and closing of entities.  *See* Am. Compl. ¶¶ 11, 41,

24   131-140.  However, this is a common business activity and certainly not indicative

25   of wrongdoing by MindGeek.  While MindGeek need not justify every corporate

26   reorganization since 2014, each change to the corporate structure was for a

27   legitimate business purpose.  In many instances, the purpose of the change is self-

28   evident; for example, creating an entity to acquire the business of another, or

---

DECLARATION IN SUPPORT OF MOTION TO DISMISS
1

dissolving an entity when it no longer functions or when its functions can be performed readily by another entity.

     5.    MindGeek S.à r.l., provides a clear example. Prior to 2014, MindGeek S.à r.l. was created specifically to acquire the business of Manwin Holding S.à r.l. In that transaction, MindGeek S.à r.l. acquired shares in an entity called Manwin RK S.à r.l. from Manwin Holding S.à r.l., the seller, thereby obtaining indirect ownership interests in the seller's subsidiaries. Since that time, MindGeek S.à r.l. has remained a holding company for various subsidiaries comprising the business of MindGeek, including the other entities named as Defendants.

     6.    The names and number of entities comprising the MindGeek business have naturally changed since 2014, each for legitimate business reasons. For example, in connection with the acquisition described above, MindGeek essentially rebranded the Manwin business to avoid confusion. In that regard, Defendant MindGeek USA Incorporated was renamed to eliminate the reference to Manwin in its prior name, Manwin USA Incorporated. Although certain Manwin subsidiaries did not have Manwin in their names, changes to some names were made to reflect changes to the business. For example, Defendant MG Global Entertainment Inc. used to be named Playboy Plus International Inc., but MindGeek changed that name when its agreement to use the name "Playboy" expired. At that time, the business no longer included running Playboyplus.com (under a digital license agreement) or offering Playboy-branded programming to television-based businesses, including cable operators, hotels and cruise ships, but focused instead on offering different adult programming to such businesses.

     7.    The structure of the MindGeek business is like that of many global organizations. Specifically, MindGeek has companies organized and existing under the laws of multiple jurisdictions where it has assets, operates businesses, or provides services for those business. The MindGeek corporate entities, for example, are organized and exist separately under the laws of Luxembourg, Cyprus,

Canada and the United States.  When MindGeek S.à r.l. acquired the Manwin business, the entities comprising that business spanned those and other jurisdictions.

8.     MindGeek's corporate structure reflects MindGeek's different lines of business.  Relevant here is the "tubesite business," which most notably includes "Pornhub," a website that offers non-subscription content.  As is true with MindGeek's other lines of business, the tubesite business is associated with an operating company.  Specifically, Defendant MG Freesites Ltd is responsible for operating Pornhub.  That entity, in turn, relies upon the services of other entities, including Defendant 9219-1568 Quebec Inc.

9.     Plaintiff's allegations regarding the financial operations of the MindGeek corporate entities are inaccurate and misleading.  As discussed below, each of the Defendants is separate from the others and has its own bank accounts. Since at least 2014, insofar as one Defendant has provided certain services to another, the entity receiving services has paid the entity providing the services pursuant to the terms of a written agreement.  The charges for such services have generally been on a "cost plus" or "mark up percentage" basis, meaning that the service provider is reimbursed for the cost of providing the service and paid an additional amount representing a percentage of the cost on top.  To determine how much is paid on top of the cost reimbursement, in situations where an entity in one jurisdiction provides services to an entity in another, MindGeek has engaged third parties to conduct transfer pricing studies.  Those studies are used to determine price ranges for the services at issue in the relevant market and ensure that intercompany charges are accounted properly for tax purposes.

10.     For the years 2014 through at least 2018, Defendant MindGeek S.à r.l. has had its consolidated financial statements audited by independent accounting firms.  During the same period, the other Defendants that are legally required to be audited on an individual company basis have also been audited in compliance with

applicable law.  They and MindGeek S.à r.l. have filed their tax returns and paid all

taxes due for the tax years through 2018. The other Defendants that are not required

to be audited on an individual company basis, MindGeek USA Inc., MG Global

Entertainment Inc., and 9219-1568 Quebec Inc., have filed their tax returns and

paid all taxes due to date.

EACH DEFENDANT OBSERVES THE REQUIRED CORPORATE
FORMALITIES.

11.     The MindGeek Defendants have not operated and do not operate as a

single business entity but instead have existed and operated as distinct legal entities

since before at least 2014.

12.     MindGeek S.à r.l. is and has been since October 2013, a private

limited liability company (société à responsabilité limitée) incorporated under the

laws of Luxembourg, having its registered office at 32, boulevard Royal, L-2449

Luxembourg and registered with the Luxembourg Register of Commerce and

Companies (R.C.S. Luxembourg) ("RCS") under number B 181337.

13.     MindGeek S.à r.l. has served during the relevant period as the ultimate

parent corporation of MG Freesites Ltd, MindGeek USA Incorporated, MG

Premium Ltd, MG Global Entertainment Inc., and 9219-1568 Quebec Inc.

14.     MindGeek S.à r.l. has been and is nothing more than a holding

company, without any employees or operations of its own. MindGeek S.à r.l. has

never had any offices or employees in the State of California, let alone the United

States.  MindGeek S.à r.l. has never exercised control over the day-to-day

operations of the other MindGeek corporate entities.

15.     MindGeek S.à r.l. has been during the relevant period adequately

capitalized, both possessing its own bank accounts and serving as a party to and

responsible for fulfilling its own contracts. MindGeek S.à r.l. has always had the

equivalent of its own designated board of directors, referred to as a board of

1   managers, and observes all necessary corporate formalities.  The current members
2   of the board of managers are Anis Baba, Claude Favre and myself.

3        16.     MG Freesites Ltd, formerly D.C.I. Capital Investments Limited, is and
4   has been since before 2014 a limited liability company organized and operating
5   under the laws of the Republic of Cyprus, having its head office at 195-197 Old
6   Nicosia-Limassol Road, Block 1 Dali Industrial Zone, Cyprus.  Since this entity
7   was acquired by MindGeek, it has been known as MG Freesites Ltd.

8        17.     MG Freesites Ltd has during the relevant period been responsible for
9   operating tubesites, including Pornhub. MG Freesites Ltd has also operated
10  associated websites, including "Pornhub Premium," which offer certain
11  subscription content. In addition, MG Freesites Ltd operates the ModelHub
12  program and Content Partner Program.

13       18.     MG Freesites Ltd has not during the relevant period ever had any
14  offices or employees in the State of California, or in the United States.

15       19.     MG Freesites Ltd has during the relevant period been adequately
16  capitalized, both possessing its own bank accounts and serving as a party to and
17  responsible for fulfilling its own contracts. MG Freesites Ltd also has had during
18  the relevant period the equivalent of its own designated board of directors, referred
19  to as a board of managers, and observes all necessary corporate formalities.  The
20  current members of the board of managers are Anis Baba, Constantine Georgoude,
21  Charme Management Ltd and myself.

22       20.     MindGeek USA Inc., formerly Manwin USA, Inc., is and has been
23  since at least 2014, a corporation incorporated under the laws of the State of
24  Delaware, having its principal executive office in California.  The current address
25  of that office is 21800 Oxnard Street, Suite 150, Woodland Hills, California 91367
26  United States of America.

27       21.     MindGeek USA Incorporated's sole function during the relevant
28  period has been to distribute DVD-based content pursuant to the terms of one

contract. MindGeek USA Incorporated has not created, solicited, posted, managed, or had any other involvement with the website content at issue in the instant case.

22.     MindGeek USA Incorporated has during the relevant period been adequately capitalized, both possessing its own bank accounts and serving as a party to and responsible for fulfilling its own contracts. MindGeek USA Incorporated also has had during the relevant period its own designated board of directors and observed all necessary corporate formalities.  Currently, the sole director of MindGeek USA Incorporated is Andrew Link.

23.     MG Premium Ltd, formerly Froytal Services Ltd, is and has been since before 2014 a limited liability company organized and operating under the laws of the Republic of Cyprus, having its head office at 195-197 Old Nicosia-Limassol Road, Block 1 Dali Industrial Zone, Cyprus.

24.     MG Premium Ltd is and has been since at least 2014 responsible for operating websites referred to as "paysites," which offer certain subscription-based content. MG Premium Ltd does not operate Pornhub or Pornhub Premium, the ModelHub program or the Content Partner Program.  MG Premium Ltd has not created, solicited, posted, managed, or had any other involvement with the website content at issue in the instant case.  MG Premium Ltd also holds intellectual property rights to certain content that is not alleged to have anything to do with Plaintiff.

25.     MG Premium Ltd has not during the relevant period ever had any offices or employees in the State of California, or in the United States.

26.     MG Premium Ltd has during the relevant period been adequately capitalized, both possessing its own bank accounts and serving as a party to and responsible for fulfilling its own contracts. MG Premium Ltd also has had during the relevant period the equivalent of its own designated board of directors and observes all necessary corporate formalities.  The current members of the board of

managers are Anis Baba, Constantine Georgoude, Charme Management Ltd and
myself.

27.     MG Global Entertainment Inc., formerly Playboy Plus Entertainment
Inc., is and has been since before 2014 a corporation incorporated under the laws of
the State of Delaware, having its principal executive office in California.  The
current address of that office is 21800 Oxnard Street, Suite 150, Woodland Hills,
California 91367 United States of America.

28.     MG Global Entertainment Inc. has during the relevant period run
Playboyplus.com (under a digital license agreement) and provided content to
television-based businesses, with a focus on cable operators, hotels, and cruise
ships, among other content providers.

29.     MG Global Entertainment Inc. has also during the relevant period
provided limited support services to other MindGeek corporate entities. As
discussed in more detail above, those services have been and are provided pursuant
to written agreements that respect the separateness of the service provider and the
service receiver.  Currently, three employees of MG Global Entertainment Inc. have
responsibilities for Trust and Safety on MindGeek websites, including the tubesites.
None have or have had any responsibility for moderation of content before it is
uploaded to the tubesites or are alleged to have had anything to do with Plaintiff.

30.     MG Global Entertainment Inc. has during the relevant period been
adequately capitalized, both possessing its own bank accounts and serving as a
party to and responsible for fulfilling its own contracts. MG Global Entertainment
Inc. also has had during the relevant period its own designated board of directors
and observed all necessary corporate formalities.  Currently, the sole director of
MG Global Entertainment is Andrew Link.

31.     9219-1568 Quebec Inc. is and has been since before 2014 a corporation
organized and operating under the laws of the Provence of Quebec, Canada, having
its head office at 7777 Decarie Boulevard, Montreal, Quebec H4P-2H2.

32.     9219-1568 Quebec Inc. has during the relevant period been a service provider to MG Freesites Ltd and other affiliates.  As discussed in more detail above, those services have been and are provided pursuant to written agreements that respect the separateness of the service provider and the service receiver.

33.     9219-1568 Quebec Inc. has not had during the relevant period any offices in the State of California, or in the United States.  It previously had two employees in the United States, not in California, who provided services to MindGeek's paysite businesses, not to MindGeek's tubesites, which are at issue in this litigation.

34.     9219-1568 Quebec Inc. has during the relevant period been adequately capitalized, both possessing its own bank accounts and serving as a party to and responsible for fulfilling its own contracts.

35.     9219-1568 Quebec Inc. also has had during the relevant period its own designated board of directors and observed all necessary corporate formalities.  The current members of the board of directors are Feras Antoon, Constantine Georgoude, Polina Hadjivasilliou, David Tassillo and myself.

1    I declare under penalty of perjury under the laws of the United States of

2  America that the foregoing is true and correct.

3

4    Date: May 23, 2022                                    _____

5                                                          Andreas Alkiviades Andreou

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT SS



# EXHIBIT TT

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| PRESERVATION TECHNOLOGIES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C. A. No. 6:22-cv-00025-ADA |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| WGCZ LIMITED, S.R.O. AND | ) | |
| WGCZ HOLDING, A.S., | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF ROBERT SEIFERT IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

I, Robert Seifert, declare and state as follows:

1.     I act as administrative director for WGCZ Holding, a.s. and WGCZ Limited, s.r.o. I make this declaration of the following facts from my direct, personal knowledge, except to the extent that facts are stated upon information and belief, and would competently testify thereto if called as a witness.

2.     WGCZ Holding, a.s. ("WGCZ Holding") is a Czech Republic corporation and WGCZ Limited, s.r.o. ("WGCZ Limited") is a Czech Republic limited liability company, each organized and existing under Czech Republic law with their principal places of business in Prague, Czech Republic, European Union. WGCZ Holding and WGCZ Limited's officers, directors, and employees reside in the Czech Republic.

3.     Neither WGCZ Holding nor WGCZ Limited have offices in Texas or the United States. Neither is registered to do business in Texas or any other U.S. state. Neither has U.S.-based operations, U.S. employees, own U.S. property, rent U.S. property, nor pay U.S. state or federal taxes. Neither has or has had any U.S. servers.

4.     At all relevant times, WGCZ Holding and WGCZ Limited have held no U.S. bank accounts, have no U.S. mailing addresses or phone numbers, and do not have any designated agents residing in, domiciled in, or doing business from Texas or the United States. They do not provide any services in Texas or the United States. None of their officers or directors reside in or are domiciled in Texas or the United States.

5.     Neither WGCZ Holding nor WGCZ Limited has ever filed a lawsuit in Texas or anywhere else in the United States, nor have they sought the protection of any Texas laws.

6.     WGCZ Holding is a holding company and is the owner of WGCZ Limited, another holding company, among other entities.

7.     WGCZ Holding and WGCZ Limited operate as distinct entities with unique business purposes and functions. They maintain separate corporate minutes and records and otherwise observe corporate formalities by, for example, maintaining separate bank accounts and not commingling assets. WGCZ Holding does not direct WGCZ Limited; WGCZ Limited operates as a separate entity. The same is true between those entities and their subsidiaries.

8.      WGCZ Holding and WGCZ Limited have not operated, monitored, or provided technological support to any websites, including those cited in the Complaint.

**XVideos**

9.      WebGroup Czech Republic, a.s. ("WebGroup") is a wholly Czech company and the operator of www.xvideos.com ("XVideos"). WebGroup is a separate company from WGCZ Holding and WGCZ Limited and was not named as a defendant in this suit. Neither WGCZ Limited nor WGCZ Holding owns or provides technical support to XVideos, nor does either entity maintain or operate the site.

10.     XVideos is a video hosting platform that allows registered users to upload adult videos. WebGroup does not perform acts related to XVideos in Texas or the United States.

11.     WebGroup does not aim XVideos at any particular country. Rather, XVideos is available to the entire world of internet users, setting aside age or country censorship filters, and is available in approximately 250 countries. The majority of XVideos' market is not concentrated in the United States. The percentage of total visitors to XVideos with United States IP addresses varies over time and recently averages about 8.5 percent (with the rest of the visitors coming from other countries around the world). Texas users account for approximately 6% of total US users, and less than 1% of all XVideos visitors.

12.     The servers for XVideos are located in Amsterdam, Netherlands, which are maintained and operated by a third party, ServerStack, Inc. WebGroup does not have, and never has had, its personnel supporting the site in Texas or anywhere in the United States. WebGroup also does not maintain servers or offices supporting the XVideos site in Texas or anywhere in the United States.

13.     Because the XVideos site has a global user base, WebGroup contracts with Content Distribution Network ("CDN") companies, including CDN companies in the U.S., so that users viewing videos have uninterrupted experience.

14.     Webgroup does not have any ownership interest, control over, or corporate relationship with any CDN providers; WebGroup is merely their customer. WebGroup also does not have access to or control over the CDN facilities owned by its CDN providers, including

those located in the U.S. Rather, the CDN providers have access to the servers that host xvideos.com, which are located in Amsterdam, and the CDN providers use automated processes to "pull" certain content from those servers in Amsterdam onto the CDN providers' regional facilities based upon local user clicks and videos. Moreover, to my knowledge, none of the CDN providers have their principal places of business in Texas.

**XNXX**

15.  NKL Associates, s.r.o., a Czech company, is the owner and operator of xnxx.com ("XNXX") and has been since 2014, as confirmed by the website's Terms of Service. NKL Associates, s.r.o. is a separate company from WGCZ Limited and WGCZ Holding and was not named as a defendant in this suit. Neither WGCZ Limited nor WGCZ Holding owns or provides technical support to XNXX, nor does either entity maintain or operate the site.

**Bangbros**

16.  Sonesta Technologies, s.r.o. operates the bangbros.com site, and Sonesta Limited, s.r.o. and Sonesta Media, s.r.o. hold the intellectual property for the website. Those entities, in turn, are held by United Communication Hldg. II, a.s., which is owned by Stephane Pacaud and myself, who are both Czech residents and owners of WebGroup. Neither United Communication Hldg. II, a.s. nor the Sonesta Entities have corporate overlap with WGCZ Holding or WGCZ Limited. Neither WGCZ Holding nor WGCZ Limited operates any physical personnel, servers, or offices supporting the bangbros.com website, whether in the United States or elsewhere.

**Penthouse**

17.  In June 2018, Penthouse World Media LLC; Penthouse World Broadcasting LLC; Penthouse World Digital LLC; Penthouse World Licensing LLC; and Penthouse World Publishing LLC (the "Penthouse Entities") acquired substantially all of the assets of Penthouse Global Media, Inc. None of these entities are defendants in this lawsuit.

18.  The penthouse.com website is owned and operated by Penthouse World Digital, LLC. Penthouse World Digital, LLC is a California-based, Delaware limited liability company of which WGCZ Limited owns 99%; a separate individual owns 1%. Penthouse World Digital,

LLC is a distinct corporate entity from WGCZ Limited and WGCZ Holding and observes corporate formalities, keeps separate corporate minutes, and keeps separate corporate records from WGCZ Limited. Likewise, the other Penthouse Entities maintain separate corporate minutes, separate records and otherwise observe corporate formalities by, for example, maintaining separate bank accounts and not commingling assets. WGCZ Limited does not operate or own the penthouse.com website.

**Litigating in the United States**

19. The individuals who might have knowledge or information related to the Complaint are located outside of the United States, and the vast majority do not speak English or do not speak it as a first language. Given the entities' locations in the Czech Republic, it would be unduly burdensome for WGCZ Holding or WGCZ Limited to defend against a lawsuit in Texas. Furthermore, as noted, neither WGCZ Holding nor WGCZ Limited have ever maintained their principal place of business in Texas or ever been incorporated in or otherwise organized under the law of the State of Texas.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct. Executed on July 11, 2022, in Prague, Czech Republic.

DATED: July 11, 2022

By: _/s/ Robert Seifert_____
Robert Seifert

# EXHIBIT UU


European
Union

# Country profiles

# Filter by

# Country profiles (27)

RSS *(/node/288/rss_en)* 

**Showing results 1 to 20**



### Austria *(/principles-countries-history/country-profiles/austria_en)*

EU member country since 1995, Euro area member since 1999, Schengen area member since 1997 and more about Austria's participation in the EU.



### Belgium *(/principles-countries-history/country-profiles/belgium_en)*

EU member country since 1958, Euro area member since 1999, Schengen area member since 1995 and more about Belgium's participation in the EU.



### Bulgaria *(/principles-countries-history/country-profiles/bulgaria_en)*

EU member country since 2007 and more about Bulgaria's participation in the EU.



## Croatia *(/principles-countries-history/country-profiles/croatia_en)*

EU member country since 2013, Euro area member since 2023, Schengen area member since 2023 and more about Croatia's participation in the EU.



## Cyprus *(/principles-countries-history/country-profiles/cyprus_en)*

EU member country since 2004, Euro area member since 2008 and more about Cyprus's participation in the EU.



## Czechia *(/principles-countries-history/country-profiles/czechia_en)*

EU member country since 2004, Schengen area member since 2007 and more about Czechia's participation in the EU.



## Denmark *(/principles-countries-history/country-profiles/denmark_en)*

EU member country since 1973, opt-out from euro, Schengen area member since 2001 and more about Denmark's participation in the EU.



## Estonia *(/principles-countries-history/country-profiles/estonia_en)*

EU member country since 2004, Euro area member since 2011, Schengen area member since 2007 and more about Estonia's participation in the EU.



# Finland *(/principles-countries-history/country-profiles/finland_en)*

EU member country since 1995, Euro area member since 1999, Schengen area member since 2001 and more about Finland's participation in the EU.



# France *(/principles-countries-history/country-profiles/france_en)*

EU member country since 1958, Euro area member since 1999, Schengen area member since 1995 and more about France's participation in the EU.



# Germany *(/principles-countries-history/country-profiles/germany_en)*

EU member country since 1958, Euro area member since 1999, Schengen area member since 1995 and more about Germany's participation in the EU.



# Greece *(/principles-countries-history/country-profiles/greece_en)*

EU member country since 1981, Euro area member since 2001, Schengen area member since 2000 and more about Greece's participation in the EU.



# Hungary *(/principles-countries-history/country-profiles/hungary_en)*

EU member country since 2004, Schengen area member since 2007 and more about Hungary's participation in the EU.



# Ireland *(/principles-countries-history/country-profiles/ireland_en)*

EU member country since 1973, Euro area member since 1999, opt-out from Schengen area and more about Ireland's participation in the EU.



# Italy *(/principles-countries-history/country-profiles/italy_en)*

EU member country since 1958, Euro area member since 1999, Schengen area member since 1997 and more about Italy's participation in the EU.



# Latvia *(/principles-countries-history/country-profiles/latvia_en)*

EU member country since 2004, Euro area member since 2014, Schengen area member since 2007 and more about Latvia's participation in the EU.



# Lithuania *(/principles-countries-history/country-profiles/lithuania_en)*

EU member country since 2004, Euro area member since 2015, Schengen area member since 2007 and more about Lithuania's participation in the EU.



# Luxembourg *(/principles-countries-history/country-profiles/luxembourg_en)*

EU member country since 1958, Euro area member since 1999, Schengen area member since 1995 and more about Luxembourg's participation in the EU.



## Malta *(/principles-countries-history/country-profiles/malta_en)*

EU member country since 2004, Euro area member since 2008, Schengen area member since 2007 and more about Malta's participation in the EU.



## Netherlands *(/principles-countries-history/country-profiles/netherlands_en)*

EU member country since 1958, Euro area member since 1999, Schengen area member since 1995 and more about the Netherlands' participation in the EU.

---

**Did this page meet your expectations?**     Yes     No

# EXHIBIT VV

# Dr. Kevin J. Negus

Contact Information:      kevin@tctwest.net, 650-472-1548
Updated: Dec. 21, 2020      522 Moose Lake Road, Philipsburg, MT, 59858

2015 – Present:      Montana Tech University
Current Position:    Professor, Department of Electrical Engineering
Responsibilities:    5G/Wi-Fi Wireless Communications, Automation/Robotics/Comms Lab

2003 – Present:      Technology Consultant
Example Clients:     Cisco, Nokia, Motorola, Apple, DISH, HP, Dell, Verizon, AT&T, Sprint
Responsibilities:    Primarily expert witness consulting for patent litigations

2010 – 2016:         Fastback Networks
Last Position Held:  Co-Founder, Chairman and Chief Technology Officer
Responsibilities:    System Architecture, Technology Roadmap, IP and Team Development

2004 – 2016:         Camp Ventures
Last Position Held:  General Partner
Responsibilities:    Early Stage Investments, Product Development, Team Mentoring

2003 –2007:          WiDeFi, Inc (acquired by Qualcomm in 2007).
Last Position Held:  Executive Chairman
Responsibilities:    Corporate Management, RF/baseband ASIC Development

1998 – 2003:         Proxim Corporation
Last Position Held:  Chief Technology Officer
Responsibilities:    ASIC Development, Standards, M&A Deals, OEM Deals, Patent Licensing

1988 – 1998:         Hewlett-Packard Company (acquired Avantek, Inc. in 1991)
Last Position Held:  Principal Systems Architect
Responsibilities:    Management, RFIC Design, RF Systems, Core Technology Development

1977 –1988:          Student Employment
Organizations:       Fairchild Semiconductor, Waterloo Engineering Software, University of
Waterloo, Wabush Mines, Chalk River Nuclear Labs, McDonald's, Canadian Armed Forces

Past Positions:      Member of the FCC Technological Advisory Council (2000-2002)
                     Member of the Wyoming State Telecommunications Council (2001-2003)

Education:           Ph.D., 1988, University of Waterloo (UW), Joint ME/EE Departments
                     M.A.Sc., 1985, University of Waterloo, Department of Mech. Engineering
                     B.A.Sc., 1984, University of Waterloo, Department of Mech. Engineering

Awards:              1985 UW Gold Medal, 1989 IEEE Best Paper, 2010 UW Alumni Award,
                     2016 IEEE Senior Member Recognition for Wireless Technology Innovation

Publications:        Over 40 published articles and approximately 75 issued US patents

**Start-up Company Engagements (1999 – Present)**

| Company | Products | Status | Engagement Type |
|---|---|---|---|
| Atheros | WiFi Chips | Sold to Qualcomm | Investor |
| Resonext | WiFi Chips | Sold to RFMD | Advisor |
| Athena | WiFi & Mobile TV Chips | Sold to Broadcom | Advisor |
| WinNet | Outdoor wireless systems | Sold to Alvarion | Investor |
| Cayman | DSL Modems | Sold to Motorola | Investor |
| Simple Devices | WLAN appliances | Sold to Motorola | Investor |
| MobileStar | WiFi Public Access | Sold to T-Mobile | Investor |
| Cymil | WiMax Chips | Liquidated | Advisor |
| Clarus | IP Telephony Tools | Liquidated | Investor |
| Mirra | Network Storage Devices | Sold to Seagate | Investor |
| WiDeFi | WiFi Chips | Sold to Qualcomm | Executive Chairman |
| Quorum | Cellular Terminal Chips | Sold to Spreadtrum | Investor, Advisor |
| Larian | IP Telephony Software | Sold to SS8 | Investor, Chairman |
| TXE | Internet Software | Liquidated | Investor, Board |
| SiTime | MEMS-based Chips | Sold to MegaChips | Investor, Advisor |
| Picaboo | Digital Photo Books | Ongoing | Investor |
| MetroFi | WiFi Public Access | Liquidated | Investor |
| AirTight | Wireless Security Devices | Liquidated | Advisor |
| Seabridge | Internet Sports Marketing | Liquidated | Investor |
| Zing | Portable Music Appliances | Sold to Dell | Investor |
| Mojix | RFID Readers | Liquidated | Advisor |
| Tribal Shout | Telephony Internet Access | Liquidated | Investor, Chairman |
| Quantance | Cellular Terminal Chips | Sold to Skyworks | Investor, Advisor, Board |
| Lemon | Mobile Payment System | Sold to LifeLock | Investor |
| GainSpan | WiFi Chips and Modules | Sold to Telit | Board, Advisor, Investor |
| Tasting Room | Internet Commerce | Liquidated | Investor |
| Work Simple | Internet Software | Liquidated | Investor |
| Cloud | IP Telephony Appliances | Liquidated | Investor |
| Qik | Mobile Video Sharing | Sold to Skype | Investor |
| Small Demons | Online books | Liquidated | Investor |
| All Trails | Mobile application | Sold to PE firm | Investor |
| Nimble Heart | Wireless ECG monitor | Ongoing | Investor, Advisor |
| AIRA Tech | Wireless Machine Learning | Ongoing | Advisor |
| Guerrilla RF | Infrastructure RF Chips | Ongoing | Investor, Advisor |
| Fastback | 4G/5G Network Equipment | Sold to ComSovereign | Investor, Founder, Board, Employee |

## Detailed Past Employment Experience:

Jun. 2010 – Dec. 2016: CBF Networks, Inc. (dba Fastback Networks)
Location:             San Jose, CA
Position Held:        Co-Founder, Chairman and Chief Technology Officer
Responsibilities:     System Architecture, Technology Roadmap, IP and Team Development

System Architecture: - Developed a novel architecture for 4G/5G cellular network backhaul in
                      non-line-of-sight (NLOS) conditions based on re-use of LTE standards-
                      based silicon chips
                      - Developed a novel architecture for 5G cellular network backhaul in line-of-
                      sight (LOS) conditions in millimeter wave bands including 57-115 GHz
                      using array antenna technology and conventional silicon modem chips
                      - Developed a novel approach to deployment challenges for backhaul of
                      high density 4G and 5G, as well as high performance Wi-Fi (802.11ac or
                      802.11ax), networks that dramatically reduced deployment time and
                      expense in both NLOS and LOS propagation environments
                      - Developed a novel approach to interference mitigation across space, time
                      and frequency dimensions for unlicensed spectrum backhaul

Technology Roadmap: - Worked with key RF and baseband silicon vendors to adapt high
                      performance infrastructure 4G/5G cellular network chips and/or 802.11
                      chips for high performance backhaul applications
                      - Provided specific input to software defined radio (SDR) chip architectures
                      adopted by silicon vendors such as Qualcomm, Coherent Logix and Lime
                      Microsystems

Intellectual Property: - Responsible for managing the IP portfolio of over 50 US patent filings
                      - Named inventor on over 50 US patent filings

Team Development: - Led the process of hiring over 40 engineers spanning disciplines such as
                      embedded firmware development, network software development,
                      baseband algorithm design, digital hardware design, RF circuit design,
                      antenna array design, and overall mechanical system design
                      - Mentored over 50 engineers and managers in development teams
                      distributed amongst San Jose, CA, Vancouver, BC and Newton Abbey, UK

Jun. 2003 – Oct. 2007: WiDeFi, Inc.
Location:             Melbourne, FL
Position Held:        Executive Chairman
Earlier Position:     Management and Technology Advisor (prior to June 2003)
Responsibilities:     Corporate Management, RF/baseband ASIC Development

Management:           - Led Board of Directors as Independent representative of both common
                      and preferred shareholders
                      - Responsible for performance evaluation of the CEO and executive staff
                      - Conducted search for and hired new CEO while retaining early stage CEO
                      as a critical technology contributor (CTO)
                      - Participated in all financing rounds and the eventual sale of the company

ASIC Development: - Provided key technology and management interface to outsourced ASIC design partner Atmel in Colorado Springs
- Co-inventor of core technology architecture
- Conducted detailed technical reviews of ASIC development at both circuit and system design levels
- Assisted in debugging technical problems encountered with prototype devices

Oct. 1998 – Nov. 2002: Proxim Corporation

Location:              Sunnyvale, CA
Last Position Held:  Chief Technology Officer
Earlier Positions:   VP Corporate Development, VP Business Development
Responsibilities:    ASIC Development, Standards, M&A Deals, OEM Deals, Patent Licensing

ASIC Development: - Recruited and managed a 20 person ASIC development team including systems architects, modem designers, ASIC designers, verification engineers, and firmware engineers
- Defined product requirements for Phoenix - a 130 nm 4M gate ASIC based on software defined radio for 802.11/16 WLAN/WMAN (project was cancelled in Nov 2002 about 3 months prior to tapeout)
- Phoenix contained full MAC and PHY for 802.11a/b/g, draft 802.11n and 802.16a/d/e with Proxim-proprietary MAC and PHY extensions and additional modes for point to point communication up to 200 Mb/s
- Core of Phoenix was an SDR fabric that extended a MIPS 4KE processor core to implement blocks such as an iterative soft-input/output Viterbi decoder, IFFT/FFT, FEC encoders, interleavers, mappers, etc
- MAC in Phoenix was 95%+ firmware based on a second MIPS core
- Security features in Phoenix included support for 802.11i (AES), TKIP, 802.1x, Radius, WEP, and Proxim proprietary modes
- I/O's included Ethernet, PCI, and USB 2.0
- Analog I/F's included dual 12 bit ADCs and DACs at 80 Ms/s
- Also drove development of the PX82475 – a 0.18 um 1M gate ARM-based ASIC for HomeRF 2.0, 1.2 and OpenAir standards that included world's first MLSE-based equalizer operating at 10 Mb/s for 4-level GMSK in a 3.5 MHz channel bandwidth (project started May 1999, taped out Nov 2000, volume production Jun 2001)

Standards:           - Directed Proxim's involvement with 802.11 and 802.16 standards groups
- Voting member of the 802.11 standards committee – most active with 802.11g, 802.11h and the WNG-SC process that launched 802.11n
- Directed Proxim's involvement with the HomeRF Working Group
- Former Chairman of both the Technical Subcommittee and the Board of Directors of HomeRF
- Successfully led a coalition of over 50 companies to convince the FCC to significantly modify the Part 15.247 2.4 GHz band rules in 1999 and 2000 against a powerful and organized opposition with much greater funding
- Accepted nomination to the FCC's Technological Advisory Committee and served alongside CTOs of major companies such as Motorola, Intel,

Disney, Panasonic, Siemens and many others to advise the FCC on wireless broadband strategies to benefit all US residents
- Nominated by the Governor and elected by Senate confirmation to the Wyoming State Telecommunications Council to advise the Governor on pending state legislation regarding telecom matters

M&A Deals:
- Completed eight separate M&A transactions including Wavespan, Farallon, Micrilor, Siemens US Cordless R&D, Card Access, nBand, Orinoco, and Western Multiplex
- Last deal was an ~$600M sale of Proxim, Inc. (Nasdaq: PROX) to Western Multiplex Corp (Nasdaq: WMUX) in Mar. 2002
- After the sale of Proxim, Inc., WMUX changed its company name to Proxim Corporation, changed its stock symbol to PROX, filed for bankruptcy in 2005, sold assets to Terabeam, Inc. (Nasdaq: TRBM) and the WMUX business unit was renamed Proxim Wireless Corporation
- Responsibilities for M&A deals included all technical diligence including patents, retaining key employees, negotiating purchase terms, and in two cases assuming direct line reporting for the purchased companies
- Led 5 venture investments including Atheros, WinNet, Cayman, Simple Devices and MobileStar

OEM Deals:
- Developed and negotiated 3 largest OEM deals in the company's history with Intel, Motorola and Siemens
- Each OEM partner made $10M equity investments in Proxim, Inc. (these investments each represented ~3-4% of the market capitalization of Proxim at the time they were made)

Patent Licensing:
- Corporate representative for licensing program including patent litigation
- Provided numerous 30(b)6 depositions for technical and business issues
- Testified at trial as fact witness on technical issues
- Filed 5 US patent applications for WLAN PHY & MAC layer inventions

Feb. 1988 – Oct. 1998: Hewlett-Packard Company (acquired Avantek, Inc. Nov 1991)

| | |
|---|---|
| Location: | Palo Alto, CA |
| Last Position Held: | Principle Systems Architect |
| Earlier Positions: | Director of RFIC Chipset Development, Manager of Silicon RFIC Design, Member of the Technical Staff |
| Responsibilities: | Management, RFIC Development, RF Systems, Core Technology |

Management:
- At departure, the RF Components division had over $100M per year in revenue from products developed under my leadership
- Negotiated strategic supply agreements for wafer fabrication
- Managed a team of about 20 engineers reporting via 3 1st level managers for RFIC development in multiple technology specialties
- Ran complex chipset development programs, such as the world's first 802.11 RF chipset, or such as a complete IS-95 transmit and receive chain with resources spread across Europe, North America and Asia
- Organized and led a joint venture program with a former East German microelectronics company

RFIC Development:
- Personally designed over 20 RFIC products
- Designed world's first highly integrated digital cell phone transmit RFIC
- Designed world's first highly integrated receive RFIC for GPS
- Designed world's first 4 Gb/s 4:1 MUX/DEMUX ICs in silicon bipolar
- Designed world's first spec-compliant, fully monolithic silicon VCO for wireless communications standards
- Designed RFICs specifically for GSM, DECT, IS-95, 802.11, HomeRF, CT-2, DBS and other wireless standards
- Designed in silicon bipolar, gallium arsenide MESFET and BiCMOS
- Designed such RF blocks as mixers, synthesizers, low noise amplifiers, power amplifiers, switches, variable gain amplifiers, phase shifters, limiters, discriminators, voltage-controlled oscillators, modulators and demodulators

RF Systems:
- Defined complete chipsets including performance characteristics and system architecture for HomeRF, 802.11, IS-95B and GSM
- Partnered with baseband suppliers such as TI, VLSI, AMD, and others on reference designs for various wireless devices
- Partnered with reference design consultancies including Symbionics, TTPCom, Wavecom, RTX and others

Core Technology:
- Developed a proprietary silicon device simulation model used by HP/Avantek to enhance first pass design success
- Primary standards monitor for HP RF Components on such efforts as 802.11, HomeRF, IS-54, IS-95, GSM, DECT, HiperLAN, and 3GPP
- Lead liaison with HP Labs on wireless research
- Lead liaison with HP Product Divisions for WLAN products and FCC policy
- Co-author of HP Company Strategic Plan for Wireless Technology across all of HP's Measurement, Components, Computing and Printing businesses
- Filed several patent applications for RFIC designs

May 1986 – Nov. 1987: Fairchild Semiconductor
Location:            Palo Alto, CA
Position Held:       Research Engineer (consultant-basis only Sep. 1986 – Nov. 1987)
Projects:            - Design of bipolar circuits for high speed ECL and telecom applications
                     - Development of packages for high speed circuits (patent granted)
                     - Optimization of clock chip for Clipper (world's first RISC processor)


Sep. 1986 – Dec. 1987: Waterloo Engineering Software
Location:            Waterloo, Canada
Position Held:       Sales Engineer
Projects:            - Venture-funded startup with 10 employees sold in late 1987
                     - Sold silicon device simulation software worldwide


May. 1981 – Dec. 1987: University of Waterloo
Location:            Waterloo, Canada
Last Position Held:  Research Engineer
Earlier Positions:   Teaching Assistant, Research Associate, Undergrad Research Assistant
Projects:            - Senior researcher for multi-disciplinary research lab on microelectronics
                     device modeling and thermal analysis
                     - Consulted to or performed research on behalf of companies such as IBM,
                     DEC, Nortel, Thomson CSF, GEC, and Westinghouse on bipolar transistor
                     modeling and cooling of high power bipolar and CMOS transistors and
                     circuits
                     - Tutored for numerous undergraduate courses


May. 1980 – Apr. 1981: Wabush Mines
Location:            Sept-Iles, Canada
Position Held:       Engineer
Projects:            - Designed numerous facilities and machinery "fixes" in an iron ore mining
                     operation located in Labrador and Northern Quebec


Summer 1979: Chalk River Nuclear Laboratories

Location:            Chalk River, Canada
Position Held:       Decontamination Technician
Tasks:               - Decontaminated radioactive waste, trained for reactor meltdown


Summer/Fall 1978: McDonald's Restaurant

Location:            Pembroke, Canada
Position Held:       Associate
Tasks:               - Flipped burgers, made fries, took orders, cleaned everything


1977 – 1979: Canadian Armed Forces Army Cadet Program

Location:            CFB Petawawa, Canada
Position Held:       Infantry Sergeant
Tasks:               - completed military basic training, received training on infantry small unit
                     tactics to counter Soviet ground invasion forces

## Detailed University Education Background:

Ph.D., Feb 1988, University of Waterloo, Waterloo, Canada

Department:        Joint Electrical and Mechanical Engineering
Thesis Title:        "Thermal and Electrical Modeling of Bipolar Transistors"
Supervisors:        Prof. David J. Roulston (EE) and Prof. M. Michael Yovanovich (ME)

Research Topic:    - Developed novel analytical techniques for predicting the performance of
                            bipolar semiconductor devices in multiple applications such as power, RF or
                            high speed data communications
                            - Key advantage was computational efficiency to enable unprecedented
                            analysis of combined thermal and electrical effects to optimize performance
                            of leading-edge bipolar transistors and circuits
                            - Foundations for research came from novel application of classical
                            mathematic techniques dating back as far as Euler combined with the
                            application of numerical advances made for fluid mechanics to the drift-
                            diffusion equations governing semiconductor devices

Coursework:        Advanced Topics in Semiconductor Device Physics and Circuits
                            Computational Fluid Mechanics and Convective Heat Transfer
                            Advanced Topics in Heat Conduction
                            Graduate Level Applied Mathematics

M.A.Sc., May 1985, University of Waterloo, Waterloo, Canada

Department:        Mechanical Engineering
Thesis Title:        "Temperature Distributions in Contacting Electrical Conductors"
Supervisor:         Prof. M. Michael Yovanovich (ME)

Research Topic:    - Solved the classic coupled problem of determining the temperatures of
                            rough surfaces that conduct electricity with self-heating due electrical
                            constriction resistance by developing novel approximate analytical
                            numerical techniques based on images
                            - Practical applications for determining contact pressures in any metal to
                            metal electrical contact

Coursework:        Semiconductor Device Physics, Fabrication and Circuits
                            Electromagnetics, RF Propagation and Field Theory
                            Fluid Mechanics, Conductive, Convective and Radiative Heat Transfer
                            Advanced Topics in Numerical Analysis
                            Theory of Models

B.A.Sc., May 1984, University of Waterloo, Department of Mechanical Engineering.

- 5-year undergraduate program that alternates 4-month coursework semesters with 4-month
"co-op" work terms in industry with engineering project work requirements.
- Studied all basic ME subjects including heat transfer, fluid mechanics, machine design, stress
analysis, automation, manufacturing techniques, and basic electrical circuit design

## Academic Achievements:

1989 IEEE "Best Paper" Award for an IEEE Journal publication, this paper was based upon my Ph.D. thesis work.

1988 University of Waterloo, Faculty of Engineering Award for Outstanding Ph.D. work and Faculty sole nominee for University-wide Gold Medal Award.

1985 University of Waterloo, Gold Medal Award for Outstanding Master's Degree work on a University-wide basis.

1984 University of Waterloo, Dept. of Mechanical Engineering, Graduated 3rd out of 200.

1981 University of Waterloo, Faculty of Engineering, Award for Outstanding Co-Op Work Term Report.

1979 Valedictorian and graduated 1st out of 200 for High School in Pembroke, Ontario.

1979 Descartes High School Math contest winner for Eastern Ontario Region.


## Selected Personal Highlights:

Amateur Radio License Holder, call sign: KI7UQA.

2010 Recipient of the University of Waterloo, Faculty of Engineering Alumni Achievement Award for technical innovations in and contributions to the development of wireless Internet and cellular communications technology products.

US Citizen since Feb 2006, US Permanent Resident since 1989, US H1 Visa 1986-1989.

Current Vice-Chair of the IEEE Western Montana Section.  Senior Member of the IEEE. Member of the IEEE since 1988.  Co-chair of the RFIC Subcommittee for the IEEE BCTM Conference from 1996 to 1998.

Director of Adult Recreation Programs and Board Member, Philipsburg Ice Association, Granite County, Montana.

Past Owner and operator with wife Eva of a working 200-cow cattle ranch in rural Wyoming.

Past Chairman (2003-2014), Hyattville Community Center Association.

Past Board Member, Hyattville Water Company.

Past Director, Youth Ice Hockey Program, Big Horn County in Wyoming.

Former provincial ("State") high school champion in the pole vault.

Avid outdoorsman, water skier, hockey player and snow skier.

## Selected Publications:

Cote, P., Richards, L. and Negus, K., "Characterization of Drilling Fluids for RF Communication", _Proc. of 96th ARFTG Microwave Measurement Symposium_, San Diego, CA, Jan. 17-20, 2021.

Apple, M., Ricketts, M., Winscot, K. and Negus, K., "Does soil temperature influence plant functional trait and microbial distribution on periglacial patterned ground in the Rocky Mountains?", MtnClim 2018: 8th Mountain Climate Conference, Gothic, CO, Sep. 17-21, 2018.

Wiles, E. and Negus, K., "Long-Term Spectrum Monitoring and Occupancy from 174 to 1000 MHz in Rural Western Montana", European Conference on Antennas and Propagation, London, UK, Apr. 9-13, 2018.

Wiles, E., Negus, K., et al., "Measurement and Analysis of Spectrum Occupancy from 140 to 1000 MHz in Rural Western Montana", European Conference on Antennas and Propagation, Davos, Switzerland, Apr. 10-15, 2016.

Lea, A., Negus, K., et al., "Spectrum Options for Wireless Backhaul of Small Cells", European Conference on Antennas and Propagation, The Hague, Netherlands, Apr. 6-11, 2014.

Negus, K.J. and Petrick, A., "History of Wireless Local Area Networks (WLANs) in the Unlicensed Bands", George Mason University Law School Conference, Information Economy Project, Arlington, VA., April 4, 2008.

Primary co-author of the HomeRF 2.01 Technical Specification (526 pages), July 2002, published by the HomeRF Working Group.

Negus, K.J. and Swan, B., "HomeRF: Design-in Module Practices", Intel Developer Forum, San Jose, CA, Feb. 2001.

Negus, K.J., "Designing with HomeRF Technology", Intel Developer Forum, San Jose, CA, Aug. 2000.

Negus, K.J., Stephens, A., and Lansford, J., "HomeRF: Wireless Networking for the Connected Home", IEEE Journal of Personal Communications, Vol. 7, No. 1, Feb. 2000, pp. 20-27.

Negus, K.J., Waters, J., et. al., "HomeRF and SWAP: Wireless Networking for the Connected Home", ACM Mobile Computing and Comms Review, Vol. 2, No. 4, Oct. 1998, pp. 28-37.

Morkner, H., Frank, M. and Negus, K., "A Novel Integrated Microwave Bias Network for Low-Cost Multistage Amplifiers", IEEE MTT-S Symposium Digest, Vol. 1, Jun. 1997, pp. 9-12.

Jansen, B., Negus, K., and Lee, D., "Silicon Bipolar VCO Family for 1.1 to 2.2 GHz with Fully-Integrated Tank and Tuning Circuits", 44th IEEE ISSCC Digest of Technical Papers, Feb. 1997, pp. 392-393.

Hutchinson, C., Frank, M., and Negus, K., "Silicon Bipolar 12 GHz Downconverter for Satellite Receivers", Proc. 1995 IEEE Bipolar Circuits and Technology Meeting, Oct. 1995, pp. 198-201.

Negus, K., et. al., "Highly-Integrated Transmitter RFIC with Monolithic Narrowband Tuning for Digital Cellular Handsets", 41st IEEE ISSCC Digest of Technical Papers, Feb. 1994, pp. 38-39.

Negus, K. and Millicker, D., "RFICs for Reduced Size, Cost and Power Consumption in Handheld Wireless Transceivers", Proceedings of the IEEE 2nd International Conference on Universal Personal Communications, Oct. 1993, pp. 919-925.

Negus, K.J., et. al., "3.3V GPS Receiver MMIC Implemented on a Mixed-Signal, Silicon Bipolar Array", IEEE MTT-S Symposium Digest, Vol. 2, Jun. 1992, pp. 1071-1074.

Negus, K., et. al., "Silicon Bipolar Mixed-Signal Parameterized-Cell Array for Wireless Applications to 4 GHz", 39th IEEE ISSCC Digest of Technical Papers, Feb. 1992, pp. 230-231.

Negus, K. J., "Multi-Gbits/s Silicon Bipolar Multiplexer and Demultiplexer with Interleaved Architectures", Proc. 1991 IEEE Bipolar Circuits and Technology Meeting, Oct. 1991, pp. 35-38.

Negus, K.J. and Wholey, J.N., "Multifunction Silicon MMICs for Frequency Conversion Applications", IEEE Transactions on Microwave Theory and Techniques, Vol. 38, No. 9, Sep. 1990, pp. 1191-1198.

Negus, K.J. and Wholey, J.N., "Implementation of RF/Microwave Receiver Components on a Semi-Custom Silicon Bipolar Array", IEEE MTT-S Symposium Digest, Jun. 1990, pp. 67-72.

Negus, K.J., Franklin, R.W. and Yovanovich, M.M., "Thermal Modeling and Experimental Techniques for Microwave Bipolar Devices", IEEE Transactions on Components, Hybrids and Manufacturing Technology, Vol. 12, No. 4, Dec. 1989, pp. 680-689.
- this paper won the IEEE award for Best CHMT Journal Paper of 1989

Negus, K.J. and Roulston, D.J., "Simplified Modeling of Delays in the Emitter-Base Junction", Solid State Electronics, Vol. 31, No. 9, Sep. 1988, pp. 1464-1466.

Negus, K.J. and Yovanovich, M.M., "Correlation of the Gap Conductance Integral for Conforming Rough Surfaces", Journal of Thermophysics and Heat Transfer, Vol. 2, No. 3, July 1988, pp. 279-281.

Negus, K.J., Yovanovich, M.M. and Thompson, J.C., "Constriction Resistance of Circular Contacts on Coated Surfaces: Effect of Boundary Conditions", Journal of Thermophysics and Heat Transfer, Vol. 2, No. 2, Apr. 1988, pp. 158-164.

Negus, K.J., Yovanovich, M.M. and Roulston, D.J., "An Introduction to Thermal Electrical Coupling in Bipolar Transistors", Proc of ASME Thermal Engineering Conference, Vol. 3, July 1987, pp. 395-401.

Negus, K.J. and Yovanovich, M.M., "Simple Separability for Steady Heat Conduction with Spatially-Varying Thermal Conductivity", Int. Journal of Heat and Mass Transfer, Vol. 30, No. 7, July 1987, pp. 1552-1555.

Negus, K.J. and Yovanovich, M.M., "Thermal Analysis and Optimization of Convectively-Cooled Microelectronic Circuit Boards", Proc of ASME Thermophysics and Heat Transfer Conference, Vol. 57, June 1986, pp. 167-176.

Negus, K.J., Yovanovich, M.M. and DeVaal, J.W., "Development of Thermal Constriction Resistance for Anisotropic Rough Surfaces by the Method of Images", 23rd ASME National Heat Transfer Conference, Denver, CO, July 1985.

Thompson, J.C. and Negus, K.J., "Developments in a Least Squares Asymptotic Analysis of Isochromatic Data from Stress Concentration Regions in Plane Problems", <u>Strain</u>, Vol. 20, No. 3, 1984, pp.133-134.

## Selected Patents:

Negus, K.J. and Proctor, J.A., Assigned to Fastback Networks, US 8,422,540, "Intelligent Backhaul Radio with Zero Division Duplexing", filed Sep. 10, 2012.

Lea, D.A., Negus, K.J., *et al*, Assigned to Fastback Networks, US 8,467,363, "Intelligent Backhaul Radio and Antenna System", filed Jun. 28, 2012.

Negus, K.J. and Proctor, J.A., Assigned to Fastback Networks, US 8,385,305, "Hybrid Band Intelligent Backhaul Radio", filed Apr. 16, 2012.

Negus, K.J. and Proctor, J.A., Assigned to Fastback Networks, US 8,502,733, "Transmit Co-Channel Spectrum Sharing", filed Feb. 10, 2012.

Negus, K.J. and Duffy, K.J., Assigned to Fastback Networks, US 8,300,590, "Intelligent Backhaul System", filed Oct. 11, 2011.

Negus, K.J., Assigned to Fastback Networks, US 8,238,318, "Intelligent Backhaul Radio", filed Aug. 17, 2011.

Gainey, K.M., Negus, K.J., *et al*, Assigned to WiDeFi, Inc., US 7,187,904, "Frequency translating repeater with low cost high performance local oscillator architecture", filed Jun. 3, 2005.

Negus, K., Assigned to Proxim, Inc., US 7,035,283, "Asymmetric data traffic throughput in CSMA/CA networks", filed Apr. 6, 2001.

Negus, K., Assigned to Proxim, Inc., US 7,085,284, "Prioritization scheme for CSMA/CA", filed Nov. 3, 2000.

Romans, C., Gaoit, L., Negus, K.J., et. al., Assigned to Hewlett Packard, US 6,587453, "Method of communicating first and second data types", filed Dec. 17, 1998.

Nguyen, N.M. and Negus, K.J., Assigned to Hewlett Packard, US 5,532,655, "Method and apparatus for AC/DC signal multiplexing", filed Feb. 24, 1995.

Wholey, J. and Negus, K., Assigned to Hewlett Packard, US 5,436,595, "Low voltage bipolar amplifier", filed Aug. 1, 1994.

Negus, K.J., Assigned to Hewlett Packard, US 5,150,364, "Interleaved time-division demultiplexor", filed Aug. 24, 1990.

Negus, K.J., Assigned to Avantek, US 5,111,455, "Interleaved time-division multiplexor with phase-compensated frequency doublers", filed Aug. 24, 1990.

Phy, W.S., Early, J.M. and Negus, K.J., Assigned to Fairchild Semiconductor, US 4,839,717, "Ceramic package for high frequency semiconductor devices", filed Dec. 19, 1986.